**96 PAGES**

1  THOMAS A. WILLOUGHBY, State Bar No. 137597
   LAUREN M. KAWANO, State Bar No. 309273
2  FELDERSTEIN FITZGERALD
   WILLOUGHBY PASCUZZI & RIOS LLP
3  500 Capitol Mall, Suite 2250
   Sacramento, CA 95814
4  Telephone: (916) 329-7400
   Facsimile: (916) 329-7435
5  e-mail: twilloughby@ffwplaw.com
   e-mail: lkawano@ffwplaw.com
6
   Proposed Attorneys for Debtor in Possession
7

8            UNITED STATES BANKRUPTCY COURT

9            EASTERN DISTRICT OF CALIFORNIA

10                SACRAMENTO DIVISION

11  | In re: | CASE NO.: 20-24123-E-11 |
    | | |
12  | RUSSELL WAYNE LESTER, an | Chapter 11 |
    | individual, dba Dixon Ridge Farms, | |
13  | | DCN: FWP-2 |
    | Debtor in Possession. | |
14  | | Date:       September 1, 2020 |
    | | Time:       1:30 p.m. |
15  | | Courtroom: 33 – Judge Ronald H. Sargis |
    | | 501 I Street, 6th Floor |
16  | | Sacramento, CA |

17

18          **EXHIBIT IN SUPPORT OF OMNIBUS DECLARATION OF RUSSELL WAYNE
            LESTER, DECLARATION OF RUSSELL WAYNE LESTER, AND DECLARATION OF
19          RUSSELL BURBANK IN SUPPORT OF DEBTOR IN POSSESSION'S EMERGENCY
            MOTION FOR AN ORDER (A) AUTHORIZING INTERIM AND FINAL USE OF
20          CASH COLLATERAL; (B) GRANTING REPLACEMENT LIENS; AND
            (C) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

21

22

23

24

25

26

27

28

EXHIBIT DOCUMENT ISO
CASH COLLATERAL MOTION

| Exhibit | Description | Page |
|---------|-------------|------|
| A | Putah Creek Road Property Google Image | 2 |
| B | Gordon Property Sale Listing | 4 |
| C | August 28, 2020 Solano Land Trust Letter | 14 |
| D | Putah Creek Road Property Valuation | 18 |
| E | First Report of Receiver | 20 |
| F | Budget | 79 |

Dated: August 31, 2020

FELDERSTEIN FITZGERALD
WILLOUGHBY PASCUZZI & RIOS LLP

By:  _/s/ Thomas A. Willoughby_
THOMAS A. WILLOUGHBY
Proposed Attorneys for Russell Wayne Lester

# EXHIBIT A

## Google Maps    5430 Putah Creek Rd



Imagery ©2020 Maxar Technologies, U.S. Geological Survey, USDA Farm Service Agency, Map data ©2020    200 ft

# EXHIBIT B



# DISCLOSURE REGARDING
## REAL ESTATE AGENCY RELATIONSHIP
**(Seller's Brokerage Firm to Seller)**
**(As required by the Civil Code)**
**(C.A.R. Form AD, Revised 12/18)**

☐ (If checked) This form is being provided in connection with a transaction for a leasehold interest exceeding one year as per Civil Code section 2079.13(j), (k) and (l).

When you enter into a discussion with a real estate agent regarding a real estate transaction, you should from the outset understand what type of agency relationship or representation you wish to have with the agent in the transaction.

**SELLER'S AGENT**

A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or a subagent of that agent has the following affirmative obligations:

To the Seller: A Fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Seller.

To the Buyer and the Seller:
  (a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
  (b) A duty of honest and fair dealing and good faith.
  (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**BUYER'S AGENT**

A Buyer's agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations:

To the Buyer: A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Buyer.

To the Buyer and the Seller:
  (a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
  (b) A duty of honest and fair dealing and good faith.
  (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**AGENT REPRESENTING BOTH SELLER AND BUYER**

A real estate agent, either acting directly or through one or more salespersons and broker associates, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer.

In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer:
  (a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer.
  (b) Other duties to the Seller and the Buyer as stated above in their respective sections.

In representing both Seller and Buyer, a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the Buyer's or Seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the Seller's willingness to accept a price less than the listing price or the Buyer's willingness to pay a price greater than the price offered.

**SELLER AND BUYER RESPONSIBILITIES**

Either the purchase agreement or a separate document will contain a confirmation of which agent is representing you and whether that agent is representing you exclusively in the transaction or acting as dual agent. Please pay attention to that confirmation to make sure it accurately reflects your understanding of your agent's role.

The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect his or her own interests. You should carefully read all agreements to assure that they adequately express your understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

If you are a Buyer, you have the duty to exercise reasonable care to protect yourself, including as to those facts about the property which are known to you or within your diligent attention and observation.

Both Sellers and Buyers should strongly consider obtaining tax advice from a competent professional because the federal and state tax consequences of a transaction can be complex and subject to change.

Throughout your real property transaction you may receive more than one disclosure form, depending upon the number of agents assisting in the transaction. The law requires each agent with whom you have more than a casual relationship to present you with this disclosure form. You should read its contents each time it is presented to you, considering the relationship between you and the real estate agent in your specific transaction. **This disclosure form includes the provisions of Sections 2079.13 to 2079.24, inclusive, of the Civil Code set forth on page 2. Read it carefully. I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE AND THE PORTIONS OF THE CIVIL CODE PRINTED ON THE BACK (OR A SEPARATE PAGE).**

☐ Buyer ☒ Seller ☐ Landlord ☐ Tenant _____ Date 3/18/2020
*Russell W. Lester*

☐ Buyer ☐ Seller ☐ Landlord ☐ Tenant _____ Date _____

Agent *Green Fields Real Estate Services* DRE Lic. # *01949058*
Real Estate Broker (Firm)

By _____ DRE Lic. # *01722363* Date 3/18/2026
(Salesperson or Broker-Associate, if any) *Curtis Stocking*

© 1991-2018, California Association of REALTORS®, Inc.

**AD REVISED 12/18 (PAGE 1 OF 2)**

## DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 1 OF 2)

Green Fields Real Estate Services, 7 E. Main Street, Suite D Winters CA 95694    Phone: 707.761.3343    Fax:    Lester
Curtis Stocking    Produced with zipForm® by zipLogix  18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

4

## CIVIL CODE SECTIONS 2079.13 – 2079.24 (2079.16 APPEARS ON THE FRONT)

2079.13. As used in Sections 2079.7 and 2079.14 to 2079.24, inclusive, the following terms have the following meanings: **(a)** "Agent" means a person acting under provisions of Title 9 (commencing with Section 2295) in a real property transaction, and includes a person who is licensed as a real estate broker under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code, and under whose license a listing is executed or an offer to purchase is obtained. The agent in the real property transaction bears responsibility for that agent's salespersons or broker associates who perform as agents of the agent. When a salesperson or broker associate owes a duty to any principal, or to any buyer or seller who is not a principal, in a real property transaction, that duty is equivalent to the duty owed to that party by the broker for whom the salesperson or broker associate functions. **(b)** "Buyer" means a transferee in a real property transaction, and includes a person who executes an offer to purchase real property from a seller through an agent, or who seeks the services of an agent in more than a casual, transitory, or preliminary manner, with the object of entering into a real property transaction. "Buyer" includes vendee or lessee of real property. **(c)** "Commercial real property" means all real property in the state, except (1) single-family residential real property, (2) dwelling units made subject to Chapter 2 (commencing with Section 1940) of Title 5, (3) a mobilehome, as defined in Section 798.3, (4) vacant land, or (5) a recreational vehicle, as defined in Section 799.29. **(d)** "Dual agent" means an agent acting, either directly or through a salesperson or broker associate, as agent for both the seller and the buyer in a real property transaction. **(e)** "Listing agreement" means a written contract between a seller of real property and an agent, by which the agent has been authorized to sell the real property or to find or obtain a buyer, including rendering other services for which a real estate license is required to the seller pursuant to the terms of the agreement. **(f)** "Seller's agent" means a person who has obtained a listing of real property to act as an agent for compensation.**(g)** "Listing price" is the amount expressed in dollars specified in the listing for which the seller is willing to sell the real property through the seller's agent. **(h)** "Offering price" is the amount expressed in dollars specified in an offer to purchase for which the buyer is willing to buy the real property. **(i)** "Offer to purchase" means a written contract executed by a buyer acting through a buyer's agent that becomes the contract for the sale of the real property upon acceptance by the seller. **(j)** "Real property" means any estate specified by subdivision (1) or (2) of Section 761 in property, and includes (1) single-family residential property, (2) multiunit residential property with more than four dwelling units, (3) commercial real property, (4) vacant land, (5) a ground lease coupled with improvements, or (6) a manufactured home as defined in Section 18007 of the Health and Safety Code, or a mobilehome as defined in Section 18008 of the Health and Safety Code, when offered for sale or sold through an agent pursuant to the authority contained in Section 10131.6 of the Business and Professions Code. **(k)** "Real property transaction" means a transaction for the sale of real property in which an agent is retained by a buyer, seller, or both a buyer and seller to act in that transaction, and includes a listing or an offer to purchase. **(l)** "Sell," "sale," or "sold" refers to a transaction for the transfer of real property from the seller to the buyer and includes exchanges of real property between the seller and buyer, transactions for the creation of a real property sales contract within the meaning of Section 2985, and transactions for the creation of a leasehold exceeding one year's duration. **(m)** "Seller" means the transferor in a real property transaction and includes an owner who lists real property with an agent, whether or not a transfer results, or who receives an offer to purchase real property of which he or she is the owner from an agent on behalf of another. "Seller" includes both a vendor and a lessor of real property. **(n)** "Buyer's agent" means an agent who represents a buyer in a real property transaction.

2079.14. A seller's agent and buyer's agent shall provide the seller and buyer in a real property transaction with a copy of the disclosure form specified in Section 2079.16, and shall obtain a signed acknowledgement of receipt from that seller and buyer, except as provided in Section 2079.15, as follows: **(a)** The seller's agent, if any, shall provide the disclosure form to the seller prior to entering into the listing agreement. **(b)** The buyer's agent shall provide the disclosure form to the buyer as soon as practicable prior to execution of the buyer's offer to purchase. If the offer to purchase is not prepared by the buyer's agent, the buyer's agent shall present the disclosure form to the buyer not later than the next business day after receiving the offer to purchase from the buyer.

2079.15. In any circumstance in which the seller or buyer refuses to sign an acknowledgement of receipt pursuant to Section 2079.14, the agent shall set forth, sign, and date a written declaration of the facts of the refusal.

2079.16 Reproduced on Page 1 of this AD form.

2079.17(a) As soon as practicable, the buyer's agent shall disclose to the buyer and seller whether the agent is acting in the real property transaction as the buyer's agent, or as a dual agent representing both the buyer and the seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller, the buyer, and the buyer's agent prior to or coincident with execution of that contract by the buyer and the seller, respectively. **(b)** As soon as practicable, the seller's agent shall disclose to the seller whether the agent is acting in the real property transaction as the seller's agent, or as a dual agent representing both the seller and buyer. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller and the seller's agent prior to or coincident with the execution of that contract by the seller.

CONFIRMATION: The following agency relationships are confirmed for this transaction:

Seller's Brokerage Firm    DO NOT COMPLETE. SAMPLE ONLY           License Number _____
Is the broker of (check one):  ☐ the seller; or ☐ both the buyer and seller. (dual agent)
Seller's Agent          DO NOT COMPLETE. SAMPLE ONLY           License Number _____
Is (check one):  ☐ the Seller's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)
Buyer's Brokerage Firm    DO NOT COMPLETE. SAMPLE ONLY           License Number _____
Is the broker of (check one):  ☐ the buyer; or ☐ both the buyer and seller. (dual agent)
Buyer's Agent          DO NOT COMPLETE. SAMPLE ONLY           License Number _____
Is (check one):  ☐ the Buyer's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)

**(d)** The disclosures and confirmation required by this section shall be in addition to the disclosure required by Section 2079.14. An agent's duty to provide disclosure and confirmation of representation in this section may be performed by a real estate salesperson or broker associate affiliated with that broker.

2079.18 (Repealed pursuant to AB-1289)

2079.19 The payment of compensation or the obligation to pay compensation to an agent by the seller or buyer is not necessarily determinative of a particular agency relationship between an agent and the seller or buyer. A listing agent and a selling agent may agree to share any compensation or commission paid, or any right to any compensation or commission for which an obligation arises as the result of a real estate transaction, and the terms of any such agreement shall not necessarily be determinative of a particular relationship.

2079.20 Nothing in this article prevents an agent from selecting, as a condition of the agent's employment, a specific form of agency relationship not specifically prohibited by this article if the requirements of Section 2079.14 and Section 2079.17 are complied with.

2079.21 **(a)** A dual agent may not, without the express permission of the seller, disclose to the buyer any confidential information obtained from the seller. **(b)** A dual agent may not, without the express permission of the buyer, disclose to the seller any confidential information obtained from the buyer. **(c)** "Confidential information" means facts relating to the client's financial position, motivations, bargaining position, or other personal information that may impact price, such as the seller is willing to accept a price less than the listing price or that the buyer is willing to pay a price greater than the price offered. **(d)** This section does not alter in any way the duty or responsibility of a dual agent to any principal with respect to confidential information other than price.

2079.22 Nothing in this article precludes a seller's agent from also being a buyer's agent. If a seller or buyer in a transaction chooses not to be represented by an agent, that does not, of itself, make that agent a dual agent.

2079.23 A contract between the principal and agent may be modified or altered to change the agency relationship at any time before the performance of the act which is the object of the agency with the written consent of the parties to the agency relationship.

2079.24 Nothing in this article shall be construed to either diminish the duty of disclosure owed buyers and sellers by agents and their associate licensees, subagents, and employees or to relieve agents and their associate licensees, subagents, and employees from liability for their conduct in connection with acts governed by this article or for any breach of a fiduciary duty or a duty of disclosure.

© 1991-2018, California Association of REALTORS®, Inc.

THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.



Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the California Association of REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



EQUAL HOUSING OPPORTUNITY

**AD REVISED 12/18 (PAGE 2 OF 2)**
**DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 2 OF 2)**

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com     Lester



**CALIFORNIA ASSOCIATION OF REALTORS®**

# VACANT LAND LISTING AGREEMENT
### (C.A.R. Form VLL, Revised 6/17)

Date Prepared: **March 21, 2020**

1. **EXCLUSIVE AUTHORIZATION:** _____ **Russell W. Lester** _____ ("Owner")
   hereby employs and grants _____ **Green Fields Real Estate Services** _____ ("Broker") beginning
   (date) _____ **March 21, 2020** _____ and ending at 11:59 P.M. on (date) _____ **September 30, 2020** _____ ("Listing Period") the
   exclusive and irrevocable right to: ☐ SELL, ☐ LEASE, ☐ EXCHANGE, ☐ OPTION, or ☐ OTHER _____
   the real property in the City of _____ **Winters** _____, County of _____ **Yolo** _____, California, Assessor's
   Parcel No.: _____ **SEE P. # 15** _____, described as: _____ **County Road 89, Winters , CA  95694** _____ ("Property").

2. **ITEMS EXCLUDED AND INCLUDED:** Unless otherwise specified in an agreement between Owner and transferee, all fixtures and
   fittings that are attached to the Property are included, and personal property items are excluded from the price.
   **ADDITIONAL ITEMS EXCLUDED:** _____ .
   **ADDITIONAL ITEMS INCLUDED:** _____
   Owner intends that the above items be excluded or included in listing the Property, but understands that: (i) the Agreement
   between owner and transferee supersedes any intention expressed above and will ultimately determine which items are excluded
   and included in the transaction; and (ii) Broker is not responsible for and does not guarantee that the above exclusions and/or
   inclusions will be in the Agreement between Owner and transferee.

3. **LISTING PRICE AND TERMS:**
   **A.** The listing price shall be **Two Million, Five Hundred Thousand**
   _____ Dollars ($ **2,500,000.00** ).
   **B.** Additional Terms: _____
   _____ .

4. **COMPENSATION TO BROKER:**
   **Notice: The amount or rate of real estate commissions is not fixed by law. They are set by each Broker individually and may
   be negotiable between Owner and Broker (real estate commissions include all compensation and fees to Broker).**
   **A.** Owner agrees to pay to Broker as compensation for services irrespective of agency relationship(s): ☒ **4.250** percent of the
   listing price (or if an agreement is entered into, of the contract price), ☐ $_____, OR ☐ in accordance with
   Broker's attached schedule of compensation; as follows:
      **(1)** If during the Listing Period, or any extension, Broker, cooperating broker, Seller or any other person procures a ready,
   willing, and able buyer(s) whose offer to purchase the Property on any price and terms is accepted by Seller, provided the
   Buyer completes the transaction or is prevented from doing so by Seller. (Broker is entitled to compensation whether any
   escrow resulting from such offer closes during or after the expiration of the Listing Period, or any extension.)
      **(2)** If within _____ **60** _____ calendar days after the end of the Listing Period or any extension, Owner enters into a contract to sell,
   lease, exchange, option, convey or otherwise transfer the Property to anyone ("Prospective Transferee") or that person's
   related entity: **(i)** who physically entered and was shown the Property during the Listing Period, or any extension by Broker
   or a cooperating broker; or **(ii)** for whom Broker or any cooperating broker submitted to Owner a signed, written offer to
   acquire, lease, exchange or obtain an option on the Property. Owner, however, shall have no obligation to Broker under
   this paragraph 4A(2) unless, not later than the end of the Listing Period or any extension or cancellation, Broker has given
   Owner a written notice of the names of such Prospective Transferees.
      **(3)** If, without Broker's prior written consent, the Property is withdrawn from sale, lease, exchange, option or other, as
   specified in paragraph 1, or is sold, conveyed, leased, rented, exchanged, optioned or otherwise transferred, or made
   unmarketable by a voluntary act of Owner during the Listing Period, or any extension thereof.
   **B.** If completion of the transaction is prevented by a party to the transaction other than Owner, then compensation due under
   paragraph 4A shall be payable only if and when Owner collects damages by suit, arbitration, settlement, or otherwise, and
   then in an amount equal to the lesser of one-half of the damages recovered or the above compensation, after first deducting
   title and escrow expenses and the expenses of collection, if any.
   **C.** In addition, Owner agrees to pay Broker: _____
   **D.** **(1)** Broker is authorized to cooperate and compensate brokers participating through the multiple listing service(s) ("MLS"): **(i)**
   by offering MLS brokers either: ☒ **2.250** percent of the purchase price, or ☐ $_____; OR **(ii)**
   (if checked) ☐ as per Broker's policy.
      **(2)** Broker is authorized to cooperate and compensate brokers operating outside the MLS as per Broker's policy.
   **E.** Owner hereby irrevocably assigns to Broker the above compensation from Owner's funds and proceeds in escrow. Broker may
   submit this Listing Agreement, as instructions to compensate Broker pursuant to paragraph 4A, to any escrow regarding the
   Property involving Owner and a buyer, transferee or Prospective Transferee.
   **F.** **(1)** Owner represents that Owner has not previously entered into a listing agreement with another broker regarding the
   Property, unless specified as follows: _____
      **(2)** Owner warrants that Owner has no obligation to pay compensation to any other broker regarding the Property unless the
   Property is transferred to any of the following Prospective Transferees: _____
      **(3)** If the Property is transferred to anyone listed above during the time Owner is obligated to compensate another broker: **(i)** Broker is
   not entitled to compensation under this Listing Agreement; and **(ii)** Broker is not obligated to represent Owner in such transaction.

Owner's Initials ( ✓ ) ( )

© 2017, California Association of REALTORS®, Inc
**VLL REVISED 6/17 (PAGE 1 OF 5)**

### VACANT LAND LISTING AGREEMENT (VLL PAGE 1 OF 5)

Green Fields Real Estate Services, 7 E. Main Street, Suite D Winters CA 95694    Phone: 707.761.3343    Fax:    Lester
Curtis Stocking    Produced with zipForm® by zipLogix  18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

Property Address: **County Road 89, Winters , CA  95694**          Date: **March 21, 2020**

5.   **MULTIPLE LISTING SERVICE:**
   A.   Broker is a participant/subscriber to **BAREIS & METRO** _____ Multiple Listing Service (MLS) and possibly others. Unless otherwise instructed in writing the Property will be listed with the MLS(s) specified above. That MLS is (or if checked ☐ is not) the primary MLS for the geographic area of the Property. All terms of the transaction, including sales price and financing, if applicable, **(i)** will be provided to the MLS in which the property is listed for publication, dissemination and use by persons and entities on terms approved by the MLS and **(ii)** may be provided to the MLS even if the Property is not listed with the MLS.

---

**BENEFITS OF USING THE MLS; IMPACT OF OPTING OUT OF THE MLS; PRESENTING ALL OFFERS**

**WHAT IS AN MLS?** The MLS is a database of properties for sale that is available and disseminated to and accessible by all other real estate agents who are participants or subscribers to the MLS. Property information submitted to the MLS describes the price, terms and conditions under which the Seller's property is offered for sale (including but not limited to the listing broker's offer of compensation to other brokers). It is likely that a significant number of real estate practitioners in any given area are participants or subscribers to the MLS. The MLS may also be part of a reciprocal agreement to which other multiple listing services belong. Real estate agents belonging to other multiple listing services that have reciprocal agreements with the MLS also have access to the information submitted to the MLS. The MLS may further transmit the MLS database to Internet sites that post property listings online.

**EXPOSURE TO BUYERS THROUGH MLS:** Listing property with an MLS exposes a seller's property to all real estate agents and brokers (and their potential buyer clients) who are participants or subscribers to the MLS or a reciprocating MLS.

**CLOSED/PRIVATE LISTING CLUBS OR GROUPS:** Closed or private listing clubs or groups are not the same as the MLS. The MLS referred to above is accessible to all eligible real estate licensees and provides broad exposure for a listed property. Private or closed listing clubs or groups of licensees may have been formed outside the MLS. Private or closed listing clubs or groups are accessible to a more limited number of licensees and generally offer less exposure for listed property. Whether listing property through a closed, private network - and excluding it from the MLS - is advantageous or disadvantageous to an seller, and why, should be discussed with the agent taking the Seller's listing.

**NOT LISTING PROPERTY IN A LOCAL MLS:** If the Property is listed in an MLS which does not cover the geographic area where the Property is located then real estate agents and brokers working that territory, and Buyers they represent looking for property in the neighborhood, may not be aware the Property is for sale.

**OPTING OUT OF MLS:** If Owner elects to exclude the Property from the MLS, Seller understands and acknowledges that: **(a)** real estate agents and brokers from other real estate offices, and their buyer clients, who have access to that MLS may not be aware that Seller's Property is offered for sale; **(b)** Information about Seller's Property will not be transmitted to various real estate Internet sites that are used by the public to search for property listings; **(c)** real estate agents, brokers and members of the public may be unaware of the terms and conditions under which Seller is marketing the Property.

**REDUCTION IN EXPOSURE:** Any reduction in exposure of the Property may lower the number of offers and negatively impact the sales price.

**PRESENTING ALL OFFERS:** Seller understands that Broker must present all offers received for Seller's Property unless Seller gives Broker written instructions to the contrary.

Seller's Initials ( _____ ) ( _____ )          Broker's/Agent's Initials ( _____ ) ( _____ )

---

   B.   MLS rules generally provide that residential real property and vacant lot listings be submitted to the MLS within 2 days or some other period of time after all necessary signatures have been obtained on the listing agreement. Broker will not have to submit this listing to the MLS if, within that time, Broker submits to the MLS a form signed by Seller (C.A.R. Form SELM or the local equivalent form).
   C.   MLS rules allow MLS data to be made available by the MLS to additional Internet sites unless Broker gives the MLS instructions to the contrary. Seller acknowledges that for any of the below opt-out instructions to be effective, Seller must make them on a separate instruction to Broker signed by Seller. Specific information that can be excluded from the Internet as permitted by (or in accordance with) the MLS is as follows:
   **(1) Property Availability On The MLS; Address On The MLS:** Seller can instruct Broker to have the MLS not display the Property or the Property address on the Internet. Seller understands that either of these opt-outs would mean consumers searching for listings on the Internet may not see the Property or Property's address in response to their search.
   **(2) Feature Opt-Outs:** Seller can instruct Broker to advise the MLS that Seller does not want visitors to MLS Participant or Subscriber Websites or Electronic Displays that display the Property listing to have the features below. Seller understands (i) that these opt-outs apply only to Websites or Electronic Displays of MLS Participants and Subscribers who are real estate broker and agent members of the MLS; (ii) that other Internet sites may or may not have the features set forth herein; and (iii) that neither Broker nor the MLS may have the ability to control or block such features on other Internet sites.
   **(a) Comments And Reviews:** The ability to write comments or reviews about the Property on those sites; or the ability to link to another site containing such comments or reviews if the link is in immediate conjunction with the Property display.
   **(b) Automated Estimate Of Value:** The ability to create an automated estimate of value or to link to another site containing such an estimate of value if the link is in immediate conjunction with the Property display. ☐ Seller elects to opt out of certain Internet features as provided by C.A.R. Form SELI or the local equivalent form.

Owner's Initials ( _____ )( _____ )

**VLL REVISED 6/17 (PAGE 2 OF 5)**

**VACANT LAND LISTING AGREEMENT (VLL PAGE 2 OF 5)**
Produced with zipForm® by zipLogix  18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com          Lester

Property Address: **County Road 89, Winters , CA 95694**      Date: **March 21, 2020**

6. **OWNER REPRESENTATIONS:** Owner represents that, unless otherwise specified in writing, Owner is unaware of: **(i)** any Notice of Default recorded against the Property; **(ii)** any delinquent amounts due under any loan secured by, or other obligation affecting, the Property; **(iii)** any bankruptcy, insolvency or similar proceeding affecting the Property; **(iv)** any litigation, arbitration, administrative action, government investigation, or other pending or threatened action that affects or may affect the Property or Owner's ability to transfer it; and **(v)** any current, pending or proposed special assessments affecting the Property. Owner shall promptly notify Broker in writing if Owner becomes aware of any of these items during the Listing Period or any extension thereof.

7. **BROKER'S AND OWNER'S DUTIES:** Broker agrees to exercise reasonable effort and due diligence to achieve the purposes of this Listing Agreement. Unless Owner gives Broker written instructions to the contrary, Broker is authorized to order reports and disclosures as appropriate or necessary, and advertise and market the Property in any method and medium, including the Internet, selected by Broker, and, to the extent permitted by these media, including MLS, control the dissemination of the information submitted to any medium. Owner agrees to consider offers presented by Broker, and to act in good faith toward accomplishing the transfer of the Property by, among other things, making the Property available for showing at reasonable times and referring to Broker all inquiries of any party interested in the Property. Owner agrees to provide Broker and transferee(s) all written disclosures, as required by law. Owner further agrees to immediately disclose in writing any condition known to Owner that affects the Property, including, but not limited to, any past or current generation, storage, release, threatened release, disposal, and presence and location of asbestos, PCB transformers, petroleum products, flammable explosives, underground storage tanks and other hazardous, toxic or contaminated substances or conditions in, on, or about the Property. Owner shall maintain public liability and property damage insurance on the Property during the Listing Period or any extension. Owner waives all subrogation rights under any insurance against Broker, cooperating brokers or employees. Owner is responsible for determining at what price to list and transfer the Property. **Owner further agrees to indemnify, defend and hold Broker harmless from all claims, disputes, litigation, judgments attorney fees and costs arising from any incorrect or incomplete information supplied by Owner, or from any material facts that Owner knows but fails to disclose including as dangerous or hidden conditions on the Property.**

☐ **(If checked) The attached property disclosure is part of this Listing Agreement and may be provided to Prospective Transferees.**

8. **DEPOSIT:** Broker is authorized to accept and hold on Owner's behalf any deposits to be applied toward the contract price.

9. **AGENCY RELATIONSHIPS:**

     A. **Disclosure:** Owner acknowledges receipt of a "Disclosure Regarding Real Estate Agency Relationship" (C.A.R. Form AD) form which is required to be provided to Owner prior to entering into this Listing Agreement.

     B. **Owner Representation:** Broker shall represent Owner in any resulting transaction, except as specified in paragraph 4F.

     C. **Possible Dual Agency With Buyer:** Depending upon the circumstances, it may be necessary or appropriate for Broker to act as an agent for both Owner and buyer, exchange party, or one or more additional parties ("Buyer"). Broker shall, as soon as practicable, disclose to Owner any election to act as a dual agent representing both Owner and Buyer. If a Buyer is procured directly by Broker or an associate licensee in Broker's firm, Owner hereby consents to Broker acting as a dual agent for Owner and such Buyer. In the event of an exchange, Owner hereby consents to Broker collecting compensation from additional parties for services rendered, provided there is disclosure to all parties of such agency and compensation. Owner understands and agrees that: **(i)** Broker, without the prior written consent of Owner, will not disclose to Buyer that Owner is willing to transfer the Property at a price less than the listing price; **(ii)** Broker, without the prior written consent of Buyer, will not disclose to Owner that Buyer is willing to pay a price greater than the offered price; and **(iii)** except for **(i)** and **(ii)** above, a dual agent is obligated to disclose known facts materially affecting the value or desirability of the Property to both parties.

     D. **Other Owners:** Owner understands that Broker may have or obtain listings on other properties, and that potential buyers may consider, make offers on, or acquire through Broker, property the same as or similar to Owner's Property. Owner consents to Broker's representation of owners and buyers of other properties before, during, and after the end of this Listing Agreement.

     E. **Confirmation:** Broker shall confirm the agency relationship described above, or as modified, in writing, prior to or concurrent with Owner's execution of an agreement to sell.

10. **SECURITY, INSURANCE, SHOWINGS, AUDIO AND VIDEO:** Broker is not responsible for loss of or damage to personal or real property, or person, whether attributable to use of a keysafe/lockbox, a showing of the Property, or otherwise. Third parties, including, but not limited to, appraisers, inspectors, brokers and prospective buyers, may have access to, and take videos and photographs of, the Property. Owner agrees: (i) to take reasonable precautions to safeguard and protect valuables that might be accessible during showings of the Property; (ii) to obtain insurance to protect against these risks. Broker does not maintain insurance to protect Owner. Persons visiting the Property may not be aware that they could be recorded by audio or visual devices installed by Owner (such as hidden security cameras) and may claim an invasion of privacy. Owner is advised to post notices disclosing the existence of security devices.
**(i)** to take reasonable precautions to safeguard and protect valuables that might be accessible during showings of the Property; and **(ii)** to obtain insurance to protect against these risks. Broker does not maintain insurance to protect Owner.

11. **KEYSAFE/LOCKBOX:** A keysafe/lockbox is designed to hold a key to the Property to permit access to the Property by Broker, cooperating brokers, MLS participants, their authorized licensees and representatives, authorized inspectors and accompanying prospective buyers. Broker, cooperating brokers, MLS and Associations/Boards of REALTORS® are not insurers against injury, theft, loss, vandalism, or damage attributed to the use of a keysafe/lockbox. Owner does (or if checked ☐ does not) authorize Broker to install a keysafe/lockbox. If Owner does not occupy the Property, Owner shall be responsible for obtaining occupant(s)' written permission for use of a keysafe/lockbox.

12. **SIGN:** Owner authorizes Broker to install a FOR SALE/SOLD/LEASE sign on the Property unless otherwise indicated in writing.

13. **EQUAL HOUSING OPPORTUNITY:** The Property is offered in compliance with federal, state and local anti-discrimination laws.

14. **ATTORNEY'S FEES:** In any action, proceeding, or arbitration between Owner and Broker to enforce the compensation provisions of this Agreement, the prevailing Owner or Broker shall be entitled to reasonable attorney's fees and costs, except as provided in paragraph 18A.

Owner's Initials ( _L_ ) ( _____ )

**VLL REVISED 6/17 (PAGE 3 OF 5)**

**VACANT LAND LISTING AGREEMENT (VLL PAGE 3 OF 5)**

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com     Lester



8

Property Address: **County Road 89, Winters , CA  95694**          Date: **March 21, 2020**

**15. ADDITIONAL TERMS:** ☐ REOL ☐ SSIA **1) Commission shall be reduced to 4% if Green Fields Real Estate also represents the Buyer.**
**2) If Tim Schimmel or related entity goes into escrow within 60 days of the listing agreement, the total real estate commission will be 1% and Green Fields will be only representing the Seller.**
**3) Property includes APN 050-100-015-000 (68.54°/- acres) & 050-100-032-000 (1.76+/- acres) for a total acreage of 70.3 +/-**

**16. MANAGEMENT APPROVAL:** If an associate-licensee in Broker's office (salesperson or broker-associate) enters into this Listing Agreement on Broker's behalf, and Broker or Manager does not approve of its terms, Broker or Manager has the right to cancel this Listing Agreement, in writing, within 5 days after its execution.

**17. SUCCESSORS AND ASSIGNS:** This Listing Agreement shall be binding upon Owner and Owner's successors and assigns.

**18. DISPUTE RESOLUTION:**
    **A. MEDIATION:** Owner and Broker agree to mediate any dispute or claim arising between them regarding the obligation to pay compensation under this Agreement, before resorting to arbitration or court action. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this paragraph applies, any party (i) commences an action without first attempting to resolve the matter through mediation, or (ii) before commencement of an action, refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action. **Exclusions from this mediation agreement are specified in paragraph 18B.**

    **B. ADDITIONAL MEDIATION TERMS: The following matters shall be excluded from mediation: (i) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage or installment land sale contract as defined in Civil Code §2985; (ii) an unlawful detainer action; (iii) the filing or enforcement of a mechanic's lien; and (iv) any matter that is within the jurisdiction of a probate, small claims or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver or violation of the mediation and arbitration provisions.**

    **C. ADVISORY:** If Owner and Broker desire to resolve disputes arising between them through arbitration rather than court, they can document their agreement by attaching and signing an Arbitration Agreement (C.A.R. Form ARB).

**19. ENTIRE CONTRACT:** All prior discussions, negotiations, and agreements between the parties concerning the subject matter of this Listing Agreement are superseded by this Listing Agreement, which constitutes the entire contract and a complete and exclusive expression of their agreement, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. This Listing Agreement and any supplement, addendum, or modification, including any photocopy or facsimile, may be executed in counterparts.

**20. OWNERSHIP, TITLE AND AUTHORITY:** Owner warrants that: **(i)** Owner is the owner of the Property; **(ii)** no other persons or entities have title to the Property, and **(iii)** Owner has the authority to both execute this Listing Agreement and transfer the Property. Exceptions to ownership, title and authority are as follows: _____

☐ REPRESENTATIVE CAPACITY: This Listing Agreement is being signed for Owner by an individual acting in a Representative Capacity as specified in the attached Representative Capacity Signature Disclosure (C.A.R. Form RCSD-S). Wherever the signature or initials of the representative identified in the RCSD appear on this Agreement or any related documents, it shall be deemed to be in a representative capacity for the entity described and not in an individual capacity, unless otherwise indicated. Owner (i) represents that the entity for which the individual is signing already exists and (ii) shall Deliver to Broker, within 3 Days After Execution of this Agreement, evidence of authority to act (such as but not limited to: applicable trust document, or portion thereof, letters testamentary, court order, power of attorney, corporate resolution, or formation documents of the business entity).

**By signing below, Owner acknowledges that Owner has read, understands, received a copy of and agrees to the terms of this Listing Agreement and any attached schedule of compensation.**

Owner _____          **Russell W. Lester** Date **3/18/2020**
Address **5430 Putah Creek Rd**          City **Winters**          State **CA**   Zip **95694-9612**
Telephone **(916)849-8578**          Fax _____   E-mail **Russ@dixonridgefarms.com**

Owner _____          Date _____
Address _____   City _____   State _____ Zip _____
Telephone _____   Fax _____   E-mail _____

Owner _____          Date _____
Address _____   City _____   State _____ Zip _____
Telephone _____   Fax _____   E-mail _____

Owner's Initials ( __ )( _____ )

**VLL REVISED 6/17 (PAGE 4 OF 5)**
**VACANT LAND LISTING AGREEMENT (VLL PAGE 4 OF 5)**
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com          Lester

9

Property Address: **County Road 89, Winters , CA  95694**                     Date: **March 21, 2020**

☐ Additional Signature Addendum attached (C.A.R. Form ASA)

Real Estate Broker (Firm) **Green Fields Real Estate Services**          DRE Lic. # **01949058**
Address **7 E. Main Street, Suite D**          City **Winters**          State **CA**     Zip **95694**
By _____  Tel. **707.761.3343**   E-mail **Curtis@greenfieldsre.com**  DRE Lic.# **01722363**   Date **3/18/2020**
  **Curtis Stocking**
By _____  Tel. _____   E-mail _____   DRE Lic.# _____   Date _____

☐ Two Brokers with different companies are co-listing the Property. Co-listing Broker information is on the attached Additional Broker Acknowledgement (C.A.R. Form ABA).

© 2017, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.



Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020



**VLL REVISED 6/17 (PAGE 5 OF 5)**

**VACANT LAND LISTING AGREEMENT (VLL PAGE 5 OF 5)**
Produced with zipForm® by zipLogix  18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com                Lester

10



**CALIFORNIA**
**ASSOCIATION**
**OF REALTORS®**

# CALIFORNIA CONSUMER PRIVACY ACT ADVISORY
**(C.A.R. Form CCPA, 12/19)**

As of January 1, 2020, the California Consumer Privacy Act (commencing with Civil Code § 1798.100) ("CCPA") grants to California residents certain rights in their private, personal information that is collected by companies with whom they do business. Under the CCPA, "personal information" is defined broadly to encompass non-public records information that could reasonably be linked directly or indirectly to you, including, potentially, photographs of or sales information about your property. Some of your personal information will be collected and likely shared with others during the process of buying and selling real estate. Depending on the situation, you may have the right to "opt out" or stop the transfer of your personal information to others and request that certain businesses delete your personal information altogether. Not all businesses you interact with are required to comply with the law, primarily just those who meet the criteria of a covered "Business" as set forth in Section 1798.140 (c)]. For more information, you may ask your Broker for a copy of the C.A.R. Legal Q&A on the subject.

A real estate broker is likely to submit personal information to a Multiple Listing Service ("MLS") in order to help find a buyer for a seller's property. Through the MLS, the information is made available to real estate brokers and salespeople, and others. Even after a sale is complete, the MLS distributes sales information to the real estate community. Brokers, agents and MLSs may also share your personal information with others who post the personal information on websites or elsewhere, or otherwise use it. Thus, there are various service providers and companies in a real estate transaction who may be engaged in using or sharing data involving your personal information.

If your broker is a covered Business, it should have a privacy policy explaining your rights on its website and giving you an opportunity to request that personal information not be shared, used and even deleted. Even if your real estate brokerage is a covered Business, it needs, and is allowed, to keep your information to effectuate a sale and, by law, is required to maintain such information for three years to comply with regulatory requirements. Not all brokers are covered Businesses, however, and those that are not, do not have to comply with the CCPA.

Similarly, most MLSs will not be considered a covered Business. Instead, the MLS may be considered a Third Party in the event a covered Business (ex: brokerages, real estate listing aggregation or advertising internet sites or other outlets who meet the criteria of covered Businesses) exchanges personal information with the MLS. You do not have the right under the CCPA to require a Third Party to delete your personal information. And like real estate brokerages, even if an MLS is a covered Business, MLSs are also required by law to retain and make accessible in its computer system any and all listing and other information for three years.

Whether an MLS is a covered Business or a Third Party, you have a right to be notified about the sharing of your personal information and your right to contact a covered Business to opt out of your personal information being used, or shared with Third Parties. Since the MLSs and/or other entities receiving your personal information do not have direct contact with buyers and sellers and also may not be aware of which entities exchanging personal information are covered Businesses, this form is being used to notify you of your rights under the CCPA and your ability to direct requests to covered Businesses not to share personal information with Third Parties. One way to limit access to your personal information, is to inform your broker or salesperson you want to opt-out of the MLS, and if so, you will be asked to sign a document (Form SELM) confirming your request to keep your listing off the MLS. However, if you do so, it may be more difficult to sell your property or obtain the highest price for it because your property will not be exposed to the greatest number of real estate licensees and others.

**I/we acknowledge receipt of a copy of this California Consumer Privacy Act Advisory.**

Buyer/Seller/Landlord/Tenant _____*Russell W. Lester*_____ Date __3/18/2020__

Buyer/Seller/Landlord/Tenant _____ Date _____

© 2019, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**CCPA 12/19 (PAGE 1 OF 1)**

## CALIFORNIA CONSUMER PRIVACY ACT ADVISORY (CCPA PAGE 1 OF 1)

| Green Fields Real Estate Services, 7 E. Main Street, Suite D Winters CA 95694 | Phone: 707.761.3343 | Fax: | Lester |
| Curtis Stocking | Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com | | |



**MODIFICATION OF LISTING, BUYER REPRESENTATION OR OTHER AGREEMENT BETWEEN PRINCIPAL AND BROKER**
(C.A.R. Form MT, Revised 6/19)

The ☒ Listing Agreement ☐ Buyer Representation Agreement, (or, if checked,) ☐ Other _____

dated _____*March 21, 2020*_____ , between _____ ("Broker")

and _____*Russell W. Lester,*_____ ("Principal"), regarding the real

property, manufactured home or business described as *County Road 89, Winters , CA 95694*_____

_____ is modified as follows:

**PRICE:** The listing price, price range, lease or rental amount shall be changed to: *Two Million, Four Hundred Thousand*___

_____ Dollars ($ *2,400,000.00*_____ )

**EXPIRATION DATE:** The expiration date is changed to: _____ .

**NOTICE: THE AMOUNT OR RATE OF REAL ESTATE COMMISSIONS IS NOT FIXED BY LAW. THEY ARE SET BY EACH BROKER INDIVIDUALLY AND MAY BE NEGOTIABLE BETWEEN PRINCIPAL AND BROKER (REAL ESTATE COMMISSIONS INCLUDE ALL COMPENSATION AND FEES TO BROKER).**

**OTHER:** _____

_____

_____

_____

_____

_____

_____

_____

All other terms of the Listing Agreement, Buyer Representation Agreement, or other agreement as applicable, remain in full force and effect, except as modified herein.

I acknowledge that I have read, understand and have received a copy of this Modification of Terms.

*Russell W. Lester*                                        08/15/2020
                                                          04:52 PM PDT
_____            _____
Principal *Russell W. Lester*                 Date

_____            _____
Principal                                     Date

Broker *Green Fields Real Estate Services*        DRE Lic # *01949058*_____
　　　(Firm)
                                              08/12/2020
By *Curtis Stocking*                          DRE Lic # *01722363*    Date 09:12 AM PDT
　　　(Agent)
　　*Curtis Stocking*

© 2019, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the California Association of REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

**MT REVISED 6/19 (PAGE 1 OF 1)**
**MODIFICATION OF LISTING BUYER REPRESENTATION OR OTHER AGREEMENT BETWEEN PRINCIPAL AND BROKER (MT PAGE 1 OF 1)**

| Green Fields Real Estate Services, 7 E. Main Street, Suite D Winters CA 95694 | Phone: 707.761.3343 | Fax: | Lester |
| Curtis Stocking | Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com | | |

# EXHIBIT C



*Land connects us all – protecting it today, saving it for tomorrow*

Board Members

*Officers*
Gale D. Spears
President

Sue Frost
Vice President

Steve Pressley
Treasurer

Carole Paterson
Immediate Past
President

Paul Lum
Secretary

*Directors*
David Eimerl
Deborah Durr Ferras
Terry Huffman
Curtis Stocking
Monica Brown

Date: 08-28-2020

Re: Conservation Easement Funding and Timeline to close on the McCune
    and Carrion properties

From: Tracy Ellison, Conservation Program Manager, Solano Land Trust

To:  Whom is My Concern

Solano Land Trust along with Kathleen and Russell Lester have entered an agreement to place the McCune and Carrion properties under an Agricultural Conservation Easement.

The funding for the purchase of the easement will come from two funders; the State of California at 75% and the United States of America at 25%.

Solano Land Trust has secured grant funds for the purchase of an Agricultural Conservation Easement with the State of California through the Sustainable Agriculture Lands Conservation program (SALC) in the amount of $4,275,000.00.  The grant agreement was finalized on 03-15-2020. See attached award letter.

Solano Land Trust has secured grant funds for the purchase of an Agricultural Conservation Easement through the Agricultural Land Easement (ALE) program with the United States of America through the Natural Resource Conservation Service (NRCS) for matching funds to the above grant in the amount of $1,425,000.00.  Solano Land Trust is currently working with the NRCS to finalize the grant agreement.  This can be supplied once completed.

The total grant amount to purchase an Agricultural Conservation Easement on the mentioned properties is $5,700,000.00

Timeline to close is expected June of 2021 pending any agency reviews and approvals.



*Get Involved! Learn more – join us – donate – land connects us all*

If there are further, questions please contact Tracy Ellison, Conservation Program Manager and lead on this transaction.  Email Tracy@solanolandtrust.org or Cell at 707-580-4263

Sincerely,

Tracy Ellison

California
**Department of Conservation**
Division of Land Resource Protection

Gavin Newsom, Governor
David Shabazian, Director

December 18, 2019

Tracy Ellison
Solano Land Trust
Via Email

RE: Funding Request for the Dixon Ridge Farms Agricultural Conservation Easement

Dear Ms. Ellison:

I am pleased to inform you that the Strategic Growth Council has awarded your request for Fiscal Year 2018-19 grant funding for the Dixon Ridge Farms (SALC18_PP18_SOL) agricultural conservation easement acquisition under the Sustainable Agricultural Lands Conservation Program (SALC). This award is made in the amount of $4,325,000 for direct acquisition costs and eligible associated costs incurred in relation to the transaction. Congratulations on your award.

To complete this transaction, Solano Land trust must meet the following contingencies:

- Execute and complete the requirements outlined in a Grant Agreement between Solano Land Trust and the Department of Conservation (Department), including completion of:
  - Conservation easement negotiations;
  - An acceptable final appraisal;
  - All due diligence and related documentation;
- Provide evidence of having secured all match funding;
- Resolve third-party mineral rights;
- Resolve all title issues;

To orient incoming grantees to the SALC grant process, the Department will host a webinar at 11:00 am on January 15, 2020. The webinar will cover: steps to entering into a grant agreement and completing your easement transaction with the Department, tips for developing and maintaining a feasible implementation schedule, and any changes in the SALC grant agreement since your previous grant. Please RSVP by January 14, 2020 to confirm your spot.

You are welcome to publicize receipt of this grant; however, all publicity related to SALC-funded easements must acknowledge California Climate Investments (CCI) as a source of funding and include the CCI logo in a manner consistent with the most current version of the California Climate Investments Logo Usage Guidelines.

Please contact Artemis Mosier, Grant Manager for this project, at (916) 324-4230 within 30 days to accept this grant and begin the grant agreement process. We look forward to working with you to conserve California's important agricultural land resources.

Sincerely,

Keali'i Bright
Division Director

State of California Natural Resources Agency | Department of Conservation
801 K Street, MS 14-15, Sacramento, CA 95814
conservation.ca.gov | T: (916) 324-0850 | F: (916) 327-3430

16

# EXHIBIT D

**Putah Creek Property**

| | Units | | | | |
|---|---|---|---|---|---|
| Irrigation | Acres | | $/Unit | | Value |
| Mainline & Pumps | 50 | $ | 5,000.00 | $ | 250,000.00 |
| Solid Set | 50 | $ | 3,500.00 | $ | 175,000.00 |
| Trees | 50 | $ | 7,500.00 | $ | 375,000.00 |
| | | | | | |
| Buildings | Square Feet | | $/Unit | | Value |
| House-Main | 2,500 | $ | 165.00 | $ | 412,500.00 |
| House-Back | 1,500 | $ | 165.00 | $ | 247,500.00 |
| Garage/Pool House | 4,000 | $ | 151.00 | $ | 604,000.00 |
| Shop | 3,500 | $ | 30.00 | $ | 105,000.00 |
| Building #1/Office | 5,000 | $ | 125.00 | $ | 625,000.00 |
| Freezer #1 | 480 | $ | 65.00 | $ | 31,200.00 |
| Building #2, Sheller w/ 1700 sq ft Freezer | 10,110 | $ | 105.00 | $ | 1,061,550.00 |
| Building #3, Freezer | 12,000 | $ | 110.00 | $ | 1,320,000.00 |
| Building #4, Freezer | 12,000 | $ | 103.50 | $ | 1,242,000.00 |
| Building #5, Warehouse - Burned 10/2018 - Residual Ins. V | 52,800 | $ | 5.30 | $ | 279,840.00 |
| Building #6, Warehouse Pad | 12,000 | $ | 7.50 | $ | 90,000.00 |
| Building #7- Huller, Dryer, Shop | 63,600 | $ | 45.00 | $ | 2,862,000.00 |
| Building #8, Warehouse Concrete Pad | 25,920 | $ | 25.00 | $ | 648,000.00 |
| Building #9, Compost and Process Water Sump | 14,400 | $ | 5.00 | $ | 72,000.00 |
| Building #10, Fuel and Storage Gravel Pad | 8,000 | $ | 7.50 | $ | 60,000.00 |
| Paved Yard | 46,900 | $ | 15.00 | $ | 703,500.00 |
| Graveled Yard | 388,700 | $ | 7.50 | $ | 2,915,250.00 |
| | | | | | |
| | Quantity | | $/Unit | | Value |
| Pool and Yard | 1 | $ | 80,000.00 | $ | 80,000.00 |
| Site Electrical system | 1 | $ | 490,928.00 | $ | 490,928.00 |
| Site Water system | 1 | $ | 400,000.00 | $ | 400,000.00 |
| Utility Building for Electrical, Process Water Pump, Filter, S | 1 | $ | 45,000.00 | $ | 45,000.00 |
| Process Water Pump, Filter, Softener and System | 1 | $ | 325,000.00 | $ | 325,000.00 |
| Fire system with 95,000 gallon Tank | 1 | $ | 631,153.78 | $ | 631,153.78 |
| Shell Storage - 54' x 70' silo & 3 - 15' x 35' silos | 1 | $ | 450,000.00 | $ | 450,000.00 |
| Receiving Pit & Elevator | 1 | $ | 35,000.00 | $ | 35,000.00 |
| Truck Scale - 100 Ton | 1 | $ | 125,000.00 | $ | 125,000.00 |
| Total Putah Creek Property | | | | $ | 16,661,421.78 |

| | Acres | | $/Unit | | Value |
|---|---|---|---|---|---|
| Putah Creek Property - Land | 68 | $ | 25,000.00 | $ | 1,700,000.00 |

**Total Putah Creek Property Value**        **$ 18,361,421.78**

# EXHIBIT E

1    CHRISTOPHER E. SEYMOUR, #126330
cseymour@gmlegal.net
2    GILMORE MAGNESS JANISSE
Post Office Box 28907
3    Fresno, California 93729-8907
Telephone: (559) 448-9800
4    Facsimile: (559) 448-9899

5    Attorneys for Donald G. Howell

6

7

8                 SUPERIOR COURT OF CALIFORNIA

9                   COUNTY OF SOLANO

10

11    FIRST NORTHERN BANK OF DIXON,      Case No. FCS054698

12          Plaintiff,                 **FIRST REPORT OF RECEIVER**

13        v.

14    RUSSELL W. LESTER, an individual;
KATHLEEN HAMROCK LESTER, an
15    individual; RUSSELL W. LESTER, as
Trustee of the Lester Family Trust;
16    KATHLEEN H. LESTER, as Trustee of
the Lester Family Trust; and DOES 1-100,
17    inclusive

18          Defendant.

19

20         Donald G. Howell, Court appointed receiver ("Receiver") for First Northern

21   Bank of Dixon ("Bank") v. Russell W. Lester an individual, Kathleen Hamrock Lester, an

22   individual, Russell W. Lester, as Trustee of the Lester Family Trust and Kathleen H.

23   Lester, as Trustee of the Lester Family Trust ("Lester"), respectfully submits the following

24   First Report of Receiver.

25        A.    <u>Appointment and Qualification to Act.</u>

26         I was appointed Receiver in this matter on June 23, 2020, which appointment

27   was confirmed on June 29, 2020 (collectively, the "Order"). Pursuant to the Order, I was

28   to take possession of, manage, preserve and in some instances liquidate, inventory,

GILMORE MAGNESS JANISSE
A PROFESSIONAL CORPORATION
POST OFFICE BOX 28907
FRESNO, CALIFORNIA 93729-8907

12898-0003\536143.5

1              20

RECEIVER'S INITIAL INVENTORY AND REPORT

1    equipment, inventory, accounts and other tangible and intangible property pledged as

2    collateral ("Collateral") by the defendants to First Northern Bank of Dixon ("Bank"), and

3    obtain all records relating to the Collateral ("Collateral Records"). Attached hereto as

4    Exhibit A is the Notice of Entry of Order Confirming Appointment of Receiver, to which

5    the ex parte and confirmation orders are attached (collectively, the "Order"). Pursuant to

6    the Order, I retained Christopher Seymour of Gilmore Magness Janisse as receiver's

7    counsel, and the court has entered an order approving that retention.

8           Pursuant to the Order, the Oath and Bond of the Receiver was filed with this

9    Court on June 19, 2020, but convinced copies were not received from the Court. Attached

10   hereto as Exhibit B are copies of the Oath and Bond of the Receiver.

11          B.    The Dixon Ridge Farms Operation and Nature of the Collateral

12          Lester operates a walnut growing and processing business in Dixon,

13   California. In addition to his own crop, Lester historically has contracted with other

14   growers to purchase organic walnuts with the grower paid an in-shell price and Lester

15   assuming ownership. This is a typical arrangement between a grower and a processor.

16   Lester markets and sells the processed product pursuant to wholesale contracts.

17          Lester maintains equipment ("Equipment Collateral") for use in his

18   processing and farming business. In total, Lester farms approximately 600 acres of

19   walnuts of various varieties, all certified organic. Walnut prices have dropped

20   significantly over the last 5 months, significantly affecting the marketability of the

21   Inventory, as discussed in Section E.1. below. As farming is not a duty I have under the

22   terms of the Order, I have informed Lester that I will not be conducting such activities, and

23   will not pay for labor and other expenses related to farming.

24          C.    Narrative Report of Events

25           Upon my appointment, I obtained a bond and, with my oath of receiver,

26   submitted both for filing with the court through my counsel. Due to delays in return of

27   conformed copies by the court, my initial activities were somewhat delayed, but I was able

GILMORE MAGNESS JANISSE
A PROFESSIONAL CORPORATION
POST OFFICE BOX 28907
FRESNO, CALIFORNIA 93729-8907

12898-0003\536143.5                          2                              21
                        RECEIVER'S INITIAL INVENTORY AND REPORT

1    to open checking and savings accounts with United Security Bank on June 16, 2020. I

2    proceeded to obtain information from Lester regarding the nature and location of all

3    Collateral, including the Collateral Records, and visited Dixon Ridge Farms to meet with

4    Lester and others at the Defendants' business, Dixon Ridge Farms on the following dates:

5    June 18, 2020; July 3, 2020; July 8 and 9, 2020; July 15, 2020; and July 22, 2020.  In my

6    initial communications with Lester,  I inquired specifically as to the shelled and in-shell

7    walnut inventory, and current and prospective sale and grower contracts, and acquired

8    information regarding the Dixon Farms processing operations and processing costs.  We

9    also discussed the existence and location of Equipment Collateral and Collateral Records.

10    Information and documents I requested were provided slowly, but as of July 22, 2020, they

11    have been provided.  I discovered the existence of seven separate bank accounts, three at

12    First Northern Bank of Dixon ("First Northern" or "Bank") and four at Bank of the West.

13    Two of the accounts at First Northern are personal accounts, as are the four Bank of the

14    West accounts.  The remaining First Northern account is the business checking account for

15    Dixon Ridge Farms.  There have been transfers between the accounts and comingling of

16    funds in and among the personal accounts and the Dixon Ridge accounts.  I received

17    complete copies of the bank statements for all three First Northern accounts and a

18    complete copy of the Check Register for the Dixon Ridge business account on July 22,

19    2020.  As of July 22, 2020, I have identified a total of $110,818.49 in funds that are

20    Collateral.  $45,048.36 of these funds I received by money wire transfer on July 14, 2020

21    and the remaining $65,770.13 by money wire transfer on July 23, 2020.  I am still

22    reviewing the accounts to ensure there are no remaining cash assets of the Receivership

GILMORE MAGNESS JANISSE
A PROFESSIONAL CORPORATION
POST OFFICE BOX 28907
FRESNO, CALIFORNIA 93729-8907

12898-0003\536143.5

3

22

RECEIVER'S INITIAL INVENTORY AND REPORT

Estate in the six personal accounts.    If I identify any additional funds that belong to the Reccidership Estate, these funds will need to be wired to the Receiver's account.

Based on the initial inventory figures provided to me by Lester on July 3, 2020, I contacted processors and brokers experienced and knowledgeable in the walnut industry to determine the marketability of Lester's walnut inventory, much of which is quite old as discussed below.  My estimate of the value of the inventory after processing and other costs is attached hereto as Exhibit D.  I discovered during the valuation process and review of Dixon Ridge Farms' financial records that the actual value of the inventory was significantly less than what was provided to me by Lester in his inventory report. Lester valued the in-shell product at cost and the meat pounds product at cost plus the $1.15 per net meat pound to process.  His valuation was not a current market valuation based on the current market conditions and market price of the product sold to processors and wholesalers in large quantity.  Rather, his estimate of value was based on stale internal sales prices applied to small ongoing future sales and he assumed the market would accept 2018 product.  I estimate it would take 2.5 to 3.0 years to move the inventory.  My estimate of value is based on current market conditions and prices per several conversations with industry processors, wholesalers, and brokers, and assumes bulk sale of the inventory.

Lester has applied for, but has not received as of this date, funds from a USDA Coronavirus Food Assistance Program (CFAP) in the amount of $500,000.  There currently is a dispute between the Plaintiff and Defendants as to whether those funds will constitute Collateral as defined in the pleadings and loan documents, which the parties are

GILMORE MAGNESS JANISSE
A PROFESSIONAL CORPORATION
POST OFFICE BOX 28907
FRESNO, CALIFORNIA 93729-8907

12898-0003\536143.5

4

23

RECEIVER'S INITIAL INVENTORY AND REPORT

attempting to resolve. However, the parties, through counsel, have tentatively agreed that such funds will be forwarded to me to hold in the receivership account pending resolution of the dispute.

D.    Bank Accounts

1.    First Northern Bank of Dixon

I have identified the following account, which Lester has represented is the only Dixon Ridge Farms account:

a.    Account No.xxx3033

I have identified the following accounts, which Lester has represented are personal accounts:

a.    Account No. xxx1336

b.    Account No. xxx4192

2.    Bank of the West

I have Identified the following accounts, which Lester has represented are personal accounts.

a.    Account No. xxx9683

b.    Account No. xxx9691

c.    Account No. xxx9709

d.    Account No. xxx9725

As of this date, I have been provided a complete Quick Books check register for the Account No. xxx3030, and bank statements for all seven accounts back to January 1, 2020.

On July 14, 2020, Lester wired the amount of $45,048.36 to my receiver account from account no. xxx3033. On July 23, 2020 Lester wired the amount of $65,770.13 from account no. xxx3033.

GILMORE MAGNESS JANISSE
A PROFESSIONAL CORPORATION
POST OFFICE BOX 28907
FRESNO, CALIFORNIA 93729-8907

12898-0003\536143.5                              5                              24
RECEIVER'S INITIAL INVENTORY AND REPORT

E.    Status of Inventory Collateral and Related Sales and Contracts.

1.    Walnut Inventory

I have located and inspected the shelled and in-shell walnut inventory ("Inventory Collateral"), with is stored in three freezers at the "home site." i.e., 5430 Putah Creek Road in Winters, California.  Based on my review of the loan documents, it is my position, with which I understand the Bank and Lester concur, that Lester's 2020 crop does not become Collateral until it is harvested.

There currently are two contracts from buyers that remain unshipped with a value of $65,590.00.  I have instructed Lester to wire those funds to the receivership checking account when the product is transferred and the funds received.

I have had several discussions with potential brokers and prospective buyers regarding sale of the Inventory Collateral.  I have engaged the services of a broker, Mr. Mike McMillian of Lone Tree Almond and Walnut,  to market the Inventory Collateral, and am in separate discussions with potential buyers of the Inventory Collateral.  One hundred percent of the inventory is organic.  As reflected in Exhibit D, a large portion of the inventory is over 18 months old, and may be extremely difficult, or virtually impossible, to sell.  Per information provided by Lester as of June, 30, 2020 and updated as of July 1, 2020, the walnut inventory consists of 1,812,000 pounds of 2018 meats, 1,991,876 pounds of 2019 in-shell, and 111,107 pounds of 2019 meats.  I have visually inspected the Inventory and confirmed the accuracy of this information.  I also have the complete inventory on a bin-by-bin basis.  Historically, organic product commands a premium price of at least $.30 per in-shell pound.  Due to a myriad of issues, including (A) a significant expansion of domestic growth in the production of organic walnuts, (B) a current glut on the market caused by (1) the Coronavirus, (2) competition from other countries, and (3) a very large carryover of the 2019 crop (industry wide inventory domestically), and (C) the expectation of a record or near record crop in 2020, the market price for all walnuts has dropped dramatically and the current market value of organic walnuts is the same or slightly above non-organic.  Although I have not conducted a

GILMORE MAGNESS JANISSE
A PROFESSIONAL CORPORATION
POST OFFICE BOX 28907
FRESNO, CALIFORNIA 93729-8907

12898-0003\536143.5                                          6                                          25

RECEIVER'S INITIAL INVENTORY AND REPORT

1   formal appraisal of the Inventory, my estimation of the current market value for the

2   Inventory is attached as Exhibit D.  If sold at my estimated current market value,  the

3   estimated total value of the Inventory is approximately $3,759,737, and assumes there are

4   no quality issues with the 2018 walnut meats, and most importantly assumes there are no

5   market barriers resulting in an absolute refusal of the potential buyers to purchase the 2018

6   product because of its age.  Any barrier to sale of the 2018 meats due to market refusal,

7   USDA tests indicating a deterioration of the product, or a continued loss of market value

8   due to external pressures may result in a much lower than estimated price received.  Once

9   sale agreements have been negotiated, I will apply to the court for approval of the sales.

10   No sales will occur prior to the July 29, 2020 status hearing, absent approval by the court

11   on shortened notice.  It should be noted that the current walnut market is in a state of flux,

12   and the market values represented are subject to change, possibly significant, as time goes

13   on.

14         In addition to Lester's prior crop years, Lester has stated his intent to harvest

15   and store his 2020 crop, which, based on my review of the Bank loan documents, becomes

16   Inventory Collateral at the time it is harvested.  Lester has represented to me he is farming

17   using non-Collateral funds.  As I did not have the full accounting information I requested

18   until July 22, 2020, I have not completed my review of the use of cash to determine

19   whether any Collateral has been used for farming.  I am not involved in the farming

20   aspects of Lester's business, as it is not within my duties set forth in the Order.  However,

21   at this time, Lester is nearing his storage capacity, and if he exceeds it, he would need to

22   rent additional space for storage if some or all of the prior years' inventory is not sold

23   before the 2020 harvest – his meat freezers  are filled wall-to-wall with inventory and his

24   in-shell storage capacity may not be sufficient if the 2020 crop exceeds expectations.  In

25   my opinion, there is little or no profit to be made by Lester in harvesting and processing

26   the 2020 crop based on his estimated harvesting, processing and storage costs, and the

27   current market for the product.  If harvested, I intend to sell the 2020 crop, to a processor

28   through a typical grower contract.  I believe the 2020 production will average between

GILMORE MAGNESS JANISSE
A PROFESSIONAL CORPORATION
POST OFFICE BOX 28907
FRESNO, CALIFORNIA 93729-8907    12898-0003\536143.5       7       26

RECEIVER'S INITIAL INVENTORY AND REPORT

3,000 and 4,000 pounds per acre on the producing 450 +/- acres. I believe 2020 prices to the grower (i.e., the Receivership Estate) will average $0.80 to $0.90 per in-shell pound based on current market conditions and the varietal mix of the orchards.

      2.   <u>Hay Inventory</u>

      Lester harvested a "volunteer" grass/oat hay crop produced on open ground, now fallowed. There are no farming costs associated with this crop. The crop consists of 784 big bales of oat/grass hay mix estimated to weigh a combined 400 tons. The hay was sold by contract at the end of May, 2020 to Pozzi Hay. The sale price for 277 of the 400 tons is $60/ton ($16,620.00). The sale price for the remaining 23 tons is $70/ton ($8,610.00). Payment of the total sale price of $25,230.00 is expected to be received by August 15, 2020, with payment to be made directly to the Receiver.

      F.   <u>Status of Equipment Collateral</u>

      I have viewed and inventoried the Defendants' equipment, which is pledged as Collateral under the loan agreement ("Equipment Collateral"). An inventory of the Equipment Collateral provided by Defendants and confirmed by me by visual inspection, is attached hereto as part of Exhibit C. According to Defendants, certain equipment was destroyed by fire on October 11, 2017. An insurance claim has been filed and partial payments were received prior to my appointment. I am currently corresponding with the insurance company to determine what issues are as of yet unresolved. There is a dispute between Lester and the Zenith Insurance Company as to the value of some of the equipment, the building, and the loss of some personal property. I have notified Lester that any and all insurance claim proceeds are a part of the Bank's Collateral. The equipment has not been appraised, although the Bank sent its own appraiser to the home site this week. The Equipment Collateral will be sold pursuant to the UCC as specified in the Order, or as otherwise agreed. No Equipment Inventory will be sold prior to the July 29, 2020 status hearing, absent approval by the court on shortened notice.

      G.   <u>Receivership Estate Financial Report.</u>

      Other than the twenty dollars I provided out of pocket to open the accounts

GILMORE MAGNESS JANISSE
A Professional Corporation
POST OFFICE BOX 28907
FRESNO, CALIFORNIA 93729-8907

12898-0003\536143.5    8    27

RECEIVER'S INITIAL INVENTORY AND REPORT

1   and later to cover Bank fees, and the transfer of funds from Lester's Account No. 3033 in

2   the total amount of $110,818.49, there have been no transfers in or out of the receivership

3   accounts.

4      H.     Insurance

5       I eventually obtained on July 15, 2020, the necessary information regarding

6   Lester's insurance policies and Lester's insurance broker to be added as a named insured

7   on the following policies: Travelers

8      a.     7001N500159-TCT-20    $12,500,000 Personal Farm Property

9      b.     EX-1N52956A-20-93     $6,000,000 Aggregate Liability

10   II.    Miscellaneous Matters

11      A.     Inventory

12       The Receiver's First Inventory of Property was served and submitted for

13   filing on July 21, 2020.

14      B.     Farming

15       As discussed above, the Order does not include farming as part of my duties.

16   There have been communications between myself, the Bank and Lester regarding farming

17   issues, but as of this report, no party has sought to amend the Order to include any farming

18   activity by the Receiver, nor use of any Collateral for that purpose.

19      C.     Contacts by Lester's Loan Broker/Advisor

20       On July 16 2020, I was contacted by telephone by BizCap, which I

21   understand is in the process of attempting to find refinancing on behalf of Lester. I

22   initially agreed to speak with BizCap upon the approval of Lester, but I became concerned

23   that my communications with BizCap would be outside of my authority and duties under

24   the Order. Because of that concern, I asked my counsel to request in writing the

25   information BizCap intended to discuss with me. Copies of the correspondence between

26   my counsel and Lester's counsel, setting forth the subjects on which I was requested to

27   discuss and my refusal to do so, are attached collectively as Exhibit E. I do not believe

28   discussions with BizCap regarding the subjects listed in Lester's counsel's e-mail are

GILMORE MAGNESS JANISSE
A PROFESSIONAL CORPORATION
POST OFFICE BOX 28907
FRESNO, CALIFORNIA 93729-8907

12898-0003\536143.5          9          28
RECEIVER'S INITIAL INVENTORY AND REPORT

1  authorized under the Order, for the reasons set forth in my counsel's e-mail of July 21,

2  2020, and would put me into the position of being a consultant to Lester and BizCap,

3  which conflicts with my duties and obligations as Receiver.

4  III.    Receiver's Fees and Expenses

5         Receiver's fees and expenses for the receivership for June 9, 2020 through

6  July 23, 2020 are $32,498.37, including Receivers fees and costs of $17,436.37 and

7  attorney fees and costs of $17,882.48.  I will submit my fees and expenses to the parties

8  pursuant to the Order following the close of my July 2020 billing period.

9

10  Dated: July 24, 2020

                                                    _____
11                                                  Donald G. Howell
                                                    COURT APPOINTED RECEIVER
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GILMORE MAGNESS JANISSE
A PROFESSIONAL CORPORATION
POST OFFICE BOX 28907
FRESNO, CALIFORNIA 93729-8907

12898-0003\536143.5                    10                              29

RECEIVER'S INITIAL INVENTORY AND REPORT

# EXHIBIT A

DOUGLAS H. KRAFT, ESQ. (State Bar No. 155127)
JOHN C. McCASLIN, ESQ. (State Bar No. 204983)
KRAFT LAW
11335 Gold Express Drive, Suite 125
Gold River, California 95670
Telephone: (916) 880-3040
Facsimile: (916) 880-3045

Attorneys for First Northern Bank of Dixon

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,

IN AND FOR THE COUNTY OF SOLANO

FIRST NORTHERN BANK OF DIXON,               CASE NO. FCS054698

       Plaintiff,                              **NOTICE OF ENTRY OF ORDER**

vs.

RUSSELL W. LESTER, an individual; et al.,

       Defendants.

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

     PLEASE TAKE NOTICE that on June 29, 2020, 2020, the above entitled court entered
an ORDER CONFIRMING APPOINTMENT OF RECEIVER AND PRELIMINARY
INJUNCTION. A true and correct copy of the Order is attached hereto as **Exhibit A.**

     PLEASE TAKE NOTICE that the Court also ordered the parties to appear on July 29,
2020, at 1:30 p.m. in department 22, 580 Texas Street, Fairfield, CA 94533, for a Status Hearing.

Dated: June 29, 2020          KRAFT LAW

                          By:_____
                            DOUGLAS H. KRAFT, ESQ.
                            Attorneys for Plaintiff First Northern Bank of Dixon

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

Notice of Entry of Order

1    DOUGLAS H. KRAFT, ESQ. (State Bar No. 155127)
     JOHN C. McCASLIN, ESQ. (State Bar No. 204983)
2    KRAFT LAW
     11335 Gold Express Drive, Suite 125
3    Gold River, California 95670
     Telephone: (916) 880-3040
4    Facsimile: (916) 880-3045
5
6    Attorneys for First Northern Bank of Dixon
7



FILED/ENDORSED
Clerk of the Superior Court

JUN 29 2020

By _____
DEPUTY CLERK

8            IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,

9                    IN AND FOR THE COUNTY OF SOLANO

10

11   FIRST NORTHERN BANK OF DIXON,          CASE NO. FCS054698

12              Plaintiff,                   [PROPOSED] ORDER CONFIRMING
                                            APPOINTMENT OF RECEIVER AND
13   vs.                                    PRELIMINARY INJUNCTION
14
     RUSSELL W. LESTER, an individual;      Date:      June 29, 2020
15   KATHLEEN HAMROCK LESTER, an            Time:      10:00 a.m.
     individual; RUSSELL W. LESTER, as      Dept:      22
16   Trustee of the Lester Family Trust;    Location:  580 Texas St.
17   KATHLEEN H. LESTER, as Trustee of the             Fairfield, CA 94533
     Lester Family Trust; and DOES 1-100,   Judge:     Hon. Alesia F. Jones
18   inclusive,
19
                Defendants.
20

21        WHEREAS, on June 12, 2020, at 1:30 p.m., in Department 22 of the above entitled court

22   (the "Court") Plaintiff FIRST NORTHERN BANK OF DIXON ("Lender" or "Plaintiff") made

23   its Ex Parte Application for Order Appoint Receiver, Temporary Restraining Order and Order to

24   Show Cause (the "Application"), before the Honorable Aleisa F. Jones, presiding; and

25        WHEREAS, at the ex parte hearing the Court issued its Order Appointing Receiver,

26   Temporary Restraining Order and Order to Show Cause (the "Receiver Order") appointing

27   Donald G. Howell (the "Receiver") as receiver over certain personal property of Defendant

28

                                          1

                                                    Order Appointing of Receiver, TRO and OSC

33

RUSSELL W. LESTER ("**Mr. Lester**") identified in the Receiver Order as the Collateral and Collateral Records. A true and correct copy of the Receiver Order is attached hereto as **Exhibit A**;

WHEREAS, Plaintiff has filed with the Court an injunction bond pursuant to California Code of Civil Procedure Section 529 in the amount of $10,000.00, as required by the Receiver Order;

WHEREAS, Plaintiff has filed with the Court an ex parte application bond pursuant to California Code of Civil Procedure Section 566(b) in the amount of $10,000.00;

WHEREAS, the Receiver has filed with the Court his Oath, as required pursuant to California Code of Civil Procedure Section 567, and as required by the Receiver Order;

WHEREAS, the Receiver has filed with the Court his undertaking, as required pursuant to California Code of Civil Procedure Section 567, in the amount of $10,000.00, as required by the Receiver Order;

WHEREAS, pursuant to the Receiver Order, the defendants were ordered to appear on June 29, 2020, at 10:00 a.m. (the "**Confirmation Hearing**"), in Department 22 of the Court before the Honorable Alesia F. Jones, and show cause, if any, why appointment of the Receiver should;

WHEREAS, Douglas H. Kraft, Esq., of Kraft Law appeared on behalf of Plaintiff, First Northern Bank of Dixon and Andrew L. Collier, of Downey Brand, LLP, appeared on behalf of the Defendant Mr. Lester and Defendant KATHLEEN HAMROCK LESTER ("**Mrs. Lester**"); and

WHEREAS, the Court have considered the Opposition to Conformation of Receiver and Preliminary Injunction and pleading filed in support thereof (the "**Opposition**"), filed by Defendants Mr. Lester and Mrs. Lester, and the Reply to Opposition to Confirmation of Receiver and Preliminary Injunction and pleadings filed in support thereof (the "**Reply**") filed by Plaintiff, First Northern Bank of Dixon, and having considered the arguments put forth at the Confirmation Hearing.

Order Appointing of Receiver, TRO and OSC

NOW, good cause appearing therefore, the Court hereby orders as follows:

IT IS ORDERED THAT:

1.  The Receiver Order is hereby confirmed. Donald G. Howell is confirmed as receiver over the Collateral and Collateral Records, as described in the Receiver Order.

2.  IT IS FURTHER ORDERED that Defendant RUSSELL W. LESTER, an individual, and Defendant KATHLEEN HAMROCK LESTER, an individual (together, "**Borrower**", and each a "**Borrower**"), and all agents and employees of Borrower (the "**Enjoined Defendants**" and each an "**Enjoined Defendant**") and each of them, and each of their agents, servants, directors, officers, affiliates, employees, attorneys, representatives, family members, and all other persons and entities who are successors in interest to or who are acting in concert or participating with them, or any of them, are hereby restrained and enjoined from engaging in or performing, directly or indirectly, any of the following acts:

   a.  retaining possession of the Collateral or the Collateral Records;

   b.  expending, disbursing, transferring, assigning, selling, conveying, devising, pledging, mortgaging, consigning, creating a security interest in, encumbering, concealing or in any manner whatsoever delaying in or disposing of the whole or any part of the Collateral or Collateral Records, without the written consent of the Receiver first being obtained;

   c.  demanding, collecting, receiving, expending, disposing, assigning, secreting or in any other way diverting, using or making unavailable to the Receiver any of the Collateral or Collateral Records, or any of the issues and proceeds thereof;

   d.  doing any act which will, or which will tend to, impair, defeat, divert, prevent or prejudice the preservation of the Collateral or Collateral Records, or Receiver's interest therein, in whatever form the interest is held or used as of this date, pending further proceedings in this action;

Order Appointing of Receiver, TRO and OSC

e.   destroying, concealing, transferring or failing to preserve any document that evidences, reflects or pertains to the Collateral or Collateral Records, or any part thereof;

f.   committing or permitting any waste of the Collateral or Collateral Records, or any part thereof, or suffering, committing or permitting any acts thereon in violation of law;

g.   removing, transferring, encumbering or otherwise disposing of the Collateral or Collateral Records, until further order of this Court; or

h.   interfering in any manner with the Collateral or Collateral Records, or Receiver's possession thereof, including, without limitation, communicating or contacting any contractees of the Receiver, exercising or attempting to exercise any control or management of functions in connection with the Collateral or Collateral Records, or otherwise engaging in acts inconsistent with the Receiver's sole authority to operate, manage and control the Collateral or Collateral Records.

3.   IT IS FURTHER ORDERED that the Enjoined Defendants shall immediately notify Receiver of the location of the inventory, equipment, and Collateral Records of Borrower, and immediately assemble all inventory, equipment, and Collateral Records, and shall allow the Receiver to take immediate possession of all inventory, equipment, and Collateral Records, and enter onto Borrower's business premises for the purposes of doing so.

4.   IT IS FURTHER ORDERED that the Enjoined Defendants provide the Receiver within 24 hours of the Receiver's request all information and documentation required by any bank or other financial institution to open or maintain any accounts as provided under this Order.

5.   IT IS FURTHER ORDERED that the Enjoined Defendants shall hold in trust and surrender to the Receiver all monies accountable to the revenues, issues and proceeds of the Collateral whether generated from the past or present, now in the possession, custody and control of Enjoined Defendants, or their agents, servants or employees, and all records, books of account, ledgers, and all documents and papers pertaining to the operation, maintenance and

Order Appointing of Receiver, TRO and OSC

proceeds of the Collateral, whether in the possession and control of the Enjoined Defendants or in the possession and control of agents, servants or employees of the Enjoined Defendants.

6.    IT IS FURTHER ORDERED that the Enjoined Defendants shall have no further contact with account debtors regarding collection of the accounts without express written instructions from the Receiver.

7.    IT IS FURTHER ORDERED that the Receiver and the parties to this action may, from time to time and upon due notice to the parties entitled thereto, petition this Court for instructions in pursuance of this order and further orders this Court may hereafter make.

IT IS SO ORDERED.

DATED: _6·29·20_                    _____

JUDGE OF THE SUPERIOR COURT



This instrument is a
correct copy of the original
on file in this office

ATTEST:   JUN 2 9 2020

Clerk of the Superior
Court of the State of California in and
for the County of Solano

By _____
DEPUTY CLERK



5

Order Appointing of Receiver, TRO and OSC

37

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

6

Order Appointing of Receiver, TRO and OSC

FILED
SOLANO SUPERIOR COURT

2020 JUN 12 P 3: 19

BY _____

1  DOUGLAS H. KRAFT, ESQ. (State Bar No. 155127)
2  JOHN C. McCASLIN, ESQ. (State Bar No. 204983)
   KRAFT LAW
3  11335 Gold Express Drive, Suite 125
   Gold River, California 95670
4  Telephone: (916) 880-3040
   Facsimile: (916) 880-3045
5
6  Attorneys for First Northern Bank of Dixon
7
8         IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,
9               IN AND FOR THE COUNTY OF SOLANO
10
11 FIRST NORTHERN BANK OF DIXON,          CASE NO. FCS054698
12          Plaintiff,                     [PROPOSED] ORDER APPOINTING
                                           RECEIVER, TEMPORARY
13 vs.                                     RESTRAINING ORDER AND ORDER
                                           TO SHOW CAUSE
14 RUSSELL W. LESTER, an individual;
15 KATHLEEN HAMROCK LESTER, an            Date:     June 12, 2020
   individual; RUSSELL W. LESTER, as      Time:     1:30 p.m.
16 Trustee of the Lester Family Trust;    Dept:     22
17 KATHLEEN H. LESTER, as Trustee of the  Location: 580 Texas St.
   Lester Family Trust; and DOES 1-100,             Fairfield, CA 94533
18 inclusive,                             Judge:    Hon. Alesia F. Jones
19          Defendants.
20

21        The Court having considered the Ex Parte Application of Plaintiff FIRST NORTHERN

22 BANK OF DIXON ("Lender" or "Plaintiff") for Order Appoint Receiver, Temporary

23 Restraining Order and Order to Show Cause (the "Application") and the pleadings filed in

24 support thereof (the "Supporting Pleadings") and the Court having determined that good cause

25 exists for the appointment of a receiver, and that Plaintiff is entitled to appointment of a receiver

26 as a matter of law, and that Donald G. Howell, an individual (hereafter referred to as

27 "Receiver"), is qualified to act as receiver in this action:

28

1

Order Appointing of Receiver, TRO and OSC

1.    IT IS ORDERED that Donald G. Howell be, and hereby is, appointed receiver of

and over all of the following property of defendant RUSSELL W. LESTER ("**Mr. Lester**"):

a. All of Mr. Lester's inventory, chattel paper, accounts, accounts receivable,
equipment, general intangibles, crops (when severed from the land) farm
equipment and contracts, including payments under any governmental
agricultural diversion programs, governmental agricultural assistance
programs, the Farm Services Agency Wheat Feed Grain Program, and any
other such program of the United States Department of Agriculture, or any
other general intangibles or programs; whether any of the foregoing is owned
now or acquired later; all accessions, additions, replacements, and
substitutions relating to any of the foregoing; all proceeds relating to any of
the foregoing (including insurance, general intangibles and other accounts
proceeds)" (the "**Collateral**"), together with all records and data relating to
any of the Collateral, whether in the form of a writing, photograph, microfilm,
microfiche, or electronic media, together with all of Grantor's right, title, and
interest in and to all computer software required to utilize, create, maintain,
and process any such records or data on electronic media (collectively, the
"**Collateral Records**").

2.    IT IS FURTHER ORDERED that, upon Plaintiff filing an injunction bond

pursuant to Code of Civil Procedure section 529 in the amount of $10,000.00 and an ex-parte

application bond pursuant to Code of Civil Procedure section 566 in the amount of $10,000.00,

and upon the Receiver's filing of an undertaking under Code of Civil Procedure section 567 in

the amount of $10,000.00 and the taking of his oath, the Receiver be vested with all of the

powers and authority provided by law to receivers subject to the further confirmation and order

of the Court.  In addition, the Receiver shall have the following powers and responsibilities:

a. After so qualifying, said Receiver shall take possession of the Collateral and
all rents, issues, profits and income generated therefrom.  Without limiting the
generality of the foregoing, the Receiver is authorized to enter into all real

property owned or leased by Mr. Lester, including without limitation, and upon which any Collateral is or may be located (collectively, the "**Real Property**"), including but not limited to replacing or changing locks and codes as may be necessary for such purpose in the Receiver's reasonable discretion.

b. To sell, lease, transfer, or otherwise deal with the Collateral on behalf of Lender in accordance with California Commercial Code ("**UCC**") §9610 and the terms of the Agricultural Security Agreement dated December 31, 2018, and the Agricultural Security Agreement dated June 16, 2019, each executed by Mr. Lester in favor of Lender (the "**Security Agreements**"), and to otherwise exercise all rights and remedies of Lender under the UCC relating to the disposition of the Collateral, including the rights to collect and enforce accounts and general intangibles in accordance with UCC §9607.

c. The Receiver shall care for, preserve and maintain the Collateral and incur the expenses necessary in such care, preservation and maintenance, and monies coming into the possession of the Receiver pursuant hereto and not expended for any of the purposes herein authorized shall be held by the Receiver, subject to such orders as this Court may hereinafter issue as to its disposition.

d. The Receiver on his taking possession of the Collateral shall determine whether or not there is sufficient insurance coverage thereon. If sufficient insurance coverage does exist, the Receiver shall direct the insurer (and all defendants shall cooperate with the Receiver's efforts) to add the Receiver as an additional insured on such policy for the period that the receivership estate shall be in possession of the Collateral. If sufficient insurance coverage does not exist, the Receiver shall notify all parties to this action, and it is hereby ordered that the Receiver shall have thirty (30) days to procure sufficient all-risk and liability insurance, excluding earthquake and flood insurance; provided, however, that, if Receiver does not have funds available to do so,

3

Order Appointing of Receiver, TRO and OSC

Receiver shall seek instructions from this Court with regard to whether insurance shall be obtained and how it is to be paid. If consistent with existing law, Receiver shall not be responsible for any actions, claims, costs, expenses, damages, liabilities, obligations, responsibilities, including any reasonable attorneys' fees and disbursements, in any way arising out of, connected to or related to Receiver's inability to obtain or procure insurance.

e. The Receiver may, in his discretion, take possession and control of all records, correspondence, general ledgers, cash receipts journals, books, and all deposit accounts which relate or refer to or that discuss the maintenance or proceeds of the Collateral, whether in possession and control of any or all of the defendants, or their agents, servants, or employees.

f. The Receiver may receive, open, and dispose of all mail addressed to the Mr. Lester and Dixon Ridge Farms and shall notify the post office authorities to change the address for delivery of mail addressed to the Mr. Lester and Dixon Ridge Farms to such address as the Receiver may designate.

g. The Receiver may conduct appropriate marketing and other activities in order to identify and obtain appropriate purchasers, selling agents, commission merchants, auctioneers or consignees for all or any portion of the Collateral. The Receiver may also, without prior court order, extend or modify, any leases of any portion of the real property on which Collateral is or may be located, on such terms the Receiver in his discretion deems best to protect Plaintiff's security under the Security Agreement.

h. The Receiver is empowered to establish accounts at such banks or financial institutions, the accounts of which are insured by the Federal Deposit Insurance Corporation, as the Receiver deems reasonably proper, and to deposit all monies that come into his possession into such accounts.

3. IT IS FURTHER ORDERED that, in addition to the power to sell, lease, consign, transfer, or otherwise deal with the Collateral on behalf of Lender in accordance with UCC §

4

Order Appointing of Receiver, TRO and OSC

9610 and the terms of the Security Agreements, the Receiver may conduct sales of any of the Collateral or portions thereof outside the ordinary course of business in compliance with California Code of Civil Procedure §568.5.

4.    IT IS FURTHER ORDERED that all defendants, as well as all persons claiming possession or other rights by, through, or under them, must, on request and exhibition of a conformed copy of this Order, immediately deliver possession of any property described herein to the Receiver, along with all accounting, maintenance, rent, deposit accounts, safe deposit box contents, checks, drafts, any other negotiable instruments or deposits, and related records concerning the Collateral.

5.    IT IS FURTHER ORDERED that, upon presentation of a conformed copy of this order to any third party, including but not limited to banks or depositories owing performance of any obligation or duty to the defendants with respect to the Collateral, such third parties shall render any performance or duties with respect to the Collateral directly to the Receiver.

6.    IT IS FURTHER ORDERED that the Receiver may use the federal taxpayer identification number of any defendant in connection with any powers exercised pursuant to this Order.  The Receiver shall have no responsibility for filing any federal or state tax returns on behalf of any defendant.  The responsibility for filing federal or state tax returns shall lie exclusively with defendants.

7.    IT IS FURTHER ORDERED that the Receiver is authorized to assume, extend, or modify any pre-receivership contracts relating to the Collateral and/or reject such contracts in the Receiver's sole judgment and discretion.

8.    IT IS FURTHER ORDERED that the Receiver shall hold all monies coming into his possession in an interest-bearing account to be expended for the following purposes and in the following priorities:

    a.  for all expenses incurred by the Receiver in managing the Collateral;

    b.  for the expenses of administering the receivership, including, but not limited to attorneys' fees and costs to be paid monthly by the Receiver from such funds as are in his possession, pursuant to paragraph 15, below;

5

Order Appointing of Receiver, TRO and OSC

43

       c.   for interim Receiver's fees to be paid monthly and to be paid by the Receiver from such funds as are in his possession, at the Receiver's normal and customary rate, pursuant to paragraph 15, below;

       d.   the payment of any remaining funds to Plaintiff in respect of the obligations alleged in the complaint herein.

9.     IT IS FURTHER ORDERED that, in addition to all powers herein above set forth, the Receiver is shall be and is hereby authorized to borrow money from Plaintiff, without further Order of this Court, up to Seventy-Five Thousand and No/100 Dollars ($75,000.00), as needed, to carry out any of the duties set forth in this Order. The borrowing of such funds shall be upon such terms and conditions acceptable to the Receiver, in the Receiver's sole and absolute discretion, provided that the interest rate charged on such funds shall be at the highest non-default rate allowed under the promissory notes (the "**Notes**") evidencing the loans secured by the Security Agreements (the "**Loan**"). Any such advances by Plaintiff to the Receiver shall be deemed to be secured advances, to be added to the indebtedness secured by the Security Agreements, and the security interests created by the Security Agreements shall retain their lien priority as to the entire indebtedness, including said advances, notwithstanding the fact that said advances shall increase the indebtedness secured by the Security Agreements. The Receiver is further authorized to issue a Receiver's Certificate of Indebtedness to evidence the obligation of the Receivership estate (and not the Receiver individually) to repay such sums borrowed from Plaintiff as may be necessary to satisfy the costs and expenses of the Receivership; the principal sum of each Certificate, together with interest thereon at the highest non-default rate specified in the Note, shall be payable out of the next available rent, issues, profits or proceeds attributable to the Collateral or from the proceeds from the sale of any of the Collateral.

10.     IT IS FURTHER ORDERED that, in addition to all powers herein above set forth, the Receiver is hereby vested with all of the general powers of receivers in cases of this kind, subject to the direction of this Court, and said Receiver shall, from time to time, or when directed by the Court, render to the Court reports of the proceedings and accountings with

Order Appointing of Receiver, TRO and OSC

1  respect to all of the acts and things done by him and all monies received and expended by him or

2  his agents.

3      11.    IT IS FURTHER ORDERED that in discharging the terms of this Order, the

4  Receiver is authorized to do all things and incur the risks and obligation incurred by owners,

5  managers and operators of businesses similar to those of defendants; provided, however, that no

6  risks or obligations so incurred shall be the personal risk or obligation of the Receiver, but shall

7  be a risk or obligation of the receivership estate.

8      12.    IT IS FURTHER ORDERED that, the Receiver is authorized to employ the law

9  firm of Gilmore Magness Janisse, a Professional Corporation, as Receiver's legal counsel

10 ("**Receiver's Counsel**") in this matter, as reasonably necessary to accomplish the purposes of

11 this Order.  Compensation to Receiver's Counsel shall be based on an hourly rate not to exceed

12 $410 per hour.  Receiver's Counsel shall be entitled to reimbursement of all reasonable costs and

13 expenses incurred on behalf of the Receivership estate. The attorneys' fees and cost incurred by

14 Receiver's Counsel may be included in the administrative costs and expenses to be paid to the

15 Receiver in accordance with paragraph 8 of this Order.

16     13.    IT IS FURTHER ORDERED that the Receiver shall be paid an hourly rate of

17 Two Hundred Twenty-Five Dollars ($225.00). Receiver shall be entitled to charge mileage at the

18 rate of $0.575 per mile (excluding mileage from Receiver's place of business to the principal

19 place of business of Mr. Lester and back).  Receiver shall be entitled to be reimbursed for

20 expenses incurred at cost.

21     14.    IT IS FURTHER ORDERED that in addition to the employment of an attorney as

22 described in paragraph 12 of this Order (which is authorized without further Order of this Court)

23 the Receiver may, without further Order of the Court, employ an accountant or CPA to assist in

24 the identification of and collection of the accounts and the Collateral, and provide such other

25 accounting services the Receiver may require, provided that the hourly rate for such accountant

26 or CPA shall not exceed $250 per hour.

27     15.    IT IS FURTHER ORDERED that the Receiver is authorized to prepare periodic

28 interim statements reflecting the Receiver's fees and administrative costs and expenses incurred

7

Order Appointing of Receiver, TRO and OSC

for said period in the operation and administration of the receivership estate herein. Upon completion of an interim statement, and mailing said statement to the parties' respective attorneys of record or any other designated person or agent, the Receiver may pay from the receivership estate funds, if any, in the amount of said statement, if no objection thereto is filed and served within ten (10) calendar days of such mailing by the Receiver. If the receivership estate has no funds at the end of the interim period, upon delivery of the interim statement and notice thereof, Plaintiff shall pay to the Receiver all fees and expenses to which it does not file an objection within ten (10) business days. Despite the periodic payment of Receiver's fees and administrative expenses, said fees and expenses shall be submitted to the Court, for its approval and confirmation, in the form of either a noticed interim request for fees, stipulation among the parties, or Receiver's final account and report. Plaintiff shall have the right to add to its secured obligation any fees and expenses of the Receiver paid by the Plaintiff to the extent that Plaintiff is entitled to do so by applicable law.

16.     IT IS FURTHER ORDERED that the Receiver shall, within thirty (30) days of his qualification hereunder, file in this action an inventory of all property of which he shall have taken possession pursuant hereto, pursuant to California Rules of Court, Rule 353(c).

17.     IT IS FURTHER ORDERED that no person or entity shall file suit against the Receiver, or take any other action against the Receiver, without an order of this Court permitting the suit or action; provided however, that no prior court order is required to file a motion in this action to enforce any provision of this Order or any other order of this Court in this action.

18.     IT IS FURTHER ORDERED that the Receiver and the receivership estate, and its employees, agents, attorneys and all professional and management companies retained by the Receiver shall have no liability or obligation for the debts incurred by defendants. The Receiver and its employees, agents and attorneys shall have no personal liability, and they shall have no claim asserted against them relating to the Receiver's duties under this Order, without prior authority from this Court as stated in paragraph 17 above.

19.     IT IS FURTHER ORDERED that Defendant RUSSEL W. LESTER, an individual, and Defendant KATHLEEN HAMROCK LESTER, an individual (together,

Order Appointing of Receiver, TRO and OSC

"Borrower", and each a "Borrower"), and all agents and employees of Borrower (the "Enjoined Defendants" and each an "Enjoined Defendant") and each of them, and each of their agents, servants, directors, officers, affiliates, employees, attorneys, representatives, family members, and all other persons and entities who are successors in interest to or who are acting in concert or participating with them, or any of them, are hereby restrained and enjoined from engaging in or performing, directly or indirectly, any of the following acts:

    a.  retaining possession of the Collateral or the Collateral Records;

    b.  expending, disbursing, transferring, assigning, selling, conveying, devising, pledging, mortgaging, consigning, creating a security interest in, encumbering, concealing or in any manner whatsoever delaying in or disposing of the whole or any part of the Collateral or Collateral Records, without the written consent of the Receiver first being obtained;

    c.  demanding, collecting, receiving, expending, disposing, assigning, secreting or in any other way diverting, using or making unavailable to the Receiver any of the Collateral or Collateral Records, or any of the issues and proceeds thereof;

    d.  doing any act which will, or which will tend to, impair, defeat, divert, prevent or prejudice the preservation of the Collateral or Collateral Records, or Receiver's interest therein, in whatever form the interest is held or used as of this date, pending further proceedings in this action;

    e.  destroying, concealing, transferring or failing to preserve any document that evidences, reflects or pertains to the Collateral or Collateral Records, or any part thereof;

    f.  committing or permitting any waste of the Collateral or Collateral Records, or any part thereof, or suffering, committing or permitting any acts thereon in violation of law;

    g.  removing, transferring, encumbering or otherwise disposing of the Collateral or Collateral Records, until further order of this Court; or

9

Order Appointing of Receiver, TRO and OSC

    h.  interfering in any manner with the Collateral or Collateral Records, or Receiver's possession thereof, including, without limitation, communicating or contacting any contractees of the Receiver, exercising or attempting to exercise any control or management of functions in connection with the Collateral or Collateral Records, or otherwise engaging in acts inconsistent with the Receiver's sole authority to operate, manage and control the Collateral or Collateral Records.

20.    IT IS FURTHER ORDERED that the Enjoined Defendants shall immediately notify Receiver of the location of the inventory, equipment, and Collateral Records of Borrower, and immediately assemble all inventory, equipment, and Collateral Records, and shall allow the Receiver to take immediate possession of all inventory, equipment, and Collateral Records, and enter onto Borrower's business premises for the purposes of doing so.

21.    IT IS FURTHER ORDERED that the Enjoined Defendants provide the Receiver within 24 hours of the Receiver's request all information and documentation required by any bank or other financial institution to open or maintain any accounts as provided under this Order.

22.    IT IS FURTHER ORDERED that the Enjoined Defendants shall hold in trust and surrender to the Receiver all monies accountable to the revenues, issues and proceeds of the Collateral whether generated from the past or present, now in the possession, custody and control of Enjoined Defendants, or their agents, servants or employees, and all records, books of account, ledgers, and all documents and papers pertaining to the operation, maintenance and proceeds of the Collateral, whether in the possession and control of the Enjoined Defendants or in the possession and control of agents, servants or employees of the Enjoined Defendants.

23.    IT IS FURTHER ORDERED that the Enjoined Defendants shall have no further contact with account debtors regarding collection of the accounts without express written instructions from the Receiver.

24.    IT IS FURTHER ORDERED that the Receiver and the parties to this action may, from time to time and upon due notice to the parties entitled thereto, petition this Court for instructions in pursuance of this order and further orders this Court may hereafter make.

Order Appointing of Receiver, TRO and OSC

25.    IT IS FURTHER ORDERED that defendants appear on **June 29**, 2020, at **10:00** a.m. in Department 22 of this Court, located at located at 580 Texas St., Fairfield, CA 94533 (the "**Hearing**"), and show cause, if any, why appointment of the Receiver should not be confirmed and the preliminary injunction requested by Plaintiff should not be issued.

26.    IT IS FURTHER ORDERED that, Plaintiff shall serve the Application, the Supporting Pleadings, and this Order on the Enjoined Defendants, through their counsel of record, on or before **June 19**, 2020, such service to be made either personally, by Federal Express or other nationally recognized overnight delivery service, email, or by personal delivery. Any opposition to the confirmation of the appointment of the Receiver and the issuance of the preliminary injunction shall be in writing and shall filed with the Court and served on Plaintiff on or before **3:00** p.m. on **June 24**, 2020. Any such opposition and supporting pleadings shall be filed and served by Federal Express or other nationally recognized overnight delivery service, email, or by personal delivery, or any other method which will cause delivery of same to be received within 24 hours of filing. Any reply to any such opposition, and all supporting pleadings, shall be filed and served by Plaintiff no later than 5:00 p.m. on **June 26**, 2020. Any such reply and supporting pleadings may be filed and served by Federal Express or other nationally recognized overnight delivery service, email, or by personal delivery, or any other method which will cause delivery of same to be received within 24 hours of filing.

IT IS SO ORDERED.

DATED: **6-12-20**

_____
JUDGE OF THE SUPERIOR COURT

11

Order Appointing of Receiver, TRO and OSC

49

## PROOF OF SERVICE

I am employed in the County of Sacramento, State of California. I am over the age of 18 and not a party to the within action; my business address is 11335 Gold Express Drive, Suite 125, Gold River, California 95670.

On **June 29, 2020,** I served the foregoing document(s) described as:

**NOTICE OF ENTRY OF ORDER**

on the interested parties to this action by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid in the United States Mail at Gold River, California addressed as follows:

Andrew L. Collier Esq.
DOWNEY BRAND LLP
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
*Attorneys for Defendants*
acollier@DowneyBrand.com
lcortez@downeybrand.com

Christopher E. Seymour, Esq.
GILMORE MAGNESS JANISSE, a Professional Corporation
7789 N. Ingram Avenue, Ste. 105
Fresno, CA 93711
*Attorneys for Receiver Donald G. Howell*
Cseymour@gmlegal.net
iwillard@gmlegal.net

☒    **(BY ELECTRONIC SERVICE)**

Based on a court order or an agreement of the parties to accept service by electronic transmission, I caused the above described document to be to the persons at the electronic notification addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☒    **(STATE)**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **June 29, 2020,** at Gold River, California.



Cheyanne Anquoe

3

# EXHIBIT B

1 CHRISTOPHER E. SEYMOUR, #126330
  cseymour@gmlegal.net
2 GILMORE MAGNESS JANISSE
  Post Office Box 28907
3 Fresno, California 93729-8907
  Telephone: (559) 448-9800
4 Facsimile: (559) 448-9899

5 Attorneys for Donald G. Howell, Receiver

**ENDORSED FILED**
Clerk of the Superior Court

JUN 1 9 2020

By _____ J. Abueg
        DEPUTY CLERK

7

8                    SUPERIOR COURT OF CALIFORNIA

9                         COUNTY OF SOLANO

10
   FIRST NORTHERN BANK OF DIXON,          Case No. FCS054698
11
              Plaintiff,                  **OATH OF RECEIVER**
12
         v.
13
   RUSSELL W. LESTER, an individual;
14 KATHLEEN HAMROCK LESTER, an
   individual; RUSSELL W. LESTER, as
15 Trustee of the Lester Family Trust;
   KATHLEEN H. LESTER, as Trustee of
16 the Lester Family Trust; and DOES 1-100,
   inclusive
17
              Defendant.
18

19
         I, Donald G. Howell, having been appointed receiver in this action, do
20
   hereby solemnly affirm that I will support the Constitutions of the United States of
21
   America and the State of California and that I will perform the duties of receiver faithfully,
22
   in accordance with the law, and to the best of my ability.
23
         I declare under penalty of perjury under the laws of the State of California
24
   that the foregoing is true and correct.  Executed on June 19, 2020, at Fresno, California.
25
26                                        _____
                                          Donald G. Howell
27

28

GILMORE MAGNESS JANISSE
A PROFESSIONAL CORPORATION
POST OFFICE BOX 28907
FRESNO, CALIFORNIA 93729-8907

12898-0003\531249.1

                                    1
                            OATH OF RECEIVER                              52

## PROOF OF SERVICE

**First Northern Bank v. Russell W. Lester, et al.**
**Case No. FCS054698**

### STATE OF CALIFORNIA, COUNTY OF FRESNO

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Fresno, State of California. My business address is Post Office Box 28907, Fresno, CA 93729-8907.

On June 17, 2020, I served true copies of the following document(s) described as **OATH RECEIVER** on the interested parties in this action as follows:

| VIA EMAIL | VIA USPS MAIL |
|---|---|
| Douglas Kraft | Andrew L. Collier |
| KRAFT LAW | DOWNEY BRAND LLP |
| 11335 Gold Express Drive, Ste. 125 | 621 Capitol Mall, 18th Floor |
| Gold River, CA 95670 | Sacramento, CA 95814 |
| Tel: (916) 880-3040 | Tel: (916) 444-1000 |
| Fax: (916) 880-3045 | Fax: (916) 444-2100 |
| Email: dkraft@douglaskraft.com | Email: acollier@downeybrand.com |

**BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Gilmore Magness Janisse's practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address iwillard@gmlegal.net to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 17, 2020, at Fresno, California.

_Irene Willard_
Irene Willard

1 | CHRISTOPHER E. SEYMOUR, #126330
cseymour@gmlegal.net

2 | GILMORE MAGNESS JANISSE
Post Office Box 28907

3 | Fresno, California 93729-8907
Telephone: (559) 448-9800

4 | Facsimile: (559) 448-9899

5 | Attorneys for Donald G. Howell

6

7

8 | SUPERIOR COURT OF CALIFORNIA

9 | COUNTY OF SOLANO

10

**ENDORSED FILED**
Clerk of the Superior Court

JUN 1 9 2020

J. Abueg
By_____
DEPUTY CLERK

11 | FIRST NORTHERN BANK OF DIXON,

12 |     Plaintiff,

13 |     v.

14 | RUSSELL W. LESTER, an individual;
KATHLEEN HAMROCK LESTER, an

15 | individual; RUSSELL W. LESTER, as
Trustee of the Lester Family Trust;

16 | KATHLEEN H. LESTER, as Trustee of
the Lester Family Trust; and DOES 1-100,

17 | inclusive

18 |     Defendant.

Case No. FCS054698

**BOND OF RECEIVER**

19

20

21

22

23

24

25

26

27

28

GILMORE MAGNESS JANISSE
A PROFESSIONAL CORPORATION
POST OFFICE BOX 28907
FRESNO, CALIFORNIA 93729-8907

BOND OF RECEIVER

54



THE HARTFORD

(This is the address for service under section 995.320 C.C.P.)

IN THE Superior COURT
COUNTY OF Solano
STATE OF CALIFORNIA

57BSBIJ0031

Plaintiff(s)

FIRST NORTHERN BANK OF DIXON

Case No. FCS054698

vs

**BOND OF RECEIVER**

Defendant(s)

RUSSEL W. LESTER, an individual; KATHLEEN
HAMROCK LESTER, an individual; RUSSELL W.
LESTER, as Trustee of the Lester Family
Trust; KATHLEEN H. LESTER, as Trustee of the
Lester Family Trust; and DOES 1-100,
inclusive

KNOW ALL MEN BY THESE PRESENTS:

That we Donald G. Howell
as Principal(s), and Hartford Fire Insurance Company        as Surety, are firmly bound unto the State Of
California as Obligee in the sum of Ten Thousand  Dollars
($ 10,000     ) to be paid to the said Obligee, for which payment, well and truly to be made, we bind
ourselves, our heirs, legal representatives, successors and assigns, jointly and severally, firmly by these
presents.

THE CONDITION OF THE ABOVE OBLIGATION IS SUCH THAT,
WHEREAS by order of the above entitled Court, the Principal(s) has (have) been appointed Receiver(s)
therein and directed to file a bond according to law in the sum above named.
NOW, THEREFORE, if the said Principal(s) shall faithfully execute the duties of the trust according to
law, then this obligation shall be void; otherwise to remain in full force and effect.

Signed, sealed and dated this 16th  day of June, 2020

Donald G. Howell Principal

By _____

Hartford Fire Insurance Company

By _____
Amy Jo Francis,     Attorney-in-Fact

Bond No. 57BSBIJ0031
The premium Charged for this bond
is $ 100          per annum



55

57BSBIJ0031

## ACKNOWLEDGEMENT OF SURETY

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of      Florida

County of      Seminole      }

On    June 16, 2020      before me,    Shantadevie Mahadeo, Notary
       date                                    here insert name and title of the officer

personally appeared      Amy Jo Francis, Attorney-in-fact
                                      name(s) of signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature     _Shantadevie Mahadeo_    (Seal)

> Notary Public State of Florida
> Shantadevie Mahadeo
> My Commission GG 961599
> Expires 05/14/2024

56

# POWER OF ATTORNEY

*Direct Inquiries/Claims to:*
**THE HARTFORD**
**BOND, T-11**
**One Hartford Plaza**
**Hartford, Connecticut 06155**
**Bond.Claims@thehartford.com**
*call:* 888-266-3488 *or fax:* 860-757-5835

**KNOW ALL PERSONS BY THESE PRESENTS THAT:**

Agency Name: OMEGA PACIFIC INSURANCE SOLUTIONS
Agency Code: 57-129520

| | |
|---|---|
| X | **Hartford Fire Insurance Company**, a corporation duly organized under the laws of the State of Connecticut |
| | **Hartford Casualty Insurance Company**, a corporation duly organized under the laws of the State of Indiana |
| | **Hartford Accident and Indemnity Company**, a corporation duly organized under the laws of the State of Connecticut |
| | **Hartford Underwriters Insurance Company**, a corporation duly organized under the laws of the State of Connecticut |
| | **Twin City Fire Insurance Company**, a corporation duly organized under the laws of the State of Indiana |
| | **Hartford Insurance Company of Illinois**, a corporation duly organized under the laws of the State of Illinois |
| | **Hartford Insurance Company of the Midwest**, a corporation duly organized under the laws of the State of Indiana |
| | **Hartford Insurance Company of the Southeast**, a corporation duly organized under the laws of the State of Florida |

having their home office in Hartford, Connecticut (hereinafter collectively referred to as the "Companies) do hereby make, constitute and appoint
Amy Jo Francis
of Lake Mary, Florida,
its true and lawful Attorney-in-Fact, to sign its name as surety(ies) only as delineated above by , and to execute, seal and acknowledge the following bond, undertaking, contract or written instrument:
Bond No. 57BSBIJ0031
Naming Donald G. Howell as Principal,
and Superior Court of CA, County of Solano as Obligee,
in the amount of See Bond Form(s) on behalf of Company in its business of guaranteeing the fidelity of persons, guaranteeing the performance of contracts and executing or guaranteeing bonds and undertakings required or permitted in any actions or proceedings allowed by law.

    **In Witness Whereof**, and as authorized by a Resolution of the Board of Directors of the Companies on May 23, 2016 the Companies have caused these presents to be signed by its Assistant Vice President and its corporate seals to be hereto affixed, duly attested by its Assistant Secretary. Further, pursuant to Resolution of the Board of Directors of the Companies, the Companies hereby unambiguously affirm that they are and will be bound by any mechanically applied signatures applied to this Power of Attorney.



Shelby Wiggins, Assistant Secretary

Joelle L. LaPierre, Assistant Vice President

**STATE OF FLORIDA**
**COUNTY OF SEMINOLE**  }  **ss.**  Lake Mary

    On this 13th day of February, 2020, before me personally came Joelle LaPierre, to me known, who being by me duly sworn, did depose and say: that (s)he resides in Seminole County, State of Florida; that (s)he is the Assistant Vice President of the Companies, the corporations described in and which executed the above instrument; that (s)he knows the seals of the said corporations; that the seals affixed to the said instrument are such corporate seals; that they were so affixed by authority of the Boards of Directors of said corporations and that (s)he signed his/her name thereto by like authority.



Jessica Noelle Ciccone
My Commission #FF029702
Expires June 20, 2021

    I, the undersigned, Assistant Vice President of the Companies, DO HEREBY CERTIFY that the above and foregoing is a true and correct copy of the Power of Attorney executed by said Companies, which is still in full force effective as of June 16, 2020.

Signed and sealed in Lake Mary, Florida.



Keith D. Dozois, Assistant Vice President



**Producer Compensation Notice
To The Principal**

You can review and obtain information on The Hartford's
producer compensation practices at www.thehartford.com
or at 1-800-592-5717.

## PROOF OF SERVICE

**First Northern Bank v. Russell W. Lester, et al.**
**Case No. FCS054698**

**STATE OF CALIFORNIA, COUNTY OF FRESNO**

    At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Fresno, State of California. My business address is Post Office Box 28907, Fresno, CA 93729-8907.

    On June 17, 2020, I served true copies of the following document(s) described as **BOND OF RECEIVER** on the interested parties in this action as follows:

| | |
|---|---|
| **VIA EMAIL** | **VIA USPS MAIL** |
| Douglas Kraft | Andrew L. Collier |
| KRAFT LAW | DOWNEY BRAND LLP |
| 11335 Gold Express Drive, Ste. 125 | 621 Capitol Mall, 18th Floor |
| Gold River, CA 95670 | Sacramento, CA 95814 |
| Tel: (916) 880-3040 | Tel: (916) 444-1000 |
| Fax: (916) 880-3045 | Fax: (916) 444-2100 |
| Email: dkraft@douglaskraft.com | Email: acollier@downeybrand.com |

    **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Gilmore Magness Janisse's practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

    **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address iwillard@gmlegal.net to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 17, 2020, at Fresno, California.

*Irene Willard*
Irene Willard

# EXHIBIT C

**Northern Bank of Dixon v Russell Lester**
**Case Number FCS054698**
**Receivers Equipment Inventory**

**WALNUT INVENTORY:**

| | | |
|---|---|---|
| In-Shell | 1,991,876 | Pounds |
| Shelled Meats | 1,923,127 | Meat Pounds |

**HAY INVENTORY:**

| | | |
|---|---|---|
| Oat Hay | 400 | Tons |

**Northern Bank of Dixon v Russell Lester**
**Case Number FCS054698**
**Receivers Equipment Inventory**

## EQUIPMENT INVENTORY:

**Harvest Equipment**

| Type | Make | Model | Description | Serial Number |
|------|------|-------|-------------|---------------|
| Combine | Case | 1660 | Grain Harvester w/ Head | 26912 |
| Combine | Case | 1010 | Wheat Head for Harvester | JJC0077704 |
| Cutter | HFT | 830 | Bean Cutter | 16809 |
| Elevator | Compton | Missing | Field Elevator | Missing |
| Elevator | Jessee | 202-36 | Field Elevator | 00045 |
| Harvester | Gustafson | Missing | Almond Harvester | Missing |
| Harvester | International | 810-17.5 | Bean Pickup Header | 23044 |
| Harvester | Weiss McNair | 9800 | Nut Harvester | 99439 |
| Hay Rake | Unknown | Unknown | Side Delivery Hay Rake | Missing |
| Nut Cart | Flory | Missing | Super Cart | Missing |
| Nut Cart | Jackrabbit | HP 335 | Reservoir Cart | 0271 |
| Nut Cart | Jackrabbit | SJ 17PF | Stickjack | Missing |
| Nut Cart | Johnie's | Missing | Super Cart | Missing |
| Nut Cart | McFaddin | Missing | Super Cart | Missing |
| Nut Cart | RFM | 1091 | Super Cart | 8 SC 003 |
| Nut Cart | RFM | 1091 | Super Cart | 8 CS 010 |
| Shaker | OMC | 3WMB | Shaker | Missing |
| Shaker | OMC | 3WMB | Shaker - Shockwave | Missing |
| Shaker | OMC | 3WMB | Shaker - Shockwave | 0050 |
| Sweeper | Weiss McNair | JD 90 | Sweeper | 99036 |
| Sweeper | Weiss McNair | 2930 | Sweeper | Missing |
| Bins | Cal Pine | Missing | 4' x 4' x 4' Wood Bins x 3,515 | Missing |
| Bins | Macro | Missing | 4' x 4' x 4' Plastic Bins x 2,486 | Missing |
| Bins | Macro | Missing | 4' x 4' x 2' Plastic Bins x 20 | Missing |

**Northern Bank of Dixon v Russell Lester**
**Case Number FCS054698**
**Receivers Equipment Inventory**
**Page Two**

## Implements

| Type | Make | Model | Description | Serial Number |
|------|------|-------|-------------|---------------|
| Cultivator | Allis Charmers | 1300 | Field Cultivator | 1488 |
| Cultivator | Custom | Missing | 10' 3 Point Root Cutter | Missing |
| Cultivator | John Deere | EO 400 | Rotary Hoe | 020564N |
| Cultivator | Johnson | 360 | All Purpose Incorporator | AP 15 |
| Cultivator | Lilliston | RC 30 | Lilliston Wheel Cultivator | 1040 |
| Cultivator | Unknown | Missing | 15' Cultivator Sled | Missing |
| Cultivator | Unknown | Missing | 20' Cultivator Bar | Missing |
| Cultivator | Unknown | Missing | 6 Row Shielded Cultivator Sled | Missing |
| Disk | AC Midland | Missing | 9'9" Wheel Disk | Missing |
| Disk | Allis Charmers | L | 12' Drag Disk | Missing |
| Disk | Allis Charmers | GWO | 12' Stubble Disk | Missing |
| Disk | Allis Charmers | WK 15 | 15' Disk | WK 15 075306-0884 |
| Disk | Allis Charmers | L | 24' Drag Disk | 075310 |
| Disk | Allis Charmers | L | 32' Drag Disk | 075310-2319 |
| Disk | John Deere | 225 | 10' Wheel Disk | Missing |
| Disk | Kilifer | K8701 | 9'9" Drag Disk | Missing |
| Disk | Kilifer | Missing | 9'9" Drag Disk | Missing |
| Disk | Unknown | Missing | Disk Plow | Missing |
| Harrow | Glencoe | Missing | 15' Harrow | Missing |
| Harrow | Spike | Missing | 20' Spike, 3 Section, Pull | Missing |
| Landplane | Eversman | Missing | 10' x 40' Triplane | Missing |
| Landplane | Gustafson | Missing | Orchard Landplane | Missing |
| Landplane | Marvin | Missing | 10' x 20' Landplane | Missing |
| Landplane | RFM | Missing | 10' Landplane | LP 97034 |
| Landplane | Sweco | 16' x 40' | 16' x 40' Triplane | ST4016-030 |
| Lister | Roll - A Cone | 6 x 60 | 6 x 60 Folding Lister | 93-02759 |
| Lister | Unknown | Missing | 15' Lister w/ Bed Shapers | Missing |
| Lister | Unknown | Missing | Heavy Duty Lister Sled | Missing |
| Mower | Bear Cat | 75065 | Wheeled String Mower | 506871 |
| Mower | Bear Cat | 75065 | Wheeled String Mower | 600015 |
| Mower | Billy Goat | BC2402H | Walk Behind Brush Shredder | 040406076 |
| Mower | Dandl | 80A | 10' Flail Mower | 80AG208 |
| Mower | Loftness | 180BPLLR | Flail Chopper | 29-E-59 |
| Mower | Rears | Missing | 10'- Flail Mower | Missing |
| Mower | Rears | Missing | 12' Flail Mower | Missing |
| Mower | Rears | Missing | 8' Flail Mower | Missing |
| Mower | Rhino | Missing | 10' Flail Mower | 10002 |
| Mower | Rhino | RC 20 | 20' Flail Mower | 10034 |
| Mower | Trimax | TTU178 | Rotary Mower | TTU011178111M |
| Planter | John Deere | 71 | 6 Row Planter | Missing |

**Northern Bank of Dixon v Russell Lester**
**Case Number FCS054698**
**Receivers Equipment Inventory**
**Page Three**

## Implements - Continued

| Type | Make | Model | Description | Serial Number |
|------|------|-------|-------------|---------------|
| Planter | John Deere | 6 x 30 | 6 x 30 Bar w/ John Deere 71 Cans | Missing |
| Planter | Lely | Missing | 3 Point Broadcaster | Missing |
| Planter | Oliver | 64 | 12' Drill | Missing |
| Plow | Oliver | Missing | 3 Bottom Roll Over Plow | Missing |
| Plow | Wilcox | 20' x 3 Bar | 7 Bottom Roll Over Plow | Missing |
| Plow | Wilcox | Missing | 7 Bottom Roll Over Plow | Missing |
| Ridger | Reynolds | LPH | 3 Pt. Ridger | 18945 |
| Ridger | Unknown | Missing | California Ridger | Missing |
| Ripper | Cash / IH | SubSol | 9 Shank Ripper | 0362907 |
| Ripper | Kilifer | Missing | Single Shank Ripper | Missing |
| Ripper | Murray | M 55 S | 5 shank 45" Ripper | Missing |
| Roller | Cat | 4 x 4 | Sheepsfoot | Missing |
| Roller | Gustafson | Missing | 3 x 5 Rollers | Missing |
| Roller | Schmeiser | Missing | 10' | Missing |
| Roller | Schmeiser | Missing | 10' Ring Roller | Missing |
| Roller | Schmeiser | Missing | 16' Ring Roller | Missing |
| Roller | Schmeiser | Missing | 20' | Missing |
| Roller | Schmeiser | Missing | 6' | Missing |
| Roller | Schmeiser | Missing | 6' | Missing |
| Roller | Unknown | Missing | 10' - 12" Flat Roller | Missing |
| Roller | Unknown | Missing | 10' - 24" Flat Roller | Missing |
| Roller | Unknown | Missing | 16' Ring Roller | Missing |
| Roller | Unknown | Missing | 16' Roller for Ripper | Missing |
| Rototiller | Belco | 590 | Rototiller | 20533 |
| Scraper | Ateco | H-71 | 7 Yard Carryall | 2794 |
| Scraper | Gannon | R-30L | 6" w/ Hyd. Rippers | 480 |
| Scraper | John Deere | 9K | 10' Carry All | 9K10-02 |
| Scraper | Porter | Missing | 10" Drag Scraper | HDS 101155 |
| Scraper | Reynolds | Missing | Scraper | 18251 |
| Scraper | Rhino | 2500 | 3 Pt. Angle Blade | 10425 |
| Scraper | Schmeiser | VBL - 14 R | V Blade Scraper | Missing |
| Spreader | KMC | Missing | Gable Spreader | Missing |
| Spreader | S & A | 3260 | Compost Spreader | Missing |

## Miscellaneous Equipment

| Type | Make | Model | Description | Serial Number |
|------|------|-------|-------------|---------------|
| Forklift | Blackwelder | Missing | 3 Pt Tractor Forklift | Missing |
| Gopher Bait | Verminator | CXE647 | Gopher Bait Machine | Missing |
| Irrigation | Unknown | Missing | 10' x 40' Aluminum Pipe x 40 | Missing |
| Irrigation | Unknown | Missing | 12" x 40' Aluminum Pipe x 24 | Missing |

**Northern Bank of Dixon v Russell Lester**
**Case Number FCS054698**
**Receivers Equipment Inventory**
**Page Four**

### Miscellaneous Equipment - Continued

| Type | Make | Model | Description | Serial Number |
|------|------|-------|-------------|---------------|
| Irrigation | Unknown | Missing | 12" x 45' Aluminum Pipe x 12 | Missing |
| Irrigation | Unknown | Missing | 12" x 45' Aluminum Pipe x 12 | Missing |
| Irrigation | Unknown | Missing | 3" Aluminum Pipe w/ Risers x 430 | Missing |
| Irrigation | Unknown | Missing | 8' x 30' Aluminum Pipe x 218 | Missing |
| Irrigation | Unknown | Missing | Drip Hose Reel | Missing |
| Magnet | Rhino | 62 | Magnetic Sweeper for ATV | Missing |
| Motor | GE | Hollow Shaft | 100 H.P Electric | Missing |
| Motor | GE | Hollow Shaft | 50 H.P Electric | Missing |
| Motor | GE | Hollow Shaft | 60 H.P Electric | Missing |
| Motor | GE | Hollow Shaft | 75 H.P Electric | Missing |
| Motor | John Deere | 6466-AF-00 | Stationary Power Unit | 103245RG |
| Pump | Berklet | Missing | 3 Pt. Pump | Missing |
| Shanks | Unknown | Missing | Various Cultivator Shanks | Missing |
| Tank | Mueller | Missing | 5,000 Gallon Jacketed Tank | Missing |
| Tank | Unknown | Missing | 600 Gallon Water Tank | Missing |
| Tank | Unknown | Missing | 600 Gallon Water Tank | Missing |

### Processing Equipment

| Type | Make | Model | Description | Serial Number |
|------|------|-------|-------------|---------------|
| Airleg | AIM | 26-6C | Airleg | Missing |
| Airleg | Gustafson | Missing | Airleg | Missing |
| Airleg | Gustafson | Missing | Airleg | Missing |
| Airleg | Gustafson | Missing | Airleg | Missing |
| Bench | Unknown | Missing | 24" x 12" SS Work Bench | Missing |
| Bin Dumper | Custom | Missing | In-Shell Bin Dumper w/ Tank | Missing |
| Cabinet | Unknown | Missing | 32" x 74" SS Work Cabinet | Missing |
| Chutes | Sortex | 3200 IR/VIS | Long Chute | Missing |
| Chutes | Sortex | 3200 IR/VIS | Long Chute | Missing |
| Chutes | Sortex | 3200 IR/VIS | Long Chute | Missing |
| Chutes | Sortex | 3200 IR/VIS | Long Chute | Missing |
| Chutes | Sortex | 3200 IR/VIS | Short Chute | Missing |
| Chutes | Sortex | 3200 IR/VIS | Short Chute | Missing |
| Chutes | Sortex | 3200 IR/VIS | Short Chute | Missing |
| Cleaner | Gustafson | Missing | Almond Meat Cleaner | Missing |
| Counter | Unknown | Missing | 24" x 7" SS Drain Counter w/ sinks | Missing |
| Dryer | Blue Line | Missing | Gas Dryer | Missing |
| Dryer | Peerless | Missing | Gas Dryer | Missing |
| Dryer | Reverse Vane | Missing | Dryer w/ Burner | Missing |
| Dryer | Reverse Vane | Missing | Dryer w/ Burner | Missing |
| Dryer | Sykup | Missing | Gas Dryer | Missing |

**Northern Bank of Dixon v Russell Lester**
**Case Number FCS054698**
**Receivers Equipment Inventory**
**Page Five**

**Processing Equipment - Continued**

| <u>Type</u> | <u>Make</u> | <u>Model</u> | <u>Description</u> | <u>Serial Number</u> |
|---|---|---|---|---|
| Dryer | Sykup | Missing | Gas Dryer | Missing |
| Dryer | Sykup | Missing | Gas Dryer | Missing |
| Dryer | Sykup | Missing | Gas Dryer | Missing |
| Dryer | Sykup | Missing | Gas Dryer | Missing |
| Dryer | Sykup | Missing | Gas Dryer | Missing |
| Dryer | Sykup | Missing | Gas Dryer | Missing |
| Dryer | Sykup | Missing | Gas Dryer | Missing |
| Dryer | Sykup | Missing | Gas Dryer | Missing |
| Dryer | Sykup | Missing | Gas Dryer | Missing |
| Elevator | RFM | Missing | Nut Elevator | Missing |
| Huller | Fadie | Missing | 30' Almond Huller | Missing |
| Huller | Wizard | R12 | Huller, Left Hand | Missing |
| Huller | Wizard | R12 | Huller, Right Hand | Missing |
| Huller | Wizard | Missing | Hulling Plant | Missing |
| Huller | Wizard | R9 | Walnut Huller | Missing |
| Roller Sizer | Commercial | Missing | Nut Sizer | Missing |
| Roller Sizer | Commercial | Missing | Nut Sizer | Missing |
| Scale | Unknown | Missing | 120 Lb. Bench Scale | Missing |
| Screener | Unknown | Missing | Commercial Screener | Missing |
| Sheller | Commercial | Missing | Walnut Sheller | Missing |
| Table | AIM | DRF SS TrplCas | SS Sorting Table | Missing |
| Table | AIM | DRF SS TrplCas | SS Sorting Table | Missing |
| Table | AIM | Missing | SS Sorting Table | Missing |
| Table | Unknown | Missing | 30"x36" SS Scale Table | Missing |
| Table | Unknown | Missing | SS Electronic Sort Frame | Missing |
| Vacuum | Turbovac | SB 1000 | Vacuum Packing Machine | Missing |
| Scale | LHW | Missing | 300 Pound Bench Scale | 000355 |
| Packing | Actionpac | ME 1095CSD | Bulk Filler | Missing |
| Packing | Actionpac | MAX109 | Scale | Missing |
| Table | AIM | DRF SS TrplCas | SS Sorting Table | Missing |
| Elevator | Stis | Missing | SS Sanitary Grade Elevator | Missing |
| Bin Dumper | Malavac | Missing | Bin Dumper | 0901-1684 |
| Scale | Flexweight | DWM IV-5000 | Platform Scale | F16482 |
| Bin Dumper | Malavac | LM448H | Bin Dumper | Missing |
| Generator | Unknown | 34 | 150 KW Electrical Generator | S6701 |
| Cleaning | Unknown | Missing | Floor Machine | Missing |
| Elevator | Universal | Missing | Bucket Elevator | Missing |
| Table | Unknown | Missing | Huller Sorting Table | Missing |
| Tank | Unknown | Missing | Floatation Tank | Missing |
| Cleaner | Unknown | Missing | Walnut Pre-Cleaner | Missing |

**Northern Bank of Dixon v Russell Lester**
**Case Number FCS054698**
**Receivers Equipment Inventory**
**Page Six**

**Trailers and Carriers**

| Type | Make | Model | Description | Serial Number |
|------|------|-------|-------------|---------------|
| ATV | Shop | Missing | ATV Cart | Missing |
| ATV | Shop | Missing | ATV Cart | Missing |
| Dolly | Custom | Missing | 5th Wheel Field Dolly | Missing |
| Dolly | Custom | Missing | 5th Wheel Field Dolly | Missing |
| Fuel | Shop | Missing | 1,000 Gallon Trap Wagon | Missing |
| Fuel | Shop | Missing | 500 Gallon Trap Wagon | Missing |
| Implement | Allis Charmers | 400 | Implement Carrier | Missing |
| Implement | Delta | Missing | 35' Implement Carrier | Missing |
| Implement | Not Avail. | Missing | 32' Goose Neck Implement Carrier | Missing |
| Implement | Wilcox | PC3 | Implement Carrier | 5027 |
| Nut | Blanton | Missing | Drying Trailer | Missing |
| Nut | Blanton | Missing | Drying Trailer | Missing |
| Nut | Blanton | Missing | Drying Trailer | Missing |
| Nut | Blanton | Missing | Drying Trailer | Missing |
| Nut | Blanton | Missing | Drying Trailer | Missing |
| Nut | Jessee | Missing | Nut Trailer | Missing |
| Nut | Jessee | Missing | Nut Trailer | Missing |
| Nut | OEC | Missing | Nut Trailer | Missing |
| Nut | OEC | Missing | Nut Trailer | Missing |
| Nut | Peerless | Missing | Drying Trailer | Missing |
| Nut | Peerless | Missing | Drying Trailer | Missing |
| Nut | Peerless | Missing | Drying Trailer | Missing |
| Nut | Peerless | Missing | Drying Trailer | Missing |
| Nut | Peerless | Missing | Drying Trailer | Missing |
| Nut | Peerless | Missing | Drying Trailer | Missing |
| Nut | Peerless | Missing | Drying Trailer | Missing |
| Nut | Peerless | Missing | Drying Trailer | Missing |
| Nut | Peerless | Missing | Drying Trailer | Missing |
| Nut | Peerless | Missing | Drying Trailer | Missing |
| Nut | Peerless | Missing | Drying Trailer | Missing |
| Nut | Peerless | Missing | Drying Trailer | Missing |
| Nut | Peerless | Missing | Drying Trailer | Missing |
| Nut | Peerless | Missing | Drying Trailer | Missing |
| Nut | Peerless | Missing | Drying Trailer | Missing |
| Nut | Peerless | Missing | Drying Trailer | Missing |
| Nut | Peerless | Missing | Drying Trailer | Missing |
| Nut | Peerless | Missing | Drying Trailer | Missing |
| Nut | Peerless | Missing | Drying Trailer | Missing |
| Nut | Peerless | Missing | Drying Trailer | Missing |

**Northern Bank of Dixon v Russell Lester**
**Case Number FCS054698**
**Receivers Equipment Inventory**
**Page Seven**

**Trailers and Carriers - Continued**

| Type | Make | Model | Description | Serial Number |
|------|------|-------|-------------|---------------|
| Pipe | Jessee | Missing | Pipe Trailer | Missing |
| Pipe | Shop | Missing | Pipe Trailer | Missing |
| Water | Shop | Missing | 1,000 Gallon Water Wagon | Missing |

**Wheeled Equipment**

| Type | Make | Model | Description | Serial Number |
|------|------|-------|-------------|---------------|
| Back Hoe | John Deere | 930 | Wheeled Tractor | 1T0410LXAHF319709 |
| Boom Lift | JLG | 450 AJ | Wheeled Tractor | Missing |
| Boom Lift | Case | M 450 AJ | Wheeled Tractor | Missing |
| Forklift | Cat | 30-lp | Forklift | Missing |
| Forklift | Cat | GP25K-L | Forklift | Missing |
| Forklift | Cat | P5000 | Forklift | AT3536082 |
| Forklift | Cat | E6000 | Forklift - Electric | A4EC341097 |
| Track Layer | Cat | D4 | Track Layer | 7U35730 |
| Track Layer | Cat | D4C | Track Layer | 40A5130 |
| Track Layer | Cat | D4D | Track Layer | 78A851 |
| Tracked Tractor | John Deere | 8520T | Rubber Tracked Tractor | RW8520T902087 |
| Wheel Tractor | Ford | 841 | Wheeled Tractor | Missing |
| Wheel Tractor | John Deere | 2755 | Wheeled Tractor | L02755U775973 |
| Wheel Tractor | John Deere | 6430 | Wheeled Tractor | L06430D651391 |
| Wheel Tractor | John Deere | 6510 | Wheeled Tractor | L06510V227534 |
| Wheel Tractor | John Deere | 6125M | Wheeled Tractor | 1L6125MKFD830198 |
| Wheel Tractor | John Deere | 6125M | Wheeled Tractor | 1L06125MCFD841147 |

# EXHIBIT D

**DIXON RIDGE FARMS**
**MARKET ANALYSIS OF INVENTORY**
July 10, 2020

Inventory Valuation Estimate:

|  | 2018 | 2019 | Total: |
|---|---|---|---|
| **In-Shell Pounds** | 0 | 1,991,876 | 1,991,876 |
| **Meat Pounds** | 1,812,020 | 111,107 | 1,923,127 |
| **Total Pounds** | **1,812,020** | **2,102,983** | **3,915,003** |

Value / Pound

|  | 2018 | 2019 |
|---|---|---|
| **In-Shell $ / Lb.** | $0.60 | $0.65 |
| **Meat $ / Lb.** | $1.25 | $1.80 |

Gross Value

|  | 2018 | 2019 | Total: |
|---|---|---|---|
| **Gross In-Shell Value** | $0.00 | $1,294,719.40 | $1,294,719.40 |
| **Gross Meat Pounds Value** | $2,265,025.00 | $199,992.60 | $2,465,017.60 |
| **Total Value** | **$2,265,025.00** | **$1,494,712.00** | **$3,759,737.00** |

1. This is the estimated market value of the inventory under the marketing conditions outline in the Order Appointing the Receiver.

2. There has been a one hundred percent refusal by the potential Organic purchasers contacted. This inventory will be sold into the conventional market assuming there are no market barriers placed there as well.

3. Current market conditions are significantly depressed, and all prices reported reflect a substantial market survey undertaken the first week of July personal contact with brokers, organic and conventional processors, industry periodicals, and monthly grower reports from processors.

4. **This is an estimated market value. The final value will be determined by what a willing and able buyer is willing to pay under the terms of sale dictated by the Order Appointing a Receiver. The final market price may differ significantly from the estimate provided herein.**

# EXHIBIT E

**Irene Willard**

| | |
|---|---|
| **From:** | Williams, Jennifer <jwilliams@downeybrand.com> |
| **Sent:** | Monday, July 20, 2020 7:56 PM |
| **To:** | Christopher E. Seymour |
| **Cc:** | 'Douglas Kraft'; 'Don Howell (Dghowell@Protonmail.com)'; Irene Willard; Collier, Andrew |
| **Subject:** | FW: Discussion topics for Don Howell |

Hi Chris,

Below is a list of topics that BizCap is interested in discussing with the receiver.  I anticipate the receiver may not have any information on some of these topics.  In which case, I can simply let BizCap know.

Again, I urge you to reconsider allowing the receiver to speak with BizCap directly.  It will save time and money to do so.  While the order may not require him to speak with BizCap, it also doesn't preclude such conversations.

We are cooperating with you and the bank and are merely asking for some cooperation in return.

Thanks.

Jennifer L. Williams

# **DOWNEY**BRAND

Downey Brand LLP
3425 Brookside Road, Suite A
Stockton, CA 95219
209.473.6450 Main
209.472.3918 Direct
209.472.3919 Fax
jwilliams@downeybrand.com
www.downeybrand.com

---

**From:** Matt Christensen <mchristensen@bizcap.com>
**Sent:** Monday, July 20, 2020 1:54 PM
**To:** Williams, Jennifer <jwilliams@downeybrand.com>; Collier, Andrew <acollier@DowneyBrand.com>
**Cc:** Chuck Doyle <cdoyle@bizcap.com>; Keith Secon <ksecon@bizcap.com>
**Subject:** Discussion topics for Don Howell

Ladies & Gentlemen:

Our objective at Business Capital is to secure capital to refinance Dixon Ridge Farm's debt with First Northern Bank of Dixon.  This process will be expedited with good communication flow and data that is as accurate as possible.  Don Howell is uniquely positioned to assist in this process.  Specific topics include:

1. Inventory evaluation and valuation
2. Best options to monetize inventory
3. Ascertaining valuations of property at 5430 Putah Creek Road
4. Status and resolution of insurance claims relative to 2017 fire
5. Resolution of on premise power generation capability
6. Timing & contingencies related to the Conservation Easement Funding on the McCune and Carrion properties

7. Clarification as to liens and collateral interests
8. Insight into future concerns as they present themselves.

Don Howell, as Receiver, has thorough visibility into activities both past, present and future. Mr. Howell also has the sole authority for certain actions including any payments to vendors, consultants and/or required maintenance. All lenders that we work with will required a complete objective current fact set. With communication we hope to achieve these requirements in the most efficient way possible.

Thank you for allowing this communication.

**Matt Christensen**
SVP, Team Leader
Business Capital
mchristensen@bizcap.com
O: (415) 989-0970
C: (415) 676-7851

**BUSINESS CAPITAL**

311 California Street I Ste 650 I San Francisco, CA 94104

**COMMERCIAL FINANCE** I **ASSET BASED DEBT, GROWTH & PRIVATE CAPITAL** I **DEBT RESTRUCTURING**

All information included in this e-mail is "Confidential Information" and the property of Business Capital. The contents of this e-mail message and its attachments are intended for the addressees hereof. If you have received this transmission in error please alert the sender by reply e-mail and please delete this message and its attachments from your system.

CONFIDENTIALITY NOTICE: This communication and any accompanying document(s) are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon the communication is strictly prohibited. Moreover, any such inadvertent disclosure shall not compromise or waive the attorney-client privilege as to this communication or otherwise. If you have received this communication in error, please contact our IS Department at its Internet address (is@downeybrand.com), or by telephone at (916)444-1000x5325. Thank you.

73

## Irene Willard

| | |
|---|---|
| **From:** | Christopher E. Seymour <Cseymour@gmlegal.net> |
| **Sent:** | Tuesday, July 21, 2020 11:01 AM |
| **To:** | 'Williams, Jennifer' |
| **Cc:** | 'Douglas Kraft'; Don Howell (Dghowell@Protonmail.com); Irene Willard; Collier, Andrew |
| **Subject:** | RE: Lester receivership |

Jenny,

Thank you for the clarification on the Bank of the West account. Your client received at least two letters from the Receiver demanding an accounting of **all** bank accounts, and two requests from me through you and Andrew to comply. The purpose is to ensure that no cash collateral applicable to the Receivership was transferred into the other accounts. As far as records for the account, the receiver is willing to limit the requirement for back-up information, *at least for now*, to transactions since he was appointed Receiver on June 12, 2020. The Receiver reserves the right to ask for additional information after reviewing the bank statements, check registers, and the account detail back to June 12.

As for BizCap, the "authorization" was for the Receiver to find out what information BizCap wanted to determine whether that was something the Receiver could and should participate in under the receivership order. We decided that the best way to determine what information BizCap was looking for was to request it in writing to ensure everyone was on the same page, as we were at a loss as to what BizCap would want from the receiver that it couldn't obtain elsewhere that was within the Receiver's duties under the order to provide. Reading the list you e-mailed last night, I'm glad we did, as it confirmed that BizCap wanted information and involvement in the refinancing process that is completely outside the duties of the receiver as set forth in the order.

The list you provided makes it clear that the intention is to put the receiver in the position of being a financial or refinancing consultant to your client and/or BizCap. The subjects listed are operational subjects. That not only is outside the parameters of the order, it is also outside the scope of the role of a Receiver appointed as to specific collateral. He was not appointed to be a business advisor or consultant. Hence, he will not communicate with BizCap based on the list you sent last night, and likely not at all, given the fact that the express purpose is to assist in obtaining refinancing. Regardless of whether refinancing would benefit Mr. Lester and the Bank, the order simply does not allow him to undertake the "business consulting" role he is being asked to take. Provided the Receiver was willing to undertake such a role (he is not), it would require that the order be modified to authorize him to do so, and likely would require that the receivership be expanded to what essentially would be an equity receivership, with the receiver taking over the entirety of Mr. Lester's operations.

What should have been a one to two week process to get the information has now taken a month. I have delayed filing a status report or initiating any contempt proceedings until after the Receiver meets with Mr. Lester tomorrow to give Mr. Lester a final opportunity to comply with the order and the Receiver's requests for information. I plan to file the report on Friday so the court has time to review it prior to the July 29 hearing, which the Receiver and I will attend as requested by the court. Please make sure Mr. Lester provides the requested (it's really a demand, but I prefer to be more cordial) account information when the Receiver is in Dixon Wednesday and Thursday.

Chris


Christopher E. Seymour, Esq.
**GILMORE MAGNESS JANISSE, a Professional Corporation**
7789 N. Ingram Avenue, Ste. 105
Fresno, CA 93711

**Irene Willard**

| | |
|---|---|
| **From:** | Williams, Jennifer <jwilliams@downeybrand.com> |
| **Sent:** | Tuesday, July 21, 2020 11:08 AM |
| **To:** | Christopher E. Seymour |
| **Cc:** | 'Douglas Kraft'; Don Howell (Dghowell@Protonmail.com); Irene Willard; Collier, Andrew |
| **Subject:** | RE: Lester receivership |

Hi Chris,

We'll have to agree to disagree.  I can see the conversation is not going anywhere.

Mr. Lester will have the bank statements for the receiver when they meet this week.  I will let Mr. Lester know about the demand for back-up documentation going back to 6/12.

Jennifer L. Williams

# DOWNEYBRAND

Downey Brand LLP
3425 Brookside Road, Suite A
Stockton, CA 95219
209.473.6450 Main
209.472.3918 Direct
209.472.3919 Fax
jwilliams@downeybrand.com
www.downeybrand.com

---

**From:** Christopher E. Seymour <Cseymour@gmlegal.net>
**Sent:** Tuesday, July 21, 2020 11:01 AM
**To:** Williams, Jennifer <jwilliams@downeybrand.com>
**Cc:** 'Douglas Kraft' <dkraft@douglaskraft.com>; Don Howell (Dghowell@Protonmail.com) <Dghowell@Protonmail.com>; Irene Willard <iwillard@gmlegal.net>; Collier, Andrew <acollier@DowneyBrand.com>
**Subject:** RE: Lester receivership

Jenny,

Thank you for the clarification on the Bank of the West account.  Your client received at least two letters from the Receiver demanding an accounting of **all** bank accounts, and two requests from me through you and Andrew to comply.  The purpose is to ensure that no cash collateral applicable to the Receivership was transferred into the other accounts.   As far as records for the account, the receiver is willing to limit the requirement for back-up information, *at least for now*, to transactions since he was appointed Receiver on June 12, 2020. The Receiver reserves the right to ask for additional information after reviewing the bank statements, check registers, and the account detail back to June 12.

As for BizCap, the "authorization" was for the Receiver to find out what information BizCap wanted to determine whether that was something the Receiver could and should participate in under the receivership order.  We decided that the best way to determine what information BizCap was looking for was to request it in writing to ensure everyone was on the same page, as we were at a loss as to what BizCap would want from the receiver that it couldn't obtain elsewhere that was within the Receiver's duties under the order to provide.  Reading the list you e-mailed last night, I'm glad we did, as it confirmed that BizCap wanted information and involvement in the refinancing process that is completely outside the duties of the receiver as set forth in the order.

1

## PROOF OF SERVICE

2

**First Northern Bank v. Russell W. Lester, et al.**
**Case No. FCS054698**

3

**STATE OF CALIFORNIA, COUNTY OF FRESNO**

4

5　　At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Fresno, State of California. My business address is Post Office Box 28907, Fresno, CA 93729-8907.

6

7　　On July 24, 2020, I served true copies of the following document(s) described as **FIRST REPORT OF RECEIVER** on the interested parties in this action as follows:

8

### SEE ATTACHED SERVICE LIST

9

**BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for

10　collection and mailing, following our ordinary business practices. I am readily familiar with Gilmore Magness Janisse's practice for collecting and processing correspondence for

11　mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a

12　sealed envelope with postage fully prepaid.

13　　**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address iwillard@gmlegal.net to the persons at the e-

14　mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was

15　unsuccessful.

16　　I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

17

18　　Executed on July 24, 2020, at Fresno, California.

19

20　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　Irene Willard

21

22

23

24

25

26

27

28

**SERVICE LIST**
**First Northern Bank v. Russell W. Lester, et al.**
**Case No. FCS054698**

**VIA EMAIL ONLY**
Douglas Kraft
KRAFT LAW
11335 Gold Express Drive, Ste. 125
Gold River, CA 95670
Tel: (916) 880-3040
Fax: (916) 880-3045
Email: dkraft@douglaskraft.com

Jennifer L. Williams
DOWNEY BRAND LLP
3425 Brookside Road, Ste. A
Stockton, CA 95219
Tel: (209) 473-6450
Fax: (209) 472-3919
Email: iwilliams@downevbrand.com

Andrew L. Collier
DOWNEY BRAND LLP
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
Tel: (916) 444-1000
Fax: (916) 444-2100
Email: acollier@downeybrand.com

# EXHIBIT F

**DRF - 13 Week Cash Budget - - September through November - v.08.30.2020 Rev.xlsx**

| Week Ending | 9/4/2020 | 9/11/2020 | 9/18/2020 | 9/25/2020 | Sept | Sept | Sept |
|---|---|---|---|---|---|---|---|
| | Forecast | Forecast | Forecast | Forecast | Forecast | Budget | Variance |
| **September Cash Flow** | | | | | | | |
| **OPERATING STATISTICS** | | | | | | | |
| | | | | | | | |
| Walnuts Harvested (lbs) | | | | | | - | |
| Walnuts Purchaed (lbs) | | | | | | - | |
| Walnuts Processed (lbs) | | | | | | - | |
| In-Shell Shipped (lbs) | | 500,000 | 695,648 | 500,000 | | 1,695,648 | |
| Meats Shipped (lbs) | | 300,000 | 300,000 | 10,000 | | 610,000 | |
| | | | | | | | |
| **ENDING INVENTORY (lbs)** | | | | | | | |
| | | | | | | | |
| In-Shell | 1,695,648 | 1,195,648 | 500,000 | - | | - | |
| Processed Meats | 2,026,484 | 1,726,484 | 1,426,484 | 1,416,484 | | 1,416,484 | |
| Total | 3,722,132 | 2,922,132 | 1,926,484 | 1,416,484 | | 1,416,484 | |
| | | | | | | | |
| **ENDING INVENTORY ($'s)** | | | | | | | |
| | | | | | | | |
| In-Shell @0.65 (blended) | $ 1,102,171 | $ 777,171 | $ 325,000 | $ - | | $ - | |
| Processed Meats @1.28 (blended) | $ 2,593,900 | $ 2,209,900 | $ 1,825,900 | $ 1,813,100 | | $ 1,813,100 | |
| Total | $ 3,696,071 | $ 2,987,071 | $ 2,150,900 | $ 1,813,100 | | $ 1,813,100 | |
| | | | | | | | |
| **INVOICES PRODUCED** | | | | | | | |
| | | | | | | | |
| In-Shell | $ - | $ 325,000 | $ 452,171 | $ 325,000 | | $ 1,102,171 | |
| Processed Meats | $ - | $ 384,000 | $ 384,000 | $ 40,000 | | $ 808,000 | |
| Total | $ - | $ 709,000 | $ 836,171 | $ 365,000 | | $ 1,910,171 | |
| | | | | | | | |
| **ACCOUNTS RECEIVABLE** | | | | | | | |
| | | | | | | | |
| Beginning Balance | $ 200,000 | $ 120,000 | $ 730,344 | $ 1,526,515 | | $ 200,000 | |
| Add: Invoices | $ - | $ 709,000 | $ 836,171 | $ 365,000 | | $ 1,910,171 | |
| Less: Receipts | $ ( 80,000 ) | $ ( 98,656 ) | $ ( 40,000 ) | $ ( 73,000 ) | | $ ( 291,656 ) | |
| Ending Balance | $ 120,000 | $ 730,344 | $ 1,526,515 | $ 1,818,515 | | $ 1,818,515 | |

**DRF - 13 Week Cash Budget - - September through November - v.08.30.2020 Rev.xlsx**

| Week Ending | September Cash Flow | | | | | | |
|---|---|---|---|---|---|---|---|
| | 9/4/2020 | 9/11/2020 | 9/18/2020 | 9/25/2020 | **Sept** | **Sept** | **Sept** |
| | Forecast | Forecast | Forecast | Forecast | **Forecast** | **Budget** | **Variance** |
| **CASH RECEIPTS** | | | | | | | |
| *Operating Receipts* | | | | | | | |
| In-Shell | $ - | $ - | $ - | $ - | | $ - | |
| Processed Meats | $ 80,000 | $ 40,000 | $ 40,000 | $ 40,000 | | $ 200,000 | |
| Hay | $ - | $ - | $ - | $ 33,000 | | $ 33,000 | |
| PPP/CFAP/FSA/EIDL | $ - | $ - | $ - | $ - | | $ - | |
| Custom Work | $ - | $ - | $ - | $ - | | $ - | |
| Insurance Claims | $ - | $ - | $ - | $ - | | $ - | |
| Patronage Dividends | $ - | $ - | $ - | $ - | | $ - | |
| Reimbursed Expenses | $ - | $ - | $ - | $ - | | $ - | |
| Rents | $ - | $ - | $ - | $ - | | $ - | |
| From/(To) Receiver's Account | $ - | $ 58,656 | $ - | $ - | | $ 58,656 | |
| Other -soil test | $ - | $ - | $ - | $ - | | $ - | |
| **TOTAL CASH RECEIPTS** | $ 80,000 | $ 98,656 | $ 40,000 | $ 73,000 | | $ 291,656 | |
| | | | | | | | |
| **CASH DISBURSEMENTS** | | | | | | | |
| *Labor & Related* | | | | | | | |
| Wages | $ 45,200 | | $ 45,200 | | | $ 90,400 | |
| Federal Payroll Taxes | $ 10,500 | | $ 10,500 | | | $ 21,000 | |
| State Payroll Taxes and Garnishments | $ 1,750 | | $ 1,750 | | | $ 3,500 | |
| Workers Comp Insurance | $ 6,000 | | $ 6,000 | | | $ 12,000 | |
| Employee Benefits/Medical | $ 50 | | $ 50 | | | $ 100 | |
| Owner Draws | $ - | | $ - | | | $ - | |
| Other | $ - | $ - | $ - | $ - | | $ - | |
| **Total** | $ 63,500 | $ - | $ 63,500 | $ - | | $ 127,000 | |
| | | | | | | | |
| *Farming Expenses* | | | | | | | |
| Contract Labor | $ 7,000 | $ - | $ - | $ - | | $ 7,000 | |
| Equipment Rent | | $ 750 | $ - | $ - | | $ 750 | |
| Fertilizer and Compost | | $ - | $ - | $ - | | $ - | |
| Freight and Trucking | | $ - | $ - | $ - | | $ - | |
| Fuel | | $ 1,875 | $ 1,875 | $ 3,750 | | $ 7,500 | |
| Irrigation | | $ 250 | $ 250 | $ 500 | | $ 1,000 | |
| Organic expense | | $ 63 | $ 63 | $ 125 | | $ 250 | |
| Property and Use Taxes | | $ - | $ - | $ - | | $ - | |
| Repairs and Maint | | $ 3,125 | $ 3,125 | $ 6,250 | | $ 12,500 | |
| Seed | | $ - | $ - | $ - | | $ - | |
| Spraying | | $ - | $ - | $ - | | $ - | |
| Supplies | | $ - | $ - | $ - | | $ - | |
| Utilities | | $ - | $ - | $ - | | $ - | |
| Other | $ - | $ 5,000 | $ 5,000 | $ 5,000 | | $ 15,000 | |
| **Total** | $ 7,000 | $ 11,063 | $ 10,313 | $ 15,625 | | $ 44,000 | |

**DRF - 13 Week Cash Budget - - September  through November  - v.08.30.2020 Rev.xlsx**

| Week Ending | 9/4/2020 | 9/11/2020 | 9/18/2020 | 9/25/2020 | Sept | Sept | Sept |
|---|---|---|---|---|---|---|---|
| | | | | | **September Cash Flow** | | |
| | Forecast | Forecast | Forecast | Forecast | **Forecast** | **Budget** | **Variance** |
| *Processing Expenses* | | | | | | | |
| Comissions | | | | | | $ - | |
| Equipment Rent | $ - | $ - | $ - | | | $ - | |
| Freight and Trucking | $ - | $ - | $ - | | | $ - | |
| Inspection Fees | $ 625 | $ 625 | $ 1,250 | | | $ 2,500 | |
| Organic Expense | $ - | $ - | $ - | | | $ - | |
| Packaging Materials | $ 125 | $ 125 | $ 250 | | | $ 500 | |
| Promotion | $ - | $ - | $ - | | | $ - | |
| Property and Use Taxes | | | $ - | | | $ - | |
| Repairs and Maint | $ 625 | $ 625 | $ 1,250 | | | $ 2,500 | |
| Supplies | $ 375 | $ 375 | $ 750 | | | $ 1,500 | |
| Uniforms and Sanitation | $ 850 | $ 850 | $ 1,000 | | | $ 2,700 | |
| Utilities | | | $ 2,000 | | | $ 2,000 | |
| Electricity - current usage | | | $ - | | | $ - | |
| Electricity - Deposit | | | $ - | | | $ - | |
| Walnut Dues and Assessments | $ 250 | $ 250 | $ 500 | | | $ 1,000 | |
| Walnut Grower Assessments | $ - | $ - | $ - | | | $ - | |
| Walnut Purchases | $ - | $ - | $ - | | | $ - | |
| Other | $ 2,500 | $ 2,500 | $ 2,500 | | | $ 7,500 | |
| **Total** | **$ -** | **$ 5,350** | **$ 5,350** | **$ 9,500** | | **$ 20,200** | |
| *Administrative  Expenses* | | | | | | | |
| Automobile | $ - | $ - | $ 250 | | | $ 250 | |
| Charitable Cont | $ - | $ - | $ - | | | $ - | |
| Dues and Subscript | $ - | $ - | $ - | | | $ - | |
| Employee Education | $ - | $ - | $ - | | | $ - | |
| Equipment Rent | $ - | $ - | $ - | | | $ - | |
| Insurance | | | $ 9,250 | | | $ 9,250 | |
| Interest | $ - | $ - | $ - | | | $ - | |
| Late Charges | $ - | $ - | $ - | | | $ - | |
| Professional (ordinary business) | $ - | $ - | $ 2,500 | | | $ 2,500 | |
| Licenses and Permits | $ - | $ - | $ 2,000 | | | $ 2,000 | |
| Office Expenses/Telephone | $ - | $ - | $ - | | | $ - | |
| Security | | | $ 1,000 | | | $ 1,000 | |
| Travel and Entertainment | $ - | $ - | $ 1,250 | | | $ 1,250 | |
| Other | $ 125 | $ 125 | $ 250 | | | $ 500 | |
| **Total** | **$ -** | **$ 125** | **$ 125** | **$ 16,500** | | **$ 16,750** | |

**DRF - 13 Week Cash Budget - - September through November - v.08.30.2020 Rev.xlsx**

| Week Ending | 9/4/2020 Forecast | 9/11/2020 Forecast | 9/18/2020 Forecast | 9/25/2020 Forecast | Sept Forecast | Sept Budget | Sept Variance |
|---|---|---|---|---|---|---|---|
| **September Cash Flow** | | | | | | | |
| *Other Operating Disbursements* | | | | | | | |
| Building Construction and Related | $ - | $ - | $ - | | $ - | |
| Land and Irrigation Improvements | $ - | $ - | $ - | | $ - | |
| Trees | $ - | $ - | $ - | | $ - | |
| Equipment Purchases | $ - | $ - | $ - | | $ - | |
| Other | $ - | $ - | $ - | | $ - | |
| **Total** | $ - | $ - | $ - | $ - | | $ - | |
| | | | | | | | |
| *Financing Expenses* | | | | | | | |
| Bank Fees | | | | $ 650 | | $ 650 | |
| Prudentual Interest | $ - | $ - | $ - | | $ - | |
| Prudential Loan # 717611678 | | | | | | $ - | |
| Prudential Loan # 717611843 | | | | | | $ - | |
| FNB (Payment for Adequate Protection) | $ - | $ - | $ - | $ - | | $ - | |
| **Total** | $ - | $ - | $ - | $ 650 | | $ 650 | |
| | | | | | | | |
| *Professional (Restructuring)* | | | | | | | |
| Debtor Attorneys | | | | | | $ - | |
| Debtor Financial Advisor | | | | | | $ - | |
| Debtor CPA | | | | | | $ - | |
| Creditor's Committee | | | | | | $ - | |
| US Trustee Fees | | | | | | $ - | |
| Other | $ - | $ - | $ - | $ - | | $ - | |
| **Total** | $ - | $ - | $ - | $ - | | $ - | |
| | | | | | | | |
| **TOTAL CASH DISBURSEMENTS** | $ 70,500 | $ 16,538 | $ 79,288 | $ 42,275 | | $ 208,600 | |
| | | | | | | | |
| **NET CASH FLOW** | | | | | | | |
| | | | | | | | |
| **NET CASH FLOW** | $ 9,500 | $ 82,119 | $ ( 39,288 ) | $ 30,725 | | $ 83,056 | |
| Cumulative Net Cash Flow | $ 9,500 | $ 91,619 | $ 52,331 | $ 83,056 | | $ 83,056 | |
| | | | | | | | |
| **CASH (BOOK) BALANCE** | | | | | | | |
| | | | | | | | |
| Beginning Book Balance | $ 182,404 | $ 191,904 | $ 274,023 | $ 234,735 | | $ 182,404 | |
| Add: Net Cash Flow | $ 9,500 | $ 82,119 | $ ( 39,288 ) | $ 30,725 | | $ 83,056 | |
| **ENDING BOOK BALANCE** | $ 191,904 | $ 274,023 | $ 234,735 | $ 265,460 | | $ 265,460 | |

**DRF - 13 Week Cash Budget - - September  through November  - v.08.30.2020 Rev.xlsx**

| | October Cash Flow | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Week Ending** | 10/2/2020 | 10/9/2020 | 10/16/2020 | 10/23/2020 | 10/30/2020 | **Oct** | **Oct** | **Oct** |
| | Forecast | Forecast | Forecast | Forecast | Forecast | **Forecast** | **Budget** | **Variance** |
| **OPERATING STATISTICS** | | | | | | | | |
| | | | | | | | | |
| Walnuts Harvested (lbs) | 25,000 | 156,200 | 156,200 | 156,200 | 156,200 | | 649,800 | |
| Walnuts Purchaed (lbs) | - | - | - | - | - | | - | |
| Walnuts Processed (lbs) | | | | | | | - | |
| In-Shell Shipped (lbs) | | | | | | | - | |
| Meats Shipped (lbs) | 10,000 | 12,000 | 14,000 | 15,000 | 16,000 | | 67,000 | |
| **ENDING INVENTORY (lbs)** | | | | | | | | |
| | | | | | | | | |
| In-Shell | 25,000 | 181,200 | 337,400 | 493,600 | 649,800 | | 649,800 | |
| Processed Meats | 1,406,484 | 1,394,484 | 1,380,484 | 1,365,484 | 1,349,484 | | 1,349,484 | |
| **Total** | 1,431,484 | 1,575,684 | 1,717,884 | 1,859,084 | 1,999,284 | | 1,999,284 | |
| **ENDING  INVENTORY ($'s)** | | | | | | | | |
| | | | | | | | | |
| In-Shell @0.65 (blended) | $  16,250 | $  117,780 | $  219,310 | $  320,840 | $  422,370 | | $  422,370 | |
| Processed Meats @1.28 (blended) | $  1,800,300 | $  1,784,940 | $  1,767,020 | $  1,747,820 | $  1,727,340 | | $  1,727,340 | |
| **Total** | $  1,816,550 | $  1,902,720 | $  1,986,330 | $  2,068,660 | $  2,149,710 | | $  2,149,710 | |
| **INVOICES PRODUCED** | | | | | | | | |
| | | | | | | | | |
| In-Shell | | | | | | | $  - | |
| Processed Meats | $  40,000 | $  48,000 | $  56,000 | $  60,000 | $  64,000 | | $  268,000 | |
| **Total** | $  40,000 | $  48,000 | $  56,000 | $  60,000 | $  64,000 | | $  268,000 | |
| **ACCOUNTS RECEIVABLE** | | | | | | | | |
| | | | | | | | | |
| Beginning Balance | $  1,818,515 | $  1,808,515 | $  1,197,515 | $  417,344 | $  112,344 | | $  1,818,515 | |
| Add:  Invoices | $  40,000 | $  48,000 | $  56,000 | $  60,000 | $  64,000 | | $  268,000 | |
| Less:  Receipts | $  ( 50,000 ) | $  ( 659,000 ) | $  ( 836,171 ) | $  ( 365,000 ) | $  40,000 | | $  ( 1,870,171 ) | |
| **Ending Balance** | $  1,808,515 | $  1,197,515 | $  417,344 | $  112,344 | $  216,344 | | $  216,344 | |

**DRF - 13 Week Cash Budget - - September through November - v.08.30.2020 Rev.xlsx**

| | October Cash Flow | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Week Ending** | 10/2/2020 | 10/9/2020 | 10/16/2020 | 10/23/2020 | 10/30/2020 | Oct | Oct | Oct |
| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Budget | Variance |
| **CASH RECEIPTS** | | | | | | | | |
| *Operating Receipts* | | | | | | | | |
| In-Shell | $ 25,000 | $ 300,000 | $ 452,171 | $ 325,000 | $ - | | 1,102,171 | |
| Processed Meats | $ 25,000 | $ 359,000 | $ 384,000 | $ 40,000 | $ 40,000 | | 848,000 | |
| Hay | $ - | $ - | $ - | $ - | $ - | | - | |
| PPP/CFAP/FSA/EIDL | $ - | $ - | $ - | $ - | $ - | | - | |
| Custom Work | $ - | $ - | $ - | $ - | $ - | | - | |
| Insurance Claims | $ - | $ - | $ - | $ - | $ - | | - | |
| Patronage Dividends | $ - | $ - | $ - | $ - | $ - | | - | |
| Reimbursed Expenses | $ - | $ - | $ - | $ - | $ - | | - | |
| Rents | $ - | $ - | $ - | $ - | $ - | | - | |
| From/(To) Receiver's Account | $ - | $ - | $ - | $ - | $ - | | - | |
| Other -soil test | $ - | $ - | $ - | $ - | $ - | | - | |
| **TOTAL CASH RECEIPTS** | $ 50,000 | $ 659,000 | $ 836,171 | $ 365,000 | $ 40,000 | | $ 1,950,171 | |
| | | | | | | | | |
| **CASH DISBURSEMENTS** | | | | | | | | |
| *Labor & Related* | | | | | | | | |
| Wages | $ 45,200 | | $ 45,200 | | $ 45,200 | | $ 135,600 | |
| Federal Payroll Taxes | $ 10,500 | | $ 10,500 | | $ 10,500 | | $ 31,500 | |
| State Payroll Taxes and Garnishments | $ 1,750 | | $ 1,750 | | $ 1,750 | | $ 5,250 | |
| Workers Comp Insurance | $ 6,000 | | $ 6,000 | | $ 6,000 | | $ 18,000 | |
| Employee Benefits/Medical | $ 50 | | $ 50 | | $ 50 | | $ 150 | |
| Owner Draws | $ - | | $ - | | $ - | | $ - | |
| Other | $ - | $ - | $ - | $ - | $ - | | $ - | |
| **Total** | $ 63,500 | $ - | $ 63,500 | $ - | $ 63,500 | | $ 190,500 | |
| | | | | | | | | |
| *Farming Expenses* | | | | | | | | |
| Contract Labor | $ 14,000 | $ 14,000 | $ 14,000 | $ 14,000 | $ 14,000 | | $ 70,000 | |
| Equipment Rent | $ - | $ - | $ - | $ - | $ - | | $ - | |
| Fertilizer and Compost | $ - | $ 8,000 | $ 4,000 | $ 4,000 | $ 4,000 | | $ 20,000 | |
| Freight and Trucking | $ - | $ - | $ - | $ - | $ - | | $ - | |
| Fuel | $ - | $ 3,000 | $ 1,500 | $ 1,500 | $ 1,500 | | $ 7,500 | |
| Irrigation | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | | $ 1,000 | |
| Organic expense | | | | | $ 250 | | $ 250 | |
| Property and Use Taxes | $ - | $ - | $ - | $ - | $ - | | $ - | |
| Repairs and Maint | | | | | $ 12,500 | | $ 12,500 | |
| Seed | $ - | $ - | $ - | $ - | $ - | | $ - | |
| Spraying | $ 60,000 | $ - | $ - | $ - | $ - | | $ 60,000 | |
| Supplies | $ - | $ - | $ - | $ - | $ - | | $ - | |
| Utilities | $ - | $ - | $ - | $ - | $ - | | $ - | |
| Other | $ - | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | | $ 12,000 | |
| **Total** | $ 74,200 | $ 28,200 | $ 22,700 | $ 22,700 | $ 35,450 | | $ 183,250 | |

**DRF - 13 Week Cash Budget - - September through November - v.08.30.2020 Rev.xlsx**

| | October Cash Flow | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Week Ending** | 10/2/2020 | 10/9/2020 | 10/16/2020 | 10/23/2020 | 10/30/2020 | Oct | Oct | Oct |
| | Forecast | Forecast | Forecast | Forecast | Forecast | **Forecast** | **Budget** | **Variance** |
| ***Processing Expenses*** | | | | | | | | |
| Comissions | | | $ 18,500 | | | | $ 18,500 | |
| Equipment Rent | $ - | $ - | $ - | $ - | $ 750 | | $ 750 | |
| Freight and Trucking | $ - | $ - | $ - | $ - | $ - | | $ - | |
| Inspection Fees | | | | | $ 2,500 | | $ 2,500 | |
| Organic Expense | $ - | $ - | $ - | $ - | $ - | | $ - | |
| Packaging Materials | $ - | $ - | $ - | $ - | $ 500 | | $ 500 | |
| Promotion | $ - | $ - | $ - | $ - | $ - | | $ - | |
| Property and Use Taxes | | $ 1,000 | | | $ - | | $ 1,000 | |
| Repairs and Maint | $ - | $ - | $ - | $ - | $ 2,500 | | $ 2,500 | |
| Supplies | $ - | $ 1,200 | $ - | $ 1,200 | $ - | | $ 2,400 | |
| Uniforms and Sanitation | $ 400 | $ 400 | $ 400 | $ 400 | $ 400 | | $ 2,000 | |
| Utilities | | | | | $ 2,000 | | $ 2,000 | |
| Electricity - current usage | $ - | | | | $ 35,000 | | $ 35,000 | |
| Electricity - Deposit | $ - | $ 23,000 | | | | | $ 23,000 | |
| Walnut Dues and Assessments | $ 200 | $ 300 | $ 400 | $ 500 | $ 600 | | $ 2,000 | |
| Walnut Grower Assessments | $ - | $ - | $ - | $ - | $ - | | $ - | |
| Walnut Purchases | $ - | $ - | $ - | $ - | $ - | | $ - | |
| Other | $ - | $ - | $ 500 | $ 500 | $ 500 | | $ 1,500 | |
| **Total** | **$ 600** | **$ 25,900** | **$ 19,800** | **$ 2,600** | **$ 44,750** | | **$ 93,650** | |
| | | | | | | | | |
| ***Administrative Expenses*** | | | | | | | | |
| Automobile | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | | $ 500 | |
| Charitable Cont | $ - | $ - | $ - | $ - | $ - | | $ - | |
| Dues and Subscript | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | | $ 250 | |
| Employee Education | $ - | $ - | $ - | $ - | $ - | | $ - | |
| Equipment Rent | $ - | $ - | $ - | $ - | $ - | | $ - | |
| Insurance | | | | | $ 18,000 | | $ 18,000 | |
| Interest | $ - | $ - | $ - | $ - | $ - | | $ - | |
| Late Charges | $ - | $ - | $ - | $ - | $ - | | $ - | |
| Professional (ordinary business) | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | | $ 2,500 | |
| Licenses and Permits | $ - | $ - | $ - | $ - | $ - | | $ - | |
| Office Expenses/Telephone | $ 1,250 | $ - | $ 500 | $ - | $ - | | $ 1,750 | |
| Security | | | | | $ 1,000 | | $ 1,000 | |
| Travel and Entertainment | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | | $ 2,500 | |
| Other | $ - | $ - | $ 500 | $ 500 | $ 500 | | $ 1,500 | |
| **Total** | **$ 2,400** | **$ 1,150** | **$ 2,150** | **$ 1,650** | **$ 20,650** | | **$ 28,000** | |

**DRF - 13 Week Cash Budget - - September  through November  - v.08.30.2020 Rev.xlsx**

| Week Ending | October Cash Flow | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 10/2/2020 | 10/9/2020 | 10/16/2020 | 10/23/2020 | 10/30/2020 | Oct | Oct | Oct |
| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Budget | Variance |
| **Other Operating Disbursements** | | | | | | | | |
| Building Construction and Related | $          - | $          - | $          - | $          - | $          - | | $          - | |
| Land and Irrigation Improvements | $          - | $          - | $          - | $          - | $          - | | $          - | |
| Trees | $          - | $          - | $          - | $          - | $          - | | $          - | |
| Equipment Purchases | $          - | $          - | 2,500 | 2,500 | 2,500 | | 7,500 | |
| Other | $          - | $          - | $          - | $          - | $          - | | $          - | |
| **Total** | $          - | $          - | $     2,500 | $     2,500 | $     2,500 | | $     7,500 | |
| | | | | | | | | |
| **Financing Expenses** | | | | | | | | |
| Bank Fees | | | | | $        650 | | $        650 | |
| Prudentuial Interest | $          - | $          - | $          - | $          - | $          - | | $          - | |
| Prudential Loan # 717611678 | 81,738 | $          - | $          - | $          - | $          - | | 81,738 | |
| Prudential Loan # 717611843 | 80,625 | $          - | $          - | $          - | $          - | | 80,625 | |
| FNB  (Payment for Adequate Protection) | $          - | $          - | $          - | $          - | $          - | | $          - | |
| **Total** | $  162,363 | $          - | $          - | $          - | $        650 | | $  163,013 | |
| | | | | | | | | |
| **Professional (Restructuring)** | $          - | $          - | $          - | $          - | $          - | | | |
| Debtor Attorneys | $          - | $          - | $          - | $          - | $          - | | $          - | |
| Debtor Financial Advisor | $          - | $          - | $          - | $          - | $          - | | $          - | |
| Debtor CPA | $          - | $          - | $          - | $          - | $          - | | $          - | |
| Creditor's Committee | $          - | $          - | $          - | $          - | $          - | | $          - | |
| US Trustee Fees | | | | | $        975 | | $        975 | |
| Other | $          - | $          - | $          - | $          - | $          - | | $          - | |
| **Total** | $          - | $          - | $          - | $          - | $        975 | | $        975 | |
| | | | | | | | | |
| **TOTAL CASH DISBURSEMENTS** | $  303,063 | $    55,250 | $  110,650 | $    29,450 | $  168,475 | | $  666,888 | |
| | | | | | | | | |
| **NET CASH FLOW** | | | | | | | | |
| | | | | | | | | |
| **NET CASH FLOW** | $ ( 253,063 ) | $  603,750 | $  725,521 | $  335,550 | $ ( 128,475 ) | | $ 1,283,283 | |
| Cumulative Net Cash Flow | $ ( 170,007 ) | $  433,743 | $ 1,159,264 | $ 1,494,814 | $ 1,366,339 | | $ 1,366,339 | |
| **CASH (BOOK) BALANCE** | | | | | | | | |
| | | | | | | | | |
| Beginning Book Balance | $  265,460 | $    12,397 | $  616,147 | $ 1,341,669 | $ 1,677,219 | | $  265,460 | |
| Add:  Net Cash Flow | $ ( 253,063 ) | $  603,750 | $  725,521 | $  335,550 | $ ( 128,475 ) | | $ 1,283,283 | |
| **ENDING BOOK BALANCE** | $    12,397 | $  616,147 | $ 1,341,669 | $ 1,677,219 | $ 1,548,744 | | $ 1,548,744 | |

**DRF - 13 Week Cash Budget - - September through November - v.08.30.2020 Rev.xlsx**

| | November Cash Flow | | | | | | |
|---|---|---|---|---|---|---|---|
| **Week Ending** | 11/6/2020 | 11/13/2020 | 11/20/2020 | 11/27/2020 | **Nov** | **Nov** | **Nov** |
| | Forecast | Forecast | Forecast | Forecast | **Forecast** | **Budget** | **Variance** |
| **OPERATING STATISTICS** | | | | | | | |
| | | | | | | | |
| Walnuts Harvested (lbs) | 156,200 | 156,200 | 156,200 | | | 468,600 | |
| Walnuts Purchaed (lbs) | - | | - | - | | - | |
| Walnuts Processed (lbs) | | 28,000 | 30,000 | 20,000 | | 78,000 | |
| In-Shell Shipped (lbs) | | | | | | - | |
| Meats Shipped (lbs) | 17,000 | 18,000 | 19,000 | 20,000 | | 74,000 | |
| **ENDING INVENTORY (lbs)** | | | | | | | |
| | | | | | | | |
| In-Shell | 806,000 | 962,200 | 1,118,400 | 1,118,400 | | 1,118,400 | |
| Processed Meats | 1,332,484 | 1,342,484 | 1,353,484 | 1,353,484 | | 1,353,484 | |
| **Total** | 2,138,484 | 2,304,684 | 2,471,884 | 2,471,884 | | 2,471,884 | |
| **ENDING INVENTORY ($'s)** | | | | | | | |
| | | | | | | | |
| In-Shell @0.65 (blended) | $ 523,900 | $ 625,430 | $ 726,960 | $ 726,960 | | $ 726,960 | |
| Processed Meats @1.28 (blended) | $ 1,705,580 | $ 1,718,380 | $ 1,732,460 | $ 1,732,460 | | $ 1,732,460 | |
| **Total** | $ 2,229,480 | $ 2,343,810 | $ 2,459,420 | $ 2,459,420 | | $ 2,459,420 | |
| **INVOICES PRODUCED** | | | | | | | |
| | | | | | | | |
| In-Shell | | | | | | $ - | |
| Processed Meats | $ 68,000 | $ 72,000 | $ 76,000 | $ 80,000 | | $ 296,000 | |
| **Total** | $ 68,000 | $ 72,000 | $ 76,000 | $ 80,000 | | $ 296,000 | |
| **ACCOUNTS RECEIVABLE** | | | | | | | |
| | | | | | | | |
| Beginning Balance | $ 216,344 | $ 236,344 | $ 204,344 | $ 172,344 | | $ 216,344 | |
| Add: Invoices | $ 68,000 | $ 72,000 | $ 76,000 | $ 80,000 | | $ 296,000 | |
| Less: Receipts | $ ( 48,000 ) | $ ( 104,000 ) | $ ( 108,000 ) | $ 40,000 | | $ ( 220,000 ) | |
| **Ending Balance** | $ 236,344 | $ 204,344 | $ 172,344 | $ 292,344 | | $ 292,344 | |

**DRF - 13 Week Cash Budget - - September  through November  - v.08.30.2020 Rev.xlsx**

| | November Cash Flow | | | | | | |
|---|---|---|---|---|---|---|---|
| **Week Ending** | 11/6/2020 | 11/13/2020 | 11/20/2020 | 11/27/2020 | **Nov** | **Nov** | **Nov** |
| | Forecast | Forecast | Forecast | Forecast | **Forecast** | **Budget** | **Variance** |
| **CASH RECEIPTS** | | | | | | | |
| *Operating Receipts* | | | | | | | |
| In-Shell | $        - | $     56,000 | $     60,000 | $     64,000 | | 180,000 | |
| Processed Meats | $   48,000 | $     48,000 | $     48,000 | $     48,000 | | 192,000 | |
| Hay | | | | | | - | |
| PPP/CFAP/FSA/EIDL | | | | | | - | |
| Custom Work | | | | | | - | |
| Insurance Claims | | | | | | - | |
| Patronage Dividends | | | | | | - | |
| Reimbursed Expenses | | | | | | - | |
| Rents | | | | | | - | |
| From/(To) Receiver's Account | | | | | | - | |
| Other -soil test | $        - | $        - | $        - | $        - | | - | |
| **TOTAL CASH RECEIPTS** | $   48,000 | $   104,000 | $   108,000 | $   112,000 | | $   372,000 | |
| | | | | | | | |
| **CASH DISBURSEMENTS** | | | | | | | |
| *Labor & Related* | | | | | | | |
| Wages | | $     45,200 | | $     45,200 | | $   90,400 | |
| Federal Payroll Taxes | | $     10,500 | | $     10,500 | | $   21,000 | |
| State Payroll Taxes and Garnishments | | $      1,750 | | $      1,750 | | $     3,500 | |
| Workers Comp Insurance | | $      6,000 | | $      6,000 | | $   12,000 | |
| Employee Benefits/Medical | | $          50 | | $          50 | | $        100 | |
| Owner Draws | | $          - | | $          - | | $          - | |
| Other | $        - | $          - | $        - | $          - | | $          - | |
| **Total** | $        - | $     63,500 | $        - | $     63,500 | | $   127,000 | |
| | | | | | | | |
| *Farming Expenses* | | | | | | | |
| Contract Labor | | | | $          - | | $          - | |
| Equipment Rent | | | $        750 | $          - | | $        750 | |
| Fertilizer and Compost | | | | $          - | | $          - | |
| Freight and Trucking | | | | $          - | | $          - | |
| Fuel | | | | $      1,047 | | $     1,047 | |
| Irrigation | | | | $          - | | $          - | |
| Organic expense | | | | $          - | | $          - | |
| Property and Use Taxes | | | | $          - | | $          - | |
| Repairs and Maint | | | $     14,000 | $        226 | | $   14,226 | |
| Seed | | | | $          - | | $          - | |
| Spraying | | | | $          - | | $          - | |
| Supplies | | | | $          - | | $          - | |
| Utilities | | | | $          - | | $          - | |
| Other | $    2,500 | $      2,500 | $      2,500 | $      2,500 | | $   10,000 | |
| **Total** | $    2,500 | $      2,500 | $     17,250 | $      3,773 | | $   26,023 | |

**DRF - 13 Week Cash Budget - - September  through November  - v.08.30.2020 Rev.xlsx**

| | November Cash Flow | | | | | | |
|---|---|---|---|---|---|---|---|
| **Week Ending** | 11/6/2020 | 11/13/2020 | 11/20/2020 | 11/27/2020 | Nov | Nov | Nov |
| | Forecast | Forecast | Forecast | Forecast | Forecast | Budget | Variance |
| | | | | | | | |
| ***Processing Expenses*** | | | | | | | |
| Comissions | $ 563 | $ 563 | $ 563 | $ 563 | | $ 2,250 | |
| Equipment Rent | | | | $ 750 | | $ 750 | |
| Freight and Trucking | | | | $ 1,200 | | $ 1,200 | |
| Inspection Fees | | | | $ 900 | | $ 900 | |
| Organic Expense | $ - | $ - | $ - | $ - | | $ - | |
| Packaging Materials | | | | $ 500 | | $ 500 | |
| Promotion | | | | $ 250 | | $ 250 | |
| Property and Use Taxes | $ 250 | $ 250 | $ 250 | $ 250 | | $ 1,000 | |
| Repairs and Maint | $ - | $ 3,125 | $ - | $ - | | $ 3,125 | |
| Supplies | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | | $ 4,000 | |
| Uniforms and Sanitation | $ 500 | $ 500 | $ 500 | $ 500 | | $ 2,000 | |
| Utilities | $ - | | | $ 12,500 | | $ 12,500 | |
| Electricity - current usage | | | | $ 25,000 | | $ 25,000 | |
| Electricity - Deposit | | | | | | $ - | |
| Walnut Dues and Assessments | $ 1,125 | $ 1,125 | $ 1,125 | $ 1,125 | | $ 4,500 | |
| Walnut Grower Assessments | $ - | $ - | $ - | $ - | | $ - | |
| Walnut Purchases | $ - | $ - | $ - | $ - | | $ - | |
| Other | $ 125 | $ 125 | $ 125 | $ 125 | | $ 500 | |
| **Total** | $ 3,563 | $ 6,688 | $ 3,563 | $ 44,663 | | $ 58,475 | |
| | | | | | | | |
| ***Administrative  Expenses*** | | | | | | | |
| Automobile | $ - | $ 31 | $ - | $ 125 | | $ 156 | |
| Charitable Cont | $ - | $ - | $ - | $ - | | $ - | |
| Dues and Subscript | $ - | $ 16 | $ 82 | $ 63 | | $ 160 | |
| Employee Education | $ - | $ - | $ - | $ - | | $ - | |
| Equipment Rent | $ - | $ - | $ - | $ - | | $ - | |
| Insurance | $ - | $ 1,125 | $ 17,500 | $ - | | $ 18,625 | |
| Interest | $ - | $ - | $ - | $ - | | $ - | |
| Late Charges | $ - | $ - | $ - | $ - | | $ - | |
| Professional (ordinary business) | $ - | $ 156 | $ - | $ 625 | | $ 781 | |
| Licenses and Permits | $ - | $ 361 | $ - | $ - | | $ 361 | |
| Office Expenses/Telephone | $ - | $ 156 | $ - | $ 625 | | $ 781 | |
| Security | $ - | $ 63 | $ - | $ 250 | | $ 313 | |
| Travel and Entertainment | $ - | $ 156 | $ - | $ 625 | | $ 781 | |
| Other | $ - | $ 31 | $ - | $ 125 | | $ 156 | |
| **Total** | $ - | $ 2,095 | $ 17,582 | $ 2,438 | | $ 22,115 | |

**DRF - 13 Week Cash Budget - - September through November - v.08.30.2020 Rev.xlsx**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **November Cash Flow** | | | | | | |
| **Week Ending** | 11/6/2020 | 11/13/2020 | 11/20/2020 | 11/27/2020 | **Nov** | **Nov** | **Nov** |
| | Forecast | Forecast | Forecast | Forecast | **Forecast** | **Budget** | **Variance** |
| **Other Operating Disbursements** | | | | | | | |
| Building Construction and Related | $ - | $ - | $ - | $ - | | $ - | |
| Land and Irrigation Improvements | $ - | $ - | $ - | $ - | | $ - | |
| Trees | $ - | $ - | $ - | $ - | | $ - | |
| Equipment Purchases | $ - | $ 313 | $ - | $ 1,250 | | $ 1,563 | |
| Other | $ - | $ - | $ - | $ - | | $ - | |
| **Total** | $ - | $ 313 | $ - | $ 1,250 | | $ 1,563 | |
| | | | | | | | |
| **Financing Expenses** | | | | | | | |
| Bank Fees | $ - | $ 41 | $ - | $ 163 | | $ 203 | |
| Prudentual Interest | $ - | $ - | $ - | $ - | | $ - | |
| Prudential Loan # 717611678 | $ - | $ - | $ - | $ - | | $ - | |
| Prudential Loan # 717611843 | $ - | $ - | $ - | $ - | | $ - | |
| FNB (Payment for Adequate Protection) | $ - | $ - | $ - | $ 500,000 | | $ 500,000 | |
| **Total** | $ - | $ 41 | $ - | $ 500,163 | | $ 500,203 | |
| | | | | | | | |
| **Professional (Restructuring)** | | | | | | | |
| Debtor Attorneys | | | | $ 150,000 | | $ 150,000 | |
| Debtor Financial Advisor | | | | $ 40,000 | | $ 40,000 | |
| Debtor CPA | | | | $ 10,000 | | $ 10,000 | |
| Creditor's Committee | | | | $ 50,000 | | $ 50,000 | |
| US Trustee Fees | | | | $ - | | $ - | |
| Other | $ - | $ - | $ - | $ - | | $ - | |
| **Total** | $ - | $ - | $ - | $ 250,000 | | $ 250,000 | |
| | | | | | | | |
| **TOTAL CASH DISBURSEMENTS** | $ 6,063 | $ 75,136 | $ 38,395 | $ 865,786 | | $ 985,379 | |
| | | | | | | | |
| **NET CASH FLOW** | | | | | | | |
| | | | | | | | |
| **NET CASH FLOW** | $ 41,938 | $ 28,864 | $ 69,606 | $ ( 753,786 ) | | $ ( 613,379 ) | |
| Cumulative Net Cash Flow | $ 1,408,277 | $ 1,437,141 | $ 1,506,746 | $ 752,961 | | $ 752,961 | |
| | | | | | | | |
| **CASH (BOOK) BALANCE** | | | | | | | |
| | | | | | | | |
| Beginning Book Balance | $ 1,548,744 | $ 1,590,681 | $ 1,619,545 | $ 1,689,151 | | $ 1,548,744 | |
| Add: Net Cash Flow | $ 41,938 | $ 28,864 | $ 69,606 | $ ( 753,786 ) | | $ ( 613,379 ) | |
| **ENDING BOOK BALANCE** | $ 1,590,681 | $ 1,619,545 | $ 1,689,151 | $ 935,365 | | $ 935,365 | |

**DRF - 13 Week Cash Budget - - September  through November  - v.08.30.2020 Rev.xlsx**

| | 13- Weeks September thru November | | |
|---|---|---|---|
| **Week Ending** | 13 Weeks Forecast | 13 Weeks Budget | 13 Weeks Variance |
| **OPERATING STATISTICS** | | | |
| | | | |
| Walnuts Harvested (lbs) | | 1,118,400 | |
| Walnuts Purchased (lbs) | | - | |
| Walnuts Processed (lbs) | | 78,000 | |
| In-Shell Shipped (lbs) | | 1,695,648 | |
| Meats Shipped (lbs) | | 751,000 | |
| | | | |
| **ENDING INVENTORY (lbs)** | | | |
| | | | |
| In-Shell | | 1,118,400 | |
| Processed Meats | | 1,353,484 | |
| **Total** | | 2,471,884 | |
| | | | |
| **ENDING  INVENTORY ($'s)** | | | |
| | | | |
| In-Shell @0.65 (blended) | | $ 726,960 | |
| Processed Meats @1.28 (blended) | | $ 1,732,460 | |
| **Total** | | **$ 2,459,420** | |
| | | | |
| **INVOICES PRODUCED** | | | |
| | | | |
| In-Shell | | $ 1,102,171 | |
| Processed Meats | | $ 1,372,000 | |
| **Total** | | **$ 2,474,171** | |
| | | | |
| **ACCOUNTS RECEIVABLE** | | | |
| | | | |
| Beginning Balance | | $ 200,000 | |
| Add:  Invoices | | $ 2,474,171 | |
| Less:  Receipts | | $ ( 2,381,827 ) | |
| **Ending Balance** | | **$ 292,344** | |

**DRF - 13 Week Cash Budget - - September through November - v.08.30.2020 Rev.xlsx**

| Week Ending | 13 Weeks September thru November | | |
|---|---|---|---|
| | 13 Weeks Forecast | 13 Weeks Budget | 13 Weeks Variance |
| **CASH RECEIPTS** | | | |
| *Operating Receipts* | | | |
| In-Shell | | 1,282,171 | |
| Processed Meats | | 1,240,000 | |
| Hay | | 33,000 | |
| PPP/CFAP/FSA/EIDL | | - | |
| Custom Work | | - | |
| Insurance Claims | | - | |
| Patronage Dividends | | - | |
| Reimbursed Expenses | | - | |
| Rents | | - | |
| From/(To) Receiver's Account | | 58,656 | |
| Other -soil test | | - | |
| **TOTAL CASH RECEIPTS** | | 2,613,827 | |
| | | | |
| **CASH DISBURSEMENTS** | | | |
| *Labor & Related* | | | |
| Wages | $ | 316,400 | |
| Federal Payroll Taxes | $ | 73,500 | |
| State Payroll Taxes and Garnishments | $ | 12,250 | |
| Workers Comp Insurance | $ | 42,000 | |
| Employee Benefits/Medical | $ | 350 | |
| Owner Draws | $ | - | |
| Other | $ | - | |
| **Total** | $ | 444,500 | |
| | | | |
| *Farming Expenses* | | | |
| Contract Labor | $ | 77,000 | |
| Equipment Rent | $ | 1,500 | |
| Fertilizer and Compost | $ | 20,000 | |
| Freight and Trucking | $ | - | |
| Fuel | $ | 16,047 | |
| Irrigation | $ | 2,000 | |
| Organic expense | $ | 500 | |
| Property and Use Taxes | $ | - | |
| Repairs and Maint | $ | 39,226 | |
| Seed | $ | - | |
| Spraying | $ | 60,000 | |
| Supplies | $ | - | |
| Utilities | $ | - | |
| Other | $ | 37,000 | |
| **Total** | $ | 253,273 | |

**DRF - 13 Week Cash Budget - - September  through November  - v.08.30.2020 Rev.xlsx**

| | 13- Weeks September thru November | | |
|---|---|---|---|
| **Week Ending** | 13 Weeks | 13 Weeks | 13 Weeks |
| | Forecast | Budget | Variance |
| | | | |
| ***Processing Expenses*** | | | |
| Comissions | | $ 20,750 | |
| Equipment Rent | | $ 1,500 | |
| Freight and Trucking | | $ 1,200 | |
| Inspection Fees | | $ 5,900 | |
| Organic Expense | | $ - | |
| Packaging Materials | | $ 1,500 | |
| Promotion | | $ 250 | |
| Property and Use Taxes | | $ 2,000 | |
| Repairs and Maint | | $ 8,125 | |
| Supplies | | $ 7,900 | |
| Uniforms and Sanitation | | $ 6,700 | |
| Utilities | | $ 16,500 | |
| Electricity - current usage | | $ 60,000 | |
| Electricity - Deposit | | $ 23,000 | |
| Walnut Dues and Assessments | | $ 7,500 | |
| Walnut Grower Assessments | | $ - | |
| Walnut Purchases | | $ - | |
| Other | | $ 9,500 | |
| **Total** | | **$ 172,325** | |
| | | | |
| ***Administrative  Expenses*** | | | |
| Automobile | | $ 906 | |
| Charitable Cont | | $ - | |
| Dues and Subscript | | $ 410 | |
| Employee Education | | $ - | |
| Equipment Rent | | $ - | |
| Insurance | | $ 45,875 | |
| Interest | | $ - | |
| Late Charges | | $ - | |
| Professional (ordinary business) | | $ 5,781 | |
| Licenses and Permits | | $ 2,361 | |
| Office Expenses/Telephone | | $ 2,531 | |
| Security | | $ 2,313 | |
| Travel and Entertainment | | $ 4,531 | |
| Other | | $ 2,156 | |
| **Total** | | **$ 66,865** | |

**DRF - 13 Week Cash Budget - - September  through November  - v.08.30.2020 Rev.xlsx**

| Week Ending | 13- Weeks September thru November | | |
|---|---|---|---|
| | 13 Weeks Forecast | 13 Weeks Budget | 13 Weeks Variance |
| | | | |
| ***Other Operating Disbursements*** | | | |
| Building Construction and Related | | $        - | |
| Land and Irrigation Improvements | | $        - | |
| Trees | | $        - | |
| Equipment Purchases | | $    9,063 | |
| Other | | $        - | |
| **Total** | | **$    9,063** | |
| | | | |
| ***Financing Expenses*** | | | |
| Bank Fees | | $    1,503 | |
| Prudentuial Interest | | $        - | |
| Prudential Loan # 717611678 | | $   81,738 | |
| Prudential Loan # 717611843 | | $   80,625 | |
| FNB  (Payment for Adequate Protection) | | $  500,000 | |
| **Total** | | **$  663,866** | |
| | | | |
| ***Professional (Restructuring)*** | | | |
| Debtor Attorneys | | $  150,000 | |
| Debtor Financial Advisor | | $   40,000 | |
| Debtor CPA | | $   10,000 | |
| Creditor's Committee | | $   50,000 | |
| US Trustee Fees | | $      975 | |
| Other | | $        - | |
| **Total** | | **$  250,975** | |
| | | | |
| **TOTAL CASH DISBURSEMENTS** | | **$  1,860,867** | |
| | | | |
| **NET CASH FLOW** | | | |
| | | | |
| **NET CASH FLOW** | | **$  752,961** | |
| Cumulative Net Cash Flow | | | |
| | | | |
| **CASH (BOOK) BALANCE** | | | |
| | | | |
| Beginning Book Balance | | $  182,404 | |
| Add:  Net Cash Flow | | $  752,961 | |
| **ENDING BOOK BALANCE** | | **$  935,365** | |