DOUGLAS H. KRAFT, ESQ. (State Bar No. 155127)
KRAFT LAW
11335 Gold Express Drive, Suite 125
Gold River, California 95670
Telephone: (916) 880-3040
Facsimile: (916) 880-3045

HOWARD NEVINS, SBN 119366
AARON A. AVERY, SBN 245448
HEFNER, STARK & MAROIS, LLP
2150 River Plaza Drive, Suite 450
Sacramento, CA 95833-4136
Telephone: (916) 925-6620
Facsimile: (916) 925-1127

Attorneys for First Northern Bank of Dixon, Creditor

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| In Re:<br><br>RUSSEL WAYNE LESTER, an individual, dba Dixon Ridge Farms,<br><br>Debtor in Possession. | Case No: 20-24123-E-11<br><br>Chapter 11<br><br>DCN: FWP-2<br><br>Date: September 17, 2020<br>Time: 11:00 a.m.<br>Courtroom: 33 – Judge Ronald H. Sargis<br>501 I Street, 6th Floor<br>Sacramento, CA 95814 |

**OPPOSITION TO MOTION FOR FINAL ORDER AUTHORIZING USE OF CASH COLLATERAL AND GRANTING REPLACEMENT LIENS**

First Northern Bank of Dixon, a California corporation ("**Bank**" or "**Lender**"), creditor in this case, hereby files its opposition (the "**Opposition**") to the Motion For An Order Authorizing Use of Cash Collateral and Granting Replacement Liens (the "**Motion**") filed by a debtor in possession, Russell Wayne Lester ("**Debtor**").

On September 1, 2020, Debtor made his Emergency Motion for and Order (A) Authorizing Interim and Final Use of Cash Collateral; (B) Granting Replacement Liens; and (C) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001( the "**Emergency Motion**"). On September 8, 2020, the Court entered its Order on the Emergency Motion (the "**Interim Order**") which authorized the Debtor to use the cash collateral of Bank and Prudential Insurance Company of America ("**Prudential**") and any disputed producer lien creditors that may exist (collectively, "**Secured Creditors**") on an interim basis through September 16, 2020, for necessary expenses in the amount of $166,325.00 plus a 15% variance for emergencies during the pre-harvest period as described in the Motion.

In addition, for the purpose of attempting to provide adequate protection for the interests of the Secured Creditors, to the extent of any diminution in Secured Creditor's interest in the Debtor in Possession's pre-petition cash collateral caused by Debtor in Possession's post-petition use of such pre-petition cash collateral, the Interim Order granted to the Secured Creditors:

  a. A valid, perfected, and enforceable replacement lien under Sections 105, 361(2), and 363(e) of the Bankruptcy Code in the Debtor's post-petition cash collateral and proceeds thereof to the same extent and with the same priority that Secured Creditors' held in the Debtor in Possession's pre-petition cash collateral as of the Petition Date, (the "**Cash Collateral Replacement Lien**");

  b. A valid, perfected, and enforceable replacement lien under Sections 105, 361(2), and 363(e)of the Bankruptcy Code in the Conservation Easement, as defined in the Motion, to the same extent and with the same priority that Secured Creditors held in the Debtor in Possession's pre-petition cash collateral as of the Petition Date (the "**Conservation Easement Replacement Lien**").

In addition, for the purpose of attempting to provide adequate protection for the interests of Bank, to the extent of any diminution in Bank's interest in the Debtor's pre-petition cash collateral caused by Debtor's post-petition use of such pre-petition cash collateral, the

**OPPOSITION TO MOTION FOR USE OF CASH COLLATERAL**

Interim Order granted to Bank:

    a.     A valid, perfected, and enforceable replacement lien under Sections 105, 361(2), and 363(e) of the Bankruptcy Code in the Putah Creek Road real property, as defined in the Motion to the same extent and with the same priority that the Bank held in the Debtor in Possession's pre-petition cash collateral as of the Petition Date (the "**Putah Creek Replacement Lien**");

    b.     To the extent that FNB does not already possess a valid, first priority lien in the Debtor's crops now growing or grown in the 2020 crop year (the "**2020 Crops**"), a valid, perfected, and enforceable first-priority lien, under Sections 105, 361(2), and 364(d) of the Bankruptcy Code on the all 2020 Crops, senior in priority to any other security interests and liens in the 2020 Crops, to the same extent and validity of the lien of FNB held in the Debtor's pre-petition cash collateral as of the Petition Date (the "**Post-Petition Crop Lien**");

This Opposition is supported by the Declaration of Chaille James (the "**James Declaration**"), and the Request for Judicial Notice ("**RJN**"), each filed and served herewith, as well as the papers, files, and records of this court in the within bankruptcy case and upon such oral and documentary evidence as may be put forth at the time of the hearing, if any. Copies of the supporting pleadings may be viewed upon request of the Clerk of the Bankruptcy Court at the address set forth above.

## I.

## FACTUAL SUMMARY

### The Loans and Collateral

**Ag Production Loan**

As set forth in the James Declaration, Debtor is indebted to Lender under a loan in the original maximum principal amount of Two Million Eight Hundred Thousand and 00/100 dollars ($2,800,000.00) (the "**Ag Production Loan**"). The Ag Production Loan is evidenced by, among other documents, the Ag Production Note, the Ag Production Security Agreement, the Ag Production Loan Agreement (each as defined in the James Declaration), which are

3

**OPPOSITION TO MOTION FOR USE OF CASH COLLATERAL**

attached as **Exhibits A**, **B** and **C** to the James Declaration. The relevant terms and provisions of the Ag Production Loan Documents[1] are set forth in the James Declaration. *[James Declaration, par. 4 thru 19]*

The Ag Production Loan was made to finance the expenses associated with the growing, cultivation and harvest of the crops grown by Debtor in the 2019 crop year (the "**2019 Crops**").

Under the terms of Ag Production Note, Debtor promised to pay the Ag Production Loan in one payment of all outstanding principal plus all accrued unpaid interest on January 30, 2020 (the "**Ag Production Loan Maturity Date**"). *[James Declaration, par.6]* Debtor is in default under the Ag Production Loan Documents for failure to pay all principal and interest owing under the Ag Production Loan on the Ag Production Loan Maturity Date (the "**Ag Production Loan Payment Default**"). *[James Declaration, par.17]*

As of June 10, 2020, the sum of $2,896,604.03 was due and owing under the Ag Production Loan consisting of principal in the amount of $2,800,000.00, and interest in the amount of $96,604.03. *[James Declaration, par. 19]*[2]

**Asset Based Line of Credit**

Mr. Lester is also indebted to Lender under an Asset Based Line of Credit in the original maximum principal amount of Five Million and 00/100 dollars ($5,000,000.00) (the "**Asset Based Line of Credit**" or "**ABL**"). The Asset Based Line of Credit is evidenced by, among other documents, the ABL Note, the ABL Security Agreement, and the ABL Loan Agreement (each as defined in the James Declaration), which are attached as **Exhibits G**, **H** and **I** to the James Declaration. The relevant terms and provisions of the ABL Loan Documents are set forth in the James Declaration. *[James Declaration, par.20 thru 38.]*

---

[1] Capitalized terms not otherwise defined herein shall have the meaning as defined in the James Declaration.

[2] Upon filing its Proof of Claim for the Ag Production Loan the Bank will update the amounts owing under the Ag Production Loan to accurately reflect the amounts owing as of the Petition Date.

Under the terms of the ABL Note, Mr. Lester promised to pay the ABL in one payment of all outstanding principal plus all accrued unpaid interest on June 5, 2020 (the "**ABL Maturity Date**"). *[James Declaration, par.22]* Mr. Lester is in default under the ABL for failure to pay the ABL in full on the ABL Maturity Date (the "**ABL Payment Default**"). *[James Declaration, par.35]*

As of June 10, 2020, the sum of $5,055,159.72 was due and owing under the ABL consisting of principal in the amount of $5,000,000.00, and interest in the amount of $55,159.72. *[James Declaration, par.28]*[3]

**Personal Property Collateral**

The Ag Production Loan and the ABL Loan are secured, respectively, by the ABL Security Agreement and the ABL Security Agreement (the "**Security Agreements**"). *[James Declaration, par.11, 29]*

Pursuant to the terms of the Security Agreements, Mr. Lester granted to Lender security interests (the "**Security Interests**") in all Inventory, Chattel Paper, Accounts, Equipment, General Intangibles, Crops, Farm Equipment and Contracts, as more fully described in the Ag Production Security Agreement (the "**Personal Property Collateral**"). *[James Declaration, par.12, 30]*

The Security Interests in the Personal Property Collateral are perfected by the UCC Financing Statements (the "**Financing Statements**") attached to the James Declaration as **Exhibits C**, **D, E**, and **F** (the "**Financing Statements**"), which are incorporated herein by this reference. *[James Declaration, par.14, 32]*

**Real Estate Loan**

Mr. Lester and his wife, Kathleen Hamrock Lester (together "**Borrowers**") are indebted to Lender under a real estate term loan in the original principal amount of Two

---

[3] Upon filing its Proof of Claim for the ABL the Bank will update the amounts owing under the ABL to accurately reflect the amounts owing as of the Petition Date.

Million and 00/100 Dollars ($2,000,000.00) (the "**Real Estate Loan**" or the "**RE Loan**"). *[James Declaration, par. 39.]*

The RE Loan is evidenced by that is evidenced by, among other documents, the RE Note (as defined in the James Declaration), which is attached as **Exhibits K** to the James Declaration. The relevant terms and provisions of the RE Loan are set forth in the James Declaration. *[James Declaration, par. 39 thru 47.]*

The RE Loan is secured by the certain Deed of Trust dated April 22, 2009 (the "**RE Loan Deed of Trust"**) executed by Borrowers as Trustors, in favor of Lender, as Beneficiary, recorded in the Official Records of Solano County, California on April 30, 2009, as Document No. 200900032520. *[James Declaration, par. 45 thru 47.]* A true and correct copy of the RE Loan Deed of Trust is attached to the James Declaration as **Exhibit L** and incorporated herein by this reference.

The RE Loan Deed of Trust encumbers the Borrowers' interest, in a first priority position, in the Putah Creek Property.

Under the terms of the RE Note, upon the occurrence of an Event of Default (as defined in the RE Note), Lender may declare the entire unpaid principal balance under the RE Note and all accrued and unpaid interest to be immediately due.

Under the terms of the RE Note, the failure of Borrowers to comply with or perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrowers, shall constitute an Event of Default under the RE Note (the "**Cross Default Provision**"). As a result of the Cross Default Provision, the Ag Production Loan Default and the ABL Payment Default constitutes event of default under the under the RE Loan, and as a result, Bank declared the amounts owing under the RE Loan to be immediately due and payable in full.

As of April 22, 2020, the sum of $1,415,185.70 was due and owing under the RE Loan consisting of principal in the amount of $1,406,303.73, interest in the amount of $8,637.90, and reconveyance, recording and statutory fees in the amount of $244.00.[4]

**Home Equity Line of Credit**

Borrowers are also indebted to Lender under a Home Equity Line of Credit in the maximum principal amount of $500,000.00 (the "**HELOC**"). The HELOC is evidenced by that certain HELOC Agreement. *[James Declaration, par. 45.]* A true and correct copy of the HELOC Agreement is attached to the James Declaration as **Exhibit M**.

The HELOC is secured by that certain Deed of Trust dated January 3, 2005 (the "**HELOC Deed of Trust**") executed by Borrowers as Trustors, in favor of Lender, as Beneficiary, recorded in the Official Records of Solano County, California on January 11, 2005, as Document No. 200500004475. *[James Declaration, par. 49.]* A true and correct copy of the HELOC Deed of Trust is attached to the James Declaration as **Exhibit N** and incorporated herein by this reference.

The HELOC Deed of Trust encumbers the Borrowers' interest in the Putah Creek Property. *[James Declaration, par. 50.]*

Pursuant to that certain Subordination Agreement dated April 22, 2009 and recorded in the Official Records of Solano County on April 30, 2009 (the "**Subordination Agreement**"), the HELOC Deed of Trust is subordinated to the RE Loan Deed of Trust. As such, the HELOC Deed of Trust constitutes a lien on the Putah Creek Property in a second priority position. *[James Declaration, par. 51.]*

---

[4] Upon filing its Proof of Claim for the RE Loan the Bank will update the amounts owing under the RE Loan to accurately reflect the amounts owing as of the Petition Date.

**OPPOSITION TO MOTION FOR USE OF CASH COLLATERAL**

As of Petition Date, approximately $503,835.62 is owed under the HELOC.[5] *[James Declaration, par. 52.]*

**The State Court Action**

On April 24, 2020, Bank filed a Verified Complaint (the "**Complaint**") in Solano County Superior Court (the "**State Court**") as Case no. FCS 054698 (the "State Court Action"), alleging causes of action for, *inter alia*, breach of contract under the Ag Production Loan, the ABL and the RE Loan and seeking to enforce Bank's rights and remedies.[6] *[James Declaration, par. 53.]*

On June 12, 2020, the State Court issued its Order Appointing Receiver, Temporary Restraining Order and Order to Show Cause (the "**Receiver Order**"), appointing Donald G. Howell (the "**Receiver**") as receiver over the Personal Property Collateral (excluding growing crops). A true and correct copy of the Receiver Order is attached to the RFJN as **Exhibit A.**

## II.

## OPPOSITION

**A.  The Adequate Protection Offered By Debtor Is Inadequate**

    **1.  Adequate Protection Should Be Based On The Market Value of Inventory Not Forced Liquidation Value**

In the Omnibus Declaration of Russell Wayne Lester filed in support of the Motion (the "**Lester Declaration**"), the Debtor states that the only way to accomplish the Debtor's goal of paying off the Bank is to maximize the value of the Bank's collateral. *[Lester Declaration, page 2, par. 6]*

The Debtor further states that Dixon Ridge Farms has approximately 3,915,003 in total "In-Shell" and "Meat" pounds of walnuts based on Exhibit D to the State Court Receiver's

---

[5] Upon filing its Proof of Claim for the HELOC the Bank will update the amounts owing under the HELOC to accurately reflect the amounts owing as of the Petition Date.

[6] The HELOC was not the subject of any of the causes of action alleged in the Complaint.

first status report (the "**Receiver Report**") and that the Receiver valued in the Receiver Report at $3,759,737. *[Lester Declaration, page12, par. 28.d.]* The Receiver Report is attached as Exhibit E to the Debtor's Exhibits filed in support of the Motion.

The Receiver Report indicates that the Receiver's value of the Walnut Inventory is based on the marketing conditions outlined in the Receiver Order. The Receiver Order provided for the Receiver to take possession of the Walnut Inventory and sell the Walnut Inventory through a UCC sale. As such, the value of the Walnut Inventory per the Receiver Report is based on a forced-sale liquidation value.

The Debtor further states that if the Court approves the use of cash collateral and allows the business to reopen and commence making market sales, the valuation of the Walnut Inventory will increase post-petition almost immediately to reflect the higher prices to be obtained from ordinary course and anticipated post-petition bulk sales. *[Lester Declaration, page12, par. 28.d.]*

### a. Value of Inventory on Debtor's Schedules

In Schedule A/B to the Debtor's bankruptcy petition ("**Schedule A/B**"). the Debtor values his "crops" at $4,743,347.00. A true and correct copy of Schedule A/B, with all attachments, is attached as **Exhibit B** to the RFJN.

Attachment H to Schedule A/B shows that the "crops" as shown on Schedule A/B includes the Debtor's inventory of walnuts (the "**Walnut Inventory**"). The Walnut Inventory as shown on Schedule A/B is exactly the same as the Walnut Inventory shown in the Receiver Report. Both the Receiver Report and Schedule A/B show the amount of Walnut Inventory in terms of pounds (3,915,003), and the breakdown between "In-Shell" and "Meat" pounds is exactly the same. In addition, the Receiver Report and Schedule A/B both show the value of the Walnut Inventory at $3,759,737, with the exact same breakdown of "In-Shell" and "Meat" values. In addition, the price per pound used in Schedule A/B is the same as in the Receiver Report, and is shown as follows:

**OPPOSITION TO MOTION FOR USE OF CASH COLLATERAL**

| | Value/Pound | 2018 | 2019 |
|---|---|---|---|
| | **In-Shell $/Lb** | **$0.60** | **$0.65** |
| | **Meat $/Lb** | **$1.25** | **$1.80** |

    b. **Value of Inventory On Debtor's July 31 Inventory Report**

On August 20, 2020 (one week before the bankruptcy petition was filed), the Debtor sent an email to the Receiver (the "**August 20 Email**"). The Bank was copied on the August 20 Email. A true and correct copy of the August 20 Email is attached to the James Declaration as **Exhibit O.**

As shown in the email chain included in the August 20 Email, the August 20 Email was in response to an email from the Receiver which, among other things, requested that the Debtor provide an updated inventory accurate as of July 31, 2020.

An Inventory Report entitled "DRF Inventory 7-31-2020.xlsx" (the "**July 31 Inventory Report**") was attached by the Debtor to the August 20 Email. A true and correct copy of the July 31 Inventory Report is attached to the James Declaration as **Exhibit P**.

The July 31 Inventory Report values the Walnut Inventory at a "Post COVID 19 Value" of $11,888,189.21, broken down as follows:

| | **Pounds** | **$/Lb** | **Total Value** |
|---|---|---|---|
| **Total Inshell** | 1,695,648 | $1.56 | $ 2,645,278.71 |
| **Total Meat in Bins** | 2,450,412 | $4.50 | $ 9,204,354.00 |
| **Cases of Inshell** | 360 | $2.20 | $       792.00 |
| **Total cased Meat #s** | 8,035 | $4.70 | $    37,764.50 |
| **Total Lbs** | 3,749,455 | | $ 11,888,189.21 |

The total pounds of Walnut Inventory shown on the Debtor's July 31 Inventory Report is 165,548 pounds less than the pounds shown on Schedule A/B and the Receiver's Report. The apparent explanation for that is that the Receiver Report was dated as of July 10, 2020, and apparently reflected the Walnut Inventory as of June 30, 2020.

10

**OPPOSITION TO MOTION FOR USE OF CASH COLLATERAL**

Contrary to the assertions in the Lester Declaration *[Lester Declaration, page5, lines 2-3]*, the Receiver did not prohibit ongoing operations and sales and the company was not closed as of the Petition Date. In an email to the Debtor from the Receiver sent on July 3, 2020 on which the Bank was copied (the "**July 3 Email**"), the Receiver sent a letter to the Debtor regarding "Ongoing Duties" (the "**Ongoing Duties Letter**"). A true and correct copy of the July 3 Email and the Ongoing Duties Letter is attached to the James Declaration as **Exhibit R**. Pursuant to the Ongoing Duties Letter, the Receiver allowed the Debtor to continue to process the Walnut Inventory.

On August 27,2020, which was the Petition Date, the Receiver sent an email to the Bank and Mr. Lester (the "**August 27 Email'**) indicating that he was provide the "ordinary course sale" for 7/27 through that day of 33,780 pounds shipped with an invoice total of $184,902.32, which equates to $5.46 per pound. A true and correct copy of the August 27 Email is attached to the James Declaration as **Exhibit S.**

Based on the information contained in the August 20 Email, and the August 27 Email, it is clear that the Debtor continued to process and sell Walnut Inventory up to the Petition Date.

Since the Debtor's goal as stated in the Lester Declaration is to maximize the value of the Bank's collateral, and since the Debtor contends that the Chapter 11 bankruptcy will allow the Debtor to continue in business and increase the value of the Walnut Inventory to ordinary course value, the Debtor should be required to provide the Bank adequate protection for the use of the Walnut Inventory, based on the $11,888,189.21 market value shown on the Debtor's July 31 Inventory Report.

**c. Walnut Inventory To Be Shipped and Sold Per Cash Collateral Budget**

The Cash Collateral Budget which is attached as Exhibit F to the Lester Declaration indicates that the Debtor plans on selling 1,695,648 pounds of In-Shell inventory (all of the In-Shell walnuts as of the July 31 Inventory Report), and 751,000 pounds of Meat inventory

though November 30, 2020 (the "**Proposed Cash Collateral Period**"). *[Cash Collateral Budget, page 13.]*

though November 30, 2020 (the "**Proposed Cash Collateral Period**"). *[Cash Collateral Budget, page 13.]*

The Cash Collateral Budget shows that the sale of the In-Shell inventory will generate invoices of $1,102,171, or $.065 per pound, and that the sale of the Meat inventory will generate invoices of $1,372,000, or $1.83 per pound. *[Cash Collateral Budget, page 13.]*

As such, it appears that the Debtor's intent is to sell the Walnut Inventory at the Receiver's forced liquidation values, rather than preserve the value of the Bank's collateral by selling the Walnut Inventory at the actual market value.

### d. Value of Walnut Inventory To Be Sold at Market Value.

Based on the market values of the Walnut Inventory as stated in the Debtor's July 31 Inventory Report, the actual value of the Walnut Inventory to be sold pursuant to the Cash Collateral Budget is $6,024,711, calculated as follows:

|           | Pounds    | $/Lb  | Value      |
|-----------|-----------|-------|------------|
| **In-Shell** | 1,695,648 | $1.56 | $2,645,211 |
| **Meats**    | 751,000   | $4.50 | $3,379,500 |
| **Total**    |           |       | $6,024,711 |

In addition, it appears that the Cash Collateral Budget anticipates collecting and using the $200,000 in Accounts Receivable that existed as of the Petition Date.

As such, it appears that the Debtor intends on using $6,224,711 of the Bank's Cash Collateral during the Proposed Cash Collateral Period.

### 2. Value of Adequate Protection Offered By Debtor

#### a. Value of Cash Collateral Replacement Lien

The Cash Collateral Budget indicates that the Debtor's use of Cash Collateral through the Proposed Cash Collateral Period will generate Accounts Receivable of $292,344. *[Cash Collateral Budget, page 13.]* The Cash Collateral Budget also indicates that the Debtor's use of Cash Collateral will generate ending Cash Balance of $935,365. *[Cash Collateral Budget, page 16.]*

**12**
**OPPOSITION TO MOTION FOR USE OF CASH COLLATERAL**

As such, the Cash Collateral Budget projects the value of the Cash Collateral Replacement Lien at $1,227,709.

### b. Value of Conservation Easement Replacement Lien

The Debtor values the Conservation Easement Replacement Lien at $5,700,000. However, based on the information provide in Exhibit C to the Lester Declaration, the Conservation Easement doesn't presently exist.

Exhibit C to the Lester Declaration includes a letter dated August 28, 2020 from the Solano Land Trust (the "**Solano Land Trust Letter**"). The Solano Land Trust Letter indicates that the Solano Land Trust has reached an agreement with the State of California through the Sustainable Agricultural Land Conservation Program (SALC) to grant of $4,275,000. The Debtor does not attach a copy of that agreement between Solano Land Trust and SALC.

However, the Solano Land Trust Letter attaches a letter from the State of California indicated that the Grant Agreement between Solano Land Trust and the State will include certain conditions which include: completion of conservation easement negotiations, an acceptable final appraisal, due diligence and related documentation, evidence of match funding, resolving third party mineral rights, and resolving all title issues.

The Solano Land Trust Letter also indicates that Solano Land Trust is currently working with the United States of America through the Natural Resources Conservation Service (NRCS) to finalize a grant agreement.

It is clear from the Solano Trust Letter that the Conservation Easement does not presently exist, the funding has not been irrevocably secured, and that there are many conditions that must be met before the Conservation Easement can become reality. At this point in time, the Conservation Easement is pure speculation.

As such, the value of the Conservation Easement Replacement Lien should be considered as $0.

### c. Value of Putah Creek Replacement Lien

The Bank has obtained an Appraisal Report on the Putah Creek Property (the "**Appraisal Report**"), which indicates that the market value of the Putah Creek Property as of July 22, 2020 is $5,650,000. A true and correct copy of the Appraisal Report is attached to the James Declaration as **Exhibit S** .

The Putah Creek Property is encumbered by the RE Loan and the HELOC with combined debt of approximately $1,915,000.

As such, there is approximately $3,735,000 in equity in the Putah Creek Property.

### d. Value of Post-Petition Crop Lien

Pursuant to Attachment H to Schedules A/B, the Debtor values the 2020 Crops at $600,000. *[Schedule A/B, Attachment H.]* The Bank contends that it already has a first priority lien on the 2020 Crops. As such, the Post-Petition Crop Lien adds no value.

### e. Adequate Protection Payment

The Cash Collateral Budget provides for an Adequate Protection Payment to the Bank in the amount of $500,000. *[Cash Collateral Budget, page 16.]* There is no assurance that the Debtors will be able to make this payment.

### f. Summary of Adequate Protection Shortfall

The Adequate Protection offered by the Debtor fall short by at least $1,142,788, calculated as follows:

| | |
|---|---|
| Cash Collateral to Be Used | $6,244,788 |
| Cash Collateral Replacement Lien | $1,227,709 |
| Conservation Easement Replacement Lien | $ 0 |
| Putah Creek Replacement Lien | $3,375,000 |
| Post-Petition Crop Lien | $ 0 |
| Adequate Protection Payment | $ 500,000 |
| Total Adequate Protection | $5,702,000 |
| Adequate Protection Shortfall | $ 1,142,788 |

### g. Value of Other Real Property

The Debtor may offer all or part of the Debtor's other real property (the "**Other Real Property**") to provide additional adequate protection.

The Debtor values the Debtors Other Real Property at $33,327,000. *[Schedule A/B, Attachment B.]*

However, the Debtor's value for the Other Real Property should be questioned.

The Debtor values the Putah Creek Property at $18,361,422. *[Schedule A/B, Attachment A.]* However, the actual appraised value of the Putah Creek Property is $5,650,000, or approximately 30% of the $18,361,422 value ascribed by the Debtor.

This raises the question as to whether the Debtor has similarly overvalued the Other Real Property. If the Debtor has similarly overvalued the Other Real Property, the Other Real Property may only be worth 30% of the Debtor's value, or $9,998,100.

The Other Real Property is encumbered by the two Prudential Loans which total $14,000,000. *[Lester Declaration, par. 51.]* As such, there may be a negative equity in the Other Real Property.

There should be a further investigation of the value of the Other Real Property before relying on the Other Real Property to offer Adequate Protection.

**B. Other Issues To Be Considered.**

**1. Can The Debtor Meet The Projected Sales Objectives?**

The Debtor's ability to continue in business and meet its operating expenses appears to be contingent on the Debtor meeting its sales objectives as set forth in the Cash Collateral Budget.

The Debtor projected selling 800,000 pounds of Walnut Inventory, generating $709,000 of invoices in the week ending September 11, 2020. Did the Debtor meet these sales projections for the week ended September 11, 2020?

The Debtor projects selling 995,648 pounds of Walnut Inventory, generating $836,171in invoices in the week ending September 18, 2020. What are the prospects for the Debtor meeting the sales projections for the week ending September 18, 2020?

**2. How Loan Can the Debtor Sustain Operations While Losing Money**.

The Declaration of Joe Danelson in Support of Reply to Opposition to Confirmation of Appointment of Receiver and Preliminary Injunction (the "**Danelson Declaration**") is attached to the RFJN as **Exhibit C**.

As set forth in the Danelson Declaration, a review of the Debtor's company prepared financial statements for the year ended December 31, 2019 shows that Mr. Lester had a net operating loss of <$3,538, 339>. A review of Mr. Lester's CPA reviewed financial statement for the year ended December 31,2019 shows that Mr. Lester had a consolidated loss from operations of <$2,595,175>. Mr. Lester's CPA reviewed financial statement for the year ended December 31.2018 shows that Mr. Lester had a consolidated loss from operations of <$2,186,967>. Mr. Lester's CPA reviewed financial statement for the year ended December 31,2017 shows Mr. Lester had a consolidated loss from operations of <$1,315,990>. *[Danelson Declaration, par. 50.]*

Operating losses during the past three years, during a period of strong walnut prices, have accelerated. *[Danelson Declaration, par. 50.]*

Mr. Lester's total liabilities also increased during the period from $19,494,510 on 12-31-2017, to $21,598,609 on 12-31-18, and finally to $23,859,464 on 12-31-2019. *[Danelson Declaration, par. 50.]*

The increasing losses and higher carrying cost of increasing debt is unsustainable, especially considering meaningfully lower walnut prices now than during the previous three years. *[Danelson Declaration, par. 50.]*

Mr. Lester's operating losses have continued in 2020. A review of Mr. Lester's company prepared financial statements through April 30, 2020 shows that Mr. Lester had a

net operating loss of <$704,000> for the first four months of 2020. *[Danelson Declaration, par. 51.]*

How long can the Debtor sustain operations while the Debtor is losing money?

### 3. Has The Debtor Taken Steps to Reduce Operating Expenses?

Historically, the Debtor has purchased, processed, and sold walnuts purchased from other growers. The Cash Collateral Budget does not show that the Debtor intends to purchase any walnuts from other growers during the Cash Collateral Period.

Do the operating expenses shown in the Cash Collateral Budget reflect reduced expenses to account for the fact that the volume of walnuts processed will be significantly less than prior years?

Should the Debtor still be processing his own crops or is it more economically feasible to send the 2020 Crops to another processor?

### 4. Does the Debtor Need to Make Adequate Protection Payments to Prudential?

The Cash Collateral Budget includes substantial debt service payments to Prudential of $162,363. *[Cash Collateral Budget, page 16.]* Yet, the Debtor values the Other Real Properties securing the Prudential Loans at $33,327,000. As such, according to the Debtor, Prudential is more than adequately protected.

Should the Debtor be permitted to use the Bank's cash collateral to make these payments to Prudential?

### C. The Debtor's Representations Regarding His Historical Relationship With The Bank Are Grossly Inaccurate.

As set forth in the Danelson Declaration, the Debtor approached the Bank in 2018 and asked for additional financing to develop the McCune Ranch. The Bank advised the Debtor that it could not provide such financing because the amount requested would cause the Debtor's total loans outstanding with the Bank to exceed the legal lending limits. At the Debtor's request, the Bank referred the Debtor to Prudential, who eventually lent the Debtor $14,000,000. Prudential required the Debtor to pay off other loans secured by property that

Prudential was requiring as collateral. The Debtor walked away from the Prudential loans with over $1,900,000 in cash. *[See Danelson Declaration par. 25 – 49]*

The Debtor fails to mention the $2,500,000 Bridge Loan made by the Bank in 2018, to allow the Debtor to pay for 2018 crops purchased from other growers.

The Debtor also fails to mention the $2,300,000 overdraft that the Debtor asked to the Bank to cover to pay growers for the crops delivered at the end of 2019.

## III

## CONCLUSION

The Debtor has failed to demonstrate that the Bank's interests will be adequately protected as a result of the Debtor's proposed use of the Cash Collateral.

There are serious questions regarding the Debtor's ability to sustain the Debtor's operations.

The Motion for Use of Cash Collateral should be denied, and if not denied, at least limited in amount to what is absolutely essential (and for which the Bank's interests are adequately protected) and in duration to a shorter period of time to determine if the Debtor can in fact sustain the Debtor's operations. At most the use of cash collateral should be permitted only for an additional 4-week period to enable a meaningful comparison of the Debtor's cash flow projections to actual results.

Dated: September 14, 2020  KRAFT LAW

*/s/ Douglas H. Kraft*

Douglas H. Kraft, Esq.
Attorney for First Northern Bank of Dixon