**11 PAGES**
Jason J. DeJonker (*pro hac vice admission granted*)
Nicholas R. Marcus (*pro hac vice admission granted*)
**Bryan Cave Leighton Paisner LLP**
161 N. Clark Street, Suite 4300
Chicago, IL 60601
Telephone 312.602.5005
Jason.DeJonker@bryancave.com
Nick.Marcus@bryancave.com

**Counsel for Secured Creditor The Prudential Insurance Company of America**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | Case No. 20-24123-E-11 |
| RUSSELL WAYNE LESTER, an individual ) | |
| d/b/a Dixon Rudge Farms ) | Chapter 11 |
| ) | |
| Debtor. ) | |
| ) | |

### SECURED CREDITOR PRUDENTIAL'S SUPPLEMENTAL, CONDITIONAL OBJECTION TO DEBTOR'S MOTION FOR AN ORDER AUTHORIZING FINAL USE OF CASH COLLATERAL AND GRANTING REPLACEMENT LIENS AND RESERVATION OF RIGHTS

Secured creditor Prudential,[1] as secured lender to Debtor, through counsel, files this Supplemental, Conditional Objection and Reservation of Rights (the "**Supplemental Objection**") to *Debtor's Motion for an Order Authorizing Final Use of Cash Collateral and Granting Replacement Liens* (the "**Motion**") and states as follows:

**I.　Introduction.**

1.　Prudential remains deeply concerned about the direction of Debtor's bankruptcy case and ability to reorganize – particularly because Debtor appears to base his entire going-forward plan on valuations of assets that are not supported (which is particularly problematic

---

[1] Capitalized terms not otherwise defined herein shall have the same meaning as ascribed to them in Prudential's *Objection to Debtor's Motion for an Order Authorizing Final Use of Cash Collateral and Granting Replacement Lien* (the "**Initial Objection**"), filed with this Court on September 14, 2020 (Docket No. 119).

given current economic conditions resulting from the COVID-19 pandemic). Such issues relate not only to the value of Debtor's existing inventory (much of it which is significantly dated), but also to the value of Debtor's real property (most of which is subject to Prudential's security interests). At present, Debtor is proposing to pay both of its secured creditors (including FNB) in substantial part through the sale of Prudential's real estate collateral. Prudential has serious misgivings about Debtor's ability to pay all of its creditors – in full – via such a sale.

2. As such, Prudential objects to the Motion because: (a) the amended 13-week budget and business plan will cause certain of Prudential's collateral, the inventory and the 2020 Crops, to decrease in value; (b) the 13-week budget is not realistic or supported; and (c) Debtor is not making adequate protection payments to Prudential (despite having proposed to do so in its initial 13-week budget). Prudential also restates the objections and reservations of rights made in the Initial Objection.

3. Nonetheless, despite these objections, Prudential will consent to a short extension of Debtor's use of cash collateral (through a date to be determined in November 2020) premised on: (a) Prudential receiving the scheduled interest payments, as adequate protection, originally proposed in Debtor's initial 13-week budget and cash collateral motion; and (b) payment of Prudential's legal fees and costs (which is typical for a fully (if not over) secured creditor in a Chapter 11 bankruptcy case).

**II.**     **Procedural History As To Debtor's Motion For Use Of Cash Collateral.**[2]

4. The Motion originally sought authority to use $166,325.00, plus a 15% variance, through the period ending September 16, 2020 (the "**First Interim Relief**") and final authority to use cash collateral pursuant to a 13-week budget, ending the week of November 27.

---

[2]     The detailed pre-petition relationship between Prudential and Debtor can be found in the Initial Objection.

5. The initial 13-week budget set forth Debtor's estimated cash receipts and disbursements over that period. According to the 13-week budget, Debtor estimated that it would have an aggregate $2,613,827 in cash receipts and an aggregate of $1,860,867 in cash disbursements, with a net cash flow of $752,961. These disbursements included, *inter alia*, the scheduled quarterly interest payments due under the Notes to Prudential in the amount of $162,363 and a "Payment for Adequate Protection" to FNB in the amount of $500,000.

6. With the consent of FNB and Prudential, this Court entered an order authorizing the First Interim Relief and granting adequate protection (the "**First Interim Order**"). However, the First Interim Order also provided FNB adequate protection through a replacement lien on the property commonly referred to as the Putah Creek Road property and a first-priority lien on the 2020 Crops. Although the Motion did not contemplate this adequate protection, Prudential consented to Debtor providing it on an interim basis.

7. Thereafter, Debtor sought authority to use $189,223.00, plus a 10% variance, through the period ending October 2, 2020 (the "**Second Interim Relief**") and final authority to use cash collateral pursuant to a 13-week budget, ending the week of November 27.

8. In conjunction with seeking such relief, Debtor filed an amended 13-week budget in which Debtor estimated that through the week ending November 27, 2020 it would have an aggregate $702,120.00 in cash receipts and an aggregate of $789,190.00 in cash disbursements, with a net cash flow of negative $86,070.00. This amended budget no longer included the required interest payments to Prudential or the adequate protection payment to FNB. Upon information and belief, the main difference between the original 13-week budget and the amended 13-week budget is that the latter does not include "bulk" sales of inventory or the expenses associated therewith, reducing both receipts and disbursements.

9. With the consent of FNB and Prudential, this Court entered an order authorizing the Second Interim Relief and granting adequate protection (the "**Second Interim Order**"). However, the Second Interim Order also provided FNB adequate protection through a replacement lien on the Putah Creek Road property and a first-priority lien on the 2020 Crops. Although the Motion did not contemplate this adequate protection, Prudential consented to Debtor providing it on an interim basis. In addition, the Second Interim Order requires Debtor to now circulate regular financial reporting to Prudential and FNB, including a comparison of its actual receipts and disbursements against its forecasted receipts and disbursements.

### III. Prudential's Objection to Use of Cash Collateral and Adequate Protection.

10. To authorize Debtor's use of cash collateral pursuant to Code sections 363(c)(2) and (e), this Court must first find that Prudential's interest in the cash collateral is adequately protected. *In re Plaza Family P'ship*, 95 B.R. 166, 171 (E.D. Cal. 1989) ("Cash collateral can be authorize only where secured creditors are adequately protected in accordance with Bankruptcy Code section 363(e)"). Debtor has the burden of demonstrating that secured creditors are adequately protected. *See* 11 U.S.C. § 363(p)(1); *In re Scottsdale Medical Pavilion*, 159 B.R. 295, 302 (B.A.P. 9th Cir. 1993).

11. The purpose of adequate protection is to safeguard the secured creditor against the depreciation of its collateral. *In re Weinstein*, 227 B.R. 284, 296 (9th Cir. B.A.P. 1998). Thus, a creditor's interest in its collateral must be protected from diminution while any property, including cash collateral, is being used or retained in the bankruptcy case. *In re Gallegos Research Grp., Corp.*, 193 B.R. 577, 584 (Bankr. D. Colo. 1995).

### A.　　Prudential Objects to the Diminution of its Collateral.

12.　　The amended 13-week budget proposes a significant reduction in sales of inventory – from aggregate cash receipts over that period of $2,613,827 down to $702,120 and an increase in inventory on hand from 2,471,884 pounds to 4,640,082 pounds. Debtor has represented that the market for walnuts is currently depressed but that it will improve in the near future. Debtor believes that by creating a large inventory stockpile, it will be able to increase revenue long-term by selling at these alleged higher prices. However, to date there has been no evidence of a stronger market lurking in the future except for Debtor's representations.

13.　　As a result, it is also likely that prices will continue to stay depressed, or fall even further, particularly as California's walnut production is expected to hit a record-high in 2020.[3] To the extent that the glut of walnuts continues to further depress the market price for walnuts, the value of the inventory will continue to decrease. This will be compounded by the possibility that Debtor is unable to store such an enormous amount of inventory – to date, Debtor has not represented the extent of its storage capability.

14.　　Indeed, at a time when the amount of demand has increased for walnuts, Debtor proposes to decrease its sales. As noted in one article: "[i]nterestingly, COVID-19 has actually helped increase sales in the retail segment. Retailers and consumers increasingly embrace e-commerce, opening new avenues for retail promotion, while also bolstering the importance of neighborhood grocery, in many countries like Spain and India…."[4] Thus, at a time when product demand and product availability are at their highest, Debtor proposes to sit on the sidelines in hopes that prices will rise.

---

[3]　　*See*, *e.g.*, *California walnut industry gears up to market record crop*, Morning Ag Clips (Aug. 31, 2020), https://www.morningagclips.com/california-walnut-industry-gears-up-to-market-record-crop/.).

[4]　　*See California walnut industry gears up to market record crop*, Morning Ag Clips (Aug. 31, 2020), https://www.morningagclips.com/california-walnut-industry-gears-up-to-market-record-crop/.

15. The use of cash collateral, or the diminution of its value, without generating replacement cash collateral is particularly prejudicial to secured creditors and often requires additional protection, such as direct payments. *See*, *e.g. In re Chardon, LLC*, Case No. 13-81372, 2015 Bankr. LEXIS 140, at *7 (Bankr. N.D. Ill. 2015); *Ridgemont Apartment Assocs., Ltd. v. Atlanta English Vill., Ltd.*,110 B.R. 77, 83 (N.D. Ga.1989). As it stands, Debtor's debt obligations will continue to mount while the value of its collateral stagnates or decreases, placing Prudential in an ever worse position as secured creditor.

16. To the extent that Debtor is selling inventory, and even if it increases such sales beyond what is provided for in the amended 13-week budget, Debtor is merely using collateral to fund a chronically unprofitable enterprise, as shown through the prior filings of FNB. This is the proverbial throwing good money after bad, and will only result in increased debts and diminished assets, with nothing else to show. While Debtor has repeatedly indicated that it has a plan to profitability, its plan is no more detailed than waiting until the market turns around. In the meantime, Prudential (and FNB) are on the hook for all of the risk – to the extent that this path falls through, their collateral is at-risk and is likely to decrease in value.

17. The potentially decreasing asset values and mounting debts creates a worse situation for Prudential than if it were simply permitted to foreclose on its collateral. This is the exact scenario that adequate protection is meant to remedy. *See*, *e.g. In re 354 E. 66th St. Realty Corp.*, 177 B.R. 776, 782 (Bankr. E.D.N.Y. 1995) ("The purpose or intent of granting adequate protection payments are to maintain the status quo for that creditor and to protect the creditor from diminution or loss of the value of its collateral during the ongoing Chapter 11 case.")

18. Therefore, Prudential objects to the Motion to the extent that the amended 13-week budget will cause the inventory to decline in value without generating replacement cash collateral unless Prudential receives additional payments in return.

*B. Prudential Objects to the Budget as it is Not Feasible.*

19. As set forth above, the amended 13-week budget provides for an enormous reduction in sales, leading to a significant increase in inventory on hand. While the projected disbursements have also decreased – from $1,860,867 to $788,190 – approximately $900,000 of this nearly $1,100,000 decrease is attributable to excising payments to Prudential, FNB, and Debtor's professionals. In other words, Debtor has only been able to reduce its operating expenses by approximately $200,000 while its cash receipts are projected to fall approximately $1,900,000.

20. Further, Debtor is simply putting off paying Prudential (and its own professionals), which it will inevitably have to pay either through a plan of reorganization or subsequent cash collateral budgets. The amounts Debtor is delaying paying to Prudential will begin accruing additional interest, further increasing Debtor's ultimate debt burden.

21. Debtor seems to believe that the walnut market will turn around soon, providing Debtor the opportunity to begin selling its massive stockpile of inventory at a price higher than what is available now. Whether this will turn out to be true – Debtor has provided no evidence of such a turnaround – it unknown. Indeed, other industry experts have suggested that pricing could be an issue now and into the future: "[d]espite the positive outlook for production, there is some concern within the industry as to what kind of effect that will have on pricing. The

expectation is that growers will have a record year in terms of tonnage with more trees coming into production."[5]

22. Irrespective of pricing, it is unclear how Debtor can continue to operate without generating revenues through the sales of its products.

23. Ordinarily, Debtor appears to require agricultural production loans, including the various such loans Debtor has obtained from FNB over the years, early in the year to fund its operations until it can harvest and sell inventory at the end of the year. Debtor has not indicated that it intends to acquire such a loan nor whether lenders exist that will provide such a loan on reasonable terms. Further, with such reduced cash receipts, Debtor will also be unable to fund operations itself in any meaningful way.

24. Finally, in the Motion informed all parties and the Court of the Conservation Easement,[6] which will purportedly provide Debtor with approximately $5,700,000 in funds in return for placing a restriction on certain of Debtor's real estate (which real estate also serves as collateral for Debtor's indebtedness to Prudential). Although the Conservation Easement has several conditions precedent that must be satisfied before the transaction can close, Debtor has represented that it has satisfied these conditions. Nonetheless, Debtor has also represented that, and upon information and belief, the proceeds from the Conservation Easement will not be available until spring of 2021. Regardless, Debtor proposes to grant replacement liens in the proceeds of the Conservation Easement and has indicated that it intends to use these proceeds to pay Prudential, FNB, and taxing authorities, not to pay for operations.

---

[5] *See California walnut industry gears up to market record crop*, Morning Ag Clips (Aug. 31, 2020), https://www.morningagclips.com/california-walnut-industry-gears-up-to-market-record-crop/.

[6] Background information regarding the Conservation Easement can be found in the Motion.

25. Finally, and as set forth above, Debtor's operations have been unprofitable for several years. While Debtor believes several external factors are to blame, there is no indication that such factors will disappear anytime soon or that Debtor is taking steps to overcome these obstacles. As a result, without structural changes to Debtor's operations or market changes beyond Debtor's control (and which changes do not appear forthcoming), Debtor will continue losing money. The budget shows neither of those changes necessary to reach profitability.

26. As a result, Prudential objects to the Motion because the amended 13-week budget does not appear feasible to allow Debtor to operate. To the extent that this Court does grant relief to Debtor, Prudential requests that such relief be on an interim basis through a date to be determined in November 2020, during which this Court and the parties can continue to evaluate Debtor's finances and ability to operate under its proposed budgets.

    C.    *Prudential Requests that Cash Collateral Be Used to Pay Its Interest Payments and Its Reasonable Attorney Fees.*

27. The Motion and its original 13-week budget proposed to pay Prudential its upcoming quarterly interest payment as required under the Notes in the amount of $162,363. However, the amended 13-week budget no longer proposes to make this interest payment. As a result, this missed payment will begin to accrue interest of its own, further increasing Debtor's debt burden which it will inevitably have to pay in the future, either through a plan of reorganization or subsequent interim cash collateral. This will only serve to further hamper Debtor's ability to fund its operations in the future (by requiring larger debt payments) and potentially reduce the payout to unsecured creditors at the end of this case.

    D.    *Prudential Requests that It Be Granted Liens on Proceeds of Avoidance Actions*

28. It is not uncommon for debtors to grant secured creditors replacement liens in the proceeds of avoidance actions, as these proceeds are generally otherwise unencumbered. *See*,

*e.g. In re AppliedTheory Corp.*, Case No. 02-11868, 2008 WL 1869770, at *1 (Bankr. S.D.N.Y. 2008). As mentioned in the hearing before this Court on September 17, 2020, Prudential intends to work with Debtor, FNB, the United States Trustee, and any other relevant parties to conduct a 2004 examination to glean more information about Debtor and its pre-petition activities. As such, it is unknown whether any avoidance actions may exist, but to the extent that they do proceeds from such actions are meant to benefit the estate, including as additional security for secured creditors.

### IV.     Reservation of Rights

29.     Nothing in this Supplemental Objection is intended to be or should be considered an acceptance of the property valuations submitted by Debtor. Prudential reserves all rights to challenge such valuations or conduct appraisals of its own to accurately determine the value of its collateral, the cost of which shall be added to the secured indebtedness Debtor owes to Prudential.

30.     Finally, Prudential has not seen a draft of the proposed Final Cash Collateral Order. As a result, Prudential may have additional objections based upon the language of such order and reserves the right to make such further objections.

### V.     Conclusion

WHEREFORE, Prudential respectfully requests that this Court modify the relief requested in accordance with this Supplemental Objection and grant such other relief as this Court deems just and proper.

Dated: September 28, 2020

Respectfully submitted,

**BRYAN CAVE LEIGHTON PAISNER LLP**

By: */s/ Nicholas R. Marcus*
Jason J. DeJonker (*pro hac vice admission granted*)
Nicholas R. Marcus (*pro hac vice admission granted*)
161 N. Clark Street, Suite 4300
Chicago, IL 60601
Telephone 312.602.5005
Jason.DeJonker@bryancave.com
Nick.Marcus@bryancave.com

**Attorneys for Secured Creditor**
**The Prudential Insurance Company of America**