# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF CALIFORNIA
# CIVIL MINUTES

**Case Title:** Russell Wayne Lester

**Case No.:** 20-24123 - E - 11
**Docket Control No.** FWP-2
**Date:** 09/17/2020
**Time:** 11:00 AM

**Matter:** [12] - Motion/Application Granting Replacement Liens [FWP-2] Filed by Debtor Russell Wayne Lester (isaf) [12] - Motion/Application Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001 [FWP-2] Filed by Debtor Russell Wayne Lester (isaf) [12] - Motion/Application to Use Cash Collateral [FWP-2] Filed by Debtor Russell Wayne Lester (isaf)

**Judge: Ronald H. Sargis**
**Courtroom Deputy: Nancy Williams**
**Reporter: Diamond Reporters**
**Department: E**

**APPEARANCES for:**
**Movant(s):**
(by phone) Debtor - Russell Wayne Lester; (by phone) Debtor's Attorney - Thomas A. Willoughby
**Respondent(s):**
(by phone) Creditor's Attorney - Jason J. DeJonker; (by phone) Creditor's Attorney - Nicholas R. Marcus; Creditor's Attorney - Douglas H. Kraft; (by phone) Creditor's Attorney - Howard S. Nevins; Mr. Russell Burbank, Atty Stephen Reynolds all by phone

## CIVIL MINUTES

HEARING TO BE HELD ON 10/1/2020 at 10:30 AM at Sacramento Courtroom 33, Department E

See Findings of fact and conclusions of law below

Local Rule 9014-1(f)(1) Motion—Hearing Required.

Sufficient Notice Provided. The Proof of Service states that the Motion and supporting pleadings were served on Debtor in Possession, creditors holding the twenty largest unsecured claims, creditors, parties requesting special notice, and Office of the United States Trustee on September 2, 2020. The initial emergency hearing was conducted on August 31, 2020, and the final hearing set by order of the court for September 17, 2020.

**The hearing on the Motion for Authority to Use Cash Collateral is continued to 10:30 a.m. on October 1, 2020.**

**Supplemental Opposition shall be filed and served on or before 2:00 p.m. on September 29, 2020, and Replies, if any, filed and served on or before noon on October 30, 2020.**

Russell Wayne Lester, an individual, dba Dixon Ridge Farms ("Debtor in Possession") moves for an order approving the use of cash collateral from:

    a. Cash in Debtor in Possession's bank accounts totaling $182,405.24 (of which $3,445.35 of which First Northern Bank has a security interest),

    b. Cash in Receiver's account totaling $58,655.89,

    c. Cash in the personal bank accounts held by Debtor in Possession's wife, Kathleen Lester, totaling $33,518.68,

    d. Inventory of approximately 3,915,003 pounds of walnuts valued by the Receiver at $3,759,737, and

    e. Equipment necessary to harvest over one million pounds of currently unharvested walnuts.

("Property").

Debtor in Possession requests the use of cash collateral to be able to pay critical and necessary expenses of its operations. Debtor in Possession proposes to use cash collateral for the following expenses:

    1. harvesting the 2020 walnut crop which will cost approximately $166,325.00,

    2. issuing payroll and related benefits in the approximate amount of $39,196.70 and

    3. paying for utilities, including utility deposits in the approximate amount of $23,000.

Debtor in Possession proposes that the cash collateral be approved with a 15% variance.

**Emergency First Day Order**

On September 8, 2020, this court entered an emergency "first day order" authorizing the use of cash collateral on an interim basis, which also set a briefing schedule and the September 17, 2020 final hearing for this Motion. The court granted replacement liens for First Northern Bank of Dixon on the 2020 walnut crop (primed senior lien) and on the real property already subject to the Bank's deed of trust to the extent that the use of the Bank's cash collateral resulted in a reduction of the cash collateral available for that creditor.

The emergency first day order was issued with the participation of creditors having secured claims.

## OPPOSITIONS FILED

**Creditor Prudential's Opposition**

Creditor the Prudential Insurance Company of America ("Prudential") filed an Opposition on September 14, 2020. Dckt. 119.

<u>Conservation Easement</u>

Prudential objects to replacement liens being given in the Conservation Easement on the basis that Prudential already has a security interest in the real properties where the easement is being placed - the Carrion Ranch and the McCune Ranch properties. Thus, Prudential believes it may already have a lien on the proceeds of the Conservation Easement once those proceeds arise.

Prudential adds that it objects to First Northern Bank ("FNB") receiving a lien in any proceeds in which Bank does not already hold a mortgage or security interest. If the court moves forward with granting a replacement lien to FNB, Prudential asserts that the FNB lien must be subordinate to Prudential's senior security interests and liens in the Conservation Easement.

<u>Inventory and 2020 Crops</u>

Additionally, Prudential objects to the replacement lien on the inventory and the 2020 crops because both Prudential and FNB claim perfected security interests in Debtor in Possession's inventory and 2020 crops, but their priority has not yet been determined. Prudential contends that it is unnecessary to add liens over the inventory and the crops when both Prudential and FNB have equity in their respective real estate. If the court allows for liens over the inventory and crops, Prudential requests that both Creditor be granted equal amount and priority.

<u>Putah Creek Property</u>

Further, Creditor objects to the proposed replacement liens on assets other that the real estate and argues that replacement liens should only be granted to those parties to the extent of their respective real estate collateral.

### $500,000 Adequate Protection Payment

As it pertains to FNB's adequate protection payment in the amount of $500,000, Prudential objects on the basis that said payment is unnecessary and it will come from the proceeds of sales of inventory and/or the crops, and will overprotect FNB at the expense of Prudential and other creditors.

Prudential objects to the proposed variance on the budget because 15% is not the common practice. Prudential calculates that if allowed Debtor in Possession could disburse without the court's or Prudential's consent, over $270,000 in funds over what is needed in the 13-week budget. Prudential asserts that 5% variance is the common practice.

Creditor also seeks clarification regarding the itemized insurance payment in the budget. Creditor requests that Debtor should identify the purpose of this payment whether it is for real property, employees or equipment. Prudential objects to any insurance for real property in which Prudential does not have a security interest.

Further, Prudential requests that the budget take into account and use cash collateral to pay Prudential's reasonable attorney fees asserting that it is common practice to make such payment in connection with the enforcement of creditor's rights during a bankruptcy proceeding.

Lastly, Prudential reserves its rights to: determine the amount of interest actually owed by Debtor; challenge Debtor in Possession's valuations or conduct appraisals to determine the value of collateral; and may object to the Final Cash Collateral Order as they have not seen a draft.

**Creditor First Northern Bank of Dixon**

Creditor First Northern Bank of Dixon ("FNB") filed an Opposition on September 14, 2020. Dckt. 121.

FNB asserts that adequate protection should be based on the market value of the inventory and not the values presented by Debtor in Possession, which is the forced liquidation value used by the Receiver. According to Creditor, Debtor in Possession has remained in operation and continued sales; thus, FNB's adequate protection payment should be based on the "Post-COVID-19" $11,888,189.21 market value shown on Debtor in Possession's July 31, 2020 Inventory Report sent to the Receiver on August 20, 2020. (Exhibit P and Q, Dckts. 137, 138)

Moreover, FNB objects on the basis that the value of adequate protection offered by the Debtor in Possession is not indeed adequate and there will be a shortfall of at least approximately $1,142,788.

### Conservation Easement

First, FNB asserts that there is no value to the Conservation Easement as it does not presently exist, the funding has not been secured, and there are conditions set by the Solano Land Trust and the state of California that must be met before the easement can become a reality. Thus, the value of this lien is $0.00.

### Putah Creek Property

Second, FNB argues that Debtor in Possession has overvalued the Putah Creek Property after obtaining an Appraisal Report valuing the property at $5,650,000, and not at $18,081.581.78 as indicated by Debtor in Possession.

### Inventory and 2020 Crops

Third, Bank contends that it already has a first priority lien on the 2020 crops and as such this post-petition lien adds no value.

### $500,000 Adequate Protection Payment

Bank does believe that Debtor in Possession will be able to make such a payment.

### Other Real Property

Although Debtor in Possession may offer other real property to cover this shortfall, FNB warns the court that an investigation of value may be in order on the basis that Debtor in Possession may have overvalued the real property. Moreover, this other real property is encumbered by Creditor Prudential.

FNB raises the issue over whether Debtor in Possession will achieve projected sales objectives after suffering financial losses for three years in a row (2017, 2018, and 2019), and Debtor in Possession's liabilities have increased during the same period from $19,494,510 to $23,859,464 by the end of 2019. Moreover, FNB points the court to Debtor in Possession's financial statement for the first four months of 2020, which show a net operating loss of $704,000.

Creditor also questions whether Debtor in Possession has taken steps to reduce operating expenses, and it is uncertain whether Debtor in Possession is accounting for a reduced volume of walnuts to be processed or whether Debtor in Possession will be processing his own crops or sending the 2020 crops to another processor.

FNB argues that Prudential is more than adequately protected than FNB as Prudential's loans secure real property valued at $33,327,000 and questions whether Prudential should be paid from FNB's cash collateral.

Lastly, FNB asserts that the use of cash collateral should be permitted only for an additional 4-week period instead of the 13-week period suggested, arguing that this shorter time would allow for a more meaningful comparison between Debtor in Possession's cash flow and actual results.

**APPLICABLE LAW**

Pursuant to 11 U.S.C. § 1101, a debtor in possession serves as the trustee in the Chapter 11 case when so qualified under 11 U.S.C. § 322. As a debtor in possession, the debtor in possession can use, sell, or lease property of the estate pursuant to 11 U.S.C. § 363, but is limited when that property is cash collateral as follows:

(c)

. . .

(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—

>   (A) each entity that has an interest in such cash collateral consents; or

>   (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

(3) Any hearing under paragraph (2)(B) of this subsection may be a preliminary hearing or may be consolidated with a hearing under subsection (e) of this section, but shall be scheduled in accordance with the needs of the debtor. If the hearing under paragraph (2)(B) of this subsection is a preliminary hearing, the court may authorize such use, sale, or lease only if there is a reasonable likelihood that the trustee will prevail at the final hearing under subsection (e) of this section. The court shall act promptly on any request for authorization under paragraph (2)(B) of this subsection.

(4) Except as provided in paragraph (2) of this subsection, the trustee shall segregate and account for any cash collateral in the trustee's possession, custody, or control.

Since the use of cash collateral and the concept is well known to the experienced attorneys involved in this case, the court provides the brief discussion below from COLLIER ON BANKRUPTCY on the required adequate protection if a creditor's cash collateral is being used:

[3]  Form of Adequate Protection for Use of Cash Collateral

In the context of a request for authorization to use cash collateral under section 363(c)(2), it is unlikely that the creditor will be able to receive the precise equivalent of cash collateral. However, section 363 does not require precise equivalency. The special treatment afforded cash collateral recognizes its unique status as the highest and best form of collateral but also establishes that upon an appropriate showing it can be used if the rights of the secured creditor can be adequately protected. Whether adequate protection may be said to exist will depend on a number of factors, including the value of all collateral, the nature of the proposed use and the value of that which is being offered. While cases are quite varied, substitute liens, **equity cushions and operating controls have all been found sufficient**. [12]   But maintaining insurance and granting a right to inspect books and records, without more, is not sufficient, where business is declining. [12a]

12. *In re James Wilson Assocs.*, 965 F.2d 160, 26 C.B.C.2d 1673 (7th Cir. 1992); *Prudential Ins. Co. v. Monnier (In re Monnier Bros.)*, 755 F.2d 1336, 12 C.B.C.2d 323 (8th Cir. 1985); *Martin v. Commodity Credit Corp.* 761 F.2d 472, 12 C.B.C.2d 974 (8th Cir. 1985); *Crocker Nat'l Bank v. American Mariner Indus. (In re American Mariner Indus.)*, 734 F.2d 426, 10 C.B.C.2d 910 (9th Cir. 1984), overruled on other grounds, *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 484 U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740, 17 C.B.C.2d 1368 (1988); *Wilmington Trust Co. v. AMR Corp. (In re AMR Corp.)*, 490 B.R. 470 (S.D.N.Y. 2013). Although the grant of an administrative priority is not adequate protection, see 11 U.S.C. § 361(3), at least one court has held that where the debtor failed to give proper notice to a creditor entitled to protection and failed to provide adequate protection, section 507(b) could provide an equitable solution. *See In re Center Wholesale, Inc.*, 759 F.2d 1440, 12 C.B.C.2d 1107 (9th Cir. 1985); *see also In re California Devices, Inc.*, 126 B.R. 82, 84 (Bankr. N.D. Cal. 1991) (purpose of section 507 is to "[e]stablish a failsafe system in recognition of the ultimate reality that protection previously determined the 'indubitable equivalent' … may later prove inadequate").

12a. *In re Sterling Estates (Delaware), LLC*, 64 C.B.C.2d 1745, 2011 Bankr. LEXIS 54 (Bankr. N.D. Ill. Jan. 6, 2011).

3 Collier on Bankruptcy, Sixteenth Edition, ¶ 363.05[3].

Federal Rule of Bankruptcy Procedure 4001(b) provides the procedures in which a trustee or a debtor in possession may move the court for authorization to use cash collateral. In relevant part, Federal Rule of Bankruptcy Procedure 4001(b) states:

(b)(2) Hearing

The court may commence a final hearing on a motion for authorization to use cash collateral no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a preliminary hearing before such 14-day period expires, but the court may authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

## DISCUSSION

As an initial point, neither FNB nor Prudential could provide the court with the Commercial Code law concerning the liens, if any, that are asserted in the 2020 crop. Rather, they merely tell the court the status of any such liens is unknown. This may well indicate that the investigation by their counsel has resulted in showing that they have no such liens and that the post-petition 2020 crop is free and clear of all liens and encumbrances.

The court begins this further consideration taking into account the asserted value of the various items of existing collateral by FNB and Prudential.

**FNB Claims**

| Collateral | FNB Statement of Value | |
|---|---|---|
| | | |
| | ($2,896,604) | **Ag Production Loan** |
| | ($5,055,159) | **Asset Based Line of Credit** |
| Personal Property Collateral Securing the Ag and Asset Based Credit | | |
| Inventory (FNB Valuation) | $11,888,189 | |
| Equipment Value | Value Not Provided by FNB | |
| Schedule A/B | $1,032,190 | |
| Accounts Receivable | Value Not Provided by FNB | |
| Schedule A/B | $272,975 | |
| Other Personal Property Collateral | Value Not Provided by FNB | |

|  | =============== |  |
|---|---|---|
| **Equity Cushion/ (Undersecured)** | $5,241,591 | **For Ag Loan and Asset LOC** |
|  |  |  |
|  | ($1,415,185) | **Real Estate Loan** |
| Secured by Putah Creek Property 1st Deed of Trust (FNB Valuation) | $5,650,000 |  |
|  | ($503,835) | **HELOC** |
| Secured by 2nd Deed of Trust on Putah Creek Property |  |  |
|  | ============ |  |
| **Equity Cushion/ (Undersecured)** | $3,730,980 | **For Real Estate Loan and HELOC** |
|  |  |  |

**Prudential Claims**

|  | Prudential Statement of Loans and Value of Collateral | Collateral |
|---|---|---|
|  |  |  |
|  |  |  |

| | | |
|---|---|---|
| **First Note** | ($6,500,000) | |
| | $33,000,000 | First Deeds of Trust on the Following Properties Securing First Note (Values of Properties Stated by Debtor on Schedule A/B - Prudential references this value in the Opposition but has presented no statement as to alleging any contrary value of its collateral) |
| | | Carrion Ranch |
| | | Gordon Ranch |
| | | MacQuiddy Ranch |
| | | Oda Ranch |
| | | |
| | Same as listed above for FNB | Personal Property Crops and Proceeds |
| | | |
| | | Personal Property Securing First Note |
| **Prudential Second Note** | ($7,500,000) | |

| | | |
|---|---|---|
| | Same as Above | Second Deeds of Trust Securing Second Note |
| | Same as Above | Personal Property Securing Second Note |
| | =================== | |
| **Equity Cushion/ (Under secured)** | **$19,000,000** | **For First and Second Note** |
| | Plus Crop inventory and proceeds if senior to FNB or to the extent in excess of other collateral securing FNB secured claims | |

     Using the best numbers available, FNB states its secured claims are oversecured by $3,730,980 (using FNB's discounted value for the Putah Creek Property) for the two loans secured by the Putah Creek Property and $5,241,591 for the Ag Loan and Asset Based Line of Credit. For the second one, such a cushion exists if it is senior on the inventory lien to Prudential. If its lien is junior to Prudential, it appears that in light of the substantial, multi-million dollar equity cushion enjoyed by Prudential, the inventory and crops collateral value would flow to FNB. This equity cushion is in inventory on the shelf and the dirt itself (real property encumbered by FNB deeds of trust), not some operating value.

     For Prudential, even without taking into account whether it holds the senior lien to the inventory and crops, it has a $19,000,000 equity cushion based on the Debtor in Possession's valuation. Cutting that in half to allow for "debtor exuberance," Prudential would still have a $9,000,000 equity cushion, which represents a 38% equity cushion based on the discounted values. This equity cushion is in the dirt itself (real property encumbered by Prudential's deeds of trust), not some operating value.

     Based on these substantial equity cushions advocated by FNB and Prudential, it appears that the adequate protection they are entitled to exists due to the prudent, very oversecured loan they have made to Debtor in Possession.

**Review of Personal Property Lien Information**

In its Opposition Prudential asserts a lien in the Debtor in Possession's crops and inventory based on the following filings:

> May 10, 2019  UCC-1 Filing With California Secretary of State For the First Note
>
> March 15, 2020  UCC-3 Financing Statement Amendment Filed With the California Secretary of State

Opposition, ¶¶ 6, 7.

FNB directs the court to the Declaration of Chaille James (Dckt. 122) and Exhibits C, D, E, and F (Dckts. 140, 136) for the documents upon which it bases its lien in the Debtor in Possession's inventory, crops, and personal property:

> Ag Production Security Agreement (Exhibit C)
>
> October 30, 1998  UCC- 1 Filing With the California Secretary of State (Exhibit D)
>
> August 13, 2003  UCC Continuation Filing With the California Secretary of State (*Id.*)
>
> September 30, 2013  UCC Continuation Filing With the California Secretary of State (*Id.*)
>
> October 15, 2018  UCC Continuation Filing With the California Secretary of State (*Id.*)
>
> October 22, 2008  UCC Continuation Filing With the California Secretary of State (*Id.*)
>
> August 3, 2019  UCC Amendment of Collateral Change Filing With the California Secretary of State (*Id.*)
>
> April 3, 2000  UCC-1 Filing With the California Secretary of State (Exhibit E)
>
> November 30, 2004  UCC Continuation Filing With the California Secretary of State (*Id.*)
>
> April 2, 2010  UCC Continuation Filing With the California Secretary of State (*Id.*)
>
> April 1, 2015  UCC Continuation Filing With the California Secretary of State (*Id.*)

September 16, 2002 UCC-1 Filing With the California Secretary of State (Exhibit F)

April 10, 2007 UCC Continuation Filing With the California Secretary of State (*Id*.)

August 12, 2011 UCC Amendment Filing With the California Secretary of State *(Id.)*

August 20, 2012 UCC Continuation Filing With the California Secretary of State (*Id*.)

July 3, 2017 UCC Continuation Filing With the California Secretary of State (*Id*.)

Beginning with California Commercial Code § 9334(i), it provides that for a security interest asserted to exist in "crops:"

> (i) A perfected security interest in crops growing on real property has priority over a conflicting interest of an encumbrancer or owner of the real property if the debtor has an interest of record in, or is in possession of, the real property.

The California Legislature further provides in California Commercial Code §§ 9308 and 9310 for the filing of a financing statement to perfect all security interests and agricultural liens.

**Revised Budget Presented by the Debtor in Possession**

In response to the Oppositions, the Debtor in Possession filed Reply pleadings and a modified proposed budget. For the 13-week period of September through November 2020, the Debtor in Possession has slimmed down the necessary budget to ($1,860,867). Dckt. 149.

On the income side, Debtor projects the following amounts as set out over the sixteen pages of Exhibit 1, Dckt. 149, the amended budget:

|  | Sept 2020 | Oct 2020 | Nov 2020 |  |
|---|---|---|---|---|
| Ending Inventory | $1,813,100 | $2,149,710 | $2,459,420 |  |
| Ending Accounts Receivable | $1,818,515 | $216,344 | $292,344 |  |
| Cash Receipts For the Month | $291,656 | $1,950,171 | $372,000 |  |

| Cash Disbursements for the Month | ($208,600) | ($666,888) | ($613,379) | |

The court is presented with an interesting situation. The two creditors objecting to the use of cash collateral have claims that are grossly oversecured. In substance, their arguments appear to be that by virtue of their liens, the bankruptcy case is dead on arrival. They appear to miss the significance of being grossly oversecured and such equity cushion providing them substantial adequate protection.

Because the two apparently grossly oversecured creditors have not consented, it is left to the court to decided what use of cash collateral is to be authorized. Here, it appears that there is substantial value in excess of the amount of each creditor's claim in their other collateral that they are adequately protected.

The Debtor in Possession requests the authorization to use cash collateral as provided in the budget through October 2, 2020, and have a final hearing on the Motion seeking authorization through November 30, 2020, on the court's October 1, 2020 calendar (specially setting to be heard on the Modesto Division calendar that day).

**September 17, 2020 Hearing**

Counsel for the Debtor in Possession reported that an agreement has been reached to go forward two weeks and iron out, with the parties in interest agreeing to limit the variance adjustments to 10%.

Further, that in the order authorizing the continued use of cash collateral, is that it is authorized to preserve the 2020 crop, and not an authorization for future years.

Counsel for the Debtor in Possession shall prepare an order form authorizing the further use of cash collateral pending the continued October 1, 2020 hearing, which shall be approved by the respective counsel for First Norther Bank of Dixon and Prudential.

Counsel for First Northern Bank of Dixon noted that while it is stipulating to the interim use of cash collateral, the Debtor's business operations had been losing money for a while, and it appears that a restructuring, including the sale of some assets, is warranted. He also noted that the Schedules reflect a large amount of case, $250,000 of cash, but did not clearly identify the source. Additionally, the Debtor in Possession may qualify for CFAP funding under the CARES Act and that such monies should be accounted for in this bankruptcy case.

Counsel for Prudential reported that the parties are setting a 2004 Examination of the Debtor. Further, that Prudential would provide the Debtor with copies of its appraisals as part of an ongoing constructive discussion with the Debtor in Possession and Debtor.