DOUGLAS H. KRAFT, ESQ. (State Bar No. 155127)
KRAFT LAW
11335 Gold Express Drive, Suite 125
Gold River, California 95670
Telephone: (916) 880-3040
Facsimile: (916) 880-3045

HOWARD NEVINS, SBN 119366
AARON A. AVERY, SBN 245448
HEFNER, STARK & MAROIS, LLP
2150 River Plaza Drive, Suite 450
Sacramento, CA 95833-4136
Telephone: (916) 925-6620
Facsimile: (916) 925-1127

Attorneys for First Northern Bank of Dixon, Creditor

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| In Re:<br><br>RUSSEL WAYNE LESTER, an individual, dba Dixon Ridge Farms,<br><br>Debtor in Possession. | Case No: 20-24123-E-11<br><br>Chapter 11<br><br>DCN: FWP-2<br><br>Date: December 10, 2020<br>Time: 10:30 a.m.<br>Courtroom: 33 – Judge Ronald H. Sargis<br>501 I Street, 6th Floor<br>Sacramento, CA95814 |

**CONDITIONAL CONSENT TO DEBTOR IN POSSESSON'S USE OF CASH COLLATERAL AND GRANTING REPLACEMENT LIENS**

First Northern Bank of Dixon, a California corporation ("**FNB**"), creditor in this case, hereby files its conditional consent (the "**Consent**") to the Motion For An Order Authorizing

Use of Cash Collateral and Granting Replacement Liens (the "**Motion**") filed by the debtor in possession, Russell Wayne Lester ("**Debtor in Possession**").

On September 1, 2020, Debtor in Possession made his Emergency Motion for an Order (A) Authorizing Interim and Final Use of Cash Collateral; (B) Granting Replacement Liens; and (C) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001( the "**Motion**"). On September 8, 2020, the Court entered its Order on the Motion (the "**First Interim Order**") which authorized the Debtor in Possession to use the Cash Collateral of FNB and Prudential Insurance Company of America ("**Prudential**") and any disputed producer lien creditors that may exist (collectively, "**Secured Creditors**") on an interim basis through September 16, 2020, for necessary expenses in the amount of $166,325.00 plus a 15% variance for emergencies during the pre-harvest period as described in the Motion.

In addition, for the purpose of attempting to provide adequate protection for the interests of the Secured Creditors, to the extent of any diminution in Secured Creditors' interest in the Debtor in Possession's pre-petition cash collateral caused by Debtor in Possession's post-petition use of such pre-petition cash collateral, the First Interim Order granted to the Secured Creditors:

a. A valid, perfected, and enforceable replacement lien under Sections 105, 361(2), and 363(e) of the Bankruptcy Code in the Debtor in Possession's post-petition cash collateral and proceeds thereof to the same extent and with the same priority that Secured Creditors held in the Debtor in Possession's pre-petition cash collateral as of the Petition Date, (the "**Cash Collateral Replacement Lien**");

b. A valid, perfected, and enforceable replacement lien under Sections 105, 361(2), and 363(e) of the Bankruptcy Code in the Conservation Easement, as defined in the Motion, to the same extent and with the same priority that Secured Creditors held in the Debtor in Possession's pre-petition cash collateral as of the Petition Date (the "**Conservation Easement Replacement Lien**").

In addition, for the purpose of attempting to provide adequate protection for the

interests of FNB, to the extent of any diminution in FNB's interest in the Debtor in Possession's pre-petition cash collateral caused by Debtor in Possession's post-petition use of such pre-petition cash collateral, the Interim Order granted to FNB:

    a.    A valid, perfected, and enforceable replacement lien under Sections 105, 361(2), and 363(e) of the Bankruptcy Code in the Putah Creek Road real property, as defined in the Motion to the same extent and with the same priority that the Bank held in the Debtor in Possession's pre-petition cash collateral as of the Petition Date (the "**Putah Creek Replacement Lien**");

    b.    To the extent that FNB does not already possess a valid, first priority lien in the Debtor's crops now growing or grown in the 2020 crop year (the "**2020 Crops**"), a valid, perfected, and enforceable first-priority lien, under Sections 105, 361(2), and 364(d) of the Bankruptcy Code on all of the 2020 Crops, senior in priority to any other security interests and liens in the 2020 Crops, to the same extent and validity of the lien of FNB held in the Debtor in Possession's pre-petition cash collateral as of the Petition Date (the "**Post-Petition Crop Lien**").

The First Interim Order set a continued interim hearing on the Motion for September 17, 2020 (the "**Second Hearing**").

On September 25, 2020, the Court entered its second Order on the Motion (the "**Second Interim Order**") authorizing use of Cash Collateral on an interim basis through September 16, 2020, for necessary expenses in the amount of $189,233.00 plus a 10% variance for emergencies during the pre-harvest period as described in the Motion, as described in the Debtor in Possession's amended budget, attached as Exhibit 1 to the Second Order (the "**Amended Budget**"). The Second Interim Order continued to provide the Cash Collateral Replacement Lien, the Conservation Easement Replacement Lien, the Putah Creek Replacement Lien, and the Post-Petition Crop Lien (collectively, the "**Replacement Liens**"). The Second Interim Order set a continued interim hearing on the Motion for October 1, 2020 (the "**Third Hearing**").

The Second Interim Order also required that within (7) days of the end of each week in which the Debtor in Possession uses Cash Collateral (a "**Budgeted Week**"), the Debtor in Possession shall provide weekly periodic accountings to the Secured Creditors' counsel setting forth the cash receipts and disbursements made by the Debtor in Possession under the Second Interim Order (the "**Cash Collateral Reporting Requirements**").  The Second Interim Order provided that Cash Collateral Reporting Requirements shall include, but not be limited to, a comparison of the Debtor in Possession's actual financial performance, including cash receipts and disbursements, during the preceding Budgeted Week with the forecast financial performance contained in the cash collateral budget for that same Budgeted Week (the "**Cash Collateral Reports**").

On October 5, 2020, the Court entered its third Order on the Motion (the "**Third Interim Order**") authorizing use of Cash Collateral on an interim basis through the week ending October 31, 2020, for necessary expenses in the amount of $252,115 plus a 10% variance for emergencies during the pre-harvest period as described in the Motion, as described in the Amended Budget. The Third Interim Order continued to provide the Replacement Liens. The Third Interim Order set a continued interim hearing on the Motion for October 29, 2020 (the "**Fourth Hearing**").

The Third Interim Order included and extended the Cash Collateral Reporting Requirements through the term of the Third Interim Order.

On November 9, 2020, the Court entered its fourth Order on the Motion (the "**Fourth Interim Order**") authorizing use of Cash Collateral on an interim basis through the week ending December 11, 2020, for necessary expenses in the amount of $332,908, plus a 10% variance for emergencies during the pre-harvest period as described in the Motion, as described in the Amended Budget. The Fourth Interim Order continued to provide the Replacement Liens. The Fourth Interim Order set a continued interim hearing on the Motion for December 10, 2020 (the "**Fifth Hearing**").

The Fourth Interim Order included and extended the Cash Collateral Reporting Requirements through the term of the Fourth Interim Order.

As required by the Fourth Interim Order, on November 25, 2020, the Debtor in Possession filed with a Court a Supplemental Declaration of Russell Burbank In Support of Debtor In Possession's Simplified Cash Collateral Budget for December 2020 through March 2021 (the "**Burbank November 25 Declaration**"). A "Simplified Budget" was attached as Exhibit A to the Burbank November 25 Declaration (the "**November 25 Budget**").

As set forth in the Burbank November 25 Declaration, the November 25 Budget projects that the Debtor in Possession will make cash disbursement for his business operations ("**Cash Disbursements**") in the amount of $665,355, for the period beginning December 12, 2020 and ending March 30, 2021. Although there does not appear to be any specific request for the continued use of Cash Collateral, it can be implied from the Burbank November 25 Declaration that the Debtor in Possession is now requesting authorization to use Cash Collateral, on an interim basis through March 30, 2021, in the amount of $665,355.00, plus a 10% variance for emergencies.

The November 25 Budget breaks down the $665,355.00 in projected Cash Disbursements by month as follows:

| | |
|---|---|
| December 2020 | $144,251 |
| January 2021 | $160,157 |
| February 2021 | $155,252 |
| March 2021 | $205,695 |
| Total through March 2021 | $665,355 |

Cash Collateral Reporting

The Debtor in Possession has provided Cash Collateral Reports for each of the Budgeted Weeks through the Budgeted Week ended November 27, 2020.

It should be noted however, that the Cash Collateral Reports for each of the Budgeted Weeks through the Budgeted Week ended November 6, 2020, included ending inventory

amounts for In-Shell and Processed Meat, both in pounds and in dollars (the "**Inventory Reporting**"). A true and correct copy of the Cash Collateral Report for the week ending November 6, 2020 is attached as **Exhibit A** to the Declaration of Douglas H. Kraft filed in support hereof (the "**Kraft December 7 Declaration**").

However, beginning with the Budgeted Week ending November 13, 2020, the Debtor in Possession eliminated the Inventory Reporting from the Cash Collateral Reports. The Cash Collateral Reports for the weeks ending November 13, 2020, November 20, 2020 and November 27, 2020, are attached as **Exhibits B**, **C**, and **D** to the Kraft December 7 Declaration.

FNB relied on the Inventory Reporting to monitor the Debtor in Possession's inventory, which is a significant portion of FNB's collateral.

<u>Budget Variances</u>

<u>Walnut Harvest</u>

The Amended Budget projected that the Debtor in Possession would harvest 1,118,400 lbs. of walnuts though the Budgeted Week ending November 27, 2020. According to the Cash Collateral Report for the Budgeted Week ending November 27, 2020 (the "**November 27 Report**"), the Debtor in Possession only harvested 712,820 lbs. of walnuts through that period. FNB understands that Debtor in Possession has completed his harvest. That amounts to <u>negative</u> variance of <405,580> lbs., or a 36% deficit in the walnut harvest.

<u>Sales (Invoices)</u>

The Amended Budget projected that the Debtor in Possession would have Sales (Invoices) totaling $825,636 through the Budgeted Week ending November 27, 2020. According to the November 27 Report, sales through the Budgeted Week ending November 27, 2020 totaled only $570,472, which is a <u>negative</u> variance of <$255,164>, or 31% deficit in Sales (Invoices).

Cash Receipts

The Amended Budget projected that the Debtor in Possession would have Cash Receipts totaling $702,100 through the Budgeted Week ending November 27, 2020. According to the November 27 Report, Cash Receipts through the Budgeted Week ending November 27, 2020 totaled $892,537, which is a positive variance of $190,417, or 27%.

However, the Cash Receipts through the Budgeted Week ending November 27, 2020 included $242,320 received in October under the United States Department of Agriculture, Coronavirus Food Assistance Program ("**CFAP**"). CFAP was established by the Coronavirus Aid, Relief, and Economic Stability Act (the "**CARES Act**"). The CARES Act appropriated $9.5 billion for the USDA to provide support for agricultural producers impacted by coronavirus. FNB's Brief Regarding Funds to Be Received Under Coronavirus Food Assistance Program (the "**CFAP Brief**"), which was filed in Solano County Superior Court in connection with FNB's prepetition loan enforcement and receivership action, is attached as **Exhibit E** to the Kraft December 7 Declaration. The CFAP Brief establishes that the $242,320 in cash received under CFAP (the "**CFAP Proceeds**") constitute FNB's Cash Collateral. The CFAP Proceeds were not included in the Amended Budget as part of the $702,100 in projected cash receipts.

In addition, Cash Receipts through the Budget Week ending November 27, 2020, also included rent of $116,482 received in October of 2020. The rent of $116,482 received in October was not included in the Amended Budget as part of the $702,100 in projected cash receipts.

As such, the $190,417 positive variance in Cash Receipts is misleading. Without the CFAP Proceeds and rent, the Debtor in Possession would have had a negative variance of <$168,385> in cash receipts, or 24% of budgeted cash receipts.

Cash Disbursements

The Amended Budget projected that the Debtor in Possession would have Cash Disbursements totaling $788,199 through the Budgeted Week ending November 27, 2020.

According to the November 27 Report, Cash Disbursement through the Budgeted Week ending November 27, 2020, totaled $475,731, which is a positive variance of $312,458, or 40% of the budgeted Cash Disbursement.

In reviewing the November 27 Report, the following significant variances in Cash Disbursements are apparent:

| | Actual | Budget | Variance |
|---|---|---|---|
| Workers Comp Insurance | $4,041 | $36,000 | $31,959 |
| Contract Labor | $1,158 | $49,000 | $47,842 |
| Spraying | $19,799 | $60,000 | $40,201 |
| Electricity – current use | $40,821 | $55,000 | $14,179 |
| Electricity – Deposit | $ 0 | $23,000 | $23,000 |
| Equipment Purchases | $ 0 | $9,063 | $9,063 |
| Debtor’s CPA | $ 0 | $10,000 | $10,000 |
| Total Variance | | | $176,244 |

The remainder of the Cash Disbursement variance seems to be widespread across the line item expenses in the Amended Budget.

Net Cash Flow

The Amended Budget projected that the Debtor in Possession would have Net Cash Flow of a negative <$86,069> through the Budgeted Week ending November 27, 2020. According to the November 27 Report, Net Cash Flow through the Budgeted Week ending November 27, 2020, totaled $416,806, which is a positive variance of $502,875.

The large positive variance in Net Cash Flow is attributable in part to the CFAP Proceeds of $242,320 and rent of $116,482, which were not included in the Amended Budget. Without these funds, the positive variance in Net Cash Flow would be $140,801.

The remainder of the positive variance in Net Cash Flow is due to the $312,458 positive variance in Cash Disbursements.

<u>General Concerns</u>

<u>The Large Variance In Cash Disbursements Is Troubling</u>

The fact that the Debtor in Possession's use of Cash Collateral was 40% less than what was projected is certainly good news. However, the 40% variance in Cash Disbursements is also troubling, and raises questions.

Is the 40% variance in Cash Disbursements a result of expenses that were not incurred and will not be incurred (i.e., true savings)? Or are they a result of expenses that were not yet incurred, but will be incurred at some time in the future (i.e., expenses deferred)? Alternatively, is the significant variance due to expenses that have been incurred and not yet paid (i.e., payments deferred)? If the variance is due to expenses deferred or payments deferred, are those expenses addressed in the November 25 Budget?

Is this large variance in Cash Disbursement an indication that the Debtor in Possession is very bad at budgeting? Or is it an indication that the Debtor in Possession intentionally "sandbagged" the Amended Budget?

Either way it calls into question the accuracy and validity of the November 25 Budget.

The Debtor in Possession is now apparently asking authorization to spend another $655,355 in Cash Collateral. Is this amount really necessary? Or is the Debtor in Possession again "sandbagging" the Budget?

<u>Are the Projected Increases in Sales Realistic?</u>

The November 27 Report shows that the Debtor in Possession missed his sales projections by 31%. Yet, the November 25 Budget is projecting a large increase in sales.

The November 25 Budget projects total sales in the four-month budget period ending March 30, 2021, of $1,382,500, or average sales of $345,625 per month.

As shown in the November 27 Report, actual sales through the Budgeted Week ending November 27 totaled $570,472, or an average of approximately $190,157 per month.

The Amended Budget projects an increase in sales, on an average monthly basis, of $155,468 per month, which is an 82% increase in sales.

Is an 82% increase in sales over the next four months realistic?

Can the Debtor Operate Profitably?

Net Cash Flow is not Net Profit.

The Debtor in Possession has a history of sizeable net operating losses. While the Debtor in Possession has a positive Net Cash Flow through the Budgeted Week ending November 27, 2020, that does not mean that the Debtor in Possession's operations are in fact profitable. The Debtor in Possession has yet to produce a true profit and loss statement showing the profitability of his operations. As such, it has yet to be established that the Debtor in Possession can operate on a profitable basis.

Professional (Restructuring) Expense

The Amended Budget and the November 25 Cash Collateral Budget includes line items for Debtor Attorneys and Debtor Financial Advisor. These line items appear to be meant to capture the attorneys' fees incurred by Mr. Willoughby and his firm and by Mr. Burbank. The Notice of Hearing also indicates that the Debtor in Possession will be engaging another law firm as trust and tax counsel. These line items are blank, and no amounts are estimated or projected for these restructuring expense.

Given the restructuring expenses which have yet to be budgeted, but which will undoubtedly be sizeable, and given the questions regarding the Debtor in Possessions' profitability, consideration should be given as to whether it is in the best interest of creditors, both secured and unsecured, to allow the Debtor in Possession to continue to operate, rather than go straight to liquidation.

**CONDITIONAL CONSENT**

FNB is concerned about the accuracy and validity of the November 25 Budget, the Debtor in Possession's ability to meet his sales projections, the ability of the Debtor in Possession to operate profitably, and what must be the ever growing Restructuring Expenses. Given these concerns, FNB believes that any authorization to use Cash Collateral shall be on a

month to month basis, until the Debtor can establish that he can operate profitably and meet his lofty sales projections, something he clearly has not yet done.

As such, FNB is willing to consent to the use of Cash Collateral through December 31, 2020, in the amount of $144,251, plus a 10% variance for emergencies, subject to the following conditions:

FNB's consent is conditioned upon the following:

1. The Secured Creditors shall be granted the Replacement Liens, as set forth in the First Interim Order, the Second Interim Order, the Third Interim Order, and Fourth Interim Order (the "**Prior Orders**").
2. The Cash Collateral Reporting Requirements shall continue, on a weekly basis, for each Budgeted Week and shall include the weekly Inventory Reporting as provided prior to the Budgeted Week ending November 13, 2020.
3. Counsel for FNB shall have approved the form of Order granting continued use of cash collateral, which shall be consistent with the form of the Prior Orders.

Dated: December 7, 2020

KRAFT LAW

*/s/ Douglas H. Kraft*

Douglas H. Kraft
Attorney for First Northern Bank of Dixon