DOUGLAS H. KRAFT, ESQ. (State Bar No. 155127)
KRAFT LAW
11335 Gold Express Drive, Suite 125
Gold River, California 95670
Telephone: (916) 880-3040
Facsimile: (916) 880-3045

HOWARD NEVINS, SBN 119366
AARON A. AVERY, SBN 245448
HEFNER, STARK & MAROIS, LLP
2150 River Plaza Drive, Suite 450
Sacramento, CA 95833-4136
Telephone: (916) 925-6620
Facsimile: (916) 925-1127

Attorneys for First Northern Bank of
Dixon, Creditor

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| In Re: | Case No: 20-24123-E-11 |
| RUSSEL WAYNE LESTER, an individual, dba Dixon Ridge Farms, | Chapter 11 |
| | DCN: FWP-2 |
| Debtor in Possession. | Date: February 4, 2021<br>Time: 10:30 a.m.<br>Courtroom: 33 – Judge Ronald H. Sargis<br>501 I Street, 6th Floor<br>Sacramento, CA 95814 |

### CONDITIONAL CONSENT TO DEBTOR IN POSSESSON'S USE OF CASH COLLATERAL AND GRANTING REPLACEMENT LIENS

---

**1**

_____
**CONDITIONAL CONSENT TO USE OF CASH COLLATERAL**

First Northern Bank of Dixon, a California corporation ("**FNB**"), creditor in this case, hereby files its conditional consent (the "**Consent**") to the Motion For An Order Authorizing Use of Cash Collateral and Granting Replacement Liens (the "**Motion**") filed by the debtor in possession, Russell Wayne Lester ("**Debtor in Possession**").

On September 1, 2020, Debtor in Possession made his Emergency Motion for an Order (A) Authorizing Interim and Final Use of Cash Collateral; (B) Granting Replacement Liens; and (C) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001( the "**Motion**"). On September 8, 2020, the Court entered its Order on the Motion (the "**First Interim Order**") which authorized the Debtor in Possession to use the Cash Collateral of FNB and Prudential Insurance Company of America ("**Prudential**") and any disputed producer lien creditors that may exist (collectively, "**Secured Creditors**") on an interim basis through September 16, 2020, for necessary expenses in the amount of $166,325.00 plus a 15% variance for emergencies during the pre-harvest period as described in the Motion. A true and correct copy of the First Interim Order is attached as **Exhibit A** to the Request for Judicial Notice (the "**RFJN**") filed in support hereof.

In addition, for the purpose of attempting to provide adequate protection for the interests of the Secured Creditors, to the extent of any diminution in Secured Creditors' interest in the Debtor in Possession's pre-petition cash collateral caused by Debtor in Possession's post-petition use of such pre-petition cash collateral, the First Interim Order granted to the Secured Creditors:

    a. A valid, perfected, and enforceable replacement lien under Sections 105, 361(2), and 363(e) of the Bankruptcy Code in the Debtor in Possession's post-petition cash collateral and proceeds thereof to the same extent and with the same priority that Secured Creditors held in the Debtor in Possession's pre-petition cash collateral as of the Petition Date, (the "**Cash Collateral Replacement Lien**");

    b. A valid, perfected, and enforceable replacement lien under Sections 105, 361(2), and 363(e) of the Bankruptcy Code in the Conservation Easement, as defined in

**2**

**CONDITIONAL CONSENT TO USE OF CASH COLLATERAL**

the Motion, to the same extent and with the same priority that Secured Creditors held in the Debtor in Possession's pre-petition cash collateral as of the Petition Date (the "**Conservation Easement Replacement Lien**").

In addition, for the purpose of attempting to provide adequate protection for the interests of FNB, to the extent of any diminution in FNB's interest in the Debtor in Possession's pre-petition cash collateral caused by Debtor in Possession's post-petition use of such pre-petition cash collateral, the Interim Order granted to FNB:

    a.     A valid, perfected, and enforceable replacement lien under Sections 105, 361(2), and 363(e) of the Bankruptcy Code in the Putah Creek Road real property, as defined in the Motion to the same extent and with the same priority that the Bank held in the Debtor in Possession's pre-petition cash collateral as of the Petition Date (the "**Putah Creek Replacement Lien**");

    b.     To the extent that FNB does not already possess a valid, first priority lien in the Debtor's crops now growing or grown in the 2020 crop year (the "**2020 Crops**"), a valid, perfected, and enforceable first-priority lien, under Sections 105, 361(2), and 364(d) of the Bankruptcy Code on all of the 2020 Crops, senior in priority to any other security interests and liens in the 2020 Crops, to the same extent and validity of the lien of FNB held in the Debtor in Possession's pre-petition cash collateral as of the Petition Date (the "**Post-Petition Crop Lien**").

The First Interim Order set a continued interim hearing on the Motion for September 17, 2020 (the "**Second Hearing**").

On September 25, 2020, the Court entered its second Order on the Motion (the "**Second Interim Order**") authorizing use of Cash Collateral on an interim basis through September 16, 2020, for necessary expenses in the amount of $189,233.00 plus a 10% variance for emergencies during the pre-harvest period as described in the Motion, as described in the Debtor in Possession's amended budget, attached as Exhibit 1 to the Second

**3**

_____
**CONDITIONAL CONSENT TO USE OF CASH COLLATERAL**

Order (the "**First Amended Budget**"). A true and correct copy of the Second Interim Order is attached as **Exhibit B** to the RFJN.

The Second Interim Order continued to provide the Cash Collateral Replacement Lien, the Conservation Easement Replacement Lien, the Putah Creek Replacement Lien, and the Post-Petition Crop Lien (collectively, the "**Replacement Liens**"). The Second Interim Order set a continued interim hearing on the Motion for October 1, 2020 (the "**Third Hearing**").

The Second Interim Order also required that within (7) days of the end of each week in which the Debtor in Possession uses Cash Collateral (a "**Budgeted Week**"), the Debtor in Possession shall provide weekly periodic accountings to the Secured Creditors' counsel setting forth the cash receipts and disbursements made by the Debtor in Possession under the Second Interim Order (the "**Cash Collateral Reporting Requirements**"). The Second Interim Order provided that Cash Collateral Reporting Requirements shall include, but not be limited to, a comparison of the Debtor in Possession's actual financial performance, including cash receipts and disbursements, during the preceding Budgeted Week with the forecast financial performance contained in the cash collateral budget for that same Budgeted Week (the "**Cash Collateral Reports**").

On October 5, 2020, the Court entered its third Order on the Motion (the "**Third Interim Order**") authorizing use of Cash Collateral on an interim basis through the week ending October 31, 2020, for necessary expenses in the amount of $252,115 plus a 10% variance for emergencies during the pre-harvest period as described in the Motion, as described in the Amended Budget. A true and correct copy of the Third Interim Order is attached as **Exhibit C** to the RFJN.

The Third Interim Order continued to provide the Replacement Liens. The Third Interim Order set a continued interim hearing on the Motion for October 29, 2020 (the "**Fourth Hearing**"). The Third Interim Order also included and extended the Cash Collateral Reporting Requirements through the term of the Third Interim Order.

On November 9, 2020, the Court entered its fourth Order on the Motion (the "**Fourth Interim Order**") authorizing use of Cash Collateral on an interim basis through the week ending December 11, 2020, for necessary expenses in the amount of $332,908, plus a 10% variance for emergencies during the pre-harvest period as described in the Motion, as described in the Amended Budget. A true and correct copy of the Fourth Interim Order is attached as **Exhibit D** to the RFJN.

The Fourth Interim Order continued to provide the Replacement Liens. The Fourth Interim Order set a continued interim hearing on the Motion for December 10, 2020 (the "**Fifth Hearing**"). The Fourth Interim Order also included and extended the Cash Collateral Reporting Requirements through the term of the Fourth Interim Order.

As required by the Fourth Interim Order, on November 25, 2020, the Debtor in Possession filed with a Court a Supplemental Declaration of Russell Burbank In Support of Debtor In Possession's Simplified Cash Collateral Budget for December 2020 through March 2021 (the "**Burbank November 25 Declaration**"). A "Simplified Budget" was attached as Exhibit A to the Burbank November 25 Declaration (the "**Second Amended Budget**").

On December 17, 2020, the Court entered its fifth Order on the Motion (the "**Fifth Interim Order**") authorizing use of Cash Collateral on an interim basis through the week ending February 4, 2021, for necessary expenses in the amount of $351,052.00, plus a 10% variance for emergencies, as described in the budget attached as Exhibit A to the Fifth Interim Order (the "**Third Amended Budget**"). A true and correct copy of the Fifth Interim Order is attached as **Exhibit E** to the RFJN.

The Fifth Interim Order continued to provide the Replacement Liens. The Fifth Interim Order set a continued interim hearing on the Motion for February 4, 2021 (the "**Sixth Hearing**"). The Fifth Interim Order also included and extended the Cash Collateral Reporting Requirements through the term of the Fifth Interim Order.

**CONDITIONAL CONSENT TO USE OF CASH COLLATERAL**

The Third Amended Budget projects that the Debtor in Possession will make cash disbursement for his business operations ("**Cash Disbursements**") in the amount of $665,355, for the period beginning December 12, 2020, and ending April 2, 2021.

The Third Amended Budget breaks down the $665,355.00 in projected Cash Disbursements by month as follows:

| | |
|---|---|
| December 12, 2020 through January 1, 2021 | $144,251 |
| January 2, 2021 through January 29, 2021 | $160,157 |
| January 30, 2021 through February 26, 2021 | $155,252 |
| February 27, 2021 through April 2, 2021 | $205,695 |
| Total through April 2, 2021 | $665,355 |

Cash Collateral Reporting

The Debtor in Possession has provided Cash Collateral Reports for each of the Budgeted Weeks through the Budgeted Week ended January 1, 2021. A true and correct copy of the Cash Collateral Report for the week ending January 1, 2021 (the "**January 1 Report**") is attached as **Exhibit A** to the Declaration of Douglas H. Kraft filed in support hereof (the "**Kraft January 14 Declaration**").

Budget Variances

    Walnut Harvest

The First Amended Budget projected that the Debtor in Possession's 2020 walnut harvest would yield 1,118,400 lbs. of walnuts. According to a crop production report provided by the Debtor in Possession on December 22, 2020 (the "**Crop Production Report**"), the 2020 walnut harvest yielded only 791,310 lbs. of walnuts, which is a negative variance of <327,090> lbs., or 29%, of the projected amount. A true and correct copy of the Crop Production Report is attached to the Kraft January 14 Declaration as **Exhibit B**.

    Sales (Invoices)

The First Amended Budget, Second Amended Budget, and Third Amended Budget (collectively, the "**Amended Budgets**") projected that the Debtor in Possession would have

Sales (Invoices) totaling $1,185,636 through the Budgeted Week ending January 1, 2021. According to the January 1 Report, sales through the Budgeted Week ending January 1, 2021 totaled only $837,256, which is a <u>negative</u> variance of <$348.380>, or 29% of the projected Sales (Invoices).

Importantly, the $827,256 in Sales through the Budgeted Week ending January 1, 2021 included $245,477.02 in invoices to Mid Valley Nut Co., Inc, as follows:

| Invoice Date | Invoice No. | Product | Invoice Amount |
| --- | --- | --- | --- |
| 09/18/2020 | 2020058 | 34,540 lbs. bulk shelled walnuts | $69,080.00 |
| 09/22/2020 | 2020061 | 38,830 lbs. bulk shelled walnuts | $81,543.00 |
| 09/24/2020 | 2020060 | 41,732 lbs. bulk shelled walnuts | $87,637.20 |
| 12/7/2020 | FC 148 | Finance Charges | 7,217.22 |
| Total | | | $245,447.42 |

True and correct copies of the invoices to Mid Valley Nut Co., Inc. (the "**Mid Valley Invoices**") are attached to the Kraft January 14 Declaration as **Exhibit C**. The terms of sale of the Mid Valley Invoices required payment in "Net 15" days.

According to an A/R Aging Summary, dated as of January 1, 2021, provided by the Debtor in Possession as part of the Cash Collateral Reports (the "**January A/R Aging**"), the Mid Valley Invoices are now over 90 days old (more than 60 days past due) and appear to be uncollectable. A true and correct copy of the January A/R Aging is attached to the Kraft January 14 Declaration as **Exhibit D**.

Without the uncollectable sales to Mid Valley Nut, Sales through the Budgeted Week ending January 1, 2021 would have only been $591,809, or approximately 50% of the $1,185,636 budgeted amount.

The January A/R Aging also shows that in addition to the Mid Valley Invoices, another $72,943.90 of accounts receivable are over 120 days old (more than 90 days past due) and appear to be uncollectable. Based on the January A/R Aging, 57% of the Debtor in

**CONDITIONAL CONSENT TO USE OF CASH COLLATERAL**

Possession's accounts receivable are over 90 days old (more than 60 days past due) and appear to be uncollectable.

The large percentage of delinquent accounts as shown on the January A/R Aging raises concern over the Debtor in Possession's credit and collection practices.

Cash Receipts

The Amended Budgets projected that the Debtor in Possession would have Cash Receipts totaling $1,487,843 through the Budgeted Week ending January 1, 2021. According to the January 1, 2021, Cash Receipts through the Budgeted Week ending January 1, 2021 totaled $1,043,486, which is a <u>negative</u> variance of $444,357.00, or 30%.

The Cash Receipts through the Budgeted Week ending January 1, 2021 included $242,320 received in October under the United States Department of Agriculture, Coronavirus Food Assistance Program ("**CFAP**"). CFAP was established by the Coronavirus Aid, Relief, and Economic Stability Act (the "**CARES Act**"). The $242,320 in cash received under CFAP (the "**CFAP Proceeds**") constitute FNB's Cash Collateral. The Amended Budgets projected the CFAP Proceeds in the amount of $43,600. As such, there was a <u>positive</u> variance from the CFAP Proceeds of $198,270.

In addition, Cash Receipts through the Budgeted Week ending January 1, 2021, also included rental income of $143,482 received through December of 2020. The Amended Budgets projected income from rent to be $303,576. As such, there was a <u>negative</u> variance in rental income of <$160,094>.

Cash Disbursements

The Amended Budgets projected that the Debtor in Possession would have Cash Disbursements totaling $1,117,357 through the Budgeted Week ending January 1, 2021. According to the January 1 Report, Cash Disbursements through the Budgeted Week ending January 1, 2021, totaled $605,395, which is a <u>positive</u> variance of $511,962, or 46% of the budgeted Cash Disbursements.

In reviewing the January 1 Report, the following significant variances in Cash Disbursements are apparent:

|  | **Actual** | **Budget** | **Variance** |
|---|---|---|---|
| Workers Comp Insurance | $8,946 | $51,250 | $42,304 |
| Contract Labor | $2,316 | $49,000 | $46,684 |
| Spraying | $19,799 | $60,000 | $40,201 |
| Electricity – current use | $40,821 | $70,000 | $29,179 |
| Electricity – Deposit | $ 0 | $23,000 | $23,000 |
| Equipment Purchases | $ 0 | $14,463 | $14,463 |
| Debtor's CPA | $ 896 | $11,282 | $10,386 |
| Property Taxes | $2,177 | $100,857 | $98,680 |
| Repairs & Main. - Farming | $4,928 | $36,976 | $32,048 |
| Repairs & Main. - Process. | $0 | $8,694 | $8,694 |
| **Total Variance These Items** |  |  | **$345,639** |

The remainder of the Cash Disbursement variance appear to be widespread across the line item expenses in the Amended Budgets.

Net Cash Flow

The Amended Budgets projected that the Debtor in Possession would have a positive Net Cash Flow of a $370,486 through the Budgeted Week ending January 1, 2021. According to the January 1, 2021 Reports, Net Cash Flow through the Budgeted Week ending January 1, 2021, totaled $438,091, which is a positive variance of $67,605.

The positive Net Cash Flow of $438,091 is due in primarily to the CFAP Proceeds of $242,230 and rental income of $143,482. Without the CFAP Proceed and rental income, the Debtor in Possession would have had a positive Cash Flow from his operations of only $52,289.

However, this positive Net Cash Flow from operation of $52,289 was only achieved by the Debtor failing to pay $511,962 of Budgeted Expenses, including the workers

compensation insurance, utilities, property taxes, and repairs and maintenance. If the Debtor had paid all of his budgeted expenses, the Debtor would have had a sizeable negative Net Cash Flow.

General Concerns

### The Large Variance In Cash Disbursements Is Troubling

The fact that the Debtor in Possession's use of Cash Collateral was 46% less than what was projected is certainly good news. However, the 46% variance in Cash Disbursements is also troubling, and raises questions.

Is the 46% variance in Cash Disbursements a result of expenses that were not incurred and will not be incurred (i.e., true savings)? Or are they a result of expenses that were not yet incurred, but will be incurred at some time in the future (i.e., expenses deferred)? Alternatively, is the significant variance due to expenses that have been incurred and not yet paid (i.e., payments deferred)? If the variance is due to expenses deferred or payments deferred, are those expenses addressed in the Third Amended Budget?

Is this large variance in Cash Disbursement an indication that the Debtor in Possession is very bad at budgeting? Or is it an indication that the Debtor in Possession intentionally "sandbagged" the Amended Budgets?

Either way it calls into question the accuracy and validity of the Amended Budgets.

### Are the Projected Increases in Sales Realistic?

The January 1 Report shows that the Debtor in Possession missed his sales projections by 29%. Yet, the Third Amended Budget is projecting a large increase in sales.

The Third Amended Budget projects total sales in the four-month budget period beginning January 2, 2021 and ending April 2, 2021, of $1,342,500, or average sales of $447,500 per month.

As shown in the January 1 Report, actual sales through the Budgeted Week ending January 1, 2021 totaled $837,526, or an average of approximately $209,314 per month through that four-month period.

---
**CONDITIONAL CONSENT TO USE OF CASH COLLATERAL**

The projected average monthly sales of $447,500 in Third Amended Budget represents a projected increase in sales, on an average monthly basis, of $238,186 per month, which is an 114% increase in sales.

Is a 114% increase in sales over the next three months realistic?

Can the Debtor Operate Profitably?

Net Cash Flow is not Net Profit.

The Debtor in Possession has a history of sizeable net operating losses. While the Debtor in Possession has a positive Net Cash Flow through the Budgeted Week ending January 1, 2021, that positive Net Cash Flow is primarily due to the injection the CFAP Proceeds and the failure to pay $511,962 of budgeted expenses.

In addition, the Debtor in Possession has yet to produce a true profit and loss statement showing the profitability of his operations. As such, the Debtor in Possession has yet to establish that he can operate on a profitable basis.

A true and correct copy of the Debtor in Possession's Monthly Operating Report for the month ended November 30, 2020 filed with the Court on December 16, 2020, as Doc 297 (the "**November MOR**") is attached to the RFJN as **Exhibit F**.

It is noted that the form of Monthly Operating Report used by the Debtor in Possession is the approved form for Small Real Estate/Individual Cases, which does not require that the Debtor include a Statement of Operations. A Statement of Operation is required as part of the Monthly Operating Report form for General Business Cases filed in the Eastern District of California.

Due to the size and complexity of the Debtor in Possession's operations, FNB believes that the Debtor in Possession should be ordered to include a Statement of Operations as part of the Monthly Operating Reports.

Professional (Restructuring) Expense

The Amended Budgets include line items for Debtor Attorneys and Debtor Financial Advisor. These line items appear to be meant to capture the attorneys' fees incurred by Mr.

**11**

_____
**CONDITIONAL CONSENT TO USE OF CASH COLLATERAL**

Willoughby and his firm and by Mr. Burbank. The Debtor in Possession has also indicated that he will be engaging another law firm as trust, tax, business and real estate counsel. The line items in the Amended Budget for Debtor Attorneys and Financial Advisor are blank, and no amounts are estimated or projected for these restructuring expenses. Meanwhile, the Disclosure Statement on file with the Court estimates Chapter 11 Professional Fees at $900,000.

The Balance Sheet included in the November MOR includes line 25 for "Accrued Professional Fees". Line item 25 on the Balance Sheet filed as part of the November MOR (and all previously filed Monthly Operating Reports) is blank.

The Debtor in Possession should be ordered to disclose the amount of Accrued Professional Fees and include those amounts in the Balance Sheet filed as part of the Monthly Operating Reports.

Given the restructuring expenses, which will undoubtedly be sizeable, and given the questions regarding the Debtor in Possessions' profitability, consideration should be given as to whether it is in the best interest of creditors, both secured and unsecured, to allow the Debtor in Possession to continue to operate, rather than go straight to liquidation.

**CONDITIONAL CONSENT**

FNB is concerned about the accuracy and validity of the Amended Budgets, the Debtor in Possession's ability to meet his sales projections, the ability of the Debtor in Possession to operate profitably, and what must be the ever-growing Restructuring Expenses. Given these concerns, FNB believes that any authorization to use Cash Collateral shall be on a month to month basis, until the Debtor can establish that he can operate profitably and meet his lofty sales projections, something he clearly has not yet done.

As such, FNB is willing to consent to the use of Cash Collateral beginning with the Budgeted Week ending February 12, 2021 through the Budgeted Week ended March 5, 2021, in the amount of $155,252, as shown in the Second Amended Budget, with a 0% variance for emergencies, subject to the following conditions:

**12**

**CONDITIONAL CONSENT TO USE OF CASH COLLATERAL**

FNB's consent is conditioned upon the following:

1. The Secured Creditors shall be granted the Replacement Liens, as set forth in the First Interim Order, the Second Interim Order, the Third Interim Order, the Fourth Interim Order and Fifth Interim Order (the "**Prior Orders**").

2. The Cash Collateral Reporting Requirements shall continue, on a weekly basis, for each Budgeted Week.

3. Beginning with the Monthly Operating Report to be filed for the month-ended December 31, 2020, and each month thereafter, Debtor in Possession shall be ordered to file a Statement of Operations in the form required in General Business Cases filed in the Eastern District of California.

4. Beginning with the Monthly Operating Report to be filed for the month-ended December 31, 2020, and each month thereafter, Debtor in Possession shall be ordered to include in the Balance Sheet filed with the Monthly Operating Report the amount of Accrued Professional Fees incurred through the date of such report.

5. Counsel for FNB shall have approved the form of Order granting continued use of cash collateral, which shall be consistent with the form of the Prior Orders.

Dated: January 14, 2021  KRAFT LAW

*/s/ Douglas H. Kraft*

Douglas H. Kraft
Attorney for First Northern Bank of Dixon

**CONDITIONAL CONSENT TO USE OF CASH COLLATERAL**