**84 PAGES**

THOMAS A. WILLOUGHBY, State Bar No. 137597
JASON E. RIOS, State Bar No. 190086
FELDERSTEIN FITZGERALD
WILLOUGHBY PASCUZZI & RIOS LLP
500 Capitol Mall, Suite 2250
Sacramento, CA 95814
Telephone: (916) 329-7400
Facsimile: (916) 329-7435
e-mail: twilloughby@ffwplaw.com
e-mail: jrios@ffwplaw.com

Attorneys for Debtor in Possession

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br>RUSSELL WAYNE LESTER, an individual, dba Dixon Ridge Farms,<br>　　　　　Debtor in Possession | CASE NO.: 20-24123-E-11<br>Chapter 11<br><br>FWP-14 |

**AMENDED PLAN OF REORGANIZATION OF THE DEBTOR IN POSSESSION (DATED MAY 18, 2021) CONFIRMED ON MAY 27, 2021 (DOCKET NO. 650) AS MODIFIED JULY 1, 2021**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT..........................................................................1

ARTICLE I DEFINITIONS...............................................................................2

ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS............................24

    2.1.    Classes of Claims and Ownership Interests .................................24

ARTICLE III TREATMENT OF UNCLASSIFIED CLAIMS ...................................25

    3.1.    Allowance of Administrative Claims ...........................................25

    3.2.    Payment of Administrative Claims ..............................................25

    3.3.    Voluntarily Deferred Allowed Administrative Claims .................26

    3.4.    Voluntary Cap on Professional Fees ............................................26

    3.5.    FNB Super-Priority Administrative Claim ...................................26

    3.6.    Post-Petition U.S. Trustee Fees ...................................................27

    3.7.    Post-Petition Tax Claims .............................................................27

    3.8.    Priority Tax Claims. .....................................................................28

    3.9.    Priority Employee Claims ............................................................28

    3.10.  Priority Employee Benefit Claims ...............................................29

ARTICLE IV TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS...............29

    4.1.    Class 1 Impaired Prudential Secured Claim ................................29

    4.2.    Class 2A (Impaired FNB RE Loan: Approx. $1.4M plus post-petition interest and attorneys' fees and costs if Allowed) ..................45

         a.      FNB RE Loan Treatment if FNB Accepts Plan:.....................45

         b.      FNB RE Loan Treatment if FNB Rejects Plan: ......................48

    4.3     Class 2B (Impaired FNB HELOC Loan: Approx. Amount $500,000 plus post-petition interest and attorneys' fees and costs if Allowed) ..........48

         a.      FNB HELOC Loan Treatment if FNB Accepts Plan:..............48

         b.      FNB HELOC Loan Treatment If FNB Rejects Plan:...............50

    4.4     Class 2C (Impaired FNB AG Production Loan Approx. $2.8M plus post-petition interest and attorneys' fees and costs if Allowed) ....................51

         a.      If FNB Accepts Plan: ..............................................................51

         b.      FNB AG Production Loan's Treatment if FNB Rejects Plan: ..................53

    4.5     Class 2D (Impaired FNB AG Asset Based LOC—Approx. $5M plus post-petition attorney's fees and costs if Allowed).................................54

|  |  | a. | If FNB Accepts Plan: | 54 |
|  |  | b. | If FNB Rejects Plan: | 56 |
| 4.6 | Class 3 (Impaired FMCC Loan) |  |  | 58 |
| 4.7 | Class 4 (Impaired John Deere Loans) |  |  | 58 |
| 4.8 | Class 5 (Impaired Yolo County Real Property Tax Claim) |  |  | 59 |
| 4.9 | Class 6 (Impaired Solano County Real Property Tax Claim) |  |  | 59 |
| 4.10 | Class 7 (Impaired 2019 Grower Claims) |  |  | 59 |
| 4.11 | Class 8 (Impaired SBA's EIDL Secured Claim) |  |  | 60 |
| 4.12 | Class 9 (Impaired Other Secured Creditors) |  |  | 61 |
| 4.13 | Class 10 (Impaired Convenience Class of General Unsecured Creditors) |  |  | 61 |
| 4.14 | Class 11 (Impaired Class of General Unsecured Creditors) |  |  | 62 |
| 4.15 | Class 12 (Impaired Ownership Interests) |  |  | 63 |
| 4.16 | Cramdown |  |  | 64 |

ARTICLE V UNIMPAIRED AND IMPAIRED CLASSES ................................................ 64

ARTICLE VI MEANS FOR IMPLEMENTATION OF THE PLAN ............................... 64

| 6.1. | Preservation of Defenses and Retained Claims and Defenses | 64 |
| 6.2. | Reorganized Debtor Powers and Duties | 65 |
| 6.3. | Formation of the SPE and Transfer of Assets to the SPE | 65 |
| 6.4. | Execution and Delivery of the SPE Profits and Distributions Pledge Agreement | 66 |
| 6.5. | Formation and Transfer of Assets of the Lester Family Trust | 67 |
| 6.6. | Power of the Reorganized Debtor to Implement Plan | 67 |
| 6.7. | SPE Farming Lease(s) | 68 |
| 6.8. | Management of the SPE | 68 |
| 6.9. | Compensation of SPE Independent Manager | 68 |
| 6.10. | Reorganized Debtor Compensation | 68 |
| 6.11. | Limitation of Liability | 69 |
| 6.12. | Approval of Transactions Outside of the Ordinary Course | 69 |
| 6.13. | Plan Default | 69 |
| 6.14. | Distribution Procedures | 70 |
| 6.15. | Resolution of Disputed Claims | 70 |
| 6.16. | Allocation of Distributions | 70 |

6.17.  De Minimis Distributions ........................................................................ 71

6.18.  Unclaimed Funds ................................................................................... 71

6.19.  Unclaimed Distributions ........................................................................ 71

6.20.  Post-Effective Date Reports ................................................................... 72

6.21.  SPE Reporting Requirements ................................................................. 72

6.22.  Post-Effective Date Employment and Compensation of Professionals .............. 73

6.23.  Jurisdictional Limitations on Claims re Plan Implementation ............................. 73

6.24.  Destruction of Records .......................................................................... 74

6.25.  Final Decree ......................................................................................... 74

6.26.  Post-Confirmation U.S. Trustee Fees ..................................................... 74

ARTICLE VII EXECUTORY CONTRACTS ............................................................. 74

7.1.  Plan Rejection ....................................................................................... 74

7.2.  Rejection .............................................................................................. 75

ARTICLE VIII EFFECTIVE DATE ........................................................................... 75

ARTICLE IX EFFECTS OF CONFIRMATION .......................................................... 75

9.1.  Binding Effect of Plan ............................................................................ 75

9.2.  Injunction ............................................................................................. 76

9.3.  No Discharge ........................................................................................ 76

9.4.  Limitation of Liability ............................................................................ 76

ARTICLE X RETENTION OF JURISDICTION ......................................................... 77

ARTICLE XI MISCELLANEOUS ............................................................................ 78

11.1  Severability of Plan Provisions .............................................................. 78

11.2  Governing Law ...................................................................................... 78

11.3  Plan Supplement Documents ................................................................. 78

11.4  Exemption from Transfer Taxes ............................................................. 79

11.5  Implementation ..................................................................................... 79

11.6  Waiver of Fourteen (14) Day Stay .......................................................... 80

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PRELIMINARY STATEMENT**

Russell Wayne Lester, dba Dixon Ridge Farms (the Debtor in Possession[1]), owns and operates an organic walnut farm and processing facility in Winters, California. The Debtor in Possession owns approximately 1,400 acres in Solano and Yolo Counties. The trade wars and COVID-19 have decimated the walnut industry and precipitated the Case.

The Debtor in Possession's goal for this Case is to reorganize his business operations to respond to the current market conditions, and to sell sufficient assets to pay off secured debt so that he can restructure his business and pay all Allowed Claims as expeditiously as possible in accordance with the priority provisions of the United States Bankruptcy Code, or if applicable, California law.

With this goal in mind, the Debtor in Possession hereby proposes the following Plan of Reorganization, pursuant to Section 1121 of the Bankruptcy Code.

The Plan provides for the payment in full of all secured and unsecured creditors from sales of real property, the Conservation Easement Sale, other income or capitalization sources, and the continued operation of the Debtor in Possession's business.

A separate special purpose entity ("SPE" as defined below in Article I) will be created on or before the Plan's Effective Date that will be owned by the Lester Family Trust. The SPE will hold title to the Gordon Ranch, Oda Ranch, MacQuiddy Ranch, Carrion Ranch, and McCune Ranch (defined below), which are described in this Plan as the SPE Designated Properties. The SPE will have the power and obligation to sell sufficient parcels of the SPE Designated Properties to provide funds to pay certain secured creditors. The unsecured creditors may also receive a beneficial interest in the profits to be paid by the SPE to the Lester Family Trust or such similar interest or benefit as will be set forth in the Plan Supplement. The Debtor in Possession's creditors will be paid by the Reorganized Debtor over time as provided for in the Plan.

The Reorganized Debtor will execute one or more triple net farming agreements with the SPE that will allow for the reorganization and continuation of the Reorganized Debtor's business. Under the farming agreement or agreements, the Reorganized Debtor will also provide funds to

---

[1] Capitalized terms are defined in Article I of the Plan.

maintain and service the debt on the SPE Designated Properties.

All Creditors should consult the Disclosure Statement before voting to accept or reject the Plan.

**ARTICLE I**
**DEFINITIONS**

For purposes of this Plan, all capitalized terms used herein and not otherwise defined shall have the meanings set forth below. A term not defined in the Plan but defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to it in the Bankruptcy Code or the Bankruptcy Rules unless the context clearly requires otherwise. The rules of construction used in Section 102 of the Bankruptcy Code shall apply to construction of this Plan.

1.1     **"2019 Growers"** shall mean those organic walnut growers that delivered and sold 2019 walnuts to the Prepetition Debtor.

1.2     **"Administrative Claim"** shall mean a Claim for an expense of administration of the Estate of the Debtor in Possession arising during the period commencing on the Petition Date and ending on the Effective Date under Sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code and entitled to priority under Section 507(a) of the Bankruptcy Code, including, but not limited to, all fees and charges assessed against the Debtor in Possession pursuant to 28 U.S.C. §1930, and the FNB Super-Priority Administrative Claim. Except as otherwise provide in this Plan, no Claim otherwise entitled to administrative priority shall be Allowed if not timely asserted by the Administrative Claims Bar Date.

1.3     **"Administrative Claims Bar Date"** shall mean for Administrative Claims, except for Post-Petition Tax Claims, the first business day that is thirty (30) days after the Effective Date pursuant to which Creditors must file a noticed motion requesting payment of any Administrative Claim that arose between the Petition Date and the Effective Date for which notice shall be provided by Debtor in Possession in the notice of Effective Date.

1.4     **"Allowed"** shall mean, with respect to any Claim (other than an Administrative Claim):

(a)     a Claim not subject to a later objection by the Debtor in Possession or the Reorganized Debtor that appears in the Debtor in Possession's schedules, except a Claim that is

listed as disputed, contingent or unliquidated, or for which a Proof of Claim has been filed;

(b)     a Claim for which a Proof of Claim has been timely filed as of the Bar Date or Rejection Claim Bar Date (as defined in Section 7.2 of the Plan), as applicable, and no objection thereto has been made by the Debtor in Possession or the Reorganized Debtor; or

(c)     a Claim that has been Allowed by a Final Order of the Court.

1.5     **"Allowed Administrative Claim"** shall mean an Administrative Claim Allowed in a Final Order of the Court after the timely filing of a noticed motion requesting payment before the Administrative Claims Bar Date. To avoid any uncertainty, the filing of a Proof of Claim asserting an Administrative Claim will not be deemed the equivalent of the filing of a motion to approve an Administrative Claim prior to the Administrative Claims Bar Date, and the amount sought in the Proof of Claim shall be deemed to be a request for payment of a general unsecured claim. If a Proof of Claim asserting an Administrative Claim is filed, then the request in the Proof of Claim for administrative claim status will be forever disallowed.

1.6     **"Allowed General Unsecured Claim"** shall mean any Allowed Claim (including any Rejection Claim, as defined in Section 7.2 of the Plan) that is not an Allowed Secured Claim, Allowed Administrative Claim, or a Priority Claim.

1.7     **"Allowed Secured Claim"** shall mean any Allowed Claim secured by a lien, security interest, or other charges against property in which the Estate has an interest, or which is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value, determined in accordance with Section 506(a) of the Bankruptcy Code, of the interest of the holder of such Allowed Secured Claim in the Estate's interest in such property, or to the extent of the amount subject to any setoff, as the case may be, excluding any and all non-pecuniary loss penalty claims (and related interest) as defined in Section 726(a)(4) of the Bankruptcy Code.

1.8     **"Avoidance Action"** shall mean any action which is filed or may be filed pursuant to chapter 5 of the Bankruptcy Code, or any applicable state law governing fraudulent conveyances, fraudulent transfers, or preferences, whether the remedy available is an avoidance of a transfer or an obligation.

1.9     **"Ballot"** shall mean the voting form to be distributed with the Plan and the

Disclosure Statement to each holder of a Claim in Classes that are impaired under the terms of the Plan and are entitled to vote to accept or reject the Plan.

1.10 **"Bankruptcy Code or Code"** shall mean the Bankruptcy Reform Act of 1978, 11 U.S.C. §101 et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, and as further amended from time to time. All citations in the Plan to Section numbers are to the Bankruptcy Code unless otherwise expressly indicated.

1.11 **"Bar Date"** shall mean, as applicable, (a) February 8, 2021, is the deadline for filing a Proof of Claim for a non-governmental unit Creditor for a Claim that arose before the Petition Date in the Chapter 11 Case (*see* Order dated December 23, 2020; Dkt. No. 314), (b) February 23, 2021, the last date for filing a Proof of Claim for a Claim that arose before the Petition Date for Governmental Units in the Chapter 11 Case, (c) the later of thirty (30) days after the Effective Date or the date on which an Order is entered approving the rejection of a specific executory contract, for the filing of a Proof of Claim for a Claim arising from the rejection of an executory contract (*see* Notice of Chapter 11 Bankruptcy Case dated September 2, 2020; Dkt. No. 82).

1.12 **"Carrion Ranch"** shall mean the following parcel(s) of real property located in Solano County, California, identified by APN 0107-080-160-01.

1.13 **"Cash"** shall mean cash and cash equivalents, including but not limited to bank deposits, checks, and other similar items.

1.14 **"Claim"** shall mean a claim against the Debtor in Possession within the meaning of Section 101(5) of the Bankruptcy Code.

1.15 **"Class" or "Classes"** shall mean that creditor or group of creditors classified in Article II of this Plan.

1.16 "Chapter 11 Case" or "Case" shall mean the Chapter 11 Case commenced by Russell Wayne Lester, in the United States Bankruptcy Court for the Eastern District of California, Sacramento Division, Case Number: 20-24123-E-11, upon the filing of a voluntary petition under chapter 11 of the Bankruptcy Code on August 27, 2020.

1.17 **"Confirmation"** shall mean the approval of the Plan by and subject to the terms

of the Confirmation Order.

1.18 **"Confirmation Date"** shall mean May 27, 2021, the date the Confirmation Order was entered on the Court's docket.

1.19 **"Confirmation Hearing"** shall mean all of the hearings held by the Court to consider Confirmation of the Plan.

1.20 **"Confirmation Order"** shall mean the Order Confirming Amended Plan of Reorganization of the Debtor in Possession (Dated May 18, 2021) (Dkt. 650 entered on May 27, 2021) and providing for the effectuation of the transactions contemplated by this Plan in accordance with the terms and provisions hereof and thereof.

1.21 **"Conservation Easement"** shall mean the document creating an easement that will be recorded in Solano County that creates a restriction in favor of the Solano Land Trust to restrict the use of the Carrion Ranch and the McCune Ranch to farming purposes as described in more detail in the treatment of Prudential in Section 4.1 below.

1.22 **"Conservation Easement Sale"** shall mean the anticipated sale of the Conservation Easement to the Solano Land Trust for the anticipated sum of $5.7 million, which amount may vary up or down depending on the appraised value of the Conservation Easement.

1.23 **"Court"** shall mean the United States Bankruptcy Court for the Eastern District of California, Sacramento Division.

1.24 **"Creditor"** or "Creditors" shall mean person(s) that holds or asserts a Claim or Claims in this Chapter 11 Case.

1.25 **"Debtor in Possession"** shall mean Russell Wayne Lester, dba Dixon Ridge Farms from the Petition Date through the Effective Date.

1.26 **"Disclosure Statement"** shall mean the disclosure statement that is approved by the Court pursuant to the provisions of Section 1125 of the Code, together with any supplements or amendments thereto approved by the Court to be sent to Creditors as part of the solicitation package seeking votes for acceptance of this Plan.

1.27 **"Disputed Claim"** shall mean any Claim or portion of a Claim as to which an objection to the allowance thereof has been interposed (whether as a separate objection to claim

or in connection with an adversary proceeding) as of the Effective Date or any later deadline fixed under the Plan or by order of the Court, which objection has not been withdrawn or determined by Final Order. To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Disputed Claim only to the extent of the objection.

1.28   **"Dixon Ridge Farms"** is the trademarked fictitious name used by the Prepetition Debtor and the Debtor in Possession to operate his farming and processing business, which is being reorganized in this Chapter 11 Case.

1.29   **"Effective Date"** shall mean July 1, 2021 at 11:59 p.m. unless the Debtor in Possession obtains approval from the Court to extend the Effective Date, for good cause shown.

1.30   **"Estate"** shall mean the bankruptcy estate created upon the filing of the Chapter 11 Case and consisting initially of all legal or equitable interests of the Prepetition Debtor in property as of the Petition Date as defined in Section 541 of the Bankruptcy Code.

1.31   "**Federal Judgment Rate**" shall mean the per annum interest rate specified by 28 U.S.C. § 1961.

1.32   "**Federal Judgment Rate as of the Petition Date**" shall mean 0.13% per annum as published in the webpage: https://www.casb.uscourts.gov/post-judgment-interest-rates-2020.

1.33   **"Final Order"** shall mean an order or judgment of the Court or other Court of competent jurisdiction which (i) has not been reversed, stayed, modified or amended, and as to which the time to or the right to appeal or seek reconsideration, review, rehearing, or certiorari has expired, there has been no stay pending appeal granted, and as to which any right to appeal, reargue, petition for a certiorari or rehearing has been waived in a manner satisfactory to the Debtor in Possession, as a result of which such order shall have become final in accordance with applicable law, (ii) if an appeal, reargument, certiorari or rehearing thereof has been sought, the order of the lower court has been affirmed by the higher court to which the order was appealed or from which the reargument or rehearing was sought or certiorari has been denied, and time to take further appeal or to seek certiorari or further reargument or rehearing has expired; or (iii) with respect to a Non-Stayed Order or Judgment, Reorganized Debtor in his sole discretion files a "Notice to Deem Non-Stayed Order or Judgment Final."

1.34   **"FNB"** shall mean First Northern Bank of Dixon.

1.35   **"FNB Accepts Plan"** shall mean that FNB files no objection to Confirmation and FNB (1) votes to accept treatment of its claims as Classes 2A, 2B, 2C, and 2D, as applicable, and/or (2) does not oppose Plan Confirmation in any way.

1.36   **"FNB AG Loans"** shall mean the two loans obtained by the Debtor in Possession from FNB in 2018 and 2019, including the FNB AG Production Loan and the FNB Asset Based LOC both of which are secured by the FNB AG Loan Collateral.

1.37   **"FNB AG Loan Collateral"** shall mean Debtor in Possession's inventory, chattel paper, accounts, equipment, general intangibles, crops, farm equipment, and contracts, such other personal property as described in the FNB AG Production Loan Documents and the FNB Asset Based LOC Loan Documents.

1.38   **"FNB Asset Based LOC"** shall mean the FNB line of credit loan made to the Prepetition Debtor secured by a security interest in the FNB AG Loan Collateral with an original principal amount of $5,000,000 as evidenced by the FNB Asset Based LOC Claim.

1.39   **"FNB Asset Based LOC Claim"** shall mean the Proof of Claim filed by FNB in the Case as Claim No. 21.

1.40   **"FNB Asset Based LOC Loan Documents"** shall mean the loan and perfection documents executed by FNB and the Prepetition Debtor evidencing and securing the FNB Asset Based LOC.

1.41   **"FNB AG Production Loan"** shall mean the FNB agricultural production loan made to the Prepetition Debtor secured by a security interest in the FNB AG Loan Collateral with an original principal amount of $2,800,000, as evidenced by the FNB AG Production Loan Claim.

1.42   **"FNB AG Production Loan Claim"** shall mean the Proof of Claim filed by FNB in the Case as Claim No. 20.

1.43   **"FNB AG Production Loan Documents"** shall mean the loan and perfection documents executed by FNB and the Prepetition Debtor evidencing and securing the FNB AG Production Loan.

1.44   **"FNB AG Production Loan Junior Deed of Trust"** shall mean a deed of trust in

FNB's standard form, encumbering the Putah Creek Ranch in third-priority position, to be executed and delivered by Reorganized Debtor and Kathleen Lester, or the Lester Family Trust, if it is the owner, and which shall secure the FNB AG Production Loan.

1.45 "**FNB AG Secured Claim**" shall mean the stipulated or Court determined secured portion of the FNB AG Loans as of the Petition Date.

1.46 "**FNB AG Unsecured Claim**" shall mean the stipulated or Court determined unsecured portion of the FNB AG Loans as of the Petition Date.

1.47 "**FNB Attorneys' Fees**" shall mean all attorney's fees incurred by FNB in connection with the FNB Loans and the Case from and after the Petition Date, which amount shall not exceed $500,000 through the Effective Date; *provided*, *however* that in the event that the Effective Date is extended or otherwise occurs on a date beyond July 1, 2021, then this amount may be adjusted upward.

1.48 "**FNB Attorneys' Fees and Costs**" shall mean collectively, the FNB Attorneys' Fees and the FNB Costs, which amount shall not exceed $500,000 through the Effective Date.

1.49 "**FNB Costs**" means all costs incurred by FNB in connection with the FNB Loans and the Case from and after the Petition Date through the Effective Date including, without limitation, appraisal fees and consultant fees;

1.50 "**FNB HELOC Loan**" shall mean the home equity line of credit loan made to the Prepetition Debtor and Kathleen Lester secured by a second trust deed on Putah Creek Ranch with the current approximate amount due of $500,000, as evidenced by the FNB HELOC Loan Claim.

1.51 "**FNB HELOC Loan Claim**" shall mean the Proof of Claim filed by FNB in the Case as Claim No. 19.

1.52 "**FNB HELOC Loan Documents**" shall mean the loan and perfection documents executed by FNB and the Prepetition Debtor and Kathleen Lester evidencing and securing the FNB HELOC Loan.

1.53 "**FNB Loan Documents**" means, collectively, the FNB Asset Based LOC Loan Documents, the FNB AG Production Loan Documents, the FNB HELOC Loan Documents, and the FNB RE Loan Documents, as modified by this Plan.

1.54 **"FNB Loans"** shall mean collectively, the FNB RE Loan, the FNB HELOC Loan, the FNB AG Production Loan, and the FNB Asset Based LOC, each an **"FNB Loan".**

1.55 **"FNB Material Default"** shall mean a Post-Effective Date FNB Payment Default, Post-Effective Date FNB Material Non-Payment Default, or Post-Effective Date FNB Material Plan Default.

1.56 **"FNB Material Non-Payment Default"** shall mean a Post-Effective Date FNB Non-Payment Default that has been determined by the Court to be an FNB Non-Payment Default that materially impairs FNB's collateral or that materially impairs the prospects of payment or performance owed to FNB under the Plan. The Post-Effective Date use and/or depletion of the Reorganized Debtor's inventory, crops, accounts receivable and FNB's Cash Collateral shall not constitute or create any form of default under the Plan or any of the FNB Loan Documents. Failure of the Reorganized Debtor to meet any of his financial projections set forth in the Three-Year Plan Proforma attached as Exhibit 7 to the Exhibit Document to the Corrected Disclosure Statement (Docket No. 584) shall not constitute an FNB Material Non-Payment Default.

1.57 **"FNB Material Plan Default"** shall mean a Post-Effective Date Plan Default that has been determined by the Court to be a Plan Default that materially impairs FNB's collateral or that materially impairs the prospects of payment or performance owed to FNB under the Plan. The Post-Effective Date use and/or depletion of the Reorganized Debtor's inventory, crops, accounts receivable and FNB's Cash Collateral shall not constitute or create any form of default under the Plan or any of the FNB Loan Documents. Failure of the Reorganized Debtor to meet any of his financial projections set forth in the Three-Year Plan Proforma attached as Exhibit 7 to the Exhibit Document to the Corrected Disclosure Statement (Docket No. 584) shall not constitute an FNB Material Plan Default.

1.58 **"FNB Non-Payment Default"** means a Post-Effective Date default under any of the FNB Loan Documents other than an FNB Payment Default. The Post-Effective Date use and/or depletion of the Reorganized Debtor's inventory, crops, accounts receivable and FNB's Cash Collateral shall not constitute or create any form of default under the Plan or any of the FNB Loan Documents. Failure of the Reorganized Debtor to meet any of his financial projections set

forth in the Three-Year Plan Proforma attached as Exhibit 7 to the Exhibit Document to the Corrected Disclosure Statement (Docket No. 584) shall not constitute an FNB Non-Payment Default.

1.59 "**FNB Payment Default**" shall mean a Post-Effective Date failure of the Reorganized Debtor to make a monetary payment due FNB in Classes 2A, 2B, 2C and/or 2D, which monetary default is not cured within the applicable provisions of Section 6.13 of the Plan.

1.60 "**FNB Pro Rated Attorneys' Fees and Costs**" shall mean the total of FNB Attorneys' Fees and Cost allocated to each FNB Loan according to the percentage of the principal balance of each FNB Loan to the total of the principal balances of all of the FNB Loans.

1.61 "**FNB RE Loan**" shall mean the FNB loan made to the Prepetition Debtor and Kathleen Lester secured by a first trust deed on the Putah Creek Ranch as evidenced by the FNB RE Loan Claim.

1.62 "**FNB RE Loan Claim**" shall mean the Proof of Claim filed by FNB in the Case as Claim No. 18.

1.63 "**FNB RE Loan Documents**" shall mean the loan and perfection documents executed by FNB and the Prepetition Debtor and Kathleen Lester evidencing and securing the FNB RE Loan.

1.64 "**FNB Rejects Plan**" shall mean that FNB (1) files an objection to Confirmation and/or votes to reject treatment of its claims as Classes 2A, 2B, 2C, and 2D, as applicable, and/or (2) opposes Confirmation of the Plan in any way.

1.65 "**FNB Reserve**" shall mean an amount equal to the funds received from the PPP2 Loan, and/or SPE Sale Excess Proceeds to which FNB becomes entitled, which funds may be set aside and reserved for payments to be made under the FNB Loans, pursuant to the Plan.

1.66 "**FNB Reserve Account**" shall mean a deposit account to be maintained at FNB into which the funds representing the FNB Reserve shall be deposited.

1.67 "**FNB State Court Action**" shall mean the lawsuit filed by FNB prior to the Petition Date against the Prepetition Debtor and Kathleen Lester in Solano County Superior Court as Case No. FCS 054698.

1.68 **"FNB Super-Priority Administrative Claim"** shall mean the Allowed super-priority administrative claim under Sections 503(b)(1), 507(a), and 507(b) of the Bankruptcy Code as provided in Section 3.5 of this Plan.

1.69 **"FMCC"** shall mean FMCC Motor Credit Company, LLC.

1.70 **"FMCC Vehicle Loan"** shall mean the loan(s) by FMCC secured by the Ford F-250 truck owned by the Debtor in Possession with a balance due in the amount of $21,203.49 as set forth in FMCC's Proof of Claim, Claim No. 9, plus FMCC's Missed Payments and Costs.

1.71 "**FMCC Loan Documents**" shall mean the loan and perfection documents executed by FMCC and the Prepetition Debtor underlying the FMCC Vehicle Loan.

1.72 "**FMCC Missed Payments and Costs**" shall mean the total Allowed amount of the missed payments and attorneys' fees and costs accrued and unpaid under the terms of the FMCC Loan Documents as of the Effective Date.

1.73 **"General Unsecured Claim"** shall mean any Claim that is neither secured nor entitled to priority or administrative status under Section 507 or Section 503 of the Bankruptcy Code, respectively.

1.74 **"General Unsecured Creditor" or "GUC"** shall mean a holder of a General Unsecured Claim.

1.75 **"Gordon Ranch"** shall mean the approximately 70.3 acres of real property located in Yolo County, south of Madison, County Road 89, identified by APNs 050-100-015-000 and 050-100-032-000.

1.76 **"John Deere"** shall mean Deere & Company and John Deere Construction and Forestry Company, Deere Credit, Inc., and/or John Deere Financial, f.s.b.

1.77 "**John Deere Loan Documents**" shall mean all the documents underlying the John Deere Secured Claim in this Case as described in and attached to the three Proofs of Claim filed by John Deere, Claim Numbers: 11, 12, and 13.

1.78 "**John Deere Missed Payments and Costs**" shall mean the total Allowed amount of the missed payments and attorneys' fees and costs accrued and unpaid under the terms of the John Deere Loan Documents as of the Effective Date.

1.79   **"John Deere Secured Claim"** shall mean the Secured Claim of John Deere for three loans secured by multiple pieces of equipment owned by the Debtor in the approximate amount of $138,000 based on the three Proofs of Claim filed by John Deere (Claims 11, 12, 13).

1.80   **"Kathleen Lester"** shall mean Kathleen Hamrock Lester, an individual, and the Debtor in Possession's wife.

1.81   **"Lester Cross-Complaint"** shall mean the Cross-Complaint filed by Russell W. Lester and Kathleen Lester in the FNB State Court Action.

1.82   "**Lester Family Trust**" shall mean the bankruptcy-remote irrevocable spendthrift trust, which will be equally liable for all the obligations of the Reorganized Debtor under the Plan, and which on the Effective Date shall be vested in title as the owner of the SPE.

1.83   "**Lester Family Trust Documents**" shall mean all documents that form, establish, and govern the management of the Lester Family Trust. The Lester Family Trust Documents will be filed with the Plan Supplement and as may be revised prior to the Effective Date. The Lester Family Trust Documents shall include terms that make the Lester Family Trust a bankruptcy-remote irrevocable spendthrift trust. The term "Lester Family Trust Documents" shall also mean and include the SPE Profits and Distributions Pledge Agreement.

1.84   "**Lester Family Trust Tax Reserve**" shall mean a segregated account held and maintained by the Lester Family Trust into which the Lester Family Trust trustee shall deposit (a) any SPE Proposed Sale Properties Tax Distribution(s) and (b) the 25% distributions to the Lester Family Trust specified in Section 4.1.iv.4)f and Section 4.1.iv.5)h of this Plan.

1.85   "**Lien Date**" is the date that the next year's property taxes attach to real property under California Law.

1.86   **"MacQuiddy Ranch"** shall mean the approximately 157 acres of real property located in Yolo County on Walnut Bayou Lane, Winters, CA, identified as APN 038-090-005-000.

1.87   **"McCune and Carrion Grant Deed"** shall mean one or more grant deeds, in recordable form, to be executed by the Debtor in Possession and Kathleen Lester, transferring fee title to the McCune Ranch and the Carrion Ranch to the SPE.

1.88    **"McCune Ranch"** shall mean the approximately 817 acres of real property located in Solano County south of the Carrion Ranch, generally identified as APNs 0107-110-020-01, 0107-110-060-01.

1.89    **"Non-Stayed Order or Judgment"** shall mean an Order entered on the Court's docket to which no stay pending an appeal or any motion for reconsideration, rehearing, or certiorari exists.

1.90    **"Oda Ranch"** shall mean the approximately 200 acres of real property located in Yolo County, identified as APNs 027-180-005-000 and 027-180-006-000.

1.91    **"Order"** shall mean an order, judgment, or decree of the Court as entered on its docket.

1.92    **"Other Secured Claims"** shall mean the Claims of any Creditor with interest or lien on any Property of the Estate (e.g., leased assets) other than the 2019 Growers, Prudential, FNB, the SBA, FMCC, or John Deere.

1.93    **"Other Secured Creditors"** shall mean Creditors holding Secured Claims other than the 2019 Growers, Prudential, FNB, FMCC, John Deere, Yolo County, Solano County, and the SBA.

1.94    **"Ownership Interest" or "Ownership Interests" or "Equity"** shall mean any type of ownership interest in the Property of the Estate, including but not limited to the Debtor in Possession's and his non-debtor wife's community property ownership interest in all the Property of the Estate.

1.95    **"Petition Date"** shall mean August 27, 2020, which is the date when the Debtor in Possession filed his Chapter 11 Case.

1.96    "**Plan" or "Plan of Reorganization"** shall mean this Amended Plan of Reorganization dated May 18, 2021, Confirmed on May 27, 2021 (Docket No. 650) as may be subsequently modified by order of the Court.

1.97    **"Plan Default"** shall mean a Plan Default as described in Section 6.13 of the Plan below, or as may be otherwise provided in the Plan. Failure of the Reorganized Debtor to meet any of his financial projections set forth in the Three-Year Plan Proforma attached as Exhibit 7 to

the Exhibit Document to the Corrected Disclosure Statement (Docket No. 584) shall not constitute a Plan Default. The Post-Effective Date use and/or depletion of the Reorganized Debtor's inventory, crops, accounts receivable and FNB's Cash Collateral shall not constitute or create any form of a Plan Default.

1.98    "**Plan Supplement**" shall mean the packet filed on June 21, 2021, which include all SPE Documents and all Lester Family Trust Documents, and the SPE Farming Lease(s) filed on June 30, 2021. The Plan Supplement documents may be amended prior to the Effective Date.

1.99    "**Plan Supplement Documents**" shall mean all documents attached to the Plan Supplement.

1.100   **"Post-Confirmation Property"** shall mean all Property of the Estate that vests in the Reorganized Debtor on the Effective Date.

1.101   **"Post-Effective Date"** shall mean the period after the Effective Date.

1.102   **"Post-Petition"** shall mean the period from the Petition Date through the Effective Date.

1.103   **"Post-Petition Tax Claims"** shall mean Claims against the Debtor in Possession for taxes due a government entity that arise Post-Petition.

1.104   **"PPP 2 Loan"** shall mean an additional loan or funding (aka as the "second draw PPP loan" that may be obtained by the Reorganized Debtor under the SBA's Payroll Protection Plan "2" as currently being offered with applications due on or before May 31, 2021.

1.105   **"Prepetition"** shall mean prior to the Petition Date.

1.106   **"Prepetition Debtor"** shall mean Russell Wayne Lester, dba Dixon Ridge Farms, prior to the Petition Date.

1.107   **"Priority Claim" or "Priority Claims"** shall mean an Allowed Claim entitled to priority under Section 507(a) of the Code, except Administrative Claims and Priority Tax Claims.

1.108   **"Priority Employee Benefit Claim"** shall mean that portion of an Allowed Claim that is unsecured and that is entitled to priority under Section 507(a)(5) of the Bankruptcy Code.

1.109   **"Priority Employee Claim"** shall mean that portion of an Allowed Claim that is unsecured and that is entitled to priority under Section 507(a)(4) of the Bankruptcy Code.

1.110 **"Priority Tax Claim"** shall mean that portion of a tax Claim, if any, entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

1.111 **"Professionals" or "Professional Persons"** shall mean professionals retained or to be compensated pursuant to Sections 327, 328, 329, 330, 503(b), or 1103 of the Bankruptcy Code.

1.112 **"Professional Claims"** shall mean Claims of Professionals employed by the Debtor in Possession.

1.113 **"Proof of Claim"** shall mean a statement under oath filed in this Case by a claimant in which the claimant sets forth the amount claimed to be owed to it and with sufficient detail to identify the basis for the Claim, in accordance with Rule 3001.

1.114 **"Pro Rata"** shall mean for Claims, the ratio of the amount of an Allowed Claim in a Class to the aggregate amount of all Allowed Claims, with reserves for Disputed Claims, in such Class or designated group.

1.115 **"Property of the Estate"** shall mean all Prepetition and Post-Petition Estate property of every kind, including all separate and community property of the Debtor in Possession whether acquired Prepetition or Post-Petition.

1.116 **"Prudential"** shall mean The Prudential Insurance Company of America.

1.117 **"Prudential Allowed Default Rate"** shall mean twelve percent (12%).

1.118 **"Prudential Collateral"** shall mean the Prudential Loan (1) Collateral and the Prudential Loan (2) Collateral.

1.119 **"Prudential Contract Interest Rates"** shall mean the non-default contract rates of interest contained for Prudential Loan (1) (5.03%) and Prudential Loan (2) (4.05%).

1.120 **"Prudential Cure and Paydown Requirements"** shall mean the obligation to (a) bring Prudential current on Prudential Loan (1) and Prudential Loan (2), including payment in full of Prudential's Missed Payments and Costs; (b) pay the principal balance of Prudential Loan (1) in full, and pay all related interest, fees, and costs, including any applicable Prudential Prepayment Premium; and (c) reduce the principal balance of Prudential Loan (2) to $6.5 million, and all related interest, fees, and costs, including any applicable Prudential Prepayment Premium.

1.121　**"Prudential Cure Date"** shall mean the date that all of Prudential's Missed Payments and Costs are paid to Prudential, and all other payments are current per the terms of the Prudential Loan Documents and the Plan.

1.122　**"Prudential Loan (1)"** shall mean that certain Prudential loan to the Debtor in Possession in the principal amount of $6,500,000 secured by the Prudential Loan (1) Collateral and cross-collateralized by the Prudential Loan (2) Collateral.

1.123　"**Prudential Loan (1) Collateral**" shall mean Carrion Ranch, Gordon Ranch, MacQuiddy Ranch, and Oda Ranch and related personal property assets, and cross-collateralized by the Prudential Loan (2) Collateral.

1.124　**"Prudential Loan (1) Documents"** shall mean the loan, security, and perfection documents executed by Prudential and the Debtor in Possession Prepetition evidencing or underlying the Prudential (1) Loan.

1.125　**"Prudential Loan (2)"** shall mean that certain Prudential loan to the Debtor in Possession in the principal amount of $7,500,000 secured by the Prudential Loan (2) Collateral and cross-collateralized by the Prudential Loan (1) Collateral.

1.126　"**Prudential Loan (2) Collateral**" shall mean McCune Ranch and related personal property assets, and cross-collateralized by the Prudential Loan (1) Collateral.

1.127　**"Prudential Loan (2) Documents"** shall mean the additional loan, security, and perfection documents executed by Prudential and the Debtor in Possession Prepetition evidencing or underlying the Prudential (2) Loan.

1.128　"**Prudential Loan Documents**" shall mean the Prudential Loan (1) Documents and the Prudential Loan (2) Documents, and all other documents related to both loans collectively.

1.129　**"Prudential Loans"** shall mean Prudential Loan (1) and Prudential Loan (2).

1.130　"**Prudential Prepayment Premium**" shall mean the contractual prepayment premium set forth in the Prudential Loan Documents.

1.131　**"Prudential Reserve"** shall mean the funds contributed through either sales of SPE Designated Properties pursuant to Section 4.1.iv.5)d) of this Plan or rents payable to the SPE under the SPE Farming Lease(s) to be deposited into the Prudential Reserve Account to: (a) pay

the future principal and interest due to Prudential under the Prudential Loan Documents; (b) if there is no default under Section 4.1.vii, to make SPE Proposed Sale Properties Tax Distributions to the Lester Family Trust up to but not exceeding maximum amount of $320,000 contributed pursuant to Section 4.1.iv.5)d); and (c) pay the SPE Estimated One-Year Expenses as defined in Section 1.152 of this Plan and the retainers due the SPE Independent Manager pursuant to Section 6.9 of this Plan.

1.132  "**Prudential Reserve Account**" shall mean a segregated deposit account owned and maintained by the SPE at a financial institution agreeable to Prudential into which the Prudential Reserve funds are deposited and in which Prudential shall have a perfected, first priority security interest.

1.133  "**Prudential Secured Claim**" shall mean all amounts owed to Prudential by the Debtor in Possession pursuant to or in connection with either or both of Prudential Loan (1) and Prudential Loan (2), which amount includes Prudential's Missed Payments and Costs, all of which are secured by the Prudential Collateral.

1.134  "**Prudential's Attorneys' Fees and Costs**" shall mean the attorneys' fees and costs incurred by Prudential protecting its interests in connection with the Prudential Loans, including in this Chapter 11 Case with respect to the Prudential Secured Claim, which amount shall not exceed $800,000 through the Effective Date; *provided*, *however* that in the event that the Effective Date is extended or otherwise occurs on a date beyond July 1, 2021 then the foregoing limitation on Prudential's Attorneys' Fees and Costs shall no longer apply. For the avoidance of doubt, there shall be no cap on Prudential's Attorneys' Fees and Costs incurred by or to be paid to Prudential (and due and owing to it under the Prudential Loan Documents) after the Effective Date (including any fees and costs related to any post-Effective Date sale of the Prudential Collateral or any post-Effective Date exercise of remedies by Prudential under the Prudential Loan Documents and as provided under this Plan).

1.135  "**Prudential's Missed Payments and Costs**" shall mean unpaid interest accrued at the applicable Prudential Contract Interest Rates and/or Prudential Allowed Default Rate, as applicable, Prudential's Attorneys' Fees and Costs, and all other fees and costs due and unpaid

under the terms of the Prudential Loan Documents as of a specific date. Such amounts represent the amounts required to be paid in order to bring Prudential Loan (1) and Prudential Loan (2) current, which Prudential shall make available to the SPE or the Reorganized Debtor calculated as of a specified date certain upon at least seven (7) days' written notice.

1.136  **"Putah Creek Ranch"** shall mean the Debtor in Possession's real property located at 5430 Putah Creek Road, Winters, California 95694, APN 107-080-040-01, in Solano County consisting of approximately 68 acres of which the Debtor in Possession farms approximately 47 acres of organic walnuts and includes the Dixon Ridge Farms headquarters, processing plant, and other outbuildings and improvements as well as the Debtor in Possession's primary residence.

1.137  **"Reorganized Debtor"** shall mean Russell Wayne Lester dba Dixon Ridge Farms on and after the Effective Date.

1.138  **"Retained Assets"** shall mean all Estate property as of the Effective Date under Sections 541 and 1115 of the Bankruptcy Code, including the SPE Designated Properties to be transferred to the SPE on or after the Effective Date.

1.139  **"Secured Claim"** shall mean an Allowed Claim secured by a lien, security interest, or other charges against property in which the Estate has an interest, or which is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value, as set forth in the Plan, as determined by Final Order of the Court pursuant to Section 506(a) of the Code, or as agreed upon by such entity and the Debtor, of any duly perfected interest in Property of the Estate, validly and enforceably securing such Allowed Claim.

1.140  **"Sale Trigger Dates"** shall mean the dates (each a "**Sale Trigger Date**") by which (i) the sale of the Gordon Ranch, MacQuiddy Ranch, the Oda Ranch and the Conservation Easement must close, as set forth in Section 4.1.iv.3) of the Plan; and (ii) the Prudential Cure and Paydown Requirements must be achieved through the sale of the Gordon Ranch, MacQuiddy Ranch, the Oda Ranch and the Conservation Easement, as set forth in Section 4.1.vii.3) of the Plan.

1.141  **"SBA"** shall mean the United States Small Business Administration.

1.142  **"SBA Loan Documents"** shall mean the loan security and perfection documents

underlying the SBA's EIDL Secured Claim.

1.143    **"SBA's EIDL Secured Claim"** shall mean the United States Small Business Administration EIDL loan in the approximate amount of $150,000 that is secured by a junior lien behind FNB on inventory, chattel paper, accounts, equipment, and general intangibles, and farm equipment.

1.144    "**SPE**" shall mean the special purpose entity owned by the Lester Family Trust that will be formed on or before the Effective Date whose purpose shall be limited to only: (i) holding, marketing and selling the SPE Designated Properties and (ii) to executing and overseeing the SPE Farming Lease(s) with the Reorganized Debtor. The SPE Documents shall be filed with the Plan Supplement.

1.145    "**SPE Annual Reports**" shall mean (i) an SPE Profit and Loss Statement for each calendar year calculating the SPE Profits and SPE Distributions for that year, and (ii) a statement calculating the SPE Excess Profits, including a statement showing the calculation of the SPE Estimated One-Year Expenses and any amounts contributed to the Prudential Reserve.

1.146    **"SPE Assumption Date"** shall mean the date the SPE's assumption of all of Debtor in Possession's and Reorganized Debtor's obligations to Prudential under the Plan and the Prudential Loan Documents becomes effective**.**

1.147    **"SPE Consent Authorized Representatives**" shall mean the designated representatives of Prudential and FNB authorized to receive an SPE Sale Consent Request and consent to a sale of an SPE Designated Property, as provided in Section 4.1.iv.1) of the Plan.

1.148    "**SPE Designated Properties**" shall mean all parcels of real property securing Prudential's Secured Claim, the crops growing thereon, and all fixtures, improvements, and other personal property located on or used in connection with such real property collateral. The parcels of real property that constitute the SPE Designated Properties include Gordon Ranch, MacQuiddy Ranch, Oda Ranch, Carrion Ranch, and McCune Ranch.

1.149    "**SPE Designated Properties Confidential Value**" shall mean the confidential values of the SPE Designated Properties as agreed upon by Prudential and the Reorganized Debtor.

1.150 "**SPE Distributions**" shall mean all distributions of funds from the SPE to the owners of the SPE, or to such other parties as the owner(s) of the SPE under the SPE Documents and the Lester Family Trust Documents or the Plan may direct such funds, including, without limitation, any voluntarily or mandated SPE Profits that are distributed and all SPE Sale Excess Proceeds, SPE Excess Profits, and SPE Refinance Excess Proceeds.

1.151 "**SPE Documents**" shall mean the organizational documents for the SPE that govern the formation, management, and operation of the SPE under the applicable law of the state of formation. The SPE Documents shall be filed with the Plan Supplement and shall contain provisions that, among other things: (i) require the SPE to be a bankruptcy remote entity; and (ii) prevent the SPE from incurring debt other than (a) debt incurred as a direct result of owning real property, such as ad valorem property taxes, (b) debt evidenced by and related to the Prudential Loans as modified by the Plan, (c) compensation and expenses of the SPE Manager, and (d) the SPE's obligations under the SPE Farming Lease(s). The SPE Documents must also require the SPE Independent Manager or the Reorganized Debtor, as applicable, to distribute all SPE Excess Profits to the SPE Profits and Distributions Pledge Holders, annually by March 31 of the previous year, beginning with the distribution on March 31, 2022, of the SPE Excess Profits for the 2021 calendar year, and continuing until the Allowed claims of the SPE Profits and Distributions Pledge Holders are paid in full. The SPE Documents must also require the SPE Independent Manager, the Lester Family Trust, or the Reorganized Debtor, as applicable, to comply with SPE Reporting Requirements.

1.152 "**SPE Estimated One-Year Expenses**" shall mean the anticipated amount the SPE will expend over the next one-year period for all the SPE Independent Manager Expenses and all of the SPE normal and customary operating expenses of the SPE measured as of January 1 of each calendar year, excluding those expenses to be paid from the proceeds from the sale of the SPE Designated Properties and the Conservation Easement including (i) any costs of the sale of the SPE Designated Properties, including commissions, legal fees, and expenses, of the SPE and Prudential, and any other repairs, expenses, fees, or costs required to be expended pursuant to the applicable sale documents necessary to execute such sale , and (ii) SPE Independent Manager's

fees, costs, and expenses relating to the sale of the SPE Designated Properties. The SPE Estimated One-Year Expenses shall not exceed $25,000.00, but such cap may be modified by consent of Prudential, FNB, and the Reorganized Debtor, or if no consent, by order of the Court for cause shown by the SPE Independent Manager.

1.153 "**SPE Excess Profits**" shall mean the SPE Profits less: (1) the SPE Estimated One-Year Expenses; (2) rent payments from the SPE Farming Lease(s), including any assigned payments from sub-leases; (3) any shortfall payments the Reorganized Debtor makes to the Prudential Reserve so that sufficient funds exist in the Prudential Reserve to make payments under the Prudential Loan Documents when due; and (4) any amounts contributed to the Prudential Reserve from (a) the sale of the SPE Designated Properties pursuant to by Section 4.1.iv.5)d) of this Plan and (b) from payment of any rent due the SPE from the SPE Farming Lease(s) or any sub-leases to the SPE Farming Lease(s).

1.154 "**SPE Farming Lease(s)**" shall mean the triple net lease agreement(s) between the Reorganized Debtor, the SPE, and the Lester Family Trust that will govern the terms for the ongoing farming operations and certain Plan payments due creditors of the SPE and the Lester Family Trust. The SPE Farming Lease(s) and any other documentation related thereto shall be filed with the Plan Supplement.

1.155 "**SPE Final Report**" shall mean a final SPE Profit and Loss Statement calculating the SPE Profits and SPE Distributions from the period ending on the sooner to occur of (i) the sale of all SPE Designated Properties, or (ii) the payment in full of the Claims of the SPE Profits and Distribution Pledge Holders and beginning on January 1 of that year.

1.156 "**SPE Independent Manager**" shall mean the independent fiduciary who will manage the sale of SPE Designated Properties pursuant to the treatment of Prudential in Class 1 of this Plan. Prudential will designate the SPE Independent Manager subject to Debtor in Possession's consent, which consent shall not be unreasonably withheld.

1.157 "**SPE Profits**" shall mean the annual net operating income of the SPE before deduction of depreciation and amortization, plus the principal portion of any payments made to Prudential, measured as of each calendar year end.

1.158 "**SPE Profits and Distributions**" shall mean, collectively, the SPE Profits and the SPE Distributions.

1.159 "**SPE Profits and Distributions Pledge Agreement**" shall mean an agreement pursuant to which all owners of the SPE, including holders of any beneficial ownership interest in the SPE, or who are otherwise entitled to receive SPE Profits and Distributions under the SPE Documents, pledge to the SPE Profit and Distributions Pledge Holders their right to receive payment of the SPE Profits and Distributions, to secure payment of their respective claims, as provided in the Plan. The SPE Profits and Distribution Pledge Agreement shall be executed by all the trustees of the Lester Family Trust and the beneficiaries of the Lester Family Trust, as necessary to create a valid and enforceable pledge of the right to receive the SPE Profits and Distributions. The SPE Profit and Distributions Pledge Agreement shall also include all documents, resolutions and agreements that may be required to evidence and/or establish the authority of any party to the SPE Profits and Distributions Pledge Agreement to executed and deliver the SPE Profits and Distributions Pledge Agreement.

1.160 "**SPE Profits and Distributions Pledge Holders**" shall mean the holders of the Voluntarily Deferred Allowed Administrative Claims, FNB, and the holder of the Class 11 General Unsecured Claim.

1.161 "**SPE Profit and Loss Statement**" shall mean a statement showing the income and expense of the SPE and calculating the SPE Profits and the SPE Distributions for the period reported.

1.162 "**SPE Proposed Sale Properties**" shall mean the Conservation Easement, the Gordon Ranch, the Oda Ranch, and the MacQuiddy Ranch.

1.163 "**SPE Proposed Sale Properties Actual Net Sale Proceeds**" shall mean actual purchase prices for the SPE Projected Sale Properties less actual, commissions, closing costs, prorations, title, required endowment contributions, and escrow fees.

1.164 "**SPE Proposed Sale Properties Estimated Net Sale Proceeds**" shall mean $13,133,050.00, consisting of the projected purchase price for the SPE Projected Sale Properties less commissions, closing costs, title, required endowment contributions, and escrow fees in the

estimated amount of 6%.

1.165　"**SPE Proposed Sale Properties Tax Distribution(s)**" shall mean the amount of funds the SPE distributes from the Prudential Reserve to the Lester Family Trust as the result of the receipt of an SPE Proposed Sale Properties Tax Distribution Request. No SPE Proposed Sale Properties Tax Distribution(s) shall be made prior to December 31, 2022.

1.166　"**SPE Proposed Sale Properties Tax Distribution Request**" shall mean a request by the Lester Family Trust and/or the Reorganized Debtor for a tax distribution from the Prudential Reserve to pay tax obligations owed by the Lester Family Trust or the Reorganized Debtor. Such request shall specify: (a) the SPE Proposed Sale Properties Actual Net Sale Proceeds (b) the amount that the SPE Proposed Sale Properties Actual Net Sale Proceeds exceed the SPE Sale Properties Estimated Net Sale Proceed, (c) the anticipated tax obligations incurred as a result of SPE Proposed Sale Properties Actual Net Sale Proceeds exceeding the SPE Proposed Sale Properties Estimated Net Sale Proceeds, and (d) a certification that the funds being held in the Lester Family Trust Tax Reserve are insufficient and the proposed distribution is necessary to timely make the estimated or actual tax obligation payments owed or estimated to be owed. The SPE Proposed Sale Properties Tax Distribution Request shall be served concurrently on the SPE Consent Authorized Representatives.

1.167　"**SPE Properties Refinancing**" shall mean a refinancing of the SPE Designated Properties as contemplated by Section 4.1.iv.8) of this Plan.

1.168　"**SPE Refinancing Excess Proceeds**" shall mean the proceeds from an SPE Properties Refinancing in excess of the amount necessary to pay the Prudential Loans in full and any loan fees, appraisal fees, document fees, escrow and title fees and other reasonable transaction costs incurred in connection with the SPE Properties Refinancing.

1.169　"**SPE Reporting Requirements**" shall mean the reporting requirements set forth in Section 6.21 of this Plan.

1.170　"**SPE Sale Consent Request**" shall mean a written request for consent to a sale of an SPE Designated Property to be delivered to the SPE Consent Authorized Representatives and the Reorganized Debtor, as required under Section 4.1.iv.1)b. of the Plan.

1.171   "**SPE Sale Excess Proceeds**" shall mean any proceeds remaining in a sale escrow from the sale of the Conservation Easement or the SPE Designated Properties that are available for distribution to the Lester Family Trust and/or, directly or indirectly, the SPE Profits and Distribution Pledge Holders pursuant to, among other things, Section 4.1.iv.4) and 4.1.iv.5) of this Plan after the full payment of all senior obligations required to be paid under the various provisions of this Plan are paid, including all amounts required to be paid to Prudential as set forth in Section 4.1.iv.4) and 4.1.iv.5) of this Plan.

1.172   "**Solano County Property Tax Claim**" shall mean all real and personal property tax owed Solano County that attached to real or personal property owned by the Prepetition Debtor on the January 1, 2020 Lien Date, which was unpaid as of the Petition Date.

1.173   "**Tolling Agreement**" shall mean an agreement between the Lester Family Trust, the Reorganized Debtor and any Insider that may be the subject of an Avoidance Action which agreement provides for the extension and tolling of any statutes of limitations that may apply to any such Avoidance Action.

1.174   "**Voluntarily Deferred Allowed Administrative Claims**" shall mean the Allowed Administrative Claims of Creditors who enter into an agreement to defer payment of all or a portion of their Allowed Administrative Claims pursuant to terms provided in Section 3.3 of this Plan.

1.175   "**U.S. Trustee**" shall mean Region 17 of the Office of the United States Trustee.

1.176   "**Yolo County Property Tax Claim**" shall mean all real property taxes owed Yolo County that attached to real property owned by the Prepetition Debtor on the January 1, 2020 Lien Date, which was unpaid as of the Petition Date.

**ARTICLE II**
**CLASSIFICATION OF CLAIMS AND INTERESTS**

2.1.   **Classes of Claims and Ownership Interests**

Class 1 shall consist of the Prudential Secured Claim;

Class 2A shall consist of the Secured Claim of FNB for its FNB RE Loan;

Class 2B shall consist of the Secured Claim of FNB for its FNB HELOC Loan;

Debtor in Possession's Amended Plan of Reorganization (Dated May 18, 2021) as Modified July 1, 2021

Class 2C shall consist of the Secured Claim of FNB for its FNB AG Production Loan;

CLASS 2D shall consist of the Secured Claim of FNB for its FNB AG Asset Based LOC;

Class 3 shall consist of Secured Claim of FMCC for its FMCC Vehicle(s) Loan;

Class 4 shall consist of the cross-collateralized Secured Claim of John Deere;

Class 5 shall consist of the Yolo County Property Tax Claim;

Class 6 shall consist of the Solano County Property Tax Claim;

Class 7 shall consist of the disputed Secured Claim of the 2019 Growers;

Class 8 shall consist of the SBA's EIDL Secured Claim;

Class 9 shall consist of the Secured Claims of Other Secured Creditors;

Class 10 shall consist of the GUC Convenience Class;

Class 11 shall consist of the General Unsecured Creditors; and

Class 12 shall consist of the Ownership Interests of Russell Wayne Lester and Kathleen Lester.

## ARTICLE III
## TREATMENT OF UNCLASSIFIED CLAIMS

3.1. **Allowance of Administrative Claims**

Holders of possible Administrative Claims against the Estate, including professionals, must file a motion to approve such claim as an Administrative Claim on or prior to the Administrative Claims Bar Date.

3.2. **Payment of Administrative Claims**

The Reorganized Debtor shall pay the Allowed Administrative Claims in the case as soon as practicable after the Effective Date. Holders of Allowed Administrative Claims may enter into an agreement with the Debtor in Possession or Reorganized Debtor to be treated as a Voluntarily Deferred Allowed Administrative Claim pursuant to Section 3.3 below. Such an agreement is subject to Court approval.

///

### 3.3. **Voluntarily Deferred Allowed Administrative Claims**

Holders of Voluntarily Deferred Allowed Administrative Claims shall be paid as a priority distribution from the Conservation Easement Sale as provided in the Section 4.1 treatment of Prudential in Class 1 herein. Holders of Voluntarily Deferred Allowed Administrative Claims shall be secured by the SPE Profits and Distributions Pledge Agreement, in a first priority position. Holders of Voluntarily Deferred Administrative Claims shall receive interest on the outstanding principal balance on their Voluntarily Deferred Allowed Administrative Claims at the Federal Judgment Rate as of the Petition Date (0.13% per annum as published in the webpage: https://www.casb.uscourts.gov/post-judgment-interest-rates-2020). The Lester Family Trust and the Reorganized Debtor shall be co-obligors on the Voluntarily Deferred Allowed Administrative Claims, and such claims shall be paid in full, including all accrued interest on or before December 31, 2022 from either the funds of the Reorganized Debtor or the SPE. Agreements to voluntarily defer the payment of the Allowed Amount of their Administrative Claims shall be entered into concurrent with, and included within the request for relief in, administrative Creditor's motion to approve the Administrative Claim. All agreements to defer payment are subject to Bankruptcy Court approval

### 3.4. **Voluntary Cap on Professional Fees**

Bankruptcy Counsel for the Debtor in Possession (FFWPR) and the Debtor in Possession's financial advisor (IBPM) have voluntarily agreed to cap their combined professional fees and costs through the Effective Date at a total amount of $1,000,000 in addition to the prepetition retainers they presently hold.

### 3.5. **FNB Super-Priority Administrative Claim**

If FNB Accepts the Plan, FNB shall have an Allowed, super-priority administrative claim under Sections 503(b)(1), 507(a), and 507(b) of the Bankruptcy Code in the amount of $250,000, which Claim shall have priority over all other costs and expenses of the kind specified in or ordered pursuant to Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 of the Bankruptcy Code, except for the Office of the United States Trustee Fees. FNB's Super-Priority Claim shall be an Allowed Administrative Claim without the filing of a Proof of Claim or a motion

seeking allowance of such Claim. The FNB Super-Priority Administrative Claim shall be a Voluntarily Deferred Administrative Claim and shall be secured by the SPE Profits and Distributions Pledge Agreement, in a first-priority position, ahead of the other Voluntarily Deferred Administrative Claims, the FNB Asset Based LOC, and the Class 11 General Unsecured Claims. FNB shall have and retain a valid, perfected, and enforceable lien on the proceeds from the sale of the Conservation Easement in the amount of the unpaid balance of the FNB Super-Priority Administrative Claim until the FNB Super-Priority Administrative Claim is paid in full. All other replacement liens provided to FNB in connection with the use of Cash Collateral shall be deemed to be released on the Effective Date. Any payments received by FNB in payment of the FNB Super-Priority Administrative Claim shall be applied to the principal balance owing under the FNB Asset Based LOC. Upon payment in full of the FNB Super-Priority Administrative Claim, the Reorganized Debtor shall be entitled to have the principal and interest payments to be made under the FNB Asset Based LOC to be adjusted to an amount required to amortize the then remaining principal balance of the FNB Asset Based LOC over the remainder of the thirteen-year amortization period. If FNB Rejects the Plan, and seeks to assert an FNB Super-Priority Administrative Claim, FNB must file a Proof of Claim asserting such claim and file a motion seeking allowance of such FNB Super-Priority Administrative Claim pursuant to Section 3.1 of the Plan.

### 3.6.     Post-Petition U.S. Trustee Fees

Post-Petition U.S. Trustee Fees that are payable through the Effective Date under 28 U.S.C. § 1930, as determined by the Court, shall be paid in full on the Effective Date or when due. The Lester Family Trust shall be jointly and severally liable for any unpaid Post-Petition U.S. Trustee Fees.

### 3.7.     Post-Petition Tax Claims

The Reorganized Debtor shall reserve for and pay Post-Petition Tax Claims that were not due and payable on the Effective Date without the requirement that a motion to approve an Administrative Claim be filed by the applicable taxing authority by the Administrative Claims Bar Date. Other than interest payments required under the Plan, the Reorganized Debtor shall not

make any payments to Allowed General Unsecured Claims or any Priority Claims until all Post-Petition Tax Claims are either paid or fully reserved for. To the extent allowed by law, all net operating losses and other tax credits and attributes of the Pre-Petition Debtor, the Debtor in Possession, the Reorganized Debtor and/or Kathleen Lester that have arisen prior to the Petition Date and the Effective Date or that may arise from and after the Effective Date shall be preserved and used exclusively to offset any Post-Petition Tax Claims or otherwise for the benefit of the Creditors. The SPE shall be, and shall remain, a pass through or disregarded entity for tax purposes with all taxable income attributed to the Lester Family Trust and shall be prohibited from filing Form 8832, or any other form or return that would cause the SPE to be treated as a taxable corporation, until all Allowed Claims of Creditors in this Chapter 11 Case are paid in full.

3.8. **Priority Tax Claims.**

Each Allowed Priority Tax Claim, unless the holder of such Claim has agreed to a different treatment, shall receive deferred Cash payments to the extent permitted by Section 1129(a)(9) of the Bankruptcy Code with interest on the unpaid portion of such Claim at the rate established by applicable non-bankruptcy law as of the calendar month in which the Plan is confirmed, or at such other rate as may be agreed upon between the Reorganized Debtor and the appropriate governmental unit, provided that the Reorganized Debtor may prepay any or all such Claims at any time, without premium or penalty, other than the real property tax claims that are treated as secured claims.

3.9. **Priority Employee Claims**

Each holder of an Allowed Priority Employee Claim who is not employed by the Debtor in Possession as of the Effective Date shall receive full payment of the Allowed amount of such Claim, less any prior payments on account of such Claim (e.g., payment of Prepetition payroll) from available Cash on hand or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Court enters a Final Order allowing the Priority Employee Claim. The Reorganized Debtor shall either pay on the Effective Date or honor in the ordinary course of business any Allowed Priority Employee Claim for any employee who is employed by the Reorganized Debtor on the Effective Date of the Plan. The Debtor in Possession obtained Court

approval to pay and/or honor the Prepetition employee wage claims and to pay the Prepetition portion of the first payroll in the Case. The Debtor in Possession does not believe that any Priority Employee Claims will exist on the Effective Date.

### 3.10.   Priority Employee Benefit Claims

Each holder of an Allowed Priority Employee Benefit Claim shall receive full payment of the Allowed amount of such Claim from available Cash on or as soon as practicable after the later of (i) the Effective Date, (ii) on the Date the Allowed Priority Employee Benefit Claim becomes due under California Law, or (iii) the date upon which the Court enters a Final Order determining or allowing the Priority Employee Benefit Claim. The Debtor in Possession does not believe that any Priority Employee Benefit Claims will exist, or if any Priority Employee Benefit Claims remain on the Effective Date, such as accrued vacation or sick leave pay, such benefits will be honored by the Reorganized Debtor in the ordinary course of business Post-Effective Date.

**ARTICLE IV**
**TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**

### 4.1.   Class 1 Impaired Prudential Secured Claim

The Prudential Loan Documents and all rights and obligations thereunder, including but not limited to Prudential's two deeds of trust on the SPE Designated Properties, shall remain in full force and effect, except as specifically modified in the Plan, and the SPE shall assume all obligations of Debtor in Possession under the Prudential Loan Documents as set forth herein. The Prudential Loan Documents are modified on the Effective Date as follows:

i.   <u>General Terms</u>.

1) On the Prudential Cure Date, the interest rates for Prudential Loan (1) and Prudential Loan (2) shall be set at their respective Prudential Contract Interest Rates.

2) Principal and interest payments shall be made from the funds held in the Prudential Reserve Account in accordance with the Prudential Loan Documents or as otherwise provided in the Prudential Loan Documents.

3) The January 1, 2029 maturity date in the Prudential Loan Documents will remain in full force and effect. As set forth in the Prudential Loan Documents, the Reorganized Debtor or the SPE (as applicable) shall pay all unpaid amounts due under the Prudential Loan Documents

on the maturity date and may do so without paying a prepayment premium if paid within sixty (60) days of such maturity date.

4) Except as otherwise set forth in Section 4.1(ix), any provisions of the Prudential Loan Documents that impose a default or other adverse consequence solely as a result of the Reorganized Debtor's and/or Kathleen Lester's financial situation or solvency after the Effective Date are deleted and shall have no force and effect.

ii.    Prepayment Premium and Default Interest Settlement.

1) The SPE and/or the Reorganized Debtor may pay down Prudential's Missed Payments and Costs at any time without incurring a Prudential Prepayment Premium.

2) Prior to the Prudential Cure Date and following any Plan Default after the Prudential Cure Date, including any default or Event of Default (as defined in the Prudential Loan Documents) under the Prudential Loan Documents, Prudential Loan (1) and Prudential Loan (2) shall bear interest at the Prudential Allowed Default Rate.

3) Prudential will reduce the Prudential Prepayment Premium for all sales or refinancing of the SPE Designated Properties and the Conservation Easement that result in principal paydowns related thereto to 50% of the formula value contained in the Prudential Loan Documents through December 31, 2022, after which date, subject to the provisions of Section 4.1.viii.6), the Prudential Prepayment Premium will revert to the original non-discounted formula as set forth in the Prudential Loan Documents.

4) In return for the foregoing, the Debtor in Possession releases any and all right to contest the Prudential Prepayment Premium (both the original, non-discounted formula and the discounted formula as set forth in Section 4.1(ii.3)) or the Prudential Allowed Default Rate.

iii.    Creation and Management of the SPE.

1) Upon or prior to the Effective Date, the Debtor in Possession or the Reorganized Debtor will create the SPE, which shall be a bankruptcy remote (i.e., ineligible to file a bankruptcy case in the future) entity, the terms of which shall be acceptable to Prudential. The organizational documents, limitations, and conditions of the SPE shall be set forth in the Plan Supplement.

///

2)   The SPE Documents shall provide for the execution and delivery of the SPE Profits and Distributions Pledge Agreement. The SPE Profits and Distributions Pledge Agreement shall govern how the SPE Independent Manager or the Reorganized Debtor, as applicable, distribute any SPE Profits and Distributions, SPE Sale Excess Proceeds and SPE Refinance Excess Proceeds on behalf of the Lester Family Trust to the SPE Profits and Distributions Pledge Holders until the claims secured by the SPE Profits and Distributions Pledge Agreement are paid in full. The SPE Documents shall also require the SPE Independent Manager or the Reorganized Debtor, as applicable, to meet the SPE Reporting Requirements and distribute the SPE Excess Profits to the SPE Profits and Distributions Pledge Holders. Notwithstanding the foregoing, nothing in the SPE Profits and Distributions Pledge Agreement shall give any SPE Profits and Distributions Pledge Holder any: (1) pledge or assignment of, or a security interest in, any equity, ownership, management, or control interest in the SPE or any of its direct or indirect members or managers or any of the SPE's other assets; or (ii) the right to vote or otherwise participate in the management or conduct of the activities of the SPE or the right to exercise any rights or powers as a member of the SPE or cause the Lester Family Trust to cease to be a member of the SPE.

3)   On or before March 31 of each year commencing on March 31, 2022, the SPE Independent Manager or the Reorganized Debtor, as applicable, shall pay any SPE Excess Profits for the prior calendar year to SPE Profits and Distribution Pledge Holders until the Allowed Claims of the SPE Profits and Distribution Pledge Holders are paid in full, and thereafter to the Lester Family Trust.

4)   The SPE Independent Manager shall serve as manager of the SPE, effective on the Effective Date. The SPE Independent Manager shall have sole authority and responsibility to sell the SPE Designated Properties, as otherwise set forth in and in accordance with the Plan, supervise any farming leases between the SPE and the Reorganized Debtor on the SPE Designated Properties, and manage the business affairs of the SPE. Reorganized Debtor shall replace the SPE Independent Manager as manager of the SPE, and the SPE Independent Manager shall be inactive, but shall not be terminated, in the event that all of the following occur on or before March 31, 2022: (a) the SPE Independent Manager sells Gordon Ranch, MacQuiddy Ranch, Oda Ranch, and the Conservation

Easement; (b) the Prudential Cure and Paydown Requirements are satisfied; and (c) no Default or Event of Default has occurred and is continuing under the Plan or the Prudential Loan Documents. At all times that the SPE Independent Manager serves as trustee and/or manager of the SPE, Reorganized Debtor shall assist the SPE Independent Manager in discharging its duties and obligations under the Plan, to the extent requested by the SPE Independent Manager. To the fullest extent permitted by law, and notwithstanding any duty otherwise existing under the SPE Operating Agreement or the Plan, the SPE Independent Manager shall have the same fiduciary duty obligations to the Creditors holding unpaid Allowed Claims as it does to the owner of the SPE.

      5)  If the SPE Independent Manager is inactive pursuant to Section 4.1.iii.4) of the Plan and there is an FNB Material Default or with the consent of the Reorganized Debtor, the SPE Independent Manager's powers shall be reactivated only to sell the balance of the SPE Designated Properties but not to oversee the SPE Farming Lease(s). The SPE Independent Manager's powers shall be reactivated by FNB providing a notice of default to the Reorganized Debtor and the SPE Independent Manager, which reactivation shall be immediate upon such notice, notwithstanding any cure period provided in Section 6.13. If, after expiration of the cure period provided in Section 6.13, the McCune and Carrion Grant Deed has not already been recorded, the SPE Independent Manager shall immediately cause the McCune and Carrion Grant Deed to be recorded transferring title to the McCune Ranch and Carrion Ranch to the SPE. If the Reorganized Debtor disputes that an FNB Material Default exists, the Reorganized Debtor can apply to the Court for relief from the reactivation of the SPE Independent Manager with the only grounds for such relief being that (i) an FNB Material Default did not occur, or (ii) did occur but was cured within the cure period provided in Section 6.13;

      6)  No Sale Trigger Date may be extended except by Order of the Court, for good cause shown.

      7)  Concurrently with or as soon after the Effective Date as possible, the Reorganized Debtor shall:

///

///

a.    transfer all of the SPE Designated Properties to the SPE subject to the existing Prudential Loan Documents, including but not limited to any security interests in or deeds of trust on the SPE Designated Properties;

b.    cause the SPE to assume all of the obligations of the Debtor in Possession and Reorganized Debtor to Prudential under the Plan and the Prudential Loan Documents, and assign their interests in the Prudential Loan Documents to the SPE; and

8) The Reorganized Debtor may delay transferring the McCune Ranch and Carrion Ranch to the SPE until after closing of the Conservation Easement Sale. On or prior to the Effective Date, the Debtor in Possession and Kathleen Lester shall execute the McCune and Carrion Grant Deed and deliver the McCune and Carrion Grant Deed into the escrow for the closing of the Conservation Easement Sale, or if such escrow has not yet been opened, to the SPE Independent Manager, with irrevocable instructions to record the McCune and Carrion Grant Deed upon the earlier of (i) immediately after the close of the Conservation Easement Sale, or (ii) March 31, 2022 or (iii) receipt of instructions from the SPE Independent Manager to record the McCune and Carrion Grant Deed.

9) The SPE shall execute assumption documents, or such other documents as may be reasonably requested by Prudential, including loan documents to amend or replace the Prudential Loan Documents. The SPE shall confirm, remake, or otherwise affirm all liens, security interests, and grants in favor of Prudential under the Prudential Loan Documents.

10) The SPE, at the SPE's expense, shall provide to Prudential all title endorsements, loan document amendments, environmental indemnification agreements, assignments, assumptions, reaffirmations, UCC filing authorizations, authority documents, and other documents and items as Prudential may require.

11) So long as there is no default under Section 4.1.vii, and the reasonable consent of Prudential which shall be given if there is no default under Section 4.1.vii, upon the receipt of an SPE Proposed Sale Properties Tax Distribution Request, the SPE Independent Manager, or the Reorganized Debtor, if applicable, shall distribute to the Lester Family Trust the amount requested up to the total amount remaining from the $320,000 contributed to the Prudential Reserve pursuant

to Section 4.1.iv.5)d) of this Plan. The Lester Family Trust shall hold such funds, as well as the 25% distributions to the Lester Family Trust specified in Section 4.1.iv.4)f and Section 4.1.iv.5)h of this Plan, in the Lester Family Trust Tax Reserve, and shall utilize such funds solely for the payment of estimated or actual tax payments due as a result of sales of the SPE Proposed Sale Properties. Any funds remaining in the Lester Family Trust Tax Reserve after payment of the taxes due as a result of the sales of the SPE Proposed Sale Properties shall be distributed back to the Prudential Reserve to replenish any funds advanced from the Prudential Reserve to the Lester Family Trust Reserve, and then to the SPE Profits and Distributions Pledge Holders in order of priority as provided in Section 6.4 of this Plan until the claims secured by the SPE Profits and Distributions Pledge Agreement are paid in full

    iv.   <u>Sale Terms for SPE Designated Properties and Conservation Easement</u>.

    1) The following Terms shall govern obtaining approvals for the sales of SPE Designated Properties after the Effective Date:

    a.   Prudential and FNB shall advise the SPE Independent Manager and the Reorganized Debtor of the names and email addresses for their respective SPE Consent Authorized Representatives. Prudential and FNB may, from time to time, by written notice to the SPE Independent Manager and the Reorganized Debtor, designate different representatives authorized to receive the SPE Consent Requests and consent to a sale of an SPE Designated Properties.

    b.   The SPE Independent Manager shall obtain the consent of Prudential, FNB and the Reorganized Debtor as to the purchase price to be paid for the sale of any of the SPE Designated Properties prior to entering in any sales and execution of any purchase agreements or other similar documents for the sale of any SPE Designated Property. Prior to entering into any sales and execution of any purchase agreements or other similar documents with respect to the SPE Designated Properties the SPE Independent Manager or if applicable, the Reorganized Debtor when acting as a Manager of the SPE, shall deliver an SPE Sale Consent Request to the SPE Consent Authorized Representatives, and the Reorganized Debtor (if such property is being sold by the SPE Independent Manager) seeking written consent to the sale price of the SPE Designated Property which consent shall not be unreasonably denied by either the Prudential, FNB or the Reorganized

Debtor (if the SPE Independent Manager has sent the consent request). The SPE Sale Price Consent Requests shall, at a minimum disclose, the SPE Designated Property to be sold, the price for which it is to be sold, and if growing crops are to be sold, the amount of the cultural cost reimbursement compensating Reorganized Debtor for the cost incurred in farming such crops (which amount shall be considered a closing cost for all distributions of sale proceeds under this Plan), and include a complete copy of the proposed purchase and sale agreement (for informational purposes only). The SPE Sale Price Consent Request shall be delivered to the SPE Consent Authorized Representatives at the designated email addresses with a confirmation of receipt of delivery requested and if applicable to the Reorganized Debtor and any representatives he designates to receive the SPE Sale Price Consent Requests. The consent or objection to the sale of a SPE Designated Property shall be in writing and shall be delivered to the SPE Independent Manager or the Reorganized Debtor (as applicable) at an email address so designated within two (2) business days of receipt of the SPE Sale Consent Request. The failure any SPE Consent Authorized Representative or the Reorganized Debtor (if applicable) to either provide a written consent or objection to such sale within two (2) business days of the receipt of the SPE Sale Consent Request shall be deemed to be a consent to the sale requested pursuant to the SPE Sale Consent Request.

c.       If any crops are growing on the Gordon Ranch, the MacQuiddy Ranch and the Oda Ranch at the time of entry into contracts of the sale for those SPE Designated Properties, the contract shall provide that the Reorganized Debtor shall (i) retain ownership in all such crops, and the rights to income from such crops, including, without limitation, the rights to income on growing crops by sharecroppers on such parcel(s) of SPE Designated Properties sold, or, upon the consent of the Reorganized Debtor in his sole discretion to the proposed sale and to the amount of the cultural cost reimbursement, and (ii) receive a cultural cost reimbursement compensating Reorganized Debtor for the costs incurred in farming such crops, which such cultural cost reimbursement shall be paid by buyer as a closing cost in addition to the purchase price. Any contract for the sale of any parcel of the SPE Designated Properties that includes a transfer of the crops growing on that parcel to the buyer shall specify the amount to be reimbursed to compensate the Reorganized Debtor for the cost incurred in farming such crops. If any parcel of the SPE

Designated Properties is sold with the purchaser acquiring the crops then growing on that parcel, FNB shall release its security interest in such crops as required to accommodate such sale.

        d.      In the SPE Independent Manager's or Reorganized Debtor's discretion, and/or if any SPE Consent Authorized Representative provides a written objection to the sale of an SPE Designated Property within two (2) business days of receipt of an SPE Sale Consent Request, the SPE Independent Manager or the Reorganized Debtor may file a motion with the Court, on ten (10) day notice, or sooner if the situation requires, seeking Court approval of such sale pursuant to Section 363 of the Bankruptcy Code.

        e.      The broker retained to sell the SPE Designated Properties shall provide to the SPE Independent Manager, or if applicable, the Reorganized Debtor, who shall provide the same to the SPE Consent Authorized Representatives and the Reorganized Debtor (if applicable), a weekly status report as to the marketing and offer activities relating to the sale of the SPE Designated Properties. Such weekly status report shall be in a form acceptable to the Reorganized Debtor, Prudential and FNB.

    2)   Any sales of any of the SPE Designated Properties that are conducted in accordance with the Plan or as otherwise provided in the Plan shall be permitted transfers and/or not considered prohibited transfers under the Prudential Loan Documents.

    3)   The SPE Independent Manager (or the Reorganized Debtor if such sales occur before the Effective Date) shall sell the Gordon Ranch, MacQuiddy Ranch, the Oda Ranch and the Conservation Easement on the following timelines:

        a.      The sales of the Gordon Ranch and the MacQuiddy Ranch shall close by December 31, 2021;

        b.      The sale of either the Conservation Easement or the Oda Ranch shall close by December 31, 2021;

        c.      If the sale of the Oda Ranch (rather than the Conservation Easement) closes by December 31, 2021, the sale of the Conservation Easement shall close by March 31, 2022;

///

d.      If the sale of the Conservation Easement (rather that the Oda Ranch) closes by December 31, 2021, the sale of the Oda Ranch shall close by March 31, 2022; and

e.      None of the foregoing Sale Trigger Dates may be extended except by Order of the Court, for good cause shown.

4)  The sale of the Conservation Easement must result in Prudential receiving a minimum of $3.0 million in net proceeds. Any sale of the Conservation Easement that would fail to yield to Prudential a minimum of $3.0 million in net proceeds will be subject to Prudential's consent, will constitute a Plan Default, and all gross proceeds therefrom remaining after payment of applicable costs and fees of the sale will be paid to Prudential. Provided that the net proceeds Prudential receives from the sale of the Conservation Easement are at least $3.0 million, the SPE will distribute the proceeds of the Conservation Easement as follows:

a.      The first $3.0 million, or such lesser amount that is necessary to pay the following, to Prudential, which will apply such proceeds in the following order:

i.      To the extent not previously paid through the sale of the SPE Designated Properties, to bring Prudential Loan (1) and Prudential Loan (2) current through payment in full of Prudential's Missed Payments and Costs;

ii.      Then, to the extent not previously paid through the sale of the SPE Designated Properties, to pay off the principal balance of Prudential Loan (1) in full and to pay all applicable Prudential Prepayment Premiums; and

iii.      Then, to the extent not previously paid through the sale of the SPE Designated Properties to pay Prudential Loan (2) down to a principal balance of $6.5 million and to pay all applicable Prudential Prepayment Premiums.

b.      Then, up to $1,500,000 to the Reorganized Debtor to pay the costs of the sale of the Conservation Easement, any required donation/contribution endowment, with the remaining balance of the $1,500,000 then paid to the SPE Profits and Distributions Pledge Holders in order of priority as provided in Section 6.4 of this Plan ; *provided, however* that the Reorganized Debtor must first provide an accounting for the use of such funds to Prudential, the failure of which shall result in all unaccounted funds flowing to Prudential;

c.     If the first $3.0 million is not sufficient to satisfy the payment required under 4.1.iv.4)a.ii. above, then to pay off the principal balance of Prudential Loan (1) in full and to pay all applicable Prudential Prepayment Premiums;

d.     If the first $3.0 million is not sufficient to satisfy the payment required under 4.1.iv.4)a.iii. above, then to pay Prudential Loan (2) down to a principal balance of $6.5 million and to pay all applicable Prudential Prepayment Premiums;

e.     Then to FNB on account of the FNB Asset Based LOC in a total amount up to $1,000,000 after deduction for any prior payments to FNB pursuant to Section 4.1.iv.5)g below;

f.     Then 75% to the SPE Profits and Distributions Pledge Holders in order of priority as provided in Section 6.4 of this Plan until paid in full and 25% to the Lester Family Trust Tax Reserve; and

g.     Then to the SPE.

5)     Provided that the sales close on or before their respective deadlines set forth in Section 4.1.iv.3) above and that no Plan Default or default or Event of Default (as defined in the Prudential Loan Documents) under the Prudential Loan Documents exists, the SPE Independent Manager shall distribute the proceeds of the sale of each of Gordon Ranch, MacQuiddy Ranch, and Oda Ranch, and the McCune Ranch and Carrion Ranch if and when sold, as follows:

a.     First, to the direct costs of the sale of such SPE Designated Property, including commissions, legal fees, and expenses, of the SPE and Prudential, and any other repairs, expenses, fees, or costs required to be expended pursuant to the applicable sale documents necessary to execute such sale;

b.     Then to the SPE Independent Manager's reasonable fees, costs, and expenses, and to replenish the SPE Independent Manager's $25,000 retainer;

c.     Then, to the extent not previously paid through the sale of the SPE Designated Properties or the Conservation Easement, to bring Prudential Loan (1) and Prudential Loan (2) current through payment in full of Prudential's Missed Payments and Costs;

d.     Then, in the Reorganized Debtor's discretion, up to $320,000 to fund the Prudential Reserve to be held in the Prudential Reserve Account to pay the future interest and

principal due to Prudential under the Prudential Loan Documents and/or, if no default under Section 4.1.vii, to fund SPE Proposed Sale Properties Tax Distribution(s). The Prudential Reserve Account shall serve as additional security for the Prudential Loans. Payments to Prudential under the Prudential Loan Documents and the Plan shall be first made from this account.

e. Then, to the extent not previously paid through the sale of the SPE Designated Properties or the Conservation Easement, to pay off the principal balance of Prudential Loan (1) in full and to pay all applicable Prudential Prepayment Premiums;

f. Then, subject to Section 4.1.iv.6) of this Plan, to the extent not previously paid through the sale of the SPE Designated Properties or the Conservation Easement, to pay Prudential Loan (2) down to a principal balance of $6.5 million and to pay all applicable Prudential Prepayment Premiums;

g. Then to FNB on account of the FNB Asset Based LOC in a total amount up to $1,000,000 after deduction for any prior payments to FNB pursuant to Section 4.1.iv.4)e) above;

h. Then 75% to the SPE Profits and Distributions Pledge Holders in order of priority as provided in Section 6.4 of this Plan until paid in full and 25% to the Lester Family Trust Tax Reserve; and

i. Then to the SPE.

6) The SPE Independent Manager, or if applicable, the Reorganized Debtor when acting as the SPE Manager, may sell McCune Ranch and Carrion Ranch at any time; provided, however that only the SPE Independent Manager may sell McCune Ranch or Carrion Ranch so long as any Plan Default pursuant to Section 4.1.vii is continuing. The proceeds from such sales (without duplication of amounts previously paid or reserved by other payments or sales) shall be distributed as set forth in Section 4.1.iv.5), except that (i) the language in Section 4.1.iv.5).f) shall be replaced by the following: "Then, to pay off the principal balance of Prudential Loan (2) in full and to pay all applicable Prudential Prepayment Premiums" and (ii) the language in Section 4.1.iv.5).h) shall be replaced with "Then to the SPE Profits and Distributions Pledge Holders in order of priority as provided in Section 6.4 of this Plan until the Allowed claims of the SPE Profits and Distributions Pledge Holders are paid in full."

7)   The SPE Independent Manager may utilize the existing broker for Gordon Ranch (subject to Prudential's right to confer with and interview such broker) and will hire a broker agreeable to Prudential and the Reorganized Debtor for the sales of MacQuiddy Ranch, Oda Ranch, and Gordon Ranch (in the event that the original broker for Gordon Ranch is not retained). If the Reorganized Debtor elects to sell, or if the SPE Independent Manager is required to sell the McCune Ranch and the Carrion Ranch, the Reorganized Debtor or the SPE Independent Manager, as applicable, shall hire a broker agreeable to Prudential and the Reorganized Debtor for the sale of the McCune Ranch and Carrion Ranch. The broker retained to sell the SPE Designated Properties shall provide to the SPE Independent Manager, or if applicable, the Reorganized Debtor, who shall provide the same to the SPE Consent Authorized Representatives and the Reorganized Debtor (if applicable), a weekly status report as to the marketing and offer activities relating to the sale of the SPE Designated Properties. Such weekly status report shall be in a form acceptable to the Reorganized Debtor, Prudential and FNB.

8)   The Reorganized Debtor may seek to refinance all, but not less than all, of the unsold SPE Designated Properties; *provided*, *however* that no SPE Properties Refinancing shall occur unless (i) the proceeds of such SPE Properties Refinancing, after related transaction costs, are sufficient to pay the Prudential Loans in full, including the payment of all applicable Prudential Prepayment Premiums, and (ii) the SPE Refinancing Excess Proceeds are sufficient to pay in full the remaining amounts secured by the SPE Profits and Distributions Pledge Agreement. All such SPE Refinancing Excess Proceeds shall be paid to the SPE Profits and Distribution Pledge Holders directly from the escrow for SPE Properties Refinancing, in the order of priority as provided in Section 6.4 of this Plan. Upon payment in full of the Prudential Loans from any SPE Refinancing, any funds remaining in the Prudential Reserve shall paid to the SPE and shall be included in the SPE Profits for purposes of calculating the SPE Excess Profits.

v.   Conservation Easement.

1)   Prudential shall cooperate in the sale of the Conservation Easement and shall subordinate the lien of its deed of trust to the Conservation Easement as long as the easement is restricting the use of the McCune Ranch and Carrion Ranch to agriculture and related activities and

the terms of such subordination are acceptable to Prudential. Consent by Prudential to the language of the Conservation Easement shall not be unreasonably denied; *provided, however* that the Reorganized Debtor shall make commercially reasonable efforts to implement Prudential's comments to such language into the final language of the Conservation Easement.

2) The SPE or, if applicable, the Reorganized Debtor, shall pay the reasonable costs incurred by Prudential in connection with Prudential's review of the Conservation Easement.

3) If the SPE seeks and obtains approval for the sale of similar conservation easements on the SPE Designated Properties, the same provisions as set forth with respect to the Conservation Easement shall apply to the SPE and Prudential with respect to these possible additional conservation easements.

4) If there is a dispute as to the reasonable costs or the language of the Conservation Easement, or any other issue respecting the Conservation Easement, the Court shall resolve such dispute via a motion filed by the Reorganized Debtor, the SPE, or Prudential.

vi.  SPE Farming Lease(s).

The Reorganized Debtor and the SPE shall execute one or more triple net leases regarding the Reorganized Debtor's ongoing farming operations on the SPE Designated Properties. The lease documents, including the form of lease to be executed, shall be included in the Plan Supplement, shall be subject to Prudential's approval, and shall contain the following terms and limitations:

1) The Reorganized Debtor shall act as lessee and the SPE as the lessor.

2) The Reorganized Debtor's rights under such leases shall be subordinate (pursuant to subordination agreements reasonably satisfactory to Prudential) to Prudential's liens on, and enforcement rights against, the Prudential Collateral, whether under the Plan or otherwise, and shall be subject to the right of any purchaser to terminate on thirty (30) days' written notice following the sale of any of the Prudential Collateral as provided under the Plan.

3) The Reorganized Debtor and the SPE will, to the maximum extent possible under applicable law, consent to relief from the automatic stay under Section 362 of the Bankruptcy Code and waive any and all similar rights related to Prudential's foreclosure or sale of the SPE Designated Properties in the event that the Reorganized Debtor or the SPE files for bankruptcy relief subsequent

to confirmation of the Plan.

4)   The SPE will assign such leases to Prudential as further security for Prudential Loan (1) and Prudential Loan (2), and the Reorganized Debtor will execute a pledge, assignment, and/or other security agreement granting to Prudential a security interest in any growing crops.

5)   The Reorganized Debtor and the SPE will subsequently determine the structure and nature of such security, which must be satisfactory to Prudential in its reasonable discretion.

6)   The rental rate under such leases shall be determined pursuant to the terms of the final executed SPE Farming Lease(s), and will initially be $343,500 per year. The rent shall be payable in equal installments of $171,750 bi-annually in advance on December 1 and June 1 of each year. The rent shall be adjusted as SPE Designated Properties are: (i) transferred to the SPE; and/or (ii) sold and the annual principal and interest payments payable under the Plan and the Prudential Loans Documents are reduced from the sale of the SPE Designated Properties. A $143,125 commencement payment shall be made as soon as practicable after the Effective Date, and such payment shall be deposited into the Prudential Reserve Account. The $171,750 bi-annual rent payments shall be deposited and held in the Prudential Reserve Account to be used solely for: (a) debt service payments to Prudential under the Plan and Prudential Loan Documents; (b) SPE Estimated One-Year Expenses; and (c) replenishment of retainers due the SPE Independent Manager pursuant to Section 6.9 of this Plan and subject to Section 4.1.iv.5)(b) of this Plan.

7)   Notwithstanding the foregoing, the terms and substance of any such lease are subject to Prudential's approval and must otherwise be in compliance with the Prudential Loan Documents.

vii.   <u>Defaults Under Prudential's Class 1 Treatment</u>.

The occurrence of any of the following will constitute a Plan Default:

1)   The Reorganized Debtor and/or the SPE fails to close (a) the sale of the Gordon Ranch, MacQuiddy Ranch, and either the Conservation Easement or the Oda Ranch by December 31, 2021, and (b) depending on which closes escrow prior to December 31, 2021, close escrow on the sale of Oda Ranch or the Conservation Easement by March 31, 2022. None of the foregoing Sale Trigger Dates may be extended except by Order of the Court, for good cause shown.

2)　The net proceeds Prudential receives from the sale of the Conservation Easement are less than $3 million;

3)　The Reorganized Debtor and/or the SPE fails to achieve the Prudential Cure and Paydown Requirements in connection with the sales of Gordon Ranch, MacQuiddy Ranch, Oda Ranch, and the Conservation Easement by March 31, 2022;

4)　The Reorganized Debtor and/or the SPE fails to make any payments to Prudential required under the Plan or the Prudential Loan Documents (including quarterly interest payments and annual principal payments);

5)　The Reorganized Debtor fails to pay all real estate taxes on the SPE Designated Properties as they become due, excepting such real property taxes as are termed out over time in the Plan; and

6)　The Reorganized Debtor and/or the SPE incurs a material default or Event of Default under Prudential Loan (1) or Prudential Loan (2), incurs an FNB Material Default, or fails to materially comply with the other terms of the Plan.

viii.　　Consequences of Default or Event of Default.

Upon the occurrence of a Plan Default or a default or Event of Default under the Prudential Loan Documents, including as set forth in Section 4.1(vii), the following shall occur:

1)　Interest on any unpaid amounts under Prudential Loan (1) and Prudential Loan (2) shall accrue at the Prudential Allowed Default Rate from the date of the applicable Plan Default;

2)　All sums due to Prudential shall be accelerated and become fully due and payable;

3)　Prudential shall be entitled, but not obligated, to exercise any remedies set forth in the Prudential Loan Documents, the Plan, or otherwise available under applicable law, subject to any applicable notice and cure periods under Section 4.1.viii.4) below and the sale obligations of the SPE Independent Manager under Section 4.1.viii.5) below;

4)　The Reorganized Debtor and/or the SPE shall have thirty (30) days after written notice of such Plan Default or default or Event of Default under the Prudential Loan Documents to: (i) cure defaults of obligations owed to Prudential, including by liquidating any remaining SPE Designated Properties; or (ii) to the extent that a monetary cure is not possible, pay off the entirety

of the indebtedness owed to Prudential; and

5)  If the Reorganized Debtor and/or the SPE fails to cure any such Default or Event of Default within the thirty (30) day cure period, the SPE Independent Manager shall immediately commence selling such parcels of the SPE Designated Properties as necessary to pay all amounts owed to Prudential in full.

6)  The SPE Independent Manager shall have until the later of December 31, 2022, or three (3) months after the expiration of the thirty (30) day cure period to sell such parcels of the SPE Designated Properties as necessary to pay off Prudential in full. In the event that the SPE Independent Manager does not sell sufficient SPE Designated Properties to pay off Prudential in full, Prudential may, in its discretion, foreclose on any remaining SPE Designated Properties or allow the SPE Independent Manager to continue selling such properties. In the event that the expiration of the aforementioned three-month period occurs after December 31, 2022, then the discount to the Prudential Prepayment Premium as set forth in Section 4.1.ii.3) of this Plan shall be extended beyond December 31, 2022 until the expiration of such period in order to sell such SPE Designated Properties as necessary to pay off Prudential in full.

ix.   Releases.

1)  Upon the Effective Date, Russell Lester and Kathleen Lester release all claims they may have against Prudential then in existence in accordance with California Civil Code §1542.

2)  On transfer of the SPE Designated Properties to the SPE, Russell Lester and Kathleen Lester shall be bound by all existing provisions in the Prudential Loan Documents except for those that relate to existing, disclosed defaults under the Prudential Loan Documents. Upon Prudential Loan (1) and Prudential Loan (2) becoming current (through payment in full of Prudential's Missed Payments and Costs), Prudential will waive Debtor's disclosed, non-monetary defaults existing as of the Effective Date.

3) Each of Russell Lester and Kathleen Lester shall execute separate recourse guaranties and, to the extent necessary, environmental indemnification agreements, in favor of Prudential with respect to each of Prudential Loan (1) and Prudential Loan (2). Specifically, each individual shall execute a joint and several recourse guaranty for each such Prudential Loan. Each

guaranty shall include traditional recourse obligations arising for, among other things, waste, environmental issues, and future bankruptcy filings by the SPE, but shall not include recourse obligations as a result of a subsequent bankruptcy filing by Russell Lester and/or Kathleen Lester unless: (a) Prudential is subject to the automatic stay under any such filing; and/or (b) the SPE Designated Properties shall be made a part of their bankruptcy estate or subject to the automatic stay.

4)  Prudential shall release Russell Lester and Kathleen Lester from all other claims under Prudential Loan (1) and Prudential Loan (2) upon the transfer of all of the SPE Designated Properties to the SPE and the assumption by the SPE of all of the obligations owed to Prudential under Prudential Loan (1) and Prudential Loan (2).

5)  Upon payment in full of Prudential Loan (1), and provided that no Plan Default or default or Event of Default exists under the Prudential Loan Documents, Prudential shall release Russell Lester and Kathleen Lester from the recourse guarantees with respect to Prudential Loan (1); *provided*, *however* that Prudential shall not release: (i) any recourse obligations relating to environmental indemnification agreements; or (ii) any obligations related to environmental issues.

6)  Upon payment in full of Prudential Loan (2), and provided that no Plan Default or default or Event of Default exists under the Prudential Loan Documents, Prudential shall release Russell Lester and Kathleen Lester from the recourse guarantees with respect to Prudential Loan (2); provided, however that Prudential shall not release: (i) any recourse obligations relating to environmental indemnification agreements; or (ii) any obligations related to environmental issues.

4.2.  **Class 2A (Impaired FNB RE Loan: Approx. $1.4M plus post-petition interest and attorneys' fees and costs if Allowed)**

a.  FNB RE Loan Treatment if FNB Accepts Plan:

i.  The FNB RE Loan Claim shall be an Allowed Secured Claim in the full amount of the FNB RE Loan Claim, plus all unpaid post-petition interest thereon and the FNB Pro Rated Attorneys' Fees and Costs allocable to the FNB RE Loan, provided that the total of FNB's Attorneys Fees and Costs shall not exceed $500,000 through the Effective Date. All unpaid interest as of the Effective Date and the FNB Pro Rated Attorneys' Fees and Costs allocable to the

FNB RE Loan shall be added to the principal balance of the FNB RE Loan on the Effective Date;

ii. The interest rate on the FNB RE Loan shall be fixed at 6.75% per annum compounded monthly, or such higher or lower interest rate that the Court may determine at the Confirmation Hearing, based on the then-applicable reference interest rates and other applicable risk factors necessary for Confirmation;

iii. The FNB RE Loan shall be restructured as a term loan with a thirteen-year amortization commencing on the Effective Date;

iv. Payments shall be made monthly in arrears commencing on October 1, 2021, and on the first day of each month thereafter;

v. All unpaid interest, principal, and attorney's fees and costs shall be due and payable, without any prepayment penalty, on or before the fourth anniversary of the Effective Date;

vi. FNB shall retain its lien on the Putah Creek Ranch and the FNB RE Loan Documents including FNB's recorded deed of trust on Putah Creek Ranch to secure the FNB RE Loan shall remain in full force and effect, except as modified herein and elsewhere in the Plan until all amounts due under this Plan on the FNB RE Loan are paid in full;

vii. Any provisions of the FNB RE Loan Documents that create a default or other adverse consequence by the SPE's, the Reorganized Debtor's and/or Kathleen Lester's financial situation or solvency after the Effective Date are deleted and shall have no force and effect. Notwithstanding the forgoing, any Post-Effective Date breach of any provision of the FNB RE Loan Documents requiring the maintenance of insurance on the Putah Creek Ranch or the payment of ad valorem property taxes on the Putah Creek Ranch that is not cured in accordance with Section 6.13 herein, shall also constitute an FNB Material Non-Payment Default and allow FNB to proceed with its Plan remedies also under Section 6.13 herein. Additionally, upon any Post Effective Date breach of any environmental provisions relating to the Putah Creek Ranch contained in the FNB RE Loan Documents, FNB may move the Court for a determination that such breach is an FNB Material Non-Payment Default, and if determined so by the Court FNB shall be allowed to enforce any of its rights and remedies under the FNB RE Loan Documents. Notwithstanding any notice and

cure provisions under Section 6.13, upon the occurrence of a Post-Effective Date FNB Payment Default or an FNB Non-Payment Default, FNB may move the Court to determine whether the FNB Non-Payment Default is an FNB Material Non-Payment Default, and also to request immediate relief if FNB reasonably believes such relief is necessary to protect and preserve its collateral. Any FNB Payment Default or FNB Material Non-Payment Default under the FNB HELOC Loan and/or the FNB AG Production Loan will constitute an FNB Payment Default or FNB Material Non-Payment Default under the FNB RE Loan;

viii. If the Debtor in Possession or the Reorganized Debtor obtains PPP2 Loan, such funds shall be used to pay for employees per the requirements of the PPP2 Loan; however, the Debtor in Possession or the Reorganized Debtor shall deposit up to $250,000.00 in funds into the FNB Reserve. Provided that no FNB Material Default has occurred, the Reorganized Debtor may use the funds in the FNB Reserve at any time to make payments due to FNB during the Plan term, to make future payments due to FNB during the Plan term, or at the discretion of the Reorganized Debtor, principal paydown payments on any of the FNB loans. The funds held in the FNB Reserve shall not be used by the Reorganized Debtor for any other purposes. FNB is be granted a first priority security interest in the FNB Reserve Account and the FNB Reserve to secure the FNB Loans, effective upon entry of the Confirmation Order. Upon the occurrence of an FNB Material Default, FNB may apply the FNB Reserve to the principal and interest owing under the FNB Asset Based LOC.

ix. Any SPE Excess Sale Proceeds, SPE Excess Profits and/or SPE Refinance Excess Proceeds received by FNB shall be applied to first to any accrued and unpaid interest accrued under the FNB Asset Based LOC after the Effective Date, and then to the principal balance outstanding under the FNB Asset Based LOC.

x. Any provision of the FNB RE Loan Documents that conflicts in any way with the language and intent of this Plan shall be null and void; and

xi. Any dispute with respect to the treatment of FNB under this Plan may be resolved by the Court by motion.

///

Debtor in Possession's Amended Plan of Reorganization (Dated May 18, 2021) as Modified July 1, 2021

b. <u>FNB RE Loan Treatment if FNB Rejects Plan:</u>

If FNB rejects the Plan the treatment of the FNB RE Loan shall be the same as provided in Section 4.2.a. above, except as follows:

i. Section 2.a.ii is modified to provide that the interest rate on the FNB RE Loan shall be fixed at 4.5% per annum compounded monthly, or such higher or lower interest rate that the Court may determine at the Confirmation Hearing, based on the then-applicable reference interest rates and other risk factors, as needed for Confirmation;

ii. Section 2.a.iii is modified to provide that the FNB RE Loan shall be restructured as a term loan with a thirty-year amortization commencing on the Effective Date; and

iii. Section 2.a.v is modified to provide that all unpaid interest, principal, and attorney's fees and costs shall be due and payable, without any prepayment penalty, on or before January 1, 2029.

iv. Notwithstanding anything to the contrary in this Plan, FNB shall be prohibited and barred by the Plan Injunction from commencing any act to recover on the FNB RE Loan including but not limited to foreclose on or recover on its collateral for the FNB RE Loan unless there is a FNB Payment Default with respect to the FNB RE Loan or an FNB Material Non-Payment Default with respect to the FNB RE Loan.

**4.3 Class 2B (Impaired FNB HELOC Loan: Approx. Amount $500,000 plus post-petition interest and attorneys' fees and costs if Allowed)**

a. <u>FNB HELOC Loan Treatment if FNB Accepts Plan:</u>

i. FNB HELOC Loan Claim shall be an Allowed Secured Claim in the full amount of the FNB HELOC Loan Claim, plus all unpaid post-petition interest thereon and the FNB Pro Rated Attorneys' Fees and Costs allocable to the FNB HELOC Loan, provided that the total of FNB's Attorneys Fees and Costs shall not exceed $500,000 through the Effective Date. All unpaid interest the FNB Pro Rated Attorneys' Fees and Costs allocable to the FNB HELOC shall be added to the principal balance of the FNB HELOC Loan on the Effective Date.

ii. The interest rate on the FNB HELOC Loan shall be fixed at 6.75% per annum compounded monthly, or such higher or lower interest rate that the Court may determine at

the Confirmation Hearing, based on the then-applicable reference interest rates and other applicable risk factors necessary for Confirmation;

iii.    The FNB HELOC Loan shall be restructured as a term loan with a thirteen-year amortization commencing on the Effective Date;

iv.    Payments shall be made monthly in arrears commencing on October 1, 2021, and on the first day of each month thereafter;

v.    All unpaid interest, principal, and attorneys' fees and costs shall be due and payable, without any prepayment penalty, on or before the fourth anniversary of the Effective Date;

vi.    FNB shall retain its lien on the Putah Creek Ranch and the FNB HELOC Loan Documents including FNB's recorded deed of trust on Putah Creek Ranch to secure the FNB HELOC Loan shall remain in full force and effect, except as modified herein and elsewhere in the Plan until all amounts due under this Plan on the FNB HELOC Loan are paid in full;

vii.    Any provisions of the FNB HELOC Loan Documents that create a default or other adverse consequence by the SPE's, the Reorganized Debtor's and/or Kathleen Lester's financial situation or solvency after the Effective Date are deleted and shall have no force and effect. Notwithstanding the forgoing, any Post-Effective Date breach of any provision of the FNB RE HELOC Documents requiring the maintenance of insurance on the Putah Creek Ranch or the payment of ad valorem property taxes on the Putah Creek Ranch that is not cured in accordance with Section 6.13 herein, shall also constitute an FNB Material Non-Payment Default and allow FNB to proceed with its Plan remedies also under Section 6.13 herein. Additionally, upon any Post-Effective Date breach of any environmental provisions relating to the Putah Creek Ranch contained in the FNB HELOC Loan Documents, FNB may move the Court for a determination that such breach is an FNB Material Non-Payment Default, and if determined so by the Court, FNB shall be allowed to proceed with any or all of its rights and remedies under the FNB HELOC Loan Documents. Notwithstanding any notice and cure provisions under Section 6.13, upon the occurrence of a Post-Effective Date FNB Payment Default or an FNB Non-Payment Default, FNB

may move the Court to determine whether the FNB Non-Payment Default is an FNB Material Non-Payment Default, and also to request immediate relief if FNB reasonably believes such relief is necessary to protect and preserve its collateral. Any FNB Payment Default or FNB Material Non-Payment Default under the FNB RE Loan and/or the FNB AG Production Loan will constitute an FNB Payment Default or FNB Material Non-Payment Default under the FNB HELOC Loan;

        viii.   Any provision of the FNB HELOC Loan Documents that conflicts in any way with the language and intent of this Plan shall be null and void;

        ix.   Any dispute with respect to the treatment of FNB under this Plan may be resolved by the Court by motion.

        b.   <u>FNB HELOC Loan Treatment If FNB Rejects Plan</u>:

        If FNB rejects the Plan the treatment of the FNB HELOC Loan shall be the same as provided in Section 4.3.a. above, except as follows:

        i.   Section 4.3.a.ii is modified to provide that the interest rate on the FNB HELOC Loan shall be fixed at 4.75% per annum compounded monthly, or such higher or lower interest rate that the Court may determine at the Confirmation Hearing, based on the then-applicable reference interest rates and other risk factors, as needed for Confirmation;

        ii.   Section 4.3.a.iii is modified to provide that the FNB HELOC Loan shall be restructured as a term loan with a thirty-year amortization commencing on the Effective Date; and

        iii.   Section 4.3.a.v. is modified to provide that all unpaid interest, principal, and attorneys' fees and costs shall be due and payable, without any prepayment penalty, on or before January 1, 2029.

        iv.   Notwithstanding anything to the contrary in this Plan, FNB shall be prohibited and barred by the Plan Injunction from commencing any act to recover on the FNB HELOC Loan including but not limited to foreclose on or recover on its collateral for the FNB HELOC Loan unless there is a FNB Payment Default with respect to the FNB HELOC Loan or an FNB Material Non-Payment Default with respect to the FNB HELOC Loan.

///

**4.4 Class 2C (Impaired FNB AG Production Loan Approx. $2.8M plus post-petition interest and attorneys' fees and costs if Allowed)**

    a.    <u>If FNB Accepts Plan:</u>

          i.    FNB AG Production Loan Claim shall be an Allowed Secured Claim in the full amount of the FNB AG Production Loan Claim, plus all unpaid post-petition interest thereon and the FNB Pro Rated Attorneys' Fees and Costs allocable to the FNB AG Production Loan, provided that the total of FNB's Attorneys Fees and Costs shall not exceed $500,000 through the Effective Date. All unpaid interest as of the Effective Date and FNB Pro Rated Attorneys' Fees and Costs allocable to the FNB Ag Production Loan shall be added to the principal balance of the FNB AG Production Loan on the Effective Date;

          ii.    The interest rate on the FNB AG Production Loan shall be fixed at 6.75% per annum compounded monthly;

          iii.    The FNB AG Production Loan shall be restructured as a term loan with a thirteen-year amortization commencing on the Effective Date;

          iv.    Payments shall be made monthly in arrears commencing on October 1, 2021, and on the first day of each month thereafter;

          v.    All unpaid interest, principal, and attorneys' fees and costs shall be due and payable, without any prepayment penalty, on or before the fourth anniversary of the Effective Date;

          vi.    The FNB AG Production Loan Documents including FNB's security interest in the FNB AG Loan Collateral shall remain in full force and effect, except as modified herein;

          vii.    The Reorganized Debtor and Kathleen Lester, or the Lester Family Trust, if it is the owner, shall execute and deliver the FNB AG Production Loan Junior Deed of Trust which shall be recorded on the Effective Date. Any provisions of the FNB AG Production Loan Junior Deed of Trust or the FNB AG Production Loan Documents that create a default or other adverse consequence by the SPE's, the Reorganized Debtor's and/or Kathleen Lester's financial situation or solvency after the Effective Date are deleted and shall have no force and effect.

Notwithstanding the forgoing, any Post-Effective Date breach of any provision of the FNB AG Production Loan Junior Deed of Trust or the FNB AG Production Loan Documents requiring the maintenance of insurance on the Putah Creek Ranch or the payment of ad valorem property taxes on the Putah Creek Ranch that is not cured in accordance with Section 6.13 herein, shall also constitute an FNB Material Non-Payment Default and allow FNB to proceed with its Plan remedies also under Section 6.13 herein. Additionally, upon any Post-Effective Date breach of any environmental provisions relating to the Putah Creek Ranch contained in the FNB AG Production Loan Documents or under the FNB AG Production Loan Junior Deed of Trust, FNB may move the Court for a determination that such breach is an FNB Material Non-Payment Default, and if determined so by the Court, FNB shall be allowed to enforce any of its rights and remedies under the FNB AG Production Loan Documents and/or the FNB Ag Production Loan Junior Deed of Trust. Notwithstanding any notice and cure provisions under Section 6.13, upon the occurrence of a Post-Effective Date FNB Payment Default or an FNB Non-Payment Default, FNB may move the Court to determine whether the FNB Non-Payment Default is an FNB Material Non-Payment Default, and also to request immediate relief if FNB reasonably believes such relief is necessary to protect and preserve its collateral. Any FNB Payment Default or FNB Material Non-Payment Default under the FNB RE Loan and/or the FNB HELOC Loan will constitute a FNB Payment Default or FNB Material Non-Payment Default under the FNB AG Production Loan;

viii.    Upon the recordation of the FNB AG Production Loan Junior Deed of Trust, except for fixtures on or relating to the Putah Creek Ranch, FNB's security interest in the FNB AG Production Collateral shall no longer secure the FNB AG Production Loan, at which time the balance due on the FNB AG Production Loan shall only be secured by the FNB AG Production Loan Junior Deed of Trust and any fixtures on the Putah Creek Ranch, and the FNB Reserve Account;

ix.    Any provision of the FNB AG Production Loan Documents that conflicts in any way with the language and intent of this Plan shall be null and void; and

x.    Any dispute with respect to the treatment of FNB under this Plan may be resolved by the Court by motion.

b.    FNB AG Production Loan's Treatment if FNB Rejects Plan:

If FNB rejects the Plan the treatment of the FNB AG Production Loan shall be the same as provided in Section 4.4.a. above, except as follows:

i.    If it has not already been resolved prior to or at the Confirmation Hearing, the Court shall determine after the Confirmation Date whether the FNB AG Loans are fully secured or under-secured, and if under-secured, the Court shall estimate the amount of FNB's Secured Claim and FNB's Unsecured Claim pursuant to a motion to be filed by the Debtor in Possession prior to or at the Confirmation Hearing. If FNB's AG Loans are not fully secured, then no attorneys' fees or post-petition interest shall accrue on the FNB AG Loans, including both the FNB AG Production Loan and the FNB AG Asset Based LOC. In that case, FNB's Unsecured Claim shall be treated as a Class 10 or 11 claim. If FNB's AG Loans are fully secured by the collateral for the FNB AG Loans, FNB's Attorneys' Fees and Costs shall be added pro rata to the principal balance of the FNB Loans on the Effective Date, but only to the extent that FNB's Secured Claim exceeds the value of the FNB AG Loans Collateral.

ii.    Section 4.4.a.ii. is modified to provide that the interest rate on the FNB AG Production Loan shall be fixed at 6% per annum compounded monthly, or such higher or lower interest rate that the Court may determine at the Confirmation Hearing, based on the then-applicable reference interest rates and other applicable risk factors necessary for Confirmation;

iii.    Section 4.4.a.iii. is modified to provide that the FNB AG Production Loan shall be restructured as a term loan with a thirty-year amortization commencing on the Effective Date;

iv.    Section 4.4.a.v. is modified to provide that all unpaid interest, principal, and attorney's fees and costs shall be due and payable, without any prepayment penalty, on or before January 1, 2029.

v.    Notwithstanding anything to the contrary in this Plan and/or in the language of the FNB AG Production Loan Junior Deed of Trust, the FNB AG Production Loan Junior Deed of Trust shall be fully and completely subordinated to the homestead exemption of the Debtor in Possession and his wife, Kathleen Lester.

vi.    Notwithstanding anything to the contrary in this Plan, FNB shall be prohibited and barred by the Plan Injunction from commencing any act to recover on the FNB AG Production Loan including but not limited to foreclose on or recover on its collateral for the FNB AG Production Loan unless there is a FNB Payment Default with respect to the FNB AG Production Loan or an FNB Material Non-Payment Default with respect to the FNB AG Production Loan.

**4.5 Class 2D (Impaired FNB AG Asset Based LOC—Approx. $5M plus post-petition attorney's fees and costs if Allowed)**

a.    <u>If FNB Accepts Plan</u>:

i.    FNB Asset Based LOC Claim shall be an Allowed Secured Claim in the full amount of the FNB Asset Based Loan Claim, plus all unpaid post-petition interest thereon, and the FNB Pro Rated Attorneys' Fees and Costs allocable to the FNB Asset Based LOC, provided that the total of FNB's Attorneys' Fees and Costs shall not exceed $500,000. All unpaid interest as of the Effective Date and the FNB Pro Rated Attorneys' Fees and Costs allocable to the FNB Asset Based LOC and shall be added to the principal balance of the FNB Asset Based LOC on the Effective Date;

ii.    The interest rate on the FNB AG Asset Based LOC shall be fixed at 6.75% per annum compounded monthly;

iii.    The FNB AG Asset Based LOC shall be restructured as a term loan with a thirteen-year amortization commencing on the Effective Date;

iv.    Payments shall be made monthly in arrears commencing on October 1, 2021, and on the first day of each month thereafter;

v.    All unpaid interest, principal, and Allowed attorney's fees and Allowed costs shall be due and payable on or before (without any prepayment penalty) the fourth anniversary of the Effective Date;

vi.    FNB shall retain its security interest in the FNB AG Loan Collateral and the existing FNB Asset Based LOC Documents including its security interest in the FNB AG Loan Collateral shall remain in full force and effect, except that any security interest in any fixtures owned by the SPE and/or attached to or located on the SPE Designated Properties shall

be deemed released on the Effective Date. In addition, effective on the Effective Date, and notwithstanding Bankruptcy Code Section 552, FNB's security interest in the FNB AG Loan Collateral shall attach to all FNB AG Loan Collateral that has been or will be acquired or created, or has arisen or will arise, after the Petition Date, including after the Effective Date, including any crops growing or to be grown on the SPE Designated Properties and the Putah Creek Ranch, but excluding any fixtures attached to or located on the SPE Designated Properties;

vii.    The FNB Asset Based LOC shall also be secured by the SPE Profits and Distributions Pledge Agreement, in a third-priority position, junior to FNB Super-Priority Administrative Claim and the Voluntarily Deferred Allowed Administrative Claims;

viii.    The FNB Asset Based LOC Documents shall be modified to eliminate all reporting obligations arising from or related in any way to the FNB Asset Based LOC Documents. FNB shall retain all enforcement rights arising from or related in any way to the FNB Asset Based LOC Documents or the FNB AG Loan Collateral but shall be limited to enforcement only in the event of an FNB Material Default. As a condition to enforcement of its remedies under the FNB Asset Based LOC Documents on the basis of an FNB Non-Payment Default or Plan Default, FNB must obtain an order from the Court determining that such FNB Non-Payment Default or Plan Default constitutes an FNB Material Non-Payment Default or FNB Material Plan Default. Notwithstanding any notice and cure provisions under Section 6.13, upon the occurrence of an FNB Material Default, FNB may move the Court for immediate relief if it reasonably believes such relief is necessary to protect and preserve its collateral. In lieu of the prior reporting obligations, the Reorganized Debtor and/or the SPE shall:

(1)    Not sell any equipment securing the FNB Asset Based LOC without obtaining prior FNB's written consent, which consent shall not be unreasonably withheld, and which consent may be conditioned on payment of 100% of the proceeds from such equipment sale to FNB at the time of such sale. Any net proceeds from the sale of equipment shall be applied to the principal balance of the FNB Asset Based LOC. FNB shall release its security interest in equipment upon payment of $2,000,000, from any sources, against the principal balance of the FNB Asset Based LOC;

(2)     Prepare and submit monthly inventory reports to FNB in the form provided customarily provided prior to November 2020 plus monthly inventory reports broken down by crop year;

ix.     Any provision of the FNB Asset Based LOC's Documents that conflicts in any way with the language and intent of this Plan shall be null and void;

x.     Any dispute with respect to the treatment of FNB under this Plan may be resolved by the Court by motion.

xi.     At any time the principal balance of the FNB Asset Based LOC is reduced by $500,000 or more through payment of SPE Excess Profits, SPE Sale Excess Proceeds, or sale of equipment or from any other sources, the Reorganized Debtor shall be entitled to have the principal and interest payments to be made under the FNB Asset Based LOC to be adjusted to an amount required to amortized the then remaining principal balance of the FNB Asset Based LOC over the remainder of the thirteen year amortization period.

xii.     On the Effective Date, all claims of that the Pre-Petition Debtor, the Debtor in Possession the Reorganized Debtor and Kathleen Lester have or hold against FNB, or any of FNB's officers, employees, shareholders, directors, agents, attorneys, or insures, whether known or unknown will be deemed released and waived, such waiver to include a waiver of the benefits conferred by California Civil Code Section 1542, provided that such waiver and release shall not be deemed to be a waiver of any of FNB's obligations to the Reorganized Debtor and Kathleen Lester under the terms of this Plan. Pursuant to the forgoing waiver and release, the Reorganized Debtor and Kathleen Lester shall file a request for dismissal in the FNB State Court Action dismissing the Lester Cross-Complaint with prejudice. On or after the Effective Date, FNB shall dismiss FNB State Court Action without prejudice. No party to the FNB State Court Action shall be deemed a prevailing party in the FNB State Court Action.

b.     <u>If FNB Rejects Plan</u>:

If FNB rejects the Plan the treatment of the FNB Asset Based LOC shall be the same as provided in Section 4.5.a. above, except as follows:

///

i. If it has not already been resolved prior to or at the Confirmation Hearing, the Court shall determine after the Confirmation Date whether the FNB AG Loans are fully secured or under-secured, and if under-secured, the Court shall estimate the amount of FNB's Secured Claim and FNB's Unsecured Claim pursuant to a motion to be filed by the Debtor in Possession prior to or at the Confirmation Hearing. If FNB's AG Loans are not fully secured, then no attorneys' fees or post-petition interest shall accrue on the FNB AG Loans, including both the FNB AG Production Loan and the FNB Asset Based LOC. In that case, FNB's Unsecured Claim shall be treated as a Class 10 or 11 claim. If FNB's AG Loans are fully secured, post-petition interest and FNB's Attorneys' Fees and Costs shall be added to the FNB AG Loans, but only to the extent that FNB's Secured Claim exceeds the value of the FNB Ag Loan Collateral.

ii. Section 4.5.a.ii is modified to provide that the interest rate on the FNB Asset Based Loan shall be fixed at 6% per annum compounded monthly, or such higher or lower interest rate that the Court may determine at the Confirmation Hearing, based on the then-applicable reference interest rates and other risk factors, as needed for Confirmation;

iii. Section 4.5.a.iii. is modified to provide that the FNB Asset Based LOC shall be restructured as a term loan with a thirty-year amortization commencing on the Effective Date;

iv. Section 4.5.a.v is modified to provide that all unpaid interest, principal, and attorney's fees and costs shall be due and payable on or before (without any prepayment penalty) January 1, 2029;

v. Section 4.5.a.xii is deleted and the Reorganized Debtor shall retain any and all known and unknown claims against FNB; and

vi. Notwithstanding anything to the contrary in this Plan, FNB shall be prohibited and barred by the Plan Injunction from commencing any act to recover on the FNB Asset Based LOC including but not limited to foreclose on or recover on its collateral for the FNB Asset Based LOC unless there is a FNB Payment Default with respect to the FNB Asset Based LOC or an FNB Material Non-Payment Default with respect to the FNB Asset Based LOC.

///

**4.6 Class 3 (Impaired FMCC Loan)**

The FMCC Loans shall be treated as follows:

a. Except as modified herein, all the loan security and perfection documentation underlying the FMCC Loan(s) shall remain in full force and effect.

b. Any provisions of the FMCC Loan Documents that create a default or other adverse consequence by the SPE's, the Reorganized Debtor's and/or his wife's financial situation or solvency after the Effective Date, or that was an uncured non-monetary default as of the Petition Date are deleted and shall have no force and effect.

c. Commencing on May 2, 2021, the Reorganized Debtor or, if applicable, the Effective Date, the Debtor in Possession shall resume making regularly scheduled payments to FMCC in the $848.13 amount provided for in the FMCC Loan Documents pursuant to the same non-default interest rate, term, and payment amounts set forth in the documents underlying the FMCC Loan Documents.

d. The FMCC Missed Payments and Costs shall be paid on or before July 15, 2021, with interest from the Effective Date at the non-default rate.

**4.7 Class 4 (Impaired John Deere Loans)**

The John Deere Loans shall be treated as follows:

a. Except as modified herein, all the loan security and perfection documentation underlying the John Deere Loans shall remain in full force and effect.

b. After the Effective Date, the Reorganized Debtor shall continue to make all monthly and annual payments when due as set forth in the documents underlying the three sets of John Deere Loan Documents for each John Deere Loan except for (a) until the John Deere Missed Payments and Costs are fully paid, the interest rate shall be 50% of the default interest rate of 20%, or 10% per annum, until (b) after the John Deere Missed Payments and Costs are fully paid, the interest rate on any unpaid balance due on the John Deere Loans shall return to applicable contract rates for such loans.

c. After the Effective Date, the John Deere Loans shall bear interest at 10% per annum until the John Deere Missed Payments and Costs are paid in full. The allocated portion

of the John Deere Missed Payments and Costs on each of the three John Deere Loans shall be paid on or before the maturity date of each of the respective John Deere Loans. If the total amount of the John Deere Missed Payments and Costs are paid prior to the last maturity date for any of the three John Deere Loans, the interest rates on the remaining unmatured portion of the John Deere Loans shall revert to the applicable loan's contract rate.

　　　　　d.　　　John Deere shall have relief from the automatic stay and any applicable Plan injunction to recover its collateral upon the existence of an uncured payment default to John Deere.

### 4.8  Class 5 (Impaired Yolo County Real Property Tax Claim)

The Class 5 Yolo County Property Tax Claim shall be repaid by the Reorganized Debtor over a five-year period in accordance with Sections 1129(a)(9)(C) and (D) of the Bankruptcy Code with annual interest paid at the applicable rate under Section 1129 of the Bankruptcy Code, with such payments commencing on October 1, 2022, and on October 1 of each year thereafter, and principal and any interest due paid on the sale of any property subject to the Yolo County Real Property Tax Lien. The Reorganized Debtor shall pay all remaining interest and principal due on or before the fifth anniversary of the Effective Date.

### 4.9 Class 6 (Impaired Solano County Real Property Tax Claim)

The Class 6 Solano County Property Tax Claim in the approximate amount of $48,000 shall be repaid by the Reorganized Debtor over a five-year period in accordance with Sections 1129(a)(9)(C) and (D) of the Bankruptcy Code with annual interest paid at the applicable rate under Section 1129 of the Bankruptcy Code, with such payments commencing on October 1, 2022, and on October 1 of each year thereafter, and principal and any interest due paid on the sale of any property subject to the Solano County Real Property Tax Lien. The Reorganized Debtor, or if applicable, the SPE shall pay all remaining interest and principal due on or before the fifth anniversary of the Effective Date.

### 4.10　Class 7 (Impaired 2019 Grower Claims)

The Debtor in Possession believes no further sums are due to the 2019 Growers, and they shall be treated as follows:

a.     The 2019 Growers who do not pursue or file any claim in the Case will be deemed to have received a release from any claim held by the Debtor in Possession that the payments made to them in 2019 and 2020 on account of the 2019 walnut season purchases by the Prepetition Debtor exceeded the reasonable value of the walnuts delivered.

b.     Any 2019 growers who elect to file proofs of claim or adversary actions to determine the allowability of a 2019 Grower Claim shall, if successful in the litigation, be treated either as a General Unsecured Creditor in Class 10 or as an "Other Secured Creditor" in Class 9. The Reorganized Debtor will retain any and all known and unknown claims against such 2019 Growers who file or otherwise assert claims in the Case.

**4.11    Class 8 (Impaired SBA's EIDL Secured Claim)**

The SBA's EIDL Secured Claim shall be treated as follows:

a.     Except as modified herein, all the loan security and perfection documentation underlying the SBA loan shall remain in full force and effect.

b.     Any provisions of the SBA Loan Documents that would create a Post-Effective Date event of default arising from (a) any financial solvency requirement for the Reorganized Debtor, his wife, or any related entity, including but not limited to the SPE, (b) any cross-default with respect to any payment to any other creditor under this Plan or otherwise, and/or (c) any uncured non-monetary default under the SBA Loan Documents as of the Effective Date, are deleted and shall have no force and effect.

c.     The Reorganized Debtor may, after the Effective Date, obtain a new working capital loan and grant such new lender a lien on the Reorganization Debtor's inventory, equipment, and accounts receivable senior to the present lien of the SBA's EIDL Secured Claim so long as (a) the Debtor in Possession gives the SBA at least a ten (10) day written notice of the new working capital loan, and (b) the amount that will prime and be senior to the SBA's EIDL Secured Claim may not exceed the lesser of $8,000,000, or the amount then owed under the FNB Asset Based LOC.

///

///

d.      If there is a Post-Effective Date dispute as to whether a specific proposed Post-Confirmation new working capital priming loan may or may not be allowable under this Class treatment, the Court may determine such dispute by motion.

**4.12    Class 9 (Impaired Other Secured Creditors)**

Other Secured Creditors, if any, shall be deemed to be in separate classes (e.g., Class 9a, 2b, etc.), but the treatment shall be the same. Each Other Secured Creditor holding an Allowed Other Secured Claim may proceed against their collateral, but only to the extent that valid and perfected security interests or liens exist. To avoid an "Other Secured Creditor" proceeding against their collateral, the Reorganized Debtor, thirty (30) days after the later of the Effective Date or the date an Other Secured Creditor serves notice on the Reorganized Debtor of an intent to proceed against their collateral, the Reorganized Debtor has the right to cure any unpaid payments and thereafter perform in accordance with the loan and security documents. Any deficiency claim shall be a Class 11 General Unsecured Claim, but only to the extent a proof of Claim was timely filed and is an Allowed Claim.

**4.13    Class 10 (Impaired Convenience Class of General Unsecured Creditors)**

Any creditor holding an Allowed General Unsecured Claim that would otherwise be treated in Class 11 has the option pursuant to Section 1122(b) of the Bankruptcy Code to accept 25% in full satisfaction of the Allowed General Unsecured Claim as follows:

a.      To exercise this Class 10 convenience class option, the holder of an Allowed General Unsecured Claim must affirmatively sign and return the election form served with the Plan, Disclosure Statement, and Ballot.

b.      If a creditor holding an Allowed General Unsecured Claim does not vote or does not select on its Ballot to accept or reject this convenience class option, the Debtor in Possession may, based on his sole discretion and based on the availability of funds, deem such unsecured creditors to have elected to accept this treatment. A creditor that did not elect to accept or reject this convenience class option shall have sixty (60) days to return the convenience class payment, and such creditor will be thereafter treated as a General Unsecured Creditor in Class 11.

///

c.      The Reorganized Debtor shall pay the 25% Class 10 Convenience Class Allowed Claim payments from available funds on or before December 31, 2021.

d.      If insufficient funds exist to pay all Allowed General Unsecured Claims that opt into this Class 10 Convenience class, the Reorganized Debtor shall begin with the smallest General Allowed General Unsecured Claims that made the election and make distributions to progressively larger Allowed General Unsecured Claims until the Reorganized Debtor's available funds are exhausted.

e.      Any Allowed General Unsecured Claims that opted to receive the 25% payment, but, due to the unavailability of funds to make such payments, does not receive the 25% payment, shall be treated as a Class 11 Allowed General Unsecured Claim.

### 4.14      Class 11 (Impaired Class of General Unsecured Creditors)

a.      The Reorganized Debtor and/or the Lester Family Trust shall make annual interest payments commencing on October 1, 2022 and on October 1 of each year thereafter, with interest accruing at the Federal Judgment Rate as of the Petition Date (0.13% per annum as published in the webpage: https://www.casb.uscourts.gov/post-judgment-interest-rates-2020).

b.      The Reorganized Debtor and/or the Lester Family Trust shall make annual ten percent (10%) principal payments to each holder of an Allowed General Unsecured Claim. The annual principal payments shall be made commencing on October 1, 2022, and on October 1 of each year thereafter.

c.      If there is an uncured Plan Default with respect to Section 4.13 Class 11, the holders of Allowed General Unsecured Claims treated in Class 11 may use the enforcement provisions in the loan or credit documents held by individual creditors to enforce the Allowed Amount of their General Unsecured Claims against the Reorganized Debtor and/or the Lester Family Trust.

d.      The Claims of the Class 11 General Unsecured Creditors shall be secured by the SPE Profits and Distribution Pledge Agreement junior in priority to the FNB Super-Priority Administrative Claim, the Voluntarily Deferred Allowed Administrative Claims, and the FNB AG Asset Based LOC. Notwithstanding the foregoing, in no event shall such creditors receive or

be provided with a pledge or assignment of, or a security interest in, any equity, ownership, management, or control interest in the SPE or any of its direct or indirect members or managers or any of SPE's assets.

e.     If FNB Accepts the Plan, on or before the fifth anniversary of the Effective Date, the Reorganized Debtor shall pay off all outstanding principal and interest due to the Class 11 General Unsecured Creditors.

f.     If FNB Rejects the Plan, on or before January 1, 2029, the Reorganized Debtor shall pay off all outstanding principal and interest due to the Class 11 General Unsecured Creditors.

g.     All provisions of the loan or credit documentation of the General Unsecured Creditors shall be null and void during the period there is no Plan Default with respect to the treatment of Class 11. The Proofs of Claim filed, any pleadings determining the Allowed amount of a General Unsecured Claim, the Confirmation Order, and the Plan shall replace all Prepetition documentation of the General Unsecured Creditors.

### 4.15    Class 12 (Impaired Ownership Interests)

Russell Wayne Lester shall remain the operator and manager of the Reorganized Debtor's business, and he and his wife, Kathleen H. Lester, shall retain 100% of their Ownership Interests in the Property of the Estate to the extent not otherwise transferred to the Lester Family Trust or the SPE under this Plan, which Ownership Interests shall revest in the Reorganized Debtor on the Effective Date and, after the Effective Date, all Post-Confirmation Property of Reorganized Debtor and 100% ownership interest in the Lester Family Trust shall remain the continuing community property of the Reorganized Debtor and Kathleen H. Lester. Notwithstanding anything the contrary in this Plan, and in consideration of the execution by Kathleen H. Lester of the FNB AG Production Loan Junior Deed of Trust, which will subordinate her homestead exemption to the FNB AG Production Loan Junior Deed of Trust as well as assuming all the other obligations and duties to creditors as set forth in this Plan, the Reorganized Debtor shall release of any and all Avoidance Actions against the children of Russell Wayne Lester and Kathleen Lester effective upon the later of the recordation of the FNB AG Production Loan Junior Deed of Trust or the

Effective Date.

**4.16    Cramdown**

Pursuant to Section 1129(b) of the Bankruptcy Code, the Debtor in Possession reserves the right to seek confirmation of the Plan despite the rejection of the Plan by one or more Classes.

**ARTICLE V**
**UNIMPAIRED AND IMPAIRED CLASSES**

All Classes are impaired under this Plan.

**ARTICLE VI**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

On the Effective Date, all transactions under the Plan shall be consummated, and control of the Estate will immediately change from the Debtor in Possession to the Reorganized Debtor.

**6.1.    Preservation of Defenses and Retained Claims and Defenses**

A "Retained Claim and Defense" shall mean all claims, rights, interests, causes of action, defenses, counterclaims, cross-claims, third-party claims, or rights of offset, recoupment, subrogation or subordination, and including all Avoidance Actions, held by the Debtor in Possession or its Estate with respect to the Prepetition Debtor, the Reorganized Debtor, the Retained Assets, or the Estate against any party whether or not pending on the Effective Date, not otherwise released or settled before the Effective Date.

Except as otherwise provided herein, as of the Effective Date, each and every Retained Claim and Defense, whether or not pending or filed as of the Effective Date, shall be deemed fully preserved and retained by the Reorganized Debtor, including but not limited to the counterclaim and other claims arising from the same facts and circumstances against FNB if FNB Rejects Plan. Additionally, all the described potential claims and causes of action listed in an exhibit to or in the Disclosure Statement are hereby incorporated by reference with the same force and effect as if set forth fully herein.

Any Avoidance Action under applicable state or federal law of any kind and nature to recover transfers from the Prepetition Debtor to Insiders, as defined in the Bankruptcy

Code, shall be assigned to the Lester Family Trust, and the trustee of the Lester Family Trust shall have the sole and exclusive responsibility to investigate and bring such actions. On or before March 31, 2022, the Lester Family Trust shall either (i) file such Avoidance Actions, (ii) settle such Avoidance Actions subject to Court approval, or (iii) if the Lester Family Trust determines that such Avoidance Actions have no merit, seek Court approval (a) not to file such avoidance actions or (b) enter into a Tolling Agreement and file a motion with the Court to approve such Tolling Agreement, that tolls and extends any statute of limitations on such Avoidance Actions, until December 31, 2026. Notwithstanding the transfer of any Avoidance Action to the Lester Family Trust, upon conversion of this Case to a case under Chapter 7 of the Bankruptcy Code or upon the appointment of a Chapter 11 Trustee, the sole and exclusive responsibility to investigate and bring such Avoidance Actions shall vest in the Chapter 7 Trustee or the Chapter 11 Trustee, as applicable. Any net recoveries on Avoidance Actions after the payment of attorneys' fees and costs shall be distributed by the Lester Family Trust as an additional principal payment on the Allowed Claims of Class 11 General Unsecured Creditors.

### 6.2. **Reorganized Debtor Powers and Duties**

The Reorganized Debtor shall have the authority and be responsible for the implementation of the Plan, including but not limited to objecting to claims, operating the business, and making real estate sales as necessary to meet the payment obligations under this Plan. The Reorganized Debtor shall have all powers and duties under federal and California law to implement the terms and provisions of this Plan. The Reorganized Debtor shall be authorized to execute such other documents as are necessary and appropriate to carry out the provisions of this Plan, without the necessity of filing such documents with the Court or obtaining approval for actions in or outside the ordinary course of business.

### 6.3. **Formation of the SPE and Transfer of Assets to the SPE**

The Reorganized Debtor shall have the power to create the SPE and to transfer the SPE Designated Properties to the SPE upon formation in accordance with the provisions of this Plan as soon as possible after the Effective Date. The SPE shall be, and shall at all times remain, a pass through or disregarded entity for tax purposes with all taxable income attributed to the Lester Family Trust.

The SPE and its managers shall be prohibited from filing Form 8832, or any other form or return that would cause the SPE to be treated as a taxable corporation.

### 6.4. Execution and Delivery of the SPE Profits and Distributions Pledge Agreement

On or prior to the Effective Date, the SPE Profits and Distribution Pledge Agreement shall be executed by all the Trustees of the Lester Family Trust and the beneficiaries of the Lester Family Trust, as necessary to create a valid and enforceable pledge of the right to receive the SPE Profits and Distributions. The SPE Profit and Distributions Pledge Agreement shall also include all documents, resolutions and agreements that may be required to evidence and/or establish the authority of any party to the SPE Profits and Distributions Pledge Agreement to executed and deliver the SPE Profits and Distributions Pledge Agreement. The SPE Profits and Distributions Pledge Agreement shall grant a pledge to the SPE Profits and Distribution Pledge Holders, of the right to receive the SPE Profits and Distributions to secure the following respective claims, in the following priority: (1) FNB shall hold a pledge of the rights to receive the SPE Profits and Distributions to secure the FNB Super-Priority Administrative Claim, in a first-priority position; (2) the other holders of the Voluntarily Deferred Allowed Administrative Claims shall hold a pledge of a right to receive the SPE Profits and Distributions to secure their respective Allowed Administrative Claims in a second-priority position, junior to the FNB Super-Priority Administrative Claim; ( (3) FNB shall hold a pledge of the right to receive the SPE Profits and Distributions to secure the FNB Asset Based LOC in a third-priority position, junior to the FNB Super-Priority Administrative Claim, and the other Allowed Administrative Claims; and (4) the Class 11 General Unsecured Clams shall hold a pledge of the rights to receive the SPE Profits and Distributions to secure their respective Allowed claims in a fourth-priority position, junior to FNB Super-Priority Administrative Claim, the other Voluntarily Deferred Allowed Administrative Claims, and the FNB Asset Based LOC. Perfection shall be automatic upon the Effective Date without the need for the filling of a UCC-1 Financing Statement. The Court shall retain exclusive jurisdiction to resolve any disputes respecting priority of payment among the SPE Profits and Distributions Pledge Holders. Any SPE Distributions made in payment of the Voluntarily Deferred Allowed Administrative Claims shall be made directly to the holders of the Voluntarily

Deferred Allowed Administrative Claims on a pro rata basis. Any SPE Distributions made in payment of the Class 11 General Unsecured Claims shall be made directly to the holders of the Class 11 General Unsecured Claims on a pro rata basis.

6.5. **Formation and Transfer of Assets of the Lester Family Trust**

The Reorganized Debtor shall have the power to create the Lester Family Trust and to transfer the ownership interests of the SPE to the Lester Family Trust upon formation in accordance with the provisions of this Plan as soon as possible after the Effective Date. The Lester Family Trust shall be considered an irrevocable spendthrift grantor trust that is disregarded as a separate entity by the IRS and shall be fully and completely liable for all the Allowed Claims of any kind and nature in the Chapter 11 Case (except to the extent that the SPE is solely liable for the Prudential Secured Claim and any other obligations owed to Prudential, as more fully set forth in this Plan) and all Post-Effective Date Claims against the Reorganized Debtor. The Lester Family Trust and its trustees shall have the same fiduciary duties and obligations as the Debtor in Possession and the Reorganized Debtor with respect to the Creditors and the Bankruptcy estate. The creation of this entity is for testamentary purposes to avoid probate upon the death of either Russell Lester or Kathleen Lester and to provide a structure to allow the SPE Profits and Distributions Pledge Holders who are creditors in this Case to receive a pledge of the right to receive the SPE Profits and Distributions pursuant to the SPE Profits and Distributions Pledge Agreement as additional protection for repayment of their respective claims under this Plan. No assets of the Reorganized Debtor or Kathleen Lester, other than the ownership interests of the SPE, shall be transferred to the Lester Family Trust, without Court approval.

6.6. **Power of the Reorganized Debtor to Implement Plan**

The Reorganized Debtor shall have the power to execute all documents necessary to implement the purposes and intent of this Plan with Court approval or with the consent of Prudential and FNB without the necessity of a Court order. The Debtor in Possession may modify the form of the SPE and the Lester Family Trust documentation, subject to and to the extent consistent with the terms of this Plan, prior to the Effective Date with Court approval or with the consent of Prudential and FNB without the necessity of a Court order.

6.7.    **SPE Farming Lease(s)**

On or prior to the Effective Date the Debtor in Possession or the Reorganized Debtor as lessee, and the SPE as lessor shall execute the SPE Farming Lease(s), which shall generally provide that the Reorganized Debtor or a successor entity may farm the SPE Designated Properties and as otherwise in accordance with Section 4.1(vi) hereof.

6.8.    **Management of the SPE**

The SPE formation documents to be filed with the Plan Supplement shall designate the identity of the initial SPE Independent Manager as of the Effective Date. The SPE shall be managed in accordance with the provisions of this Plan.

6.9.    **Compensation of SPE Independent Manager**

The SPE Independent Manager's costs, including but not limited to the SPE Independent Manager's compensation and any professionals retained by the SPE Independent Manager, will be compensated from an initial retainer to be funded by the Debtor in Possession on or prior to the Effective Date in the amount of $25,000 and proceeds from sales of the SPE Designated Properties and the Conservation Easement, as set forth in Section 4.1.iv.4) and 5). The SPE Independent Manager's $25,000 retainer may be replenished three times annually in 2021, 2022, and 2023 from the Prudential Reserve as defined in Section 1.131 of this Plan. The SPE Independent Manager's retention agreement shall include the terms of engagement, but the hourly rate shall be capped at $350 plus reasonable expenses. The compensation may be paid by the SPE without the filing of a fee application but is subject to review by the Reorganized Debtor Prudential and FNB. Any party may file a motion with the Court to object to the reasonableness of the fees and costs (including but not limited to any professional fees and costs incurred by the SPE Independent Manager) that are sought to be paid by the SPE Independent Manager. Even if no objection exists, the SPE Independent Manager may, but is not required to, independently seek Bankruptcy Court approval of the reasonableness and necessity of the billings and costs.

6.10.   **Reorganized Debtor Compensation**

The Reorganized Debtor may use up to $120,000 per year from the business operations of the Reorganized Debtor's farming operations to compensate himself for his

management of the business Post-Effective Date so long as taking such compensation does not lead to a Plan Default.

### 6.11. **Limitation of Liability**

To the fullest extent allowed by applicable law, the Reorganized Debtor and the SPE Independent Manager shall have no liability for any error of judgment made in good faith in connection with the implementation of this Plan, other than because of gross negligence or willful misconduct. In performing his duties hereunder, the Reorganized Debtor may consult with counsel and other Professionals selected by him at the expense of the Estate.

### 6.12. **Approval of Transactions Outside of the Ordinary Course**

The Reorganized Debtor need not obtain approval of the Court for the exercise of any legal actions under California law and/or taken pursuant to the powers granted in this Plan inside or outside the ordinary course of business Post-Effective Date. But if the Reorganized Debtor believes that obtaining approval for an action outside the ordinary course of business is in the best interests of the creditors and parties in interest in the Case, the Reorganized Debtor may seek approval for such actions.

### 6.13. **Plan Default**

Except as otherwise set forth in Section 4.1(vii) and (viii), if the Reorganized Debtor or the SPE or the Lester Family Trust fails to make any payment or to perform any other material obligation required under the Plan, for more than fifteen (15) days after the time specified in the Plan for such payment or other performance, any member of a Class affected by the default may serve written notice of the default upon (i) the Reorganized Debtor, (ii) counsel for the Reorganized Debtor, and (iii) the SPE Independent Manager. If the Reorganized Debtor or the SPE or the Lester Family Trust fails within fifteen (15) days after the date of service of the notice of default either: (i) to cure the default; (ii) to obtain from the Court an extension of time to cure the default; or (iii) to obtain from the Court a determination that no default occurred, then the Reorganized Debtor is in material default under the Plan to all the members of the affected Class (also defined above as a "Plan Default").

Upon a Plan Default arising from an unpaid payment to any affected Class in which

the SPE, the Lester Family Trust, or the Reorganized Debtor is the obligor on a Plan payment obligation, the creditors in such Class with an uncured default shall immediately have relief from the Plan Injunction to pursue all available remedies against the Reorganized Debtor and/or the Lester Family Trust or to file a motion to convert the case to a case under Chapter 7 of the Bankruptcy Code.

Upon a Plan Default arising from an asserted "non-payment" obligation of the Reorganized Debtor under this Plan, the affected creditors in such Class must first obtain a Court determination that the "non-payment" defaulted obligation is material with respect to the treatment of that Class before pursuing any available remedies against the Reorganized Debtor and/or the Lester Family Trust or filing a motion to convert the case to a case under Chapter 7 of the Bankruptcy Code.

### 6.14.    **Distribution Procedures**

No payments or distributions shall be made by the Reorganized Debtor on account of Disputed Claims unless and to the extent such Claims become Allowed Claims, but the Reorganized Debtor shall reserve for the potential distribution on Disputed Claims pending resolution of the disputes. In lieu of reserving for a Disputed Claim, the Reorganized Debtor may file a motion to estimate a Disputed Claim for distribution purposes if a resolution of the dispute would unduly delay the administration of the Estate.

### 6.15.    **Resolution of Disputed Claims**

The Reorganized Debtor may file objections to Claims that have not been previously objected to as warranted. Except as otherwise provided in the Confirmation Order, the Reorganized Debtor shall be authorized to settle or withdraw any objections to any Disputed Claim following the Effective Date. The Court shall retain jurisdiction to hear and adjudicate the allowance or disallowance of Claims, as provided for in Article X of this Plan. Settled Claims shall be deemed to be Allowed Claims in the amount compromised for purposes of this Plan.

### 6.16.    **Allocation of Distributions**

Distributions to any holder of an Allowed Claim shall be allocated first to the interest amount and costs or expense due, including but not limited to any interest or expenses

added to the principal amount of any Allowed Claim on the Effective Date (but only to the extent that interest or expenses are an allowable portion of such Allowed Claim), and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising principal. To the extent that this Section conflicts with the allocation of distributions to Prudential as set forth in Section 4.1 hereof, the terms of said Section 4.1 shall control with respect to Prudential.

### 6.17.    **De Minimis Distributions**

Notwithstanding any other provision of this Plan, distributions of less than $10.00 need not be made by the Reorganized Debtor on account of any Allowed Claim, provided that the amount of such de minimis distributions that would otherwise be made but for this provision shall carry over until the next date of a distribution until the cumulative amount to which any holder of an Allowed Claim is entitled is more than $10.00, at which time the cumulative amount of such distributions shall be paid to such holder of the subject Allowed Claim. Distributions that will not be made as of the date of a final distribution shall be treated as unclaimed funds as provided in the Plan.

### 6.18.    **Unclaimed Funds**

Notwithstanding any other provision of this Plan, at the point at which the remaining funds consist of an amount impractical to distribute, the Reorganized Debtor shall lodge with the Court such sums as unclaimed funds under 11 U.S.C. § 347, and the Court clerk shall accept such funds notwithstanding that this Case is a Chapter 11 case.

### 6.19.    **Unclaimed Distributions**

"Unclaimed Distributions" shall mean any Cash or other property unclaimed on or after the Effective Date or any date on which a Distribution would have been made in respect of the relevant Allowed Claim. Unclaimed Distributions shall include: (a) checks and other property returned as undeliverable without a proper forwarding address; (b) funds for checks not cashed within 60 days of mailing or delivery; and (c) checks not mailed or delivered because no address to mail or deliver such property was available.

Creditors have an obligation to file change of address forms with the Court and to serve such changes of address on the Reorganized Debtor and his counsel. If a Creditor fails to

claim any distribution of Cash within one hundred twenty (120) days from the date upon which a distribution is made, such Creditor shall be subject to having its Claim excluded from future distributions. The Reorganized Debtor may, but is not required to, file an omnibus post-confirmation motion and opportunity for hearing seeking to exclude such Creditors from future distributions and shall serve such Creditors at (a) the address for service of process for such Creditors as listed on the California Secretary of State website, if any; (b) the addresses on Creditors' Proofs of Claim, if any; (c) the addresses scheduled by the Debtor in Possession for such Creditors, if any; and (d) any addresses supplied by such Creditors in the last change of address filed with the Court, if any. Upon Court approval of the subject Creditors' forfeiture, such Cash (including any interest thereon) shall be made available for redistribution to other holders of Allowed Claims of like Class. After disallowance, such Creditors shall forfeit their rights thereto and shall have no claim whatsoever against the Retained Assets or the Reorganized Debtor, as applicable, or any holder of an Allowed Claim to whom distributions are made under this Plan. If the Reorganized Debtor elects, based on his business discretion, that the cost of filing such a motion to exclude Creditors does not reasonably exceed the benefit to other Creditors from such a motion, the Reorganized Debtor may alternatively treat such returned distributions as unclaimed funds under the Plan.

6.20. **Post-Effective Date Reports**

Following the Effective Date, and as long as the Case remains open, the Reorganized Debtor shall prepare and submit to the Court and the Office of the United States Trustee post-confirmation reports in the form suggested by the Office of the United States Trustee for Region 17 based on distributions of any of the Retained Assets. The first post-confirmation report shall be due within twenty (20) days following the end of the first calendar quarter from the Effective Date and shall be filed on a quarterly basis thereafter within twenty (20) days after the end of each quarter unless otherwise agreed by the Reorganized Debtor and the Office of the United States Trustee.

6.21. **SPE Reporting Requirements**

The Lester Family Trust, the SPE Independent Manager or the Reorganized Debtor shall provide to Prudential and FNB and any other party who requests such information, in writing,

the following information:

        i)      A copy of the fully executed contract for the sale of any of the SPE Designated Properties, promptly upon entering into such contract;

        ii)     Promptly, upon the close of escrow for the sale of any of the SPE Designated Properties, a copy of the final Seller Closing Statement for that sale;

        iii)    Promptly, upon the close of escrow for any SPE Properties Refinancing, a copy of the final Borrower Closing Statement for such SPE Properties Refinancing;

        iv)    Annually, on or before March 31 of each year, the SPE Annual Reports; *provided that* the obligation to provide such SPE Annual Reports shall terminate upon the sooner to occur of (i) the sale of all SPE Designated Properties, or (ii) the payment in full of the Claims of the SPE Profits and Distribution Pledge Holders.

        v)     The SPE Final Report within ninety (90) days following the sooner to occur of (i) the sale of all SPE Designated Properties, or (ii) the payment in full of the Claims of the SPE Profits and Distribution Pledge Holders.

### 6.22. **Post-Effective Date Employment and Compensation of Professionals**

        After the Effective Date, the Reorganized Debtor may retain and pay any existing Professionals of the Estate without further employment agreements or orders for Post-Effective Date services and expenses. Additionally, after the Effective Date, the Reorganized Debtor may hire other professionals without the requirement that such professionals file employment applications for Court approval of their employment, whether on an hourly, contingency fee or other basis and without the requirement that such professionals file applications for payment of Post-Effective Date fees and expenses on an interim or final basis.

### 6.23. **Jurisdictional Limitations on Claims re Plan Implementation**

        Any party in interest who believes that the conduct of the Reorganized Debtor and/or any professionals employed by him is not consistent with the provisions of this Plan or believes that any claims exist against the Reorganized Debtor and/or any professionals employed by him for any conduct taken within the scope of their respective duties under the Plan, all such claims, rights, requests for relief, or enforcement of the Plan must be filed in and determined by

the Court. No concurrent jurisdiction shall exist for the determination or enforcement of any such rights under or arising under this Plan or claims against the Reorganized Debtor and/or any professionals employed by him, in any other state, federal, or foreign Court.

### 6.24. Destruction of Records

After the Effective Date, the Reorganized Debtor may destroy or store all books and records that are no longer necessary to complete administration under this Plan. This provision does not modify any other non-bankruptcy statutory or regulatory requirement to maintain business or personal records.

### 6.25. Final Decree

Upon the vesting of all the Property of the Estate with the Reorganized Debtor, the Reorganized Debtor may file a motion to close the Chapter 11 Case pursuant to Bankruptcy Code § 350. The closing of the Chapter 11 Case shall be without prejudice to reopening of the Chapter 11 Case to assist in the accomplishment of any purposes set forth in this Plan.

### 6.26. Post-Confirmation U.S. Trustee Fees

The U.S. Trustee quarterly fees shall be budgeted for and paid by the Reorganized Debtor for each quarter (including any fraction thereof) calculated only on any distributions of the Reorganized Debtor. Upon closing of the Case, no further U.S. Trustee fees shall be due, except for any calendar quarter during which the Case may be reopened and stay open for at least three (3) consecutive months.

## ARTICLE VII
## EXECUTORY CONTRACTS

### 7.1. Plan Rejection

Upon the Effective Date, any and all Executory Contracts not previously assumed and assigned by the Estate shall be rejected pursuant to the Confirmation Order, except insurance contracts, to the extent they are Executory Contracts, shall be deemed assumed on the Effective Date. "Executory Contracts" shall mean executory contracts and unexpired leases within the meaning of Section 365 of the Bankruptcy Code. A list of Executory Contracts to be assumed shall be filed with the Plan Supplement. Notwithstanding anything herein to the contrary, any and

all unexpired leases related to any of the SPE Designated Properties shall be assumed and may be assigned to the SPE on the Effective Date.

       7.2.    **Rejection**

       Nothing contained herein shall constitute a waiver by the Estate or a Creditor to such contracts of the right to contend that some or all of a rejected Executory Contract is not executory or that it was not terminated earlier by agreement or operation of law. All Claims arising from the rejection of an Executory Contract pursuant to the Plan or otherwise ("Rejection Claims") must be filed by the earlier of (a) the date that is thirty (30) days after the Effective Date as set forth in the notice of Effective Date; or (b) such other date established by the Court by which entities asserting a Rejection Claim against the Debtor in Possession must have filed a Proof of Claim ("Rejection Claim Bar Date").

       Any Rejection Claim not filed by the applicable Rejection Claim Bar Date shall be a disallowed Claim and shall be forever barred as a Claim against the Post-Confirmation Property and from sharing in any distribution under this Plan.

**ARTICLE VIII**
**EFFECTIVE DATE**

    The Effective Date is July 1, 2021.

**ARTICLE IX**
**EFFECTS OF CONFIRMATION**

      9.1.    **Binding Effect of Plan**

       The provisions of the confirmed Plan shall bind the Debtor in Possession, the Reorganized Debtor, the SPE, the Lester Family Trust, Kathleen Lester, all Creditors and all holders of any interest in the Property of the Estate, including but not limited to liens and community property interests, whether or not such Creditors or parties have filed Proofs of Claim or interest in the Chapter 11 Case, whether or not the Claims of such Creditors or interest holders are impaired under the Plan, and whether or not such Creditors or interest holders have accepted or rejected the Plan.

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9.2.　**Injunction**

From the Effective Date until all Retained Assets are fully administered, and except as otherwise provided by the Plan, all entities who have held, hold, or may hold Claims against or interests in the Debtor in Possession or the Estate that arose prior to the Effective Date are enjoined from taking legal action against the Reorganized Debtor for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any Claim or demand against the Reorganized Debtor, the Debtor in Possession, the SPE, the Lester Family Trust or the Estate.

9.3.　**No Discharge**

Pursuant to Section 1141(d)(5) of the Bankruptcy Code, confirmation of this Plan does not operate as a discharge of the Debtor in Possession. After completion of the Plan and all payments under this Plan are completed, the Reorganized Debtor may, but is not required to file a motion for entry of a discharge.

9.4.　**Limitation of Liability**

To the fullest extent allowed by law, the Reorganized Debtor will not incur any liability to any entity for any actions in good faith taken or omitted to be taken in connection with or related to the Chapter 11 Case, the investigations of potential claims, or the formulation, preparation, dissemination, implementation, confirmation or consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan or incident to the Chapter 11 Case, provided that the foregoing shall not exonerate the Debtor in Possession from any liability that results from an act or omission to the extent such act or omission is determined by Final Order to have constituted gross negligence or willful misconduct. This limitation of liability does not include any professionals because any liability for negligence or other misconduct in relation to the Chapter 11 Case with respect to any professionals must be raised during the final fee application process; provided, however, that nothing herein shall limit the legal immunities provided for by law to any person participating in the Chapter 11 Case.

///

///

Debtor in Possession's Amended Plan of Reorganization (Dated May 18, 2021) as Modified July 1, 2021

**ARTICLE X**
**RETENTION OF JURISDICTION**

Except as provided herein, from and after the Effective Date, the Court shall retain jurisdiction to the fullest extent legally permissible, including, but not limited to, for the following purposes:

a.      To administer, interpret or enforce the Plan;

b.      To hear and determine any and all adversary proceedings, contested matters, claim objections, motions, or applications pending on or filed after the Effective Date;

c.      To hear and determine any and all applications by professionals for an award of Post-Petition professional fees, and to consider and rule upon the final fee applications of the professionals as provided in this Plan, and/or to resolve any disputes respecting professional fee applications;

d.      To enter and implement such orders as may be appropriate in the event Confirmation is for any reason stayed, reversed, revoked, modified, or vacated;

e.      To modify any provision of the Plan to the extent permitted by the Bankruptcy Code and to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

f.      To approve any compromise and settlements and/or abandonments of claims against third parties, and/or the abandonment of any Retained Asset, for which the Plan requires approval, or which the Reorganized Debtor and his bankruptcy counsel believe should be noticed to creditors;

g.      To approve any Post-Effective Date sales of assets pursuant to Section 363 of the Bankruptcy Code, and to resolve any disputes regarding any Post-Effective Date sales of assets;

h.      To issue an injunction or injunctions post-confirmation pursuant to Section 105 of the Bankruptcy Code upon a proper showing;

i.      To close the Chapter 11 Case when warranted and, when administration of the Case has been completed, to enter a discharge of the Reorganized Debtor; and

j.      To enter an order or orders reopening the Case as appropriate. Any motion to reopen the Case may be filed with or included within any motion seeking relief or a Court

determination of any of the above. An application for an order shortening time may be filed concurrent with a motion to reopen the Case.

## ARTICLE XI
## MISCELLANEOUS

### 11.1    Severability of Plan Provisions

In the event that, prior to the Effective Date, any term or provision of this Plan is held by the Court to be invalid, void, or unenforceable, the Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 11.2    Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties, and obligations arising under this Plan shall be governed by, construed, and enforced in accordance with the laws of the State of California.

### 11.3    Plan Supplement Documents

All of the Plan Supplement Documents are, by this reference, hereby incorporated into the Plan. The final version of all Plan Supplement Documents to the Plan and the Disclosure Statement will be substantially in the forms attached to the Plan Supplement. The Debtor in Possession reserves the right to make non-substantive or minor changes and corrections to the Plan Supplement Documents in advance of the hearing to confirm the Plan. If any of the Plan Supplement Documents are changed or corrected, the replacement documents will be filed with the Court prior to the Effective Date. No Court approval for the final form of the Plan Supplement

Documents is required.

### 11.4   Exemption from Transfer Taxes

To the maximum extent permitted pursuant to Section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto, including but not limited to transfers and sales contemplated by the SPE of SPE Designated Entities, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sales or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local government officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

### 11.5   Implementation

Upon confirmation of the Plan, the Debtor in Possession, and after the Effective Date, the Reorganized Debtor are authorized to take all steps and execute all documents necessary to effectuate the provisions contained in the Plan without further Court order.

///
///
///
///
///
///
///
///
///
///
///
///

11.6    **Waiver of Fourteen (14) Day Stay**

The Debtor in Possession requests that the Court include in the Confirmation Order a waiver from the Court of the fourteen (14) day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the fourteen (14) day stay of Bankruptcy Rule 6004(h).

Dated: June 30, 2021

Submitted by:

FELDERSTEIN FITZGERALD
WILLOUGHBY PASCUZZI & RIOS LLP

By:  _/s/ Thomas A. Willoughby_____
Thomas A. Willoughby
Attorneys for Debtor in Possession

Approved by:

Russell Wayne Lester

By:  _/s/ Russell Wayne Lester_
Russell Wayne Lester
Debtor in Possession